Nos. 2022-1455, 2022-1456

# United States Court of Appeals
# for the Federal Circuit

COREPHOTONICS, LTD.,
*Appellant,*

v.

APPLE INC.,
*Appellee.*

_____

Appeals from the Patent Trial and Appeal Board in
*Inter Partes* Review Nos. IPR2020-00861, IPR2020-00862

_____

## NON-CONFIDENTIAL JOINT APPENDIX VOLUME I OF III
## PAGES APPX1 TO APPX5505

_____

**ORRICK, HERRINGTON & SUTCLIFFE LLLP**

Erin M.B. Leach                          Mark S. Davies
2050 Main Street, Suite 1100             1152 15th Street NW
Irvine, CA 92614                         Washington, DC 20005
Phone: (949) 567-1100                    Phone: (202) 339-8400

*Attorneys for Appellee Apple Inc.*

**RUSS AUGUST & KABAT**

Marc A. Fenster          Brian D. Ledahl          James S. Tsuei
12424 Wilshire           12424 Wilshire           12424 Wilshire
Blvd.,12th Floor         Blvd.,12th Floor         Blvd.,12th Floor
Los Angeles, CA 90025    Los Angeles, CA 90025    Los Angeles, CA 90025
Tel: (310) 826-7474      Tel: (310) 826-7474      Tel: (310) 826-7474
Fax: (310) 826-6991      Fax: (310) 826-6991      Fax: (310) 826-6991

*Attorneys for Appellant Corephotonics, Ltd.*

December 23, 2022

# APPENDIX TABLE OF CONTENTS

## *Corephotonics, Ltd. v. Apple Inc.*
## Nos. 2022-1455, 2022-1456

### Materials Required Pursuant to Fed. Cir. R. 30(a)(2), (c)(1)

| Page No. | Date | Description |
|---|---|---|
| Appx1-Appx74 | 12/7/2021 | Final Written Decision in IPR2020-00861 [[Filed Publicly w/o redactions]] |
| Appx75-Appx149 | 12/7/2021 | Final Written Decision in IPR2020-00862 [[Filed Publicly w/o redactions]] |
| Appx150-Appx164 | 3/12/2019 | U.S. Patent No. 10,230,898 (Ex. 1001, IPR2020-00861) |
| Appx165-Appx179 | 7/16/2019 | U.S. Patent No. 10,356,332 (Ex. 1001, IPR2020-00862) |
| Appx180-Appx197 | 3/21/2022 | Certified List of Papers Comprising the Record before the Patent Trial and Appeal Board in IPR2020-00861 (*Corephotonics, Ltd. v. Apple Inc.*, Case No. 2022-1455) |
| Appx198-Appx215 | 3/21/2022 | Certified List of Papers Comprising the Record before the Patent Trial and Appeal Board in IPR2020-00862 (*Corephotonics, Ltd. v. Apple Inc.*, Case No. 2022-1456) |

**Record, No. IPR2020-00861**

| Page No. | Date | Description |
|---|---|---|
| Appx1001-Appx1088 | 5/6/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 10,230,898 |
| Appx1100-Appx1102 | 9/11/2020 | Excerpt from Patent Owner's Preliminary Response to Petition |
| Appx1111-Appx1154 | 12/9/2020 | Decision Instituting *Inter Partes* Review |

| Appx1177; Appx1184; Appx1196-Appx1204; Appx1214 | 3/2/2021 | Excerpts from Patent Owner's Response to Petition |
|---|---|---|
| Appx1264 | 6/11/2021 | Excerpt from Petitioner's Reply |
| Appx1308-Appx1311 | 7/23/2021 | Excerpt from Patent Owner's Sur-Reply |
| Appx1362-Appx1364; Appx1381-Appx1384; Appx1392-Appx1396; Appx1398-Appx1404 | 9/9/2021 | Excerpts from Transcript of Hearing |
| Appx1457-Appx1535 | 2/8/2022 | Patent Owner's Notice of Appeal |

**Exhibits, No. IPR2020-00861**

| Page No. | Exhibit Number | Description |
|---|---|---|
| Appx5436-Appx5544 | 1003 | Declaration of Fredo Durand, Ph.D. in Support of the Petition for *Inter Partes* Review for U.S. Patent No. 10,230,898 |
| Appx5567-Appx5579 | 1005 | U.S. Patent Application Publication No. 2012/0026366 (Golan) |
| Appx5580-Appx5590 | 1006 | U.S. Patent No. 8,081,206 (Martin) |
| Appx5612-Appx5660 | 1008 | U.S. Patent No. 7,859,588 (Parulski) |

| Appx5661-Appx5677 | 1009 | U.S. Patent Publication No. 2008/0030592 (Border) |
|---|---|---|
| Appx5678-Appx5707 | 1010 | J.P. Patent Application Publication No. JP 2011-55246, Certified English Translation and Original (Togo) |
| Appx6225-Appx6273 | 1033 | U.S. Patent No. 5,880,892 (Ohtake) |
| Appx6274-Appx6274 | 1034 | NextVision-Sys.com 2012 Website Video Capture, September 2, 2012 |
| Appx6275-Appx6275 | 1035 | NextVision Stabilized Systems Ltd. Company Profile, September 2, 2012 ("NextVision Company Profile") |
| Appx6276-Appx6357 | 1040 | Supplemental Declaration of Dr. Fredo Durand (Portions Sealed) |
| Appx6715; Appx6724-Appx6726; Appx6739-Appx6740; Appx6752-Appx6753; Appx6762-Appx6763; Appx6765-Appx6767 | 2001 | Excerpts from Declaration of John Hart, Ph.D |
| Appx6935-Appx6963 | 2017 | Fredo Durand July 1, 2021 Deposition Transcript |
| Appx6964-Appx7295 | 2018 | Fredo Durand June 2, 2021 Deposition Transcript |

**Record, No. IPR2020-00862**

| Page No. | Date | Description |
|---|---|---|

| Appx10001-Appx10087 | 5/6/2020 | Petition for *Inter Partes* Review of U.S. Patent No. 10,356,332 |
| Appx10111-Appx10154 | 12/9/2020 | Decision Granting Institution of *Inter Partes* Review |
| Appx10198-Appx10199 | 3/2/2021 | Excerpt from Patent Owner's Response |
| Appx10264; Appx10278 | 6/11/2021 | Excerpts from Petitioner's Reply |
| Appx10307-Appx10309 | 7/23/2021 | Excerpt from Patent Owner's Sur-Reply |
| Appx10464-Appx10543 | 2/8/2022 | Patent Owner's Notice of Appeal |

**Exhibits, No. IPR2020-00862**

| Page No. | Exhibit Number | Description |
| --- | --- | --- |
| Appx15204-Appx15311 | 1003 | Declaration of Fredo Durand, Ph.D. |
| Appx15607 | 1017 | Excerpt from Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 |
| Appx16043-Appx16124 | 1040 | Supplemental Declaration of Dr. Fredo Durand (Portions Sealed) |

**CONFIDENTIAL MATERIAL OMITTED**

The material redacted from this Joint Appendix is subject to a protective order. The material omitted from appendix pages Appx6339-6340, Appx6343, Appx6346, Appx16106-16107, Appx16110, and Appx16113 contains confidential information concerning licensing negotiations between Corephotonics and Apple and concerning

the terms of license agreements between Corephotonics and third parties, which is covered by the terms of the governing protective order entered by the Patent Trial and Appeal Board.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————————

Case IPR2020-00861
U.S. Patent No. 10,230,898

———————————

## [PROPOSED] PROTECTIVE ORDER

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."

2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) Parties. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) Party Representatives. Representatives of record for a party in the proceeding.

(C) Experts. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) In-house counsel. In-house counsel of a party.

(E) Support Personnel. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) The Office. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

3. Employees (e.g., corporate officers), consultants, or other persons

performing work for a party, other than in-house counsel and in-house counsel's support staff, who sign the Acknowledgement shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person. The party opposing disclosure to that person shall have the burden of proving that such person should be restricted from access to confidential information.

4. Persons receiving confidential information shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the confidential information understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of confidential information to a reasonable number

of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) Documents and Information Filed With the Board.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The submission shall be treated as confidential and remain under seal, unless the Board determines that the documents or information do not to qualify for confidential treatment. The information shall remain under seal unless the Board determines that some or all of the information does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together

with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed under seal. The redacted information shall remain under seal unless the Board determines that some or all of the redacted information does not qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents (including deposition transcripts) and other information designated as confidential that are disclosed to another party during discovery or other proceedings before the Board shall be clearly marked as "PROTECTIVE ORDER MATERIAL" and shall be produced in a manner that maintains its confidentiality.

6. Within 60 days after the final disposition of this action, including the exhaustion of all appeals and motions, each party receiving confidential information must return, or certify the destruction of, all copies of the confidential information to the producing party.

The following form may be used to acknowledge a protective order and gain access to information covered by the protective order:

**PATENT TRIAL AND APPEAL BOARD**

| | |
|---|---|
| APPLE INC., | IPR2020-00861 |
| Petitioner, | **Standard Acknowledgment for Access to Protective Order Material** |
| v. | |
| COREPHOTONICS, LTD., | |
| Patent Owner. | |

I _____, affirm that I have read the Protective Order; that I will abide by its terms; that I will use the confidential information only in connection with this proceeding and for no other purpose; that I will only allow access to support staff who are reasonably necessary to assist me in this proceeding; that prior to any disclosure to such support staff I informed or will inform them of the requirements of the Protective Order; that I am personally responsible for the requirements of the terms of the Protective Order and I agree to submit to the jurisdiction of the Office and the United States District Court for the Eastern District of Virginia for purposes of enforcing the terms of the Protective Order and providing remedies for its breach.

_____

[Signature]

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————————

Case IPR2020-00862
U.S. Patent No. 10,356,332

———————————

## [PROPOSED] PROTECTIVE ORDER

This protective order governs the treatment and filing of confidential information, including documents and testimony.

1. Confidential information shall be clearly marked "PROTECTIVE ORDER MATERIAL."

2. Access to confidential information is limited to the following individuals who have executed the acknowledgment appended to this order:

(A) Parties. Persons who are owners of a patent involved in the proceeding and other persons who are named parties to the proceeding.

(B) Party Representatives. Representatives of record for a party in the proceeding.

(C) Experts. Retained experts of a party in the proceeding who further certify in the Acknowledgement that they are not a competitor to any party, or a consultant for, or employed by, such a competitor with respect to the subject matter of the proceeding.

(D) In-house counsel. In-house counsel of a party.

(E) Support Personnel. Administrative assistants, clerical staff, court reporters and other support personnel of the foregoing persons who are reasonably necessary to assist those persons in the proceeding shall not be required to sign an Acknowledgement, but shall be informed of the terms and requirements of the Protective Order by the person they are supporting who receives confidential information.

(F) The Office. Employees and representatives of the United States Patent and Trademark Office who have a need for access to the confidential information shall have such access without the requirement to sign an Acknowledgement. Such employees and representatives shall include the Director, members of the Board and their clerical staff, other support personnel, court reporters, and other persons acting on behalf of the Office.

3. Employees (e.g., corporate officers), consultants, or other persons

performing work for a party, other than in-house counsel and in-house counsel's support staff, who sign the Acknowledgement shall be extended access to confidential information only upon agreement of the parties or by order of the Board upon a motion brought by the party seeking to disclose confidential information to that person. The party opposing disclosure to that person shall have the burden of proving that such person should be restricted from access to confidential information.

4. Persons receiving confidential information shall use reasonable efforts to maintain the confidentiality of the information, including:

(A) Maintaining such information in a secure location to which persons not authorized to receive the information shall not have access;

(B) Otherwise using reasonable efforts to maintain the confidentiality of the information, which efforts shall be no less rigorous than those the recipient uses to maintain the confidentiality of information not received from the disclosing party;

(C) Ensuring that support personnel of the recipient who have access to the confidential information understand and abide by the obligation to maintain the confidentiality of information received that is designated as confidential; and

(D) Limiting the copying of confidential information to a reasonable number

of copies needed for conduct of the proceeding and maintaining a record of the locations of such copies.

5. Persons receiving confidential information shall use the following procedures to maintain the confidentiality of the information:

(A) Documents and Information Filed With the Board.

(i) A party may file documents or information with the Board along with a Motion to Seal. The Motion to Seal should provide a non-confidential description of the nature of the confidential information that is under seal, and set forth the reasons why the information is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The submission shall be treated as confidential and remain under seal, unless the Board determines that the documents or information do not to qualify for confidential treatment. The information shall remain under seal unless the Board determines that some or all of the information does not qualify for confidential treatment.

(ii) Where confidentiality is alleged as to some but not all of the information submitted to the Board, the submitting party shall file confidential and non-confidential versions of its submission, together

with a Motion to Seal the confidential version setting forth the reasons why the information redacted from the non-confidential version is confidential and should not be made available to the public. A party may challenge the confidentiality of the information by opposing the Motion to Seal. The non-confidential version of the submission shall clearly indicate the locations of information that has been redacted. The confidential version of the submission shall be filed under seal. The redacted information shall remain under seal unless the Board determines that some or all of the redacted information does not qualify for confidential treatment.

(B) Documents and Information Exchanged Among the Parties. Documents (including deposition transcripts) and other information designated as confidential that are disclosed to another party during discovery or other proceedings before the Board shall be clearly marked as "PROTECTIVE ORDER MATERIAL" and shall be produced in a manner that maintains its confidentiality.

6. Within 60 days after the final disposition of this action, including the exhaustion of all appeals and motions, each party receiving confidential information must return, or certify the destruction of, all copies of the confidential information to the producing party.

The following form may be used to acknowledge a protective order and gain access to information covered by the protective order:

## PATENT TRIAL AND APPEAL BOARD

| | |
|---|---|
| APPLE INC.,<br><br>        Petitioner,<br><br>v.<br><br>COREPHOTONICS, LTD.,<br><br>        Patent Owner. | IPR2020-00862<br><br>**Standard Acknowledgment for Access to Protective Order Material** |

I _____, affirm that I have read the Protective Order; that I will abide by its terms; that I will use the confidential information only in connection with this proceeding and for no other purpose; that I will only allow access to support staff who are reasonably necessary to assist me in this proceeding; that prior to any disclosure to such support staff I informed or will inform them of the requirements of the Protective Order; that I am personally responsible for the requirements of the terms of the Protective Order and I agree to submit to the jurisdiction of the Office and the United States District Court for the Eastern District of Virginia for purposes of enforcing the terms of the Protective Order and providing remedies for its breach.

_____

[Signature]

Trials@uspto.gov                                   Paper 35
571-272-7822                            Entered: December 7, 2021

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

————————

IPR2020-00861
Patent 10,230,898 B2

————————

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

MOORE, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00861
Patent 10,230,898 B2

## I.    INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1, 4, 8–12, 15, 19, and 20 ("the challenged claims") of U.S. Patent No. 10,230,898 B2 (Ex. 1001, "the '898 patent").  Paper 2 ("Pet.").  Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").

We instituted an *inter partes* review.  Paper 7 ("Institution Decision" or "Inst. Dec."); *see* 35 U.S.C. § 314(a) (2018); 37 C.F.R. § 42.4(a).  Patent Owner filed a Response (Paper 13, "Patent Owner Response" or "PO Resp.").[1]  Petitioner filed a Reply (Paper 21, "Petitioner's Reply" or "Pet. Reply").[2]  Thereafter, Patent Owner filed a Sur-Reply (Paper 25, "Patent Owner Sur-Reply" or "PO Sur-Reply").[3]

An oral hearing was held on September 9, 2021 and a transcript (Paper 33, "Tr.") was entered in the record.

We have jurisdiction pursuant to 35 U.S.C. § 6.  This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial.  Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent are unpatentable.

---

[1] We cite to the sealed version of Patent Owner's Response (Paper 13).  The public version is Paper 14.
[2] We cite to the sealed version of Petitioner's Reply (Paper 21).  The public version is Paper 22.
[3] We cite to the sealed version of Patent Owner's Sur-Reply (Paper 25).  The public version is Paper 26.

IPR2020-00861
Patent 10,230,898 B2

## II.    BACKGROUND

### A.    Related Proceedings

Petitioner and Patent Owner identify the following corresponding district court proceeding: *Corephotonics, Ltd. v. Apple Inc.*, Case No. 5:19-cv-04809 (N.D. Cal.).  Pet. 2; Paper 4, 1.[4]

We identify the following related administrative matters, including applications and patents claiming the benefit of the priority of the filing date of patents in the priority chain of the '898 patent.  *See* Office Consolidated Trial Practice Guide[5] at 18; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019) (explaining what is considered an "administrative matter").  U.S. Patent No. 10,356,332 ('332 patent) is a continuation of Application No. 15/324,720 (now U.S. Patent No. 10,230,898, "the '898 patent").  The following co-pending proceeding challenges a patent in the priority chain of the '898 patent:  IPR2020-00862 (claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent).

### B.    The '898 Patent

The '898 patent is titled "Dual Aperture Zoom Camera with Video Support and Switching / Non-Switching Dynamic Control," and is directed to a "dual aperture zoom digital camera operable in both still and video modes."  Ex. 1001, code (57).

---

[4] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, Case No. 3:19-cv-04809-LHK (N.D. Cal.) (Paper 5, 1), but this case number appears to reflect a typographical error.  A PACER search of Case No. 5:19-cv-04809 reveals that Patent Owner's complaint in that case was erroneously identified as "Civil Action No. 3:19-cv-4809" on its cover page.

[5] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-00861
Patent 10,230,898 B2

The '898 patent describes video mode zoom operation from low zoom factor (ZF) to higher ZF above a switch point (described variously as Z*switch* or $ZF_T$ or uptransfer ZF), with "[processing] applied to eliminate the changes in the image during crossover from one camera to the other." *Id.* at 7:57–8:29.

The '898 patent describes that "[s]witching from the Wide camera output to the transformed Tele camera output will be performed unless some special condition (criterion), determined based on inputs obtained from the two camera images, occurs.  In other words, switching will not be performed only if [a] no switching criteria is fulfilled." *Id.* at 10:2–9.

Figure 1A of the '898 patent, reproduced below, illustrates a dual-aperture Zoom imaging system 100 including a Wide imaging section and a Tele imaging section, each having a respective lens with respect field of view (FOV) and respective image sensor to provide image data of an object or scene.



FIG. 1A

IPR2020-00861
Patent 10,230,898 B2

Figure 1A shows a dual-aperture zoom imaging system. *Id.*

### C.    Challenged Claims

Petitioner challenges claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent. Claims 1 and 13 are independent. Claim 1 is reproduced below.

1. A zoom digital camera comprising:

   a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;

   b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and

   c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

Ex. 1001, 12:32–54.

### D.    Asserted Grounds of Unpatentability

Petitioner challenges claims 1, 4, 8–12, 15, 19, and 20 as follows. *See* Pet. 7.

IPR2020-00861
Patent 10,230,898 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 4, 8, 12, 15 | 103 | Golan[6], Martin[7], Togo[8] |
| 9 | 103 | Golan, Martin, Togo, Levey[9] |
| 11, 19 | 103 | Golan, Martin, Togo, Border[10] |
| 10, 20 | 103 | Golan, Martin, Togo, Parulski[11] |

In support, Petitioner relies on the declaration of Dr. Frédo Durand (Ex. 1003).

III.    ANALYSIS

A.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the

[6] U.S. Patent Application Publication No. 2012/0026366 A1, published Feb. 2, 2012 (Ex. 1005, "Golan").
[7] U.S. Patent No. 8,081,206 B2, issued Dec. 20, 2011 (Ex. 1006, "Martin").
[8] Japanese Patent Application Publication No. JP 2011/055246 (P2011-55246A), published Mar. 17, 2011 (Ex. 1010, "Togo"); we refer to the English translation.
[9] U.S. Patent Application Publication No. 2012/0019704 A1, published Jan. 26, 2012 (Ex. 1015, "Levey").
[10] US Patent Application Pub. No. 2008/0030592 A1, filed Aug. 1, 2006, published Feb. 7, 2008 (Ex. 1009, "Border").
[11] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1008, "Parulski").

IPR2020-00861
Patent 10,230,898 B2

prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### B.    Level of Ordinary Skill in the Art

Petitioner contends

[A] Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's degree or the equivalent degree in electrical and/or computer engineering, or a related field and 2–3 years of experience in imaging systems including optics and image processing. Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.

Pet. 7 (citing Ex. 1003 ¶ 17). Patent Owner argues Petitioner's definition of a person of ordinary skill in the art improperly fails to require knowledge,

IPR2020-00861
Patent 10,230,898 B2

skills or experience in the specific field of photography.  PO Resp. 8.
According to Patent Owner, the field of photography would represent
knowledge, skills and experience that include, e.g., the choice of lens,
exposure, aperture and other settings appropriate for the aesthetics of a given
shot.  *Id.*  Additionally, Patent Owner argues that neither an engineering
education nor experience in imaging systems, even if they were focused on
optics and image processing, require any knowledge, skills or experience in
the field of photography.  *Id.* at 8–9 (citing Ex. 2001 ¶¶ 32–33 (Hart
declaration)).

    "The importance of resolving the level of ordinary skill in the art lies
in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko
Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).  "A less
sophisticated level of skill generally favors a determination of [non-
obviousness] . . . while a higher level of skill favors the reverse."
*Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir.
2011).

    Here, as explained below in Section III.E.2., under either articulation
of the level of skill in the art Petitioner has shown the claims would have
been obvious.  Therefore, we do not need to determine whether knowledge
of photography is required for the level of skill in this case.  *Okajima v.
Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (Where a determination of
level of skill would not change the result, "we find no harm under the
circumstances of this case in the Board's failure to set forth express findings
as to the level of skill.").

    For the reasons above, we determine, on the full record before us, that
the level of ordinary skill in the art proposed by Petitioner is consistent with

IPR2020-00861
Patent 10,230,898 B2

the '898 patent and the asserted prior art. We adopt that level for the
purpose of this Decision.

## C.    Claim Construction

For *inter partes* reviews filed on or after November 13, 2018, we
apply the same claim construction standard used by Article III federal courts
and the ITC, both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303
(Fed. Cir. 2005) (en banc), and its progeny. 37 C.F.R. § 42.100(b).
Accordingly, we construe each challenged claim of the '898 patent to
generally have "the ordinary and customary meaning of such claim as
understood by one of ordinary skill in the art and the prosecution history
pertaining to the patent." *Id.*

Petitioner asserts "for the purposes of this proceeding and the analysis
presented herein, no claim term requires express construction [and that it]
analyzes the claims consistent with ordinary and customary meaning as
would be understood by a POSITA in light of the specification." Pet. 8.
Patent Owner does not request construction of any claim term. *See
generally* PO Resp.[12]

---

[12] Patent Owner proposed a construction for the limitation "no-switching
criterion," as recited in each of the challenged claims, in its Preliminary
Response. Prelim. Resp. 7–9. Patent Owner asserted "no-switching
criterion" should be construed as "one more criteria determined based on
inputs obtained from the two camera images." *Id.* at 7. In the Institution
Decision, we did not limit "no-switching criterion" to "one more criteria
determined based on inputs obtained from the two camera images." Patent
Owner did not address claim construction in its Patent Owner Response. *See
generally* PO Resp. Our Scheduling Order states that "Patent Owner is
cautioned that any arguments not raised in the response may be
deemed waived." Paper 8, 8. Thus, Patent Owner's proposed construction
for the limitation "no-switching criterion" is waived, and we do not

We do not discern a dispute between the parties regarding any limitation and we need not expressly construe any limitation to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D.    Obviousness over Golan, Martin, and Togo

Petitioner contends that claims 1, 4, 8, 12, and 15 are unpatentable as obvious under 35 U.S.C. § 103 over Golan, Martin, and Togo. Pet. 13–59. For the reasons that follow, we determine that the evidence sufficiently supports Petitioner's contentions, Patent Owner's contentions regarding secondary considerations of non-obviousness do not weigh in favor of non-obviousness, and thus Petitioner's contentions establish by a preponderance of evidence that claims 1, 4, 8, 12, and 15 would have been obvious over Golan, Martin, and Togo.

### 1.    Overview of Golan (Ex. 1005)

Golan concerns a "method for continuous electronic zoom in a computerized image acquisition system," in which the system has "a wide image acquisition device and a tele image acquisition device." Ex. 1005, code (57). By providing "multiple imaging devices each with a different fixed field of view (FOV)," Golan's system "facilitates a light weight electronic zoom with a large lossless zooming range." *Id.* ¶ 9. Golan's

---

explicitly construe the term for the purpose of this Decision. *In re NuVasive, Inc.*, 842 F.3d 1376, 1380–81 (Fed. Cir. 2016).

Figure 1, reproduced below, illustrates a zoom control sub-system for an image acquisition system. *Id.* ¶ 26.



*Fig 1*

Figure 1 of Golan illustrates a zoom control sub-system for an image acquisition system. *Id.*

According to Golan, "[z]oom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* ¶ 37. Zoom control circuit 130 selects an appropriate image sensor through image sensor selector 150 and calculates a camera

IPR2020-00861
Patent 10,230,898 B2

zoom factor when it receives a required zoom from an operator. *Id.* ¶ 39.
Golan's system facilitates "continuous electronic zoom capabilities with
uninterrupted imaging," which "is also maintained when switching back and
forth between adjacently disposed image sensors." *Id.* ¶ 40.

### 2.   Overview of Martin (Ex. 1006)

Martin concerns a method for generating an autostereoscopic display
by aligning a first parallax image and at least one other parallax image. Ex.
1006, code (57). By manipulating parallax images—two or more images
with overlapping visual fields but different points of view—Martin's method
creates a moving three-dimensional image without the use of special
viewing aids, i.e., an autostereoscopic display. *Id.* at 1:16–20; 3:32–41.
Martin's Figure 1, reproduced below, illustrates a method of capturing
parallax images. *Id.* at 3:41–51.



**FIG. 1**

12

IPR2020-00861
Patent 10,230,898 B2

> Figure 1 of Martin illustrates exemplary camera positions for generating parallax images. *Id.* at 3:17–18.

According to Martin, "a camera 10 may capture a first set of images and a camera 12 may capture a second set of images of a common scene 14 while being displaced from one another. The resulting sets of images from cameras 10 and 12 will be parallax images." *Id.* at 3:42–46. Martin discloses generating a set of aligned parallax images by displaying alternating views of two or more parallax images at a desired view rate and manipulating the images such that at least a portion of the images are aligned with each other. *Id.* at 3:6–13. Figures 3a–3d, reproduced below, illustrate an alignment process.



FIG. 3a    FIG. 3b

FIG. 3c    FIG. 3d

> Figures 3a–3d of Martin illustrate a transformation process for aligning parallax images. *Id.* at 3:20–22.[13]

In Martin, "[t]he alignment matching process begins by selecting a reference image 30, as shown in FIG. 3a, from a set of parallax images.

---

[13] According to Petitioner, "[a] POSITA would have understood that element 34′ in FIG. 3b referring to a circle is a clerical error, and instead corresponds to the rectangle corresponding to region 34." Pet. 17 n.1.

IPR2020-00861
Patent 10,230,898 B2

Once reference image 30 has been selected, other images 32, as shown in
FIG. 3b, from the parallax image set can be aligned to reference image 30."
*Id.* at 4:39–43. "Reference image 30 may include region of interest 34." *Id.*
at 4:51. "Unaligned image 32 may be manipulated, as shown in FIG. 3c, for
example, until region 34′ matches alignment with region 34, as illustrated in
FIG. 3d." *Id.* at 4:54–56. "The manipulation process may be represented by
an affine transformation including translation, rotation, scaling, and/or any
other desired transformation." *Id.* at 4:56–59.

Martin discloses that a computer may align the images using
convergence points in the images. *Id.* at 5:6–11. "The computer may
further perform pattern matching or feature extraction algorithms . . . to
match alignment of regions of interest in the selected images at or near the
selected convergence points." *Id.* at 5:11–28. The computer may
continuously adjust the transformation parameters to achieve "critical
alignment," corresponding "to a condition where the degree of alignment is
sufficient to achieve a stable auto-stereoscopic display. Stability of the
whole image may not be required, as long as at least a particular region of
interest in the auto stereoscopic display is stable." *Id.* at 5:53–58. Martin
further discloses that the process may include "parallax image manipulations
of sub-pixel resolution to achieve critical alignment . . . where one image is
moved with respect to another image by an amount less than an integral
number of pixels." *Id.* at 5:59–65.

### 3.    *Overview of Togo (Ex. 1010)*

Togo is titled "Telephoto Imaging Device," and discloses
improvements for "[d]igital cameras and imaging devices (cameras) of
mobile terminal devices such as mobile phones" that "realize a zoom

14

IPR2020-00861
Patent 10,230,898 B2

function by using a plurality of imaging modules made of a plurality of lenses with different focal lengths— that is, lenses of different fixed magnifications." Ex. 1010 ¶¶ 2, 7, code (54).

Togo describes switching between the respective imaging modules according to a magnification (zoom factor) set by a user. *Id.* ¶ 7. "For example, in a configuration . . . with a wide-angle lens and . . . a telephoto lens, when a subject is at a short distance, an image . . . [from] the wide-angle lens, which has a short focal length, is switched to, and when the subject is at a long distance, an image . . . [from] the telephoto lens is switched to." *Id.* ¶ 8. "Small changes in magnification are realized by electronic zooming, which changes [to] a cutout region" of the switched-to image. *Id.*

Togo teaches a zoom digital camera with "[a] first imaging module . . . for a wide-angle image" including a "wide angle lens system 7" and "a first imaging element 8 such as a CCD camera . . ." (a Wide imaging section). *Id.* ¶ 23. Togo's zoom digital camera also includes "[a] second imaging module 2 . . . for a telephoto image" including a "telephoto lens system 10" and "a second imaging element 11 such as a CCD camera" (a Tele imaging section). *Id.* ¶ 26.

### 4.    *Independent Claim 1*

Patent Owner explicitly contests Petitioner's showing as to motivation to combine, and the last limitation of claim 1, which recites "a camera controller . . . ," and presents secondary considerations of non-obviousness. We discuss Petitioner's contentions as to each limitation and Patent Owner's arguments below.

IPR2020-00861
Patent 10,230,898 B2

> "A zoom digital camera comprising:
>
> a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;
>
> b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene"

Petitioner contends that the embodiment depicted in Figure 1 of Golan teaches "a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image." Pet. 33 (citing Ex. 1005 ¶¶ 3, 9, code (54); Ex. 1003 ¶¶ 70–74). Petitioner explains that Golan's image acquisition system includes, "tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* at 30–33 (citing Ex. 1005 ¶¶ 37, 39, Fig. 1; Ex. 1003 ¶ 72; Ex. 1001, 3:26–28).

Petitioner further contends that Golan teaches the claimed Wide imaging section and Tele imaging section. *Id.* at 35–39. Specifically, Petitioner argues Golan discloses "a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with FOV [Field of View] 142 (Wide field of view $FOV_w$) and a wide image sensor 112 (Wide sensor)." *Id.* at 35 (citing Ex. 1005 ¶¶ 36–37, Fig. 1; Ex. 1003 ¶ 76); *see id.* at 36 (citing Ex. 1001, 7:3–5; Ex. 1003 ¶¶ 77–82; Ex. 1005 ¶¶ 9, 36, 37, 43; Ex. 1017, Fig. 4.13, 48 (Jacobson photography textbook)). Petitioner also contends that Golan's zoom control sub-system 100 includes "a Tele

IPR2020-00861
Patent 10,230,898 B2

imaging section that includes a tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV)." *Id.* at 37–38 (citing Ex. 1003 ¶ 86; Ex. 1005 ¶¶ 36, 37, code (57), Fig. 1); *see id.* at 38 (citing Ex. 1003 ¶¶ 87; Ex. 1005 ¶¶ 9, 36, 37, 39, 43). Petitioner further asserts that Golan discloses that "wide FOV 142 is substantially wider than narrow FOV 140." *Id.* at 38 (quoting Ex. 1005 ¶ 43) (citing Ex. 1003 ¶ 82; Ex. 1005 ¶¶ 9, 37, Fig. 1) (emphasis omitted).

Patent Owner does not specifically address the preamble and the Wide and Tele imaging sections of claim 1. Having reviewed the cited evidence and Petitioner's contentions, we determine that Petitioner's contentions are sufficiently supported.[14]

> *"c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data."*

Petitioner contends that "Golan's zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections for receiving a requested zoom and

---

[14] We need not determine whether the preamble is limiting because Petitioner shows sufficiently that it is satisfied by the prior art.

IPR2020-00861
Patent 10,230,898 B2

provides an acquired image frame with the requested zoom." Pet. 40–41 (citing Ex. 1003 ¶¶ 91–95); *see id.* at 39–40 (citing Ex. 1005, Figs. 1 and 2, claim 1, ¶¶ 48, 49; Ex. 1003 ¶¶ 92, 93).

Petitioner relies on the combination of Golan, Martin, and Togo to teach the claimed configuration of the camera controller. *Id.* at 39–55. Specifically, Petitioner contends that "Golan teaches a zoom switching setting that depends on the Wide and Tele fields of view, including a predetermined switch zoom factor $ZF_T$=tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)." *Id.* at 41 (citing Ex. 1003 ¶ 97).

Petitioner contends that "Golan describes that in an example, such a large lossless zooming range has a value of $(Wide\_FOV/Narrow\_FOV)^2$, which is provided by 'switching between the image sensors' and performing digital zoom to both Wide and Tele images." *Id.* at 41–42 (citing Ex. 1005 ¶ 9). Petitioner asserts "that [a] POSITA would have understood . . . the underlying geometric relationships and as such, would have understood that Golan's informal terminology, 'Wide_FOV/Narrow_FOV,' corresponds to . . . '*tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)*' as claimed." *Id.* at 42. Petitioner further contends that

> Golan teaches selecting Wide image sensor and providing a zoom video output image including only Wide image data when a requested zoom factor value is less than the predetermined switch zoom factor $ZF_T$, and selecting Tele image sensor and providing a zoom video output image including only Tele image data when the requested zoom factor value is greater than the up-transfer ZF (e.g., the predetermined switch zoom factor $ZF_T$).

*Id.* (citing Ex. 1003 ¶ 108 (citing Ex. 1005 ¶ 39)).

Petitioner contends that "Togo recognizes that 'by **switching between or compositing images** of a plurality of optical systems and a plurality of

18

IPR2020-00861
Patent 10,230,898 B2

imaging elements joined to these optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized.'" *Id.* at 44–45 (quoting Ex. 1010 ¶¶ 2, 8; citing Ex. 1003 ¶ 111). Petitioner further contends that "Togo recognized that 'a telephoto imaging module with a long focal length is **less sharp at close distances** compared to a wide-angle imaging module whose focal length is short.'" *Id.* at 45 (quoting Ex. 1010 ¶ 12). Further, Petitioner contends that Togo recognizes "[d]uring a zoom in operation, 'a switch is made from the wide-angle imaging module to the telephoto imaging module. However, at this time, if the subject is close, the **image quality degrades** due to the image being from the telephoto imaging module.'" *Id.* (quoting Ex. 1010 ¶ 13; citing Ex. 1003 ¶ 112).

Petitioner contends that "Togo's solution is for image control means 4 (a camera controller) to employ a no-telephoto **criterion** based on image quality." *Id.* (citing Ex. 1003 ¶ 113). For example, according to Petitioner "as shown in annotated FIG. 7 . . . one switching criterion is based on when '**the image quality** of the cutout image 22 of the wide-angle image becomes **poorer** than **the image quality** of the telephoto image 23.'" *Id.* at 45 (citing Ex. 1010 ¶ 66).

Petitioner also contends that "Togo describes an example image quality no-switching criterion to include that 'setting magnification X < A" or "setting magnification X ≥ A and the imaging distance Y ≤ B." *Id.* (quoting Ex. 1010 ¶¶ 61, 62).

Petitioner contends that Golan combined with Martin and Togo teach the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that

IPR2020-00861
Patent 10,230,898 B2

includes only transformed, digitally zoomed Tele image data." *Id.* at 50.
Specifically, Petitioner contends that in addition to the disclosure discussed
above, "[a] POSITA would have understood that in the combination, if the
no-switching criterion is **<u>not</u>** fulfilled, switching from Wide image to Tele
image as taught in Golan is performed, and the zoom video output image
includes only digitally-zoomed Tele image data." *Id.* at 51 (citing Ex. 1005
¶¶ 9, 36, Fig. 1; Ex. 1010, Fig. 5(4); Ex. 1003 ¶ 123).

As to "transformed, digitally zoomed Tele image data," Petitioner
contends further that "Martin teaches when switching between two
successive images having different points of view, executing registration
using critical alignment to register a succeeding image to a preceding image
to generate **a transformed succeeding image** in video output images for a
stable video display." *Id.* (citing Ex. 1003 ¶ 124).

Martin's Figure 3, reproduced as annotated by Petitioner below,
illustrates registration between two images as part of Martin's critical
alignment. *Id.* at 52–53 (citing e.g. Ex. 1006, 4:51–56).

20

IPR2020-00861
Patent 10,230,898 B2



Petitioner's annotated version of Martin's
Figures 3A–3D.[15]

According to Petitioner, with respect to the annotated version of Martin's

Figures 3A through 3D:

> A POSITA would have understood that Martin's critical alignment teaches determining correspondences between the coordinate systems of the two images from different points of view, which represent the registration between the two images (e.g., "represented by affine transformation . . . and/or any other desired transformation"), and therefore teaches executing registration of successive images for position matching in the ROI [Region of Interest] and generating a transformed succeeding image (e.g., transformed and shifted succeeding image 32 as in FIG. 3d above).

*Id.* at 53–54 (citing Ex. 1003 ¶ 128; Ex. 1009 ¶¶ 41, 42; Ex. 1013, Figs. 2.4,

6.2, Tables 2.1, 6.1, 33–35, 273–77; Ex. 1016, 137 (Xiong article on image

---

[15] Petitioner apparently takes the position that element number 34′ should reference the rectangle, not the circle, in Martin's Figure 3b.

IPR2020-00861
Patent 10,230,898 B2

registration methods)).  Petitioner further argues that "Martin teaches in critical alignment, the transformed succeeding image is used to achieve position matching of ROI between the preceding image and transformed succeeding image to the video output images when switching between the two images for providing stable video output images" and the critical alignment "changes with object distance of the ROI in a specific image, and is performed when switching between each pair of parallax images." *Id.* at 54 (citing Ex. 1003 ¶ 129; Ex. 1006, 7:36–51, 5:6–21).

Petitioner takes the position that in the digital camera of Golan, Togo, and Martin, "after the no-switching criterion is not fulfilled, when switching from the Wide image (preceding image) to Tele image (succeeding image), a transformed digitally zoomed Tele image (transformed succeeding image as taught by Martin) is provided for smooth transition in the video output image, which renders obvious" the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data." *Id.* at 55 (citing Ex. 1003 ¶ 128).

Below we address Patent Owner's arguments regarding this claim limitation, the motivation to combine Golan and Martin, the motivation to combine Golan, Martin, and Togo, and secondary considerations of non-obviousness, respectively.

*Patent Owner's Arguments Regarding Claim Limitation of:*

*"[the camera controller ...] configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, wherein if the no-switching criterion is not*

IPR2020-00861
Patent 10,230,898 B2

*fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data"*

Patent Owner criticizes Petitioner's presentation as to claim 1, suggesting Dr. Durand spends too many pages explaining errors in Golan's paragraph 9 and does not explain how those errors would have affected a person of ordinary skill's motivation to utilize Golan.  PO Resp. 36.  Patent Owner appears to suggest, without explicitly arguing, that Golan's errors would have discouraged one of ordinary skill from looking to Golan to address the subject matter of the claims.  *Id.*  Because Patent Owner's argument is unclear and poorly supported, we are unable to determine the extent to which Patent Owner's argument undermines Petitioner's showing.

Patent Owner argues that Golan's teaching that "[t]he zoom control 130 selects an image acquisition device with the having a zoom more proximal to the requested zoom (Ex. 1005, ¶47)" is insufficient to support Petitioner's contentions as to claim 1.  *Id.* (alteration in original).  According to Patent Owner, "[a] POSITA would find the term 'proximal' far too nebulous and indeterminate to prescribe the specific threshold selection provided by the '898."  *Id.*

Petitioner responds that a "POSITA would have understood both Golan's teachings of up-transfer ZF with a switch zoom factor (e.g., at 6x in the 36x zoom range example) when zooming in, and that, in the context of Golan, the term 'proximal' in Golan [0047] is far from nebulous."  Pet. Reply 12 (citing Ex. 1040 ¶¶ 63–65 (Durand reply declaration)).  We agree. Golan explicitly discloses such thresholds.  Ex. 1005 ¶¶ 7–9.  Thus, Patent Owner's argument does not undermine Petitioner's showing.

23

IPR2020-00861
Patent 10,230,898 B2

Patent Owner also argues that "Petitioner provides not [sic] evidence of Golan disclosing any non-switching criteria that would cause Golan to ***not*** 'select an image acquisition device … having a zoom more proximal to the requested zoom.'" PO Resp. 37 (citing Ex. 2001 ¶ 75) (second alteration in original). Nevertheless, Petitioner relies on Togo to teach this limitation of the claim.[16] Non-obviousness cannot be established by attacking the references individually when a challenge is predicated upon a combination of prior art disclosures. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo's switching criteria is not "fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value," as required by claim 1. PO Resp. 37–38 (quoting Ex. 2001 ¶ 77). Rather, according to Patent Owner, "Togo's switching criteria are evaluated for a zoom setting regardless of whether the zoom factor was set in a continuously increasing, continuously decreasing or discretely specified manner." *Id.* Nevertheless, Petitioner relies on Golan to teach the continuous zoom aspect of this limitation of the claim.[17] Non-obviousness cannot be established by attacking the references individually when a challenge is predicated upon a combination of prior art

---

[16] Petitioner asserts "Petitioner details why and how to combine Togo' no-switching criterion based on image quality in the combination of Golan and Martin, and POSITA reading Golan would not have been discouraged from the combination." Pet. Reply 12.

[17] Petitioner asserts "Petitioner details why and how to combine Togo'[s] no-switching criterion based on image quality in the combination of Golan and Martin, and [a] POSITA reading Golan would not have been discouraged from the combination." Pet. Reply 12.

IPR2020-00861
Patent 10,230,898 B2

disclosures. *See Merck & Co.*, 800 F.2d at 1097.  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo's alleged no switching criteria is not based on image quality.  PO Resp. 38.  Patent Owner relies on the following statement in Togo, that "***in the mobile terminal device of the present invention***, the photography distance Y between the photography subject and the mobile terminal device is estimated from an output signal of the autofocusing means or a control signal controlling the autofocusing means."  *Id.* (quoting Ex. 1010 ¶ 19).  Although Togo may use autofocus to estimate the distance, Petitioner contends Togo also "describes switching/no-switching based on comparing '**image qualities** of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21.'" Pet. Reply 15 (citing Pet 45–46; Ex. 1010 ¶¶ 66–67, Fig. 7 ("image qualities of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21 at the long distance (B) in FIG. 7 are compared")).  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo does not "perform image analysis using the disparity of corresponding wide-angle and telephoto pixels to estimate distance."  PO Resp. 38–39.  We find the claims do not recite "image analysis;" rather, the claims recite "image quality" which, as explained above, is used by Togo.  Therefore, this argument does not undermine Petitioner's showing.

Finally, as to the limitation of "wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data," Patent Owner argues that the '898 patent "teaches away" from

25

IPR2020-00861
Patent 10,230,898 B2

Martin's use of parallax to create its autostereoscopic effect. *Id.* at 39–40 (citing Ex. 2001 ¶ 84; Ex. 1001, 7:46–48, 7:50–53; Pet. 51). We discuss this issue below in association with the arguments regarding the motivation to combine Golan and Martin.

Having reviewed the whole record including the cited evidence, Petitioner's contentions, and Patent Owner's arguments, we determine that Petitioner's contentions are sufficiently supported.

### *Petitioner's Contentions Regarding the Rationale for Combining Golan and Martin*

Petitioner contends a person of ordinary skill in the art would have been motivated to apply Martin's teachings to Golan "to produce the obvious, beneficial, and predictable results of a stable transition between images from different points of view for providing continuous zoom video output images." Pet. 18–19 (citing Ex. 1003 ¶¶ 49–54). Petitioner supports its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using two imaging sections having different points of view." *Id.* at 19 (quoting Ex. 1003 ¶ 50).

*Second*, "they share a need to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy." *Id.* at 19–20 (citing Ex. 1003 ¶ 58); *see id.* (citing Ex. 1005 ¶ 15; Ex. 1006, 5:51–55, 5:59–6:5).

*Third*, Martin addresses these needs identified in Golan by providing "critical alignment of an ROI [Region of Interest] in two images having

IPR2020-00861
Patent 10,230,898 B2

different points of view to calculate 'transformation parameters of subpixel resolution' for position matching of the ROI to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan." *Id.* at 20–21 (quoting Ex. 1006, 5:51–58) (citing Ex. 1003 ¶ 59; Ex. 1005 ¶ 36).

*Fourth*, applying Martin to the teachings of Golan would have required no more than combining "known elements according to known methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control subsystem of Golan) to achieve the benefits of a stable transition in video output images described by Martin." *Id.* at 21. According to Petitioner, the combined teachings of Golan and Martin would have "produced operable results that are predictable." *Id*. (citing Ex. 1003 ¶ 49).

*Fifth*, that Golan and Martin have a "shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections." *Id.* at 22 (citing Ex. 1003 ¶ 62). According to Petitioner,

> A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images.

*Id.* at 22.

IPR2020-00861
Patent 10,230,898 B2

*Discussion of Petitioner's Reasons to Combine Martin and Golan*

With respect to Petitioner's *third* and *fourth* reasons, we find that these reasons are sufficiently supported by the cited evidence. Golan teaches "a first image acquisition device having a first image sensor array coupled with a first lens having a first FOV, typically a wide FOV, and a first electronic zoom and "a second image acquisition device having a second image sensor array coupled with a second lens having a second FOV, typically a narrow FOV, and a second electronic zoom," and that the "*calibration the alignment, between the first image sensor array and the second image sensor array*, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array." Ex. 1005 ¶¶ 14, 15 (emphasis added). Petitioner argues that the ordinarily skilled artisan would have been motivated "to incorporate Martin's teaching of *executing registration using critical alignment of ROI in two images having different points of view* to calculate 'transformation parameters of sub-pixel resolution' for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan." Pet. 20 (citing Ex. 1005 ¶ 36; Ex. 1006, 5:51–58; Ex. 1003 ¶ 57) (emphasis added). Petitioner presents evidence, Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *Id.* (citing-in-part Ex. 1007, 4:58–62, 10:2–5).

Martin teaches *aligning images*:

Reference image 30 may include a region of interest 34. The same region of interest 34′, albeit as viewed from a different point of view, may appear in unaligned image 32. Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example,

IPR2020-00861
Patent 10,230,898 B2

> until region 34′ matches alignment with region 34, as illustrated
> in FIG. 3d.  The manipulation process may be represented by an
> affine transformation including translation, rotation, scaling,
> and/or any other desired transformation.

Ex. 1006, 4:51–59.  Martin discloses that *critical alignment* "corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display," and that "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58.  According to Martin, the "alignment process is the use of parallax image manipulations of sub-pixel resolution to achieve critical alignment" and "the transformations for achieving critical alignment may proceed to a sub-pixel level where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

We determine that Martin's teaching of critical alignment that reduces positional differences in a region of interest does not conflict with Martin's teaching of producing or maintaining parallax artifacts in other portions of the image, based on the entirety of the record developed at trial.  *See* Ex. 1006, 7:46–51 ("while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image").

Dr. Durand testifies that "a POSITA would have understood that Martin's teachings of critical alignment for stable transition between images of different points of view apply to electronic camera systems providing continuous zoom video output [i]mages as taught in Golan, regardless of

29

IPR2020-00861
Patent 10,230,898 B2

whether a three dimensional illusion is provided." Ex. 1003 ¶ 54. Citing
Ahiska (Ex. 1007), Border (Ex. 1009), Orimoto (Ex. 1014), and Hansen (Ex.
1019) to support his testimony, Durand further testifies that

> It was well known in the art that for seamless transition between
> two images of different points of views in continuous zoom video
> applications, when calibration between two cameras (*e.g.*, the
> electronic calibration of Golan) is not sufficient alone (*e.g.*,
> because of shocking, vibration, thermal variation, etc.), image
> registration of two images from two imaging sections for
> position matching (e.g., critical alignment of Martin) may be
> used.

*Id.* ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:63–2:1; Ex. 1019,
1059; Ex. 1009 ¶¶ 41, 42). The portion of Hansen (Ex. 1019) cited by Dr.
Durand addresses how extrinsic calibration errors occur and "a method to
recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019,
1059 (emphasis omitted). Orimoto discloses how misalignment occurs,
irrespective of "how exactly the dual lens camera has been conditioned and
adjusted by the manufacturer." Ex. 1014, 1:63–2:1. Border addresses image
registration as an alternative to correspondence (i.e., calibration). Ex. 1009
¶¶ 41, 42. And Ahiska disclose image registration or matching, when
calibration is insufficient, to provide a seamless transition between master
and slave cameras and "create the quality of a continuous zoom function."
Ex. 1007, 4:58–62, 10:2–5 ("[i]f calibration between the [wide-angle] master
and slave cameras is insufficient alone, image registration or matching can
be carried out," "transition[ing] between the master view and the slave view
as seamlessly as possible to create the quality of a continuous zoom
function").

IPR2020-00861
Patent 10,230,898 B2

Petitioner's *third* and *fourth* reasons for combining Golan and Martin
are supported by Dr. Durand's testimony quoted above, which is in turn
supported by Ahiska and Border. The portions of Border cited by Dr.
Durand address image registration as an alternative to correspondence (i.e.,
calibration). Ex. 1009 ¶¶ 41, 42. The portions of Ahiska cited by Dr.
Durand address the additional step of image registration or matching, when
calibration is insufficient, to provide a seamless transition between master
and slave cameras and "create the quality of a continuous zoom function."
Ex. 1007, 4:58–62, 10:2–5. Thus, each of Border and Ahiska show a
relation between electronic calibration and registration.

*Patent Owner's Arguments Regarding Petitioner's Rationale for Combining Golan and Martin*

As to Petitioner's proffered rationale for combining Golan and Martin,
Patent Owner contends that the "Golan and Martin references are
fundamentally dissimilar, address different problems, and prescribe different
techniques to address those different problems." PO Resp. 30 (citing *Nichia
Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1340 (Fed. Cir. 2017)
(affirming district court conclusion of no motivation to combine where the
combination of references relating to LED packages "describe[d] different
structures" and "address[ed] different problems")); *see id.* at 31–32 (citing
*Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1360 (Fed. Cir. 2020); Ex. 2015 ¶
66). Patent Owner argues that "Golan teaches a preference that camera
calibration occur before zooming resulting in 'alignment offsets'" [and
teaches that] "[t]ypically, since the spatial offsets between wide image
sensor array 110 and tele image sensor array 112 are fixed, the electronic
calibration step is performed one time, after the manufacturing of the image

IPR2020-00861
Patent 10,230,898 B2

acquisition system and before the first use." *Id.* at 28 (Ex. 1005 ¶ 44).
Patent Owner argues that "Martin, on the other hand, teaches away from
Golan with an 'exemplary embodiment' that uses 'convergence points' in
the two camera images to determine alignment that would continue to work
even if the position and orientation of the two cameras varied." *Id.* (quoting
Ex. 1006, 5:6–21).

Patent Owner further argues that "[s]ince both Golan and Martin rely
on careful 'sub-pixel' alignment, these differences in alignment processing
would be critical, and it would not be obvious to a POSITA which choice to
use for a hypothetical combined embodiment." *Id.* at 28. Patent Owner also
argues "[a] POSITA would understand from Golan that its approach works
better if the cameras can be as close as possible to minimize the differences
in their points of view." *Id.* at 27 (citing Ex. 1005 ¶ 22). Patent Owner
further argues "Martin on the other hand ***requires*** 'parallax images' that a
POSITA would understand as images captured from necessarily different
points-of-view." *Id.* (citing Ex. 1006, 3:56–60; Ex. 2001 ¶ 61).

Petitioner responds by distinguishing *Nichia*, arguing that "the
relevant teachings of Golan and Martin address the same problem, and a
relation between solutions of Golan and Martin was well-known and no
alleged difference between the relevant teachings would require the
alteration of Golan's principles of operation or render Golan inoperable."
Pet. Reply 7 (citing *Nichia Corp.*, 855 F.3d at 1339; *Adidas AG*, 963 F.3d at
1358–159; Pet. 18–20; Ex. 1006, 2:49–50, 5:51–58). According to
Petitioner, "for seamless transition between two images in continuous zoom
video applications, when calibration between two cameras . . . is not
sufficient alone . . . , image registration of two images from two imaging

sections (e.g., critical alignment of Martin) may be used for position matching."  Pet. 54–55 (citing Ex. 1007, 4:58–62; 10:2–5; Ex. 1014, 1:58–62; Ex. 1019, 1059; Ex. 1009 ¶¶ 41–42).  Petitioner further contends that a "POSITA starting with Golan would have found it obvious to use Martin's critical alignment including registration to provide improved seamless transition."  Pet. Reply 6 (citing Pet. 20–21).

We are not persuaded that Golan and Martin are "fundamentally dissimilar," because Golan and Martin both involve parallax effects caused by two cameras with different fields of view and they both address a common problem—a discontinuity in images that are misaligned due to parallax from two different cameras—albeit in different contexts and with different techniques.  *See* PO Resp. 23–31.

Martin also does not need to share a goal, objective, problem, or purpose in order to be combined with Golan.  Golan and Martin are not incompatible with each other for having different objectives.  *Intelligent Bio-Systems v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).  Even assuming, *arguendo*, that Golan discloses reducing a parallax and Martin discloses the *opposite* (i.e., creating or maintaining a parallax)—this is not necessarily fatal to the combination of these references.  Nonetheless, one of the problems noted by each of the references *is* shared in common between Golan and Martin, as discussed in the preceding paragraph.  Thus, Patent Owner's "fundamentally dissimilar" argument does not undermine Petitioner's contentions.

Patent Owner also argues that "these differences in camera configurations [between Martin and Golan] teach away from each other.  PO Resp. 28.  Patent Owner also argues that the '898 patent "teaches away"

IPR2020-00861
Patent 10,230,898 B2

from parallax, which Martin depends on. *Id.* at 40 (citing Ex. 2001 ¶ 84; Ex. 1001, 7:50–53). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1332 (Fed. Cir. 2008) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).

We are not persuaded that the invention claimed in the '898 patent or Golan teaches away from Martin because they do not discourage or lead one in a direction divergent from Martin's teachings relevant to "evaluat[ing] if a no-switching criterion is fulfilled or not fulfilled . . ." as recited in claim 1. In addition to providing an autostereoscopic display of 3D images using parallax images, Martin also discloses aligning these same parallax images using transformation parameters. *See* Ex. 1006, 5:38–42. Thus, Martin's teaching of critical alignment does not appear to be divergent from or incompatible with the scope of independent claim 1 *or* the objectives of the '898 patent. Nor is Martin incompatible with Golan for having a different objective. Petitioner need not show that Martin shares a common objective with Golan or the patent at issue. *Intelligent Bio-Systems*, 821 F.3d at 1367. Thus, Patent Owner's teaching away argument does not undermine Petitioner's contentions.

Patent Owner also argues that although Martin is for autostereoscopic display, there is no evidence in the record of a camera utilizing autostereoscopic visual perception. PO Resp. 24–25. Patent Owner contends "a POSITA would recognize Martin as a display system patent intended for post-processing images for display, whereas Golan is an image

IPR2020-00861
Patent 10,230,898 B2

acquisition patent intended for pre-processing images in preparation for photographic image capture." *Id.* Nevertheless, we determine that Patent Owner does not explain sufficiently in its Patent Owner Response why Martin's critical alignment could not be used in Golan during image acquisition.

As discussed above, Petitioner, by contrast, presents evidence, i.e. Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *See* Pet. 20–21 (citing-in-part Ex. 1007, 4:58–62, 10:2–5 ("If calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out . . ." and "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function.")). Dr. Durand also cites Ahiska, in addition to other references, to support his testimony. Ex. 1003 ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:58–62 (Orimoto patent) (describing "image registration on the side of the manufacturer . . . to obtain the three dimensional image without noticing misalignment of the plural images"); Ex. 1019, 1059 (Hansen article) (describing how extrinsic calibration errors occur due to shock, vibration, thermal variation and cycling); Ex. 1009 ¶ 52 (explaining that registration between wide image 204 and telephoto image 206 is an alternative to correspondences preferably determined at the time of manufacturing)).

Dr. Durand testifies that

It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*,

35

> because of shocking, vibration, thermal variation, etc.), image
> registration of two images from two imaging sections for
> position matching (e.g., critical alignment of Martin) may be
> used.

*Id.* Dr. Durand's testimony quoted above is supported by some of the cited references. The cited portion of Hansen (Ex. 1019) addresses how extrinsic calibration errors occur and "a method to recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019, 1059 (emphasis omitted). The cited portion Orimoto (Ex. 1014) concerns image registration, at the manufacturer's end, to address misalignment of images. The quoted portion of Orimoto discloses how misalignment occurs, irrespective of "how exactly the dual lens camera has been conditioned and adjusted by the manufacturer." Ex. 1014, 1:63–2:1. The cited portions of Border (Ex. 1009) address image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. And the cited portions of Ahiska disclose image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5.

Thus, Petitioner has shown sufficiently that one of ordinary skill would have chosen to use registration such as occurs in Martin, in the system of Golan during acquisition.[18] Thus, Patent Owner's pre- processing

---

[18] Patent Owner asserts in its Sur-Reply that Petitioner's statement that Patent Owner's argument at pages 27–28 of the Patent Owner Response "would not have discouraged POSITA from applying Martin's critical alignment teachings in Golan" incorporates a nine-paragraph, 1163-word discussion from Dr. Durand into the Petitioner's Reply in violation of 37 C.F.R. § 42.6(a)(3)'s prohibition on incorporation by reference of arguments from expert declarations. PO Sur-Reply 6. We have reviewed

versus post-processing argument does not undermine Petitioner's contentions.

Patent Owner further argues that "the core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: 'whether [a] skilled artisan would have plucked one reference out of the sea of prior art … and combined it with conventional [] elements to address some need present in the field.'" PO Resp. 24, 29 (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016)) (alterations in original).

Petitioner responds that the evidence of record does not indicate that there was a "sea" of other image registration or position matching patents or literature to choose from; rather it was a finite pool including Martin and Ahiska. *See* Pet. Reply 6. Petitioner further argues that it is not required to show why it chose one reference, in this case, Martin, over another. *Id.* (citing *Infineum USA L.P. v. Chevron Oronite Co. LLC*, 2021 WL 210722, at *4 (Fed. Cir. 2021)). We are persuaded that the evidence of record does not indicate that there were several alternatives that a POSITA could have chosen instead of Martin so as to establish a "sea" or "ocean" as Patent Owner contends, nor has Patent Owner shown Petitioner is relying on the concept of "combining known element to yield predictable results" under which a finite number of alternatives may be required.[19] *See Fanduel, Inc.*

---

the referenced section of the Reply and declaration and do not find that Petitioner violated the page limits or any other rules.

[19] We do not suggest that this is required. *WBIP* was not concerned with showing that a particular reference could be found in the "sea." Rather, *WBIP* pointed out that one must show a rationale to combine instead of assuming that "a person of skill, [has] two (and only two) references sitting on the table in front of him." *WBIP*, 829 F.3d at 1337. In other words, one does ***not*** need to show that there is something about the references relied on

IPR2020-00861
Patent 10,230,898 B2

*v. Interactive Games LLC*, 966 F.3d 1334, 1346 (Fed. Cir. 2020) ("when the record shows a finite number of identified, predictable solutions to a design need that existed at the relevant time, which a person of ordinary skill in the art ha[d] a good reason to pursue, common sense can supply a motivation to combine") (citations and internal quotation marks omitted, alteration in original).

We are further persuaded that Petitioner need not explain why it chose Martin over another reference with similar teachings, or why its combination is superior. *See Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("It is thus improper to require West-Ward to prove that a person of ordinary skill would have selected everolimus over other prior art treatment methods."); *see also In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention."). Thus, Patent Owner's "sea" of references argument does not undermine Petitioner's contentions.

Patent Owner also argues that Durand's "analogous art" analysis is deficient because it fails to address whether Golan and Martin, separately, are "analogous" to the invention of the '898 patent, because it instead "only

---

that is different than *all* other references in the sea *nor* does one need to show the sea is so small that the two references would be easily found (unless one is relying on combining known elements to yield predictable results). *See Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1044–45 (Fed. Cir. 2018) (associating "sea" of prior art argument with concept of "a finite number of identified, predictable solutions").

IPR2020-00861
Patent 10,230,898 B2

asserted that Golan and Martin were 'analogous' because they are both in 'the same field of endeavor.'"  PO Sur-Reply 2.

Art is analogous when it is: (1) from the same field of endeavor as the claimed invention; and (2) if the art is not from the same field of endeavor, reasonably pertinent to the particular problem faced by the inventor.  *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).  In its Petition, Petitioner compares Golan and Martin to each other instead of the claimed invention.  *See* Pet. 17–18.  In its Reply, Petitioner rectifies the improper comparison and asserts that Golan and Martin are in the same field of endeavor as the claimed invention: "pertaining to imaging systems including digital cameras generating video output images of the same scene from two imaging sections having different points of view."  Pet. Reply 3 (citing Pet. 19; Ex. 1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35; 5:51–55).[20]  Also as discussed above, Petitioner asserts that Golan and Martin "are each pertinent to the problem addressed in the '898 Patent, namely, achieving 'a continuous, smooth zoom in video mode.'"  *Id.* (citing Ex. 1040 ¶ 32; Ex. 1001, 3:16–17; Petition 18–19; Ex. 1005 ¶ 15; Ex. 1006, 5:51–55).

---

[20] Petitioner properly replied to Patent Owner's criticism of its showing regarding analogous art.  *Dynamic Drinkware, LLC*, 800 F.3d at 1379 (finding an *inter partes* review petitioner has both the "burden of persuasion to prove unpatentability" and also "the initial burden of production," which "is a shifting burden, 'the allocation of which depends on where in the process of trial the issue arises.'  The burden of production may entail 'producing additional evidence and presenting persuasive argument based on new evidence or evidence already of record.'"); *see also Apple Inc. v. Qualcomm Inc.*, IPR2018-01245, Paper 39, 16 (PTAB Jan. 15, 2020) (citing *Drinkware* and finding a petitioner properly established a reference was analogous art for the first time in its Petitioner Reply).

IPR2020-00861
Patent 10,230,898 B2

We are persuaded that Golan is in the same field of endeavor as the claimed invention because Golan describes performing digital zoom using a wide image sensor array and lens and a tele image sensor array and lens with the goal of providing "continuous electronic zoom with uninterrupted imaging." *See* Ex. 1005 ¶ 15. We are persuaded that Martin is reasonably pertinent to the problem faced by the inventor: reducing an image jump effect seen in video output images when switching between cameras that have different fields of view. Both Golan and Martin have multiple cameras with differing fields of view. Martin describes the problem in terms of its solution: "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display" and "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." Ex. 1006, 5:53–58. Thus, Patent Owner's analogous argument does not undermine Petitioner's contentions.

As such, and for the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan and Martin is supported by sufficient rational underpinning, based on the entirety of the record developed at trial. *See KSR*, 550 at 418.

*Petitioner's Rationale for Combining Golan, Martin, and Togo*

Petitioner contends that a person of ordinary skill in the art would have been motivated to apply Togo's teachings to Golan to "produce the obvious, beneficial, and predictable results of avoiding output image degradation when the quality of the telephoto image data would be degraded based on closeness of the subject as taught by Togo." Pet. 29–30 (citing Ex.

IPR2020-00861
Patent 10,230,898 B2

1003 ¶¶ 49–54). Petitioner supports its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field of endeavor pertaining to digital zoom camera systems including a camera controller operatively connected to wide and tele lens systems." *Id.* at 30 (citing Ex. 1003 ¶ 66).

*Second*, "the references share a need to provide output images of objects at various ranges with a compact imaging system." *Id.* at 31–32 (citing Ex. 1003 ¶ 67).

*Third*, "Golan's expressed desire to achieve 'continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array' would have motivated a POSITA to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged." *Id.* at 32 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 68).

*Fourth*, combining the teachings of Togo with the system of Golan "would have produced operable results that are predictable." *Id.* at 32–33.

We are persuaded by Petitioner's contentions that Golan's expressed desire to achieve continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array would have motivated a person of ordinary skill in the art to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged.

IPR2020-00861
Patent 10,230,898 B2

*Patent Owner's Arguments Regarding Petitioner's Rationale for
Combining Golan, Martin, and Togo*

Patent Owner argues "a POSITA reading Golan would not be motivated to combine it with Togo because the POSITA would not be aware from Golan of any issues regarding focus and subject depth.  Ex. 2001, ¶67." PO Resp. 32.  Patent Owner asserts that Golan "assumes both images are always in perfect focus."  *Id*.  Petitioner contends "POSITA would have understood the tele image degradation would be an issue for Golan, e.g., when capturing images of a subject at close distance in zoom-in operation using both Tele and Wide imaging system."  Pet. Reply 8 (citing Ex. 1040 ¶ 48).  Further, Petitioner contends that a "POSITA would have understood that Golan includes embodiments that focus subjects at various distances, including at close distance and the infinite, and would be motivated to resolve any associated issues using teachings in the art."  *Id.* at 8–9 (Ex. 1040 ¶ 49; Ex. 1005 ¶ 17, claims 3, 17).  We agree and thus, Patent Owner's argument does not undermine Petitioners showing.

Patent Owner also argues because Togo requires parallel optical axes "when the imaging distance (Y) to the subject is long (several tens of m), center positions of the wide-angle image 17 and the telephoto image are substantially equal" and "a function of correcting the center positions of the wide-angle image and the telephoto image as in patent literature 3 is unnecessary. Ex. 1010, [0052]."  PO Resp. 34 (citing Ex. 2001 ¶ 70; Ex. 1010 ¶¶ 18, 38) (internal quotations omitted).  Patent Owner also argues "Martin teaches away from this requirement by specifying that '[a]dditionally, cameras ***10 and 12 need not be in any special alignment configuration*** to produce suitable parallax images for use with the present

IPR2020-00861
Patent 10,230,898 B2

invention.' *Id.* (Ex. 1006, 3:64–67; Ex. 2001 ¶ 70)." Patent Owner also points to Martin's teaching that "[previous] methods require the use of at least two ***carefully aligned*** cameras to capture images" and that alignment can be "cumbersome" and "difficult." *Id.* at 34–35 (citing Ex. 1006, 2:19–59).

We do not agree with Patent Owner's arguments, which are premised on a "physical" or "bodily" incorporation of limitations of one reference into the other. However, this is not the standard. *See In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review."). The relevant inquiry is whether the claimed subject matter would have been obvious to those of ordinary skill in the art in light of the *combined teachings* of those references. *See In re Keller,* 642 F.2d 413, 425 (CCPA 1981). "Combining the *teachings* of references does not involve an ability to combine their specific structures." *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973). Rather than express obviousness as the physical incorporation of a structure from one reference into the structure of another reference, the prior art should be viewed as a combination of teachings from different sources, and the use of those teachings by one of ordinary skill in the art. *See KSR Int'l Co.*, 550 U.S. at 418 (the conclusion of obviousness can be based on the interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art.)

Petitioner contends "Togo's image-quality-based no-switching criterion teachings apply to the combination regardless of whether a distance

IPR2020-00861
Patent 10,230,898 B2

between cameras is close or whether optical axes are parallel."  Pet. Reply 10 (citing Ex. 1040 ¶ 52).  Petitioner seeks only "to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged." Pet. 32 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 68).  Thus, Patent Owner's argument does not undermine Petitioners showing

For the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan, Martin, and Togo is supported by sufficient rational underpinning.  *See KSR*, 550 U.S. at 418.  We are further persuaded that the cited evidence sufficiently supports Dr. Durand's testimony.

*Evidence of Secondary Considerations*

Patent Owner presents evidence of secondary considerations of non-obviousness.  PO Resp. 56–69.  As to licensing, Patent Owner presents evidence in the form of emails and its litigation complaint to show that "the licensing discussions between Petitioner and Patent Owner lasted over many years."  *Id.* at 62.  "Petitioner specifically asked Patent Owner for an 'option to license all of Corephotonics IP' in August 2016."  *Id.*  Patent Owner further notes that Petitioner "specifically asked for information about smooth transition technology."  *Id.* (citing Ex. 2007; Ex. 2011; Ex. 2012).  "The licensing discussions specifically would have encompassed the smooth transition technology," and a license to '898 patent.  *Id.*  These discussions, Patent Owner contends, establish "that there is a 'nexus' between the licensing negotiations between Patent Owner and Petitioner as [to] the claims of the '898 patent challenged by Petitioner in this proceeding."  *Id.* at 62–63.  Patent Owner also lists several companies that licensed Patent

IPR2020-00861
Patent 10,230,898 B2

Owner's technology, and contends that this is "evidence of industry-wide respect for the patented technology." *Id.* at 63–64 (citing Ex. 2001 ¶ 91).

As to industry praise, Patent Owner cites several articles that show it is an "industry leader in developing dual-camera designs and software technologies to power them." *Id.* at 64–65.

Patent Owner asserts that the failure of others and "Petitioner's copying of Patent Owner's technologies, including the smooth transition techniques that Patent Owner demonstrated to Petitioner, is evidence of non-obviousness." *Id.* at 68 (citing Ex. 2001 ¶ 150). Patent Owner presents arguments with respect to the failure of Golan and Border inventors to achieve what is disclosed by the '898 patent. *Id.* at 66–69. Patent Owner also asserts: "[t]hat Petitioner copied the invention of the '898 patent (among other Corephotonics technologies, which Petitioner also appears to have copied) is strongly implied by the course of conduct between the parties and the timing of Petitioner's announcement of their own version of 'smooth transition' in their iPhone 7 series in Fall of 2016." *Id.* at 68–69 (citing Ex. 2001 ¶ 150).

*Analysis of Patent Owner's Evidence of Secondary Considerations*

Objective indicia of non-obviousness (also referred to as secondary considerations) may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Objective indicia are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of non-obviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463

IPR2020-00861
Patent 10,230,898 B2

F.3d 1299, 1312 (Fed. Cir. 2006)); *see also ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). As the Federal Circuit explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, the patentee is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process. *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and the evidence of secondary considerations. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential). We first consider whether a patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* If not, that "does not end the inquiry into secondary considerations"; "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the

IPR2020-00861
Patent 10,230,898 B2

claimed invention.'" *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75). Once a patent owner has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger to adduce evidence showing that the objective indicia were due to extraneous factors other than the patented invention. *Demaco*, 851 F.2d at 1392–93.

With regard to the first step of an analysis under *Fox Factory*, Patent Owner's evidence of secondary considerations is not tied to a specific product or technology that is disclosed and claimed in the '898 patent, for the reasons discussed below. *See* Pet. Reply 24–25 (citing *Fox Factory*, 944 F.3d at 1374).

Patent Owner presents evidence of secondary considerations purporting to address at least: industry praise and licensing; commercial success; and failure of others and copying. *See* PO Resp. 56–69.

According to one of the emails submitted by Patent Owner, licensing negotiations with Petitioner involved not only the '898 patent, but all patents in Patent Owner's intellectual property portfolio. *Id.* at 62; Ex. 2010 (email chain between Corephotonics and Apple discussing an "option to license all of Corephotonics IP"). In the licensing context, the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing "arose out of recognition and acceptance of the subject matter claimed" in the patent. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). To the extent that negotiations with Petitioner or any other licensee (*see* PO Resp. 63–64 (listing entities that have taken a license from Patent Owner)) were specific to the smooth transition technology Patent Owner mentions, Petitioner argues that "smooth transition' [relied on by Patent Owner] refers to techniques used ***when***

47

IPR2020-00861
Patent 10,230,898 B2

***switching***, in order to provide for a more seamless transition between the
camera images" but, the "'898 claims recite evaluating a 'non-switching
criterion,' to determine ***whether to switch*** between cameras, and depending
on the evaluation, outputting the Wide image data or the Tele image data."
Pet. Reply 26 (citing PO Resp. 57–58; Ex. 1001, 5:27–34, 7:41–56, claims
1, 12).  Petitioner further argues that "Patent Owner fails to even discuss, let
alone prove, whether any usage of 'smooth transition' is actually a reference
to the *claimed* technique or merely *unclaimed* techniques described as
'smooth transition' in the '898 patent." *Id.* (citing Ex. 1040 ¶ 107).  For the
reasons that follow, we find that Petitioner has the better position.

> In the '898 patent,
>
> [a] "smooth transition" (ST) is a transition between cameras or
> POVs that minimizes the jump effect. This may include matching
> the position, scale, brightness and color of the output image
> before and after the transition. However, an entire image position
> matching between the sub-camera outputs is in many cases
> impossible, because parallax causes the position shift to be
> dependent on the object distance. Therefore, in a smooth
> transition as disclosed herein, the position matching is achieved
> only in the ROI region while scale brightness and color are
> matched for the entire output image area.

Ex. 1001, 7:46–56.  At its broadest, "[a] 'smooth transition' . . . minimizes
the jump effect," and as disclosed in the '898 patent, this encompasses
position matching "only in the ROI region" and matching "scale brightness
and color . . . for the entire output image area." *See id.*  In other patents in
the continuity chain of the '898 patent, "smooth transition" is similarly
defined. *See* U.S. Patent No. 10,326,942 ("the '942 patent," 10:41–51).  But
this disclosure does not appear to address "evaluat[ing] if a no-switching
criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is

IPR2020-00861
Patent 10,230,898 B2

fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data," as required by independent claim 1 and similarly required by independent claim 12 of the '898 patent. That is, independent claim 1 recites a more specific invention than "smooth transition" as it is broadly defined in the '898 patent.

As Patent Owner discloses "smooth transition" in multiple patents, it is not clear what inventions the term encompasses. *See*, *e.g.*, Ex. 1001, 7:46–56; '942 patent, 10:41–51. Patent Owner's arguments, too, appear to imply that the inventions disclosed in more than one patent are encompassed by smooth transition technology. *See generally* PO Resp. 58–65. The '898 patent defines a smooth transition as a transition between cameras or POVs that minimizes the jump effect and teaches methods for achieving a smooth transition in video zoom mode, including position matching, to address the different spatial perspectives and viewing angles of each camera, as well as matching scale, brightness, and color. Ex. 1001, 7:46–56. With respect to the '898 patent specifically, Dr. Hart testifies that its "central innovation" is the "reduction of the image discontinuity in video output seen when a multi-aperture camera switches from one sensor to another during the zooming process *using registration and* position matching." Ex. 2001 ¶ 147 (emphasis added). Both Dr. Hart's characterization of the '898 patent's "central innovation" and the recitations of claim 1 are more particular than

49

IPR2020-00861
Patent 10,230,898 B2

the broad definition of "smooth transition" in the '898 patent. Patent
Owner's evidence of industry-wide praise and licensing, commercial
success, as well as failure of others and copying is tied to, at its most
specific, Patent Owner's smooth transition technology, which is defined
more broadly than the invention recited in claim 1 of the '898 patent.

For example, as evidence of licensing negotiations, Patent Owner
submits Exhibits 2011 and 2012, which discuss "Corephotonic's
technologies and intellectual property, including 'software that fuses wide
angle and telephoto video together,' 'sensor synchronization,' 'MIPI
signaling and image processing requirements,' and 'image registration in
GPU . . . .'" Not only are these areas of technology not limited to the
invention recited in claim 1, it is not entirely clear how, aside from image
registration, they even relate to it. Exhibit 2007 is an email chain discussing
"a number of eleven 'top level deliverables'." Those top level deliverables
are not limited to the invention recited in claim 1. Exhibit 2008 concerns
smooth transitions and technical discussions between Petitioner and Patent
Owner. For the reasons discussed above, evidence tied to Patent Owner's
smooth transition technology is not coextensive with the invention recited in
claim 1 of the '898 patent.

As industry praise, Patent Owner cites several articles describing it as
a "leader in multi-camera technology," "world-renowned leader in the
mobile imaging space," a "leading supplie[r]" and a "'key player' in the
computational photography market." PO Resp. 64. The praise is for Patent
Owner, Corephotonics, as a company, not the specific invention recited in
claim 1 of the '898 patent. Similarly, Patent Owner's evidence of
commercial success, which includes articles in Forbes.com, Globes.co.il,

IPR2020-00861
Patent 10,230,898 B2

and Engadget.com concerning Samsung's purchase of Corephotonics, does not specifically address the invention recited in claim 1. *Id.* at 65–66.

As evidence of failure of others, Patent Owner points to Golan's failure to "recognize the problem of discontinuities due to parallax which are present in such switching or the use of the position matching techniques and image registration techniques discussed in the '898 patent." *Id.* at 67 (citing Ex. 2001 ¶ 148). Patent Owner also points to Border's purported failure to "recognize the need for a 'continuous' zoom or 'smooth transition' between sensors or," "the need to provide a 'continuous zoom video output.'" *Id.* at 67–68 (citing Ex. 2001 ¶ 149). We do not consider Golan's and Border's lack of disclosure on this specific problem, even if it is a failure to recognize the problem, sufficient evidence of failure of others to solve the problem. Failure of other requires "that, notwithstanding knowledge of the references, the art *tried and failed* to solve the problem." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1338 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (emphasis added). Nevertheless, even if Patent Owner's argument about Golan and Border is relevant, neither reference has been shown to support failure of others.

For the reasons discussed above, the evidence presented is not sufficiently tied to, or coextensive with, the invention of claim 1 in the '898 patent in particular. We further determine that, presenting evidence that is tied to "smooth transition" instead of the invention recited in claim 1 as Patent Owner does, does not establish that any of the evidence is coextensive with the invention recited in claim 1 of the '898 patent.

In view of step 1 of the analysis under *Fox Factory*, we move to step 2 and determine whether Patent Owner's evidence of secondary considerations

IPR2020-00861
Patent 10,230,898 B2

is "the direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–75. Patent Owner is not entitled to a presumption of nexus where the relevant product embodies at least two patented inventions, and the burden remains on Patent Owner to show that the claimed secondary considerations were due to the invention claimed in the patent at issue here. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d. 1289, 1299 (Fed. Cir. 2010).

Applying *Therasense*, the Federal Circuit explained that allowing a presumption in such a situation would not be "consistent with *Demaco*'s explanation that nexus cannot be presumed where, for example, 'the patented invention is only a component of a commercially successful machine or process.'" *See Fox Factory*, 944 F.3d at 1377 (citing *Demaco*, 851 F.2d at 1392) (rejecting a patent owner's "attempt to reduce the coextensiveness requirement to an inquiry into whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

For reasons substantially similar to those discussed above, we determine that none of the evidence presented is "the direct result of the unique characteristics of the claimed invention," because Patent Owner's evidence is only as particular as discussing smooth transition technology, which we determine above is broader than and thus, not coextensive with the invention recited in claim 1 of the '898 patent. *See Fox Factory*, 944 F.3d at 1373–75. It is further unclear that any of the industry-wide praise and articles resulted from the preeminence of the invention recited in claim 1 of the '898 patent.

IPR2020-00861
Patent 10,230,898 B2

Because the same evidence of secondary considerations cannot be presumed to be attributable to two or more different features, Patent Owner retains the burden of proving the degree to which the evidence tied to "smooth transition" technology is attributable to the invention recited in the challenged claims. *Fox Factory*, 944 F.3d at 1378 (citing *Therasense*, 593 F.3d at 1299; *WMS Gaming, Inc. v. Int'l. Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)); *see also Lectrosonics*, Paper 33 at 34–35.

Some of the exact same evidence and arguments submitted in the present proceeding has also been submitted in IPR2020-00905—Petitioner contends that "Patent Owner's reliance on the same underlying allegations in other PTAB proceedings involving different patents of different scope casts considerable doubt on [Patent Owner's] argument." Pet. Reply 25 (citing IPR2020-00905, Paper 15 at 41 (contending that licensing discussions "specifically would have encompassed lens design and image fusion technology" in addition to smooth transition technology)). This is despite the fact that independent claim 1 of U.S. Patent No. 10,225,479 ("the '479 patent) in IPR2020-00905 recites a different invention from that of the inventions recited in independent claims 1 and 12 of the '898 patent. Independent claim 1 of the '479 patent recites, *inter alia*, "a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms and to process the Wide and Tele images to create a fused image." Independent claim 23 of the '479 patent recites substantially similar features. Neither claim includes "evaluat[ing] if a no switching criterion is fulfilled or not fulfilled" as in the inventions of claims 1 and 12 of the '898 patent. The '479 and the '898 patents do not claim the same inventions. *See*

53

IPR2020-00861
Patent 10,230,898 B2

*generally Fox Factory*, 944 F.3d at 1377 (rejecting the argument that a presumption should exist where the two patents at issue are related). In this case, the '479 and '898 patents have claims that address different aspects of smooth transition technology.

We are not persuaded that Patent Owner has met its burden to establish a nexus between the merits of the claimed invention and the submitted evidence relating to industry-wide praise and licensing, commercial success, as well as failure of others and copying. Absent a nexus, we determine that Patent Owner's evidence of objective indicia does not weigh in favor of non-obviousness.

*Summary — Claim 1*

We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan, Martin, and Togo, and the other cited evidence and we are persuaded that the proposed combination teaches the limitations recited in independent claim 1 as set forth above. Petitioner's rationales for combining Golan and Martin and Golan, Martin, and Togo are set forth earlier in this Section, and are determined to be supported by sufficient rational underpinning for at least the reasons set forth above. Patent Owner's contentions regarding secondary considerations of non-obviousness are set forth above and, as discussed, do not weigh in favor of non-obviousness because Patent Owner has not established a nexus between the claimed invention and the cited evidence. For the foregoing reasons, we conclude Petitioner establishes unpatentability of independent claim 1 over Golan, Martin, and Togo by a preponderance of the evidence.

IPR2020-00861
Patent 10,230,898 B2

Accordingly, we are persuaded that Petitioner demonstrates the unpatentability of claim 1 over the combination of Golan, Martin, and Togo by a preponderance of the evidence.

### 5.    *Independent Claim 12*

Independent claim 12 recites a method for providing a digital video output in a multiple aperture zoom digital camera similar to that recited in independent claim 1.  Ex. 1001, 13:18–37.

Petitioner's arguments for independent claim 13 refer, in large part, to its arguments for independent claim 1.  *See* Pet. 58–59.

Patent Owner does not present separate arguments for independent claim 12.  *See generally* Prelim. Resp.  For substantially the same reasons discussed in section III.D.4, we are persuaded that Petitioner sufficiently demonstrates the unpatentability of claim 12 over the combination of Golan, Martin, and Togo by a preponderance of the evidence.

### 6.    *Dependent Claim 4*

Claim 4, which depends from claim 1, further recites "[t]he camera of claim 1, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image."  Ex. 1001, 12:54–56.

Patent Owner asserts that "a POSITA would understand the plain and ordinary meaning of 'effective resolution,' as illuminated by the '898 [patent] and its description of an 'effective resolution score' utilizing image analysis of image sensor data."  PO Resp. 41 (citing Ex. 2001 ¶ 88; Ex. 1001 at 6:4–24).  Patent Owner essentially asks us to construe "effective resolution" as requiring calculation of an "effective resolution score" as defined in the Specification of the '898 patent.  Limitations in the

IPR2020-00861
Patent 10,230,898 B2

specification must not be read into the claims absent lexicography or disclaimer/disavowal. *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). We find neither lexicography nor disavowal here.

Petitioner responds to this implicit construction by contending that "the plain and ordinary meaning of 'effective resolution' means the degree of detail, which may be measured by image quality including blurriness and sharpness—a meaning supported by undisputed evidence." Pet. Reply 17 (citing Pet. 56; Ex. 1017, 80–81; Ex. 1020, 7:15–17; Ex. 1003 ¶ 135). Petitioner relies on Jacobson (Ex. 1017), which determines resolution by calculating "resolving power," and Shabatay (Ex. 1020), which defines resolution using "spatial frequencies."

Neither party proposed a construction in its initial briefing for "effective resolution." Petitioner has not explained how its construction of "effective resolution" as image quality including blurriness and sharpness is supported by resolving power and determining spatial frequencies as recited in Jacobson and Shabtay.

We decline to agree with Patent Owner's implicit request to limit effective resolution to calculating an effective resolution score or with Petitioner's implicit definition as resolving power involving special frequencies. There is no indication that the patentee intended to limit the claim in that way or redefine effective resolution to be something that can only be determined by an effective resolution score.

The effective resolution score in the '898 patent does include a measure of sharpness, which tends to support Petitioner's construction that sharpness and blurriness are a part of "effective resolution." Ex. 1001, 6:20–

56

IPR2020-00861
Patent 10,230,898 B2

23 ("The effective resolution score can be derived from a combination of the sharpness scores and edge scores.").  We construe "effective resolution" as image quality including but not limited to blurriness and sharpness.

Petitioner relies on Togo's disclosure doing a comparison based on blurriness and sharpness, but does not explain how the comparison would be done or on what calculations (or strict derivation) it would be based.  Pet. 56 (citing Ex. 1010, code (57), ¶¶ 11, 12 ("telephoto imaging module with a long focal length is less sharp at close distances compared to a wide-angle imaging module whose focal length is short"), 57 ("a telephoto image 23 is blurry"), 50 ("Note that because image quality depends on a performance of a lens system that is used and the like, theoretically strict derivation is difficult.")).  Nevertheless, the patentee drafted the claim broadly to require only an "effective resolution" of one image to be lower than the effective resolution of another, rather than an effective resolution score lower than another image's effective resolution score.  Thus, we determine that Togo teaches the limitation of "an effective resolution of the Tele image being lower than an effective resolution of the Wide image." *See id.* at 55–57.

We have reviewed Petitioner's arguments and evidence concerning claim 4 and are persuaded that Petitioner sufficiently demonstrates by a preponderance of the evidence the unpatentability of this claim over the combination of Golan, Martin, and Togo.  *See id.* at 55–57.

### 7.     *Dependent Claims 8, 15*

Patent Owner does not present separate arguments for claims 8 and 15, which depend directly from claims 1 and 12 respectively.  *See generally* PO Resp.  We have reviewed Petitioner's arguments and evidence concerning claims 8 and 15 and are persuaded that Petitioner sufficiently

demonstrates by a preponderance of the evidence the unpatentability of these claims over the combination of Golan, Martin, and Togo. *See* Pet. 57–58, 59.

### E.    *Obviousness over Golan, Martin, Togo, and Levey*

#### 1.    *Overview of Levey (Ex. 1015)*

Levey concerns digital cameras and automatically selecting a photography mode. Ex. 1015 ¶ 2. In Levey, a user can select between different photography modes by "single button activation," instead of interacting with a multi-step menu selection process—this reduces the amount of user input required to select the photography mode. *Id.* ¶ 18.

#### 2.    *Dependent Claim 9*

Claim 9 depends from claim 8, which depends from claim 1. Claim 9 further recites "wherein the user inputs include a zoom factor, a camera mode and a region of interest." Ex. 1001, 13:8–9.

According to Petitioner,

> First, as discussed at [8.1], Golan teaches that the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs, where in the user inputs include a zoom factor. (APPL-1003), ¶157.
>
> Second, Levey describes "a photography mode user interface for selecting between a plurality of photography modes," and configuring its image sensor using associated image capture settings. (APPL-1015), Abstract, [0045], [0057], [0070][, ][0039], [0041], [0070]-[0071]; (APPL-1003), ¶158.

Pet. 61–62 (emphases omitted). As one reason for combining Golan, Martin, and Levey, Petitioner contends that

IPR2020-00861
Patent 10,230,898 B2

> a POSITA would have been motivated to incorporate Levey's
> teachings in the dual-aperture zoom digital camera of Golan
> combined with Martin to produce the obvious, beneficial, and
> predictable results of providing a plurality of camera modes "that
> can be selected by the user to control various elements of the
> image capture process and the image processing chain."

*Id.* at 60 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶ 153).

A portion of Martin cited by the Petition describes that "while

displaying the images, aligning **a user-selected region of interest**

associated with the first image with a corresponding region of interest of the

second image such that said region of interest of the first image occupies in

the display the same location as the region of interest in the second image."

Ex. 1006, 7:36–51 (emphasis added); Ex. 1003 ¶ 157.  A portion of Levey

cited by the Petition discloses that "[m]ost digital cameras have a variety of

photography modes that can be selected by the user to control various

elements of the image capture process and the image processing chain."

Ex. 1015 ¶ 4.  Levey further discloses determining "image capture settings

such as the exposure index, the lens F/# [F number], the exposure time and

the electronic flash setting, as well as other user settings 175, such as those

discussed with reference to FIG. 2," with respect to an automatic mode.  *Id.*

¶ 70.  As an example, Levey discloses, in a portion cited by the Petition, that

"if a user is capturing images at a soccer game, they would typically set the

camera to operate in a sport photography mode" which "would generally

choose appropriate image capture settings to minimize the motion blur

associated with moving subjects."  *Id.* ¶ 71.

Patent Owner argues because Levey uses a preview setting that is of

lower quality "a POSITA would thus not be motivated to apply Levey's

teaching to the task of selecting an appropriate lens based on a zoom setting

IPR2020-00861
Patent 10,230,898 B2

for use in the preview window." Ex. 2001 ¶ 99.  However, a portion of Levey cited in the Petition recites that the image sensor is actuated by a timing generator when capturing video images ***and also*** when previewing a still image.  Ex. 1015 ¶ 39 (emphasis added).  Patent Owner has not explained sufficiently why Levey is limited to a preview mode.

Patent Owner also argues Levey's preview mode is not appropriate for "the task of selecting an appropriate lens based on a zoom setting.  Claim 9 is not limited to the task of selecting an appropriate lens based on a zoom setting and Patent Owner has not explained sufficiently why claim 9 would be limited to such a task.

Patent Owner argues that a person of ordinary skill in that art would be familiar with photography.  We analyze this claim under that level of skill and, below, without Patent Owner's proposed familiarity with photography.  Under that level of skill Patent Owner argues

> a POSITA that had additional knowledge, skill and experience in photography would understand that for each and every individual example of a photography mode enumerated by Levey, the photographer may want to access multiple settings of the preview display for framing a shot. For example, each photography mode enumerated by Levey may be executed using a wide-angle or telephoto zoom setting, as the choice of photography mode is independent of the choice of framing.

PO Resp. 45 (citing Ex. 2001 ¶¶ 101–103; Ex. 2003).  Patent Owner has not explained sufficiently why the distinction between framing and photography mode would mean that one of ordinary skill would not have wanted both options available on a dual lens camera.  We are persuaded by Petitioner's contention that one of ordinary skill would have been motivated to have both features.  Pet. 60 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶¶ 153–159).

IPR2020-00861
Patent 10,230,898 B2

Patent Owner also argues "Petitioner seeks to intermix Levey's 'photography mode' with Levey's 'camera mode' since Levey's user input innovation is used to control ***photography mode,*** not ***camera mode*** as required by Claim 9." PO Resp. 47. To the extent Patent Owner is correct that photography mode is different than camera mode, Patent Owner has not explained sufficiently how that difference would have prevented the use of Levey's user input with camera modes. Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues "A POSITA would not necessarily be familiar with photography and would therefore not necessarily understand how settings involving the preview display used for framing shots would be related to the settings used for a 'photography mode.'" *Id.* at 44–45. Again, regardless of one of ordinary skill's knowledge of a preview display used for framing shots, he or she would either have recognized the photography modes as camera modes as claimed or recognized that Levey's user input for adjusting photography modes could be combined with Golan's and Martin's user controls.

Patent Owner also repeats its argument that Martin involves post-acquisition activity and the '898 patent involves pre-processing activity. Specifically, Patent Owner argues "the '898 [patent] discloses the selection of a region of interest ***before*** the still image is acquired whereas Martin discloses the selection of a region of interest ***after*** the images used for autostereoscopic display have been acquired." *Id.* at 48. We rejected this argument above at Section III.D.4. Nevertheless, the claims do not distinguish pre-acquisition and post-acquisition and Patent Owner has not explained sufficiently why pre-acquisition and post-acquisition are

IPR2020-00861
Patent 10,230,898 B2

incompatible such that they cannot be combined or undermine the reasons for combining presented by Petitioner. Thus, Patent Owner's argument does not undermine Petitioner's showing. We are persuaded by Petitioner's contention that Martin describes that "aligning **a user-selected region of interest** associated with the first image with a corresponding region of interest of the second image." Pet. 61–62 (quoting Ex. 1006, 7:36–51; citing Ex. 1003 ¶ 157).

We are persuaded that Golan discloses the user control module and the sensor control module in the claimed camera controller, Martin discloses "a user-selected region of interest," and Levey discloses "wherein the user inputs include a zoom factor, a camera mode and a region of interest" based on the cited portions of Golan and Levey. We are persuaded also that Petitioner's rationale for combining Golan, Martin, Togo, and Levey is supported by sufficient rational underpinning, based on the entirety of the record developed at trial. *See KSR*, 550 at 418. Accordingly, we are persuaded the combination of Golan, Martin, and Levey teaches the limitations recited in claims 9. Thus, we are persuaded that Petitioner has shown, by a preponderance of the evidence, the unpatentability of these claims over the combination of Golan, Martin, Togo and Levey.

### F.    *Obviousness over Golan, Martin, Togo, and Border*

#### 1.    *Overview of Border (Ex. 1009)*

Border describes providing a digital camera with an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range." Ex. 1009 ¶ 10. As shown in Figure 5 of Border, reproduced below, the processor of a digital camera includes an image compositor 202 to form a

IPR2020-00861
Patent 10,230,898 B2

composite image 208 using the two images, wide image 204 and telephoto image 206 of the same scene, that are captured using lenses having different focal lengths. *Id.* ¶ 70.



*FIG. 5*

As seen in Figure 5, above, the image registration determiner 212 determines the registration between the wide image 204 and the telephoto image 206, so that the two images are matched to "locate the high-resolution image accurately into the low-resolution image and then stitched into place so the edge between the two images in the composite image is not discernible." *Id.* ¶ 29, Fig. 5. Border goes on to explain that in the context of Figure 5, telephoto image 206 captures a smaller portion of the scene, but with greater resolution than wide image 204. *Id.* ¶ 36.

Border also describes that an image resampler 214 of the processor produces the composite image 208 based on a zoom amount Z specifying the desired relative zoom amount of the produced composite image 208. *Id.* ¶ 43. Specifically, Border explains that the composite image 208 is generated from the two images and that the resulting composite image is produced differently for different zoom amount values, such as Z=1,

1<Z<M, and Z=M, where M is the relative magnification ratio M of the telephoto image 206 to the wide image 204. *Id.* ¶¶ 29, 44.

### 2.    *Dependent Claims 11 and 19*

Claim 11, which depends from claim 1, further recites "wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view." Ex. 1001, 13:13–17.  Claim 19, which depends from claim 12, further recites essentially the same features. *Id.* at 14:26–30.

According to Petitioner,

> Border describes providing a digital camera include lenses having different focal lengths for an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range."

> As shown in Figure 5 of Border. . . , the processor of the digital camera includes an image compositor 202 to form a composite image 208 using the two images, wide image 204 and telephoto image 206.

Pet. 63 (citing Ex. 1003 ¶¶ 162–165) (citations omitted).  Petitioner contends that

> [a] POSITA would have been motivated to apply Border's teachings of combining in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view in the digital camera of Golan combined with Martin and Togo to achieve the benefit of 'a zoomed image with high resolution throughout the zoom range and improved image quality' in still mode as taught by Border.

*Id.* at 64 (citing Ex. 1009, code (57); Ex. 1003 ¶¶ 166–169).  Petitioner contends that in its combination

IPR2020-00861
Patent 10,230,898 B2

> Golan's zoom control sub-system 100 (as applied in combination
> with Martin and Togo) is adapted to apply Border's teaching of
> still mode operation in which wide image and telephoto image
> are combined, which for zoom amounts between 1 and M (a
> relative magnification ratio of Tele image to Wide image), uses
> registration information to transform coordinates of the telephoto
> image to the wide image and produces a composite image having
> the point of view of the wide image.

*Id.* at 70.

Patent Owner argues that none of Golan, Togo, and Border creates a
fused image from a particular point of view. PO Resp. 49–50. Patent
Owner does not offer a construction of the term "point of view." Patent
Owner implies that "distortion" is required to change a point of view. *Id.*
Patent Owner has not cited to evidence explaining sufficiently what
distortions are required or why translation and rotation are not enough to
change a point of view. We are persuaded by Petitioner's contention that
Border teaches using registration information to transform coordinates of the
telephoto image to the wide image and produces a composite image having
the point of view of the wide image.[21]

Patent Owner also does not offer a construction for the term "fused."
Patent Owner argues that Border results in an image "consist[ing] of a
quadrilateral portion from the telephoto point of view surrounded by a

---

[21] In an appeal of a related IPR, a similar argument regarding whether a
related patent required resolving occlusions cause by different points of view
was rejected by the Federal Circuit *Apple Inc. v. Corephotonics Ltd.*,
IPR2018-01133, Paper 34 (PTAB Dec. 2, 2019), *aff'd* 857 F. App'x 641
(Fed. Cir. 2021) (nonprecedential). That similar argument was based in part
on the essentially the same "rectification" and/or distortion process argued
by Patent Owner in this IPR. *Id.*

IPR2020-00861
Patent 10,230,898 B2

remaining image portion from the wide-angle point of view." *Id.* at 50.
Even if we agree with Patent Owner's characterization of Border, Patent
Owner has not explained sufficiently how such a combination of the Wide
and Tele images would not be considered as being from the Wide point of
view based on the transformation of coordinates that was done. *See* Pet. 70.

Patent Owner also suggests that "fus[ing]" as claimed requires
"rectification" as shown in Figure 3C of the '898 patent and excludes any
parallax. PO Resp. 51–53. Patent Owner implicitly argues that a limitation
to rectification should be read into the claims. Notwithstanding the
importance of a specification, limitations in the specification must not be
read into the claims absent lexicography or disclaimer/disavowal. *Hill-Rom
Services, Inc.*, 755 F.3d at 1371. Thus, absent a clear disavowal or
alternative lexicography by a patentee, he or she "is free to choose a broad
term and expect to obtain the full scope of its plain and ordinary
meaning." *Thorner v. Sony Comput. Entm't Am. LLC,* 669 F.3d 1362, 1367
(Fed. Cir. 2012).

We decline to require the rectification process in order to fuse two
images to a particular point of view as claimed. *See* Pet. Reply 21. Thus,
Patent Owner's argument does not undermine Petitioner's showing. We are
persuaded by Petitioner's reliance on Border's use of registration
information to transform coordinates of the telephoto image to the wide
image and produce a composite image having the point of view of the wide
image. *See* Pet. 70.

We have reviewed the cited portions of Border and are persuaded the
combination of Golan, Martin, Togo, and Border teaches the limitations
recited in claims 11 and 19. We are further persuaded that Petitioner's

rationale for combining Golan, Martin, Togo, and Border is supported by sufficient rational underpinning. Accordingly, we are persuaded Petitioner has shown, by a preponderance of the evidence, the unpatentability of these claims over the combination of Golan, Martin, Togo and Border.

G.   *Obviousness over Golan, Martin, Togo, and Parulski*

1.   *Overview of Parulski (Ex. 1008)*

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex. 1008, 1:8–10. In one embodiment, an image capture assembly can be a digital camera that includes two image capture stages. *See id.* at 12:36–45. The two image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes, and the other is used for capturing an image. *Id.* at 8:9–13. This allows for improved imaging capability without unduly increasing the size or cost of the digital camera. *Id.* at 8:13–16. In one example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens. *Id.* at 23:28–40. An image processor that "may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface . . . ." *Id.* at 23:54–56.

2.   *Dependent Claims 10 and 20*

Claim 10, which depends from claim 1, further recites "wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1." Ex. 1001, 13:10–12.

IPR2020-00861
Patent 10,230,898 B2

Petitioner contends "[a] POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ('less than unit')." Pet. 76 (citing Ex. 1003 ¶ 189). Petitioner further contends that to the extent that Patent Owner argues that Golan does not explicitly describe tele lens 120 as a telephoto lens as claimed, it would have been obvious to a POSITA to implement Golan's tele lens 120 with "a fixed focal length **telephoto lens**" having TTL/EFL smaller than 1 as taught in Parulski for the benefit of a "very small figure." *Id.* at 77 (citing Ex. 1008, 23:38, 24:20–21; Ex. 1003 ¶ 190).

As rationale for combining, Petitioner contends that a POSITA would have been motivated to apply Parulski's teachings of, in still mode, combining Wide and Tele image data only in focused areas to generate a fused output image in the system of Golan combined with Martin and Togo for the benefit of a fused output image having a broadened depth of field, at a predefined range of ZF values (e.g., the large lossless zooming range described in Golan) in such a digital camera. *Id.* at 74 (citing Ex. 1008, 28:52–53, 29:4–7, 30:17–20; Ex. 1003 ¶¶ 181–185).

Patent Owner argues

Petitioner confuses the fusion disclosed by Golan, used to fuse the color of a low-resolution image with the detail of a high-resolution monochromatic image, with block 514 of Parulski that uses an "enhancement signal" to "sharpen portions of the primary still image that are positioned near the secondary focus distance." Ex. 2001, ¶122; Ex. 1003, ¶185; Ex. 1008, 22:40-42. Parulski lacks sufficient disclosure for a POSITA to understand what source of "enhancement signal" was available from the combination of Golan, Martin and Togo. Togo estimates the distance to the subject, but this distance is a single value for the entire pair of wide-angle and telephoto images and does not

68

indicate which pixels from which image should be used. Ex. 2001, ¶122.

PO Resp. 53–54. As to Golan and Parulski, Petitioner contends a person of ordinary skill "would have been motivated to apply Parulski's teachings of still mode fusion to a still mode of Golan, while in video mode, maintaining Golan's design choice of video switching (e.g., for the benefit of reduced computation power of video switching over video fusion)." Pet. Reply 21–22 (citing Pet. 74) (emphasis omitted). We agree and adopt and rely on Petitioner's contentions explained above. As to Togo's estimate of distance and Border's enhancement signal, we do not find this argument persuasive because it is directed to bodily incorporation and not to what the combined teachings would have suggested to one of skill in the art. *In re Keller*, 642 F.2d 413, 425 (CCPA 1981); Pet. Reply 22.

We are persuaded that the cited portions of Golan, Martin, Togo, and Parulski teach the limitations recited in claim 10. We are also persuaded that the ordinarily skilled artisan would have combined Golan, Martin, and Parulski.

Claim 20, which depends from claim 12, further recites "the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image includes configuring the camera controller to combine Wide and Tele image data only in focused areas." Ex. 1001, 14:31–36.

Petitioner contends that "Golan's zoom control sub-system 100 (as applied in combination with Martin and Togo in claim 12) is adapted to apply Parulski's teaching of still mode operation in which wide image and telephoto image are combined only in focused areas, which for a

IPR2020-00861
Patent 10,230,898 B2

predetermined lossless zooming range, produces a fused output image having a broadened depth of field." Pet. 80 (citing Ex. 1003 ¶¶ 192–196). We are persuaded that the cited portions of Golan, Martin, Togo, and Parulski teach the limitations recited in claim 20.

Patent Owner also argues that it would require "undue experimentation" to combine the references because "Parulski does not disclose this 'enhancement signal,' nor does Parulski disclose how this enhancement signal is used to sharpen pixels in the primary still image." PO Resp. 55. To the extent that Patent Owner argues that Border is not enabled, "[i]n general, a prior art reference asserted under § 103 does not necessarily have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to the obviousness inquiry." *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021).

Additionally, we do not find Patent Owner's argument regarding combining the enhancement signal of Parulski with Golan and Martin persuasive because it is directed to bodily incorporation and not to what the combined teachings would have suggested to one of skill in the art. *In re Keller*, 642 F.2d at 425; Pet. Reply 23. As to the feasibility of the combination, we credit Dr. Durand's testimony that the combination would have been within the ordinary skill in the art. Ex. 1003 ¶¶ 192–196; Ex. 1040 ¶ 101.

Patent Owner also argues

Parulski['s] "broadened depth of field" that Petitioner points to addresses an entirely different issue than the one addressed and required by Claim 20. Ex. 2001, ¶129. In light of the specification, a POSITA would understand Claim 20 "focus" in the context of "[t]he ROI is the region of interest on which both cameras are focused on." Ex. 1001, 6:50-51. This region of

IPR2020-00861
Patent 10,230,898 B2

interest is used specifically for the fusion of Wide and Tele images. "… [T]he position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area." *Id*. at 7:54-56. A POSITA would understand Claim 20 "to combine … *at least some* of the Wide and Tele image data to provide a *fused* output image includes configuring the camera controller to *combine Wide and Tele image data only in focused areas*" (emphasis added). In other words, a POSITA reading claim 20 in light of the '898 specification would understand the requirement to only fuse (transform to the same point of view) the same portion of the Wide and Tele images only where *both* were in focus. Dr. Durand uses Parulski to show how one might combine portions of images together where *either* was in focus. Ex. 2001, ¶129.

PO Resp. 55–56. Petitioner responds

PO's reliance upon "position matching [] achieved only in the ROI region" (POR, 56) is inapposite because that description is for "Video Mode Operation/Function," not for still mode as claimed. (APPL- 1001), 7:40-56. On the contrary, the '898 Patent describes under "**Still Mode** Operation/Function" that image processing "fuses the wide and the Tele images to…**provide wide dynamic range**," (APPL-1001), 7:14-30, which is consistent with the issue addressed by Parulski's fusion to provide 'broadened depth of field.' APPL-1040, ¶102.

Pet. Reply 23 (alterations in original). We agree with Petitioner that Petitioner's contentions in the Petition rely on the still mode function and thus, Patent Owner's argument does not undermine Petitioner's showing.

For the foregoing reasons, we are persuaded the combination of Golan, Martin, and Parulski teaches the limitations recited in claims 10 and 20. We are further persuaded that Petitioner's rationale for combining Golan, Martin, Togo, and Parulski is supported by sufficient rational underpinning. Accordingly, Petitioner has shown by a preponderance of the

IPR2020-00861
Patent 10,230,898 B2

evidence the unpatentability of these claims over Golan, Martin, Togo, and Parulski.

## IV.    CONCLUSION

For the foregoing reasons, we conclude that Petitioner has established unpatentability of: claims 1–4, 8, 12, and 15 over Golan, Martin, and Togo; claim 9 over Golan, Martin, Togo, and Levey; claims 11 and 19 over Golan, Martin, Togo, and Border; and claims 10 and 20 over Golan, Martin, Togo, and Parulski.[22]  Our conclusions regarding the challenged claims are summarized below:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 8, 12, 15 | 103 | Golan, Martin, Togo | 1–4, 8, 12, 15 | |
| 9 | 103 | Golan, Martin, Togo, Levey | 9 | |
| 11, 19 | 103 | Golan, Martin, Togo, Border | 11, 19 | |
| 10, 20 | 103 | Golan, Martin, Togo, Parulski | 10, 20 | |

---

[22] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-00861
Patent 10,230,898 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| **Overall Outcome** | | | 1, 4, 8–12, 15, 19, 20 | |

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent are determined to be unpatentable; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00861
Patent 10,230,898 B2

PETITIONER:

David W. O'Brien
Andrew S. Ehmke
Hong Shi
HAYNES AND BOONE, LLP
david.obrien.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
hong.shi.ipr@haynesboone.com

PATENT OWNER:

Neil A. Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

Trials@uspto.gov                                                     Paper 35
571-272-7822                                      Entered: December 7, 2021

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

IPR2020-00862
Patent 10,356,332 B2

———————

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

MOORE, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00862
Patent 10,356,332 B2

## I.     INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1, 2, 5, 9–14, 17, 21, and 22 ("the challenged claims") of U.S. Patent No. 10,356,332 B2 (Ex. 1001, "the '332 patent").  Paper 2 ("Pet.").  Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").

We instituted an *inter partes* review.  Paper 7 ("Institution Decision" or "Inst. Dec."); *see* 35 U.S.C. § 314(a) (2018); 37 C.F.R. § 42.4(a).  Patent Owner filed a Response (Paper 13, "Patent Owner Response" or "PO. Resp.").[1]  Petitioner filed a Reply (Paper 21, "Petitioner's Reply" or "Pet. Reply").[2]  Thereafter, Patent Owner filed a Sur-Reply (Paper 25, "Patent Owner Sur-Reply" or "PO Sur-Reply").[3]

An oral hearing was held on September 9, 2021 and a transcript (Paper 34, "Tr.") was entered in the record.

We have jurisdiction pursuant to 35 U.S.C. § 6.  This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial.  Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent are unpatentable.

---

[1] We cite to the sealed version of Patent Owner's Response (Paper 13).  The public version is Paper 14.
[2] We cite to the sealed version of Petitioner's Reply (Paper 21).  The public version is Paper 22.
[3] We cite to the sealed version of Patent Owner's Sur-Reply (Paper 25).  The public version is Paper 26.

IPR2020-00862
Patent 10,356,332 B2

## II.    BACKGROUND

### A.    Related Proceedings

Petitioner and Patent Owner identify the following corresponding district court proceeding: *Corephotonics, Ltd. v. Apple Inc.*, Case No. 5:19-cv-04809 (N.D. Cal.).  Pet. 2; Paper 4, 1.[4]

We identify the following related administrative matters, including applications and patents claiming the benefit of the priority of the filing date of patents in the priority chain of the '332 patent.  *See* Office Consolidated Trial Practice Guide[5] at 18; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019) (explaining what is considered an "administrative matter").  The '332 patent is a continuation of Application No. 15/324,720 (now U.S. Patent No. 10,230,898, "the '898 patent").  Ex. 1001, code (63).  The following co-pending proceeding challenges a patent in the priority chain of the '942 patent:  IPR2020-00861 (claims 1, 4, 8-12, 15, 19, and 20 of the '898 patent).

### B.    The '332 Patent

The '332 patent is titled "Dual Aperture Zoom Camera with Video Support and Switching / Non-Switching Dynamic Control," and is directed to a "dual aperture zoom digital camera operable in both still and video modes."  Ex. 1001, code (57).

---

[4] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, Case No. 3:19-cv-04809-LHK (N.D. Cal.) (Paper 4, 1), but this case number appears to reflect a typographical error.  A PACER search of Case No. 5:19-cv-04809 reveals that Patent Owner's complaint in that case was erroneously identified as "Civil Action No. 3:19-cv-4809" on its cover page.
[5] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-00862
Patent 10,356,332 B2

The '332 patent describes video mode zoom operation from low zoom factor (ZF) to higher ZF above a switch point (described variously as Z*switch* or $ZF_T$ or uptransfer ZF), with "[processing] applied to eliminate the changes in the image during crossover from one camera to the other." *Id.* at 7:61–8:34.

The '332 patent describes that "[s]witching from the Wide camera output to the transformed Tele camera output will be performed unless some special condition (criterion), determined based on inputs obtained from the two camera images, occurs.  In other words, switching will not be performed only if [a] no switching criteria is fulfilled." *Id.* at 10:7–12.

FIG. 1A of the '332 patent, reproduced below, illustrates a dual-aperture Zoom imaging system 100 including a Wide imaging section and a Tele imaging section, each having a respective lens with respect field of view (FOV) and respective image sensor to provide image data of an object or scene.

4

IPR2020-00862
Patent 10,356,332 B2



FIG. 1A

Figure 1A shows a dual-aperture zoom imaging system. *Id.*

C.    *Challenged Claims*

Petitioner challenges claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent.  Claims 1 and 13 are independent.  Claim 1 is reproduced below.

1. A dual-aperture zoom digital camera comprising:

a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;

b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower

IPR2020-00862
Patent 10,356,332 B2

than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and

c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein at a zoom factor (ZF) value greater than a zoom factor $ZF_T$=tangent ($FOV_{Wide}$)/tangent ($FOV_{Tele}$), if the no-switching criterion is fulfilled the camera controller is further configured to output a zoom video output image that includes only digitally-zoomed Wide image data, and if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

Ex. 1001, 12:32–54.

### D.    *Asserted Grounds of Unpatentability*

Petitioner challenges claims 1, 2, 5, 9–14, 17, 21, and 22 as follows. *See* Pet. 7.

IPR2020-00862
Patent 10,356,332 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 2, 5, 9, 13, 14, 17 | 103 | Golan[6], Martin[7], Togo[8] |
| 10 | 103 | Golan, Martin, Togo, Levey[9] |
| 12, 21 | 103 | Golan, Martin, Togo, Border[10] |
| 11, 22 | 103 | Golan, Martin, Togo, Parulski[11] |

In support, Petitioner relies on the declaration of Dr. Frédo Durand (Ex. 1003).

## III.    ANALYSIS

### A.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the

---

[6] U.S. Patent Application Publication No. 2012/0026366 A1, published Feb. 2, 2012 (Ex. 1005, "Golan").
[7] U.S. Patent No. 8,081,206 B2, issued Dec. 20, 2011 (Ex. 1006, "Martin").
[8] Japanese Patent Application Publication No. JP 2011/055246 (P2011-55246A), published Mar. 17, 2011 (Ex. 1010, "Togo"); we refer to the English translation.
[9] U.S. Patent Application Publication No. 2012/0019704 A1, published Jan. 26, 2012 (Ex. 1015, "Levey").
[10] US Patent Application Pub. No. 2008/0030592 A1, filed Aug. 1, 2006, published Feb. 7, 2008 (Ex. 1009, "Border").
[11] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1008, "Parulski").

IPR2020-00862
Patent 10,356,332 B2

prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

### B.    Level of Ordinary Skill in the Art

Petitioner contends

[A] Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's degree or the equivalent degree in electrical and/or computer engineering, or a related field and 2–3 years of experience in imaging systems including optics and image processing. Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.

Pet. 6 (citing Ex. 1003 ¶ 17). Patent Owner argues Petitioner's definition of a person of ordinary skill in the art improperly fails to require knowledge,

IPR2020-00862
Patent 10,356,332 B2

skills or experience in the specific field of photography.  PO Resp. 8.
According to Patent Owner, the field of photography would represent
knowledge, skills and experience that include, e.g., the choice of lens,
exposure, aperture and other settings appropriate for the aesthetics of a given
shot.  *Id.*  Additionally, Patent Owner argues that neither an engineering
education nor experience in imaging systems, even if they were focused on
optics and image processing, require any knowledge, skills or experience in
the field of photography.  *Id.* at 8–9 (citing Ex. 2001 ¶¶ 30–32 (Hart
declaration)).  "The importance of resolving the level of ordinary skill in the
art lies in the necessity of maintaining objectivity in the obviousness
inquiry."  *Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714, 718 (Fed. Cir.
1991).  "A less sophisticated level of skill generally favors a determination of
[non-obviousness] . . . while a higher level of skill favors the
reverse."  *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323
(Fed. Cir. 2011).

    Here, as explained below in Section III.E.2., under either articulation
of the level of skill in the art Petitioner has shown the claims would have
been obvious.  Therefore, we do not need to determine whether knowledge
of photography is required for the level of skill in this case.  *Okajima v.
Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (Where a determination of
level of skill would not change the result "we find no harm under the
circumstances of this case in the Board's failure to set forth express findings
as to the level of skill.").

    For the reasons above, we determine, on the full record before us, that
the level of ordinary skill in the art proposed by Petitioner is consistent with

IPR2020-00862
Patent 10,356,332 B2

the '332 patent and the asserted prior art.  We adopt that level for the purpose of this Decision.

### C.    Claim Construction

For *inter partes* reviews filed on or after November 13, 2018, we apply the same claim construction standard used by Article III federal courts and the ITC, both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny.  37 C.F.R. § 42.100(b). Accordingly, we construe each challenged claim of the '332 patent to generally have "the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."

Petitioner asserts "for the purposes of this proceeding and the analysis presented herein, no claim term requires express construction [and that it] analyzes the claims consistent with ordinary and customary meaning as would be understood by a POSITA in light of the specification."  Pet. 8. Patent Owner does not request construction of any claim term.  *See generally* PO Resp. [12]

---

[12] Patent Owner proposed a construction for the limitation "no-switching criterion," as recited in each of the challenged claims in its Preliminary Response.  Prelim. Resp. 7–8.  Patent Owner asserted "no-switching criterion" should be construed as "one more criteria determined based on inputs obtained from the two camera images."  *Id.* at 7.  In the Institution Decision, we did not limit "no-switching criterion" to "one more criteria determined based on inputs obtained from the two camera images."  Patent Owner did not address claim construction in its Patent Owner Response.  *See generally* PO Resp.  Our Scheduling Order states that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."  Paper 8, 8.  Thus, Patent Owner's proposed construction for the limitation "no-switching criterion" is waived and we do not explicitly

IPR2020-00862
Patent 10,356,332 B2

We do not discern a dispute between the parties regarding any limitation and we need not expressly construe any limitation to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D.    Obviousness over Golan, Martin, and Togo

Petitioner contends that claims 1, 2, 5, 9, 13, 14, and 17 are unpatentable as obvious under 35 U.S.C. § 103 over Golan, Martin, and Togo. Pet. 11–58. For the reasons that follow, we determine that the evidence sufficiently supports Petitioner's arguments and thus establishes by a preponderance of evidence that claims 1, 2, 5, 9, 13, 14, and 17 would have been obvious over Golan, Martin, and Togo.

### 1.    Overview of Golan (Ex. 1005)

Golan concerns a "method for continuous electronic zoom in a computerized image acquisition system," in which the system has "a wide image acquisition device and a tele image acquisition device." Ex. 1005, code (57). By providing "multiple imaging devices each with a different fixed field of view (FOV)," Golan's system "facilitates a light weight electronic zoom with a large lossless zooming range." *Id.* ¶ 9. Golan's Figure 1, reproduced below, illustrates a zoom control sub-system for an image acquisition system. *Id.* ¶ 26.

---

construe the term for the purpose of this Decision. *In re NuVasive, Inc.*, 842 F.3d 1376, 1380–81 (Fed. Cir. 2016).

IPR2020-00862
Patent 10,356,332 B2



## Fig 1

Figure 1 of Golan illustrates a zoom control sub-system for an image acquisition system.  *Id.*

According to Golan, "[z]oom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150."  *Id.* ¶ 37.  Zoom control circuit 130 selects an appropriate image sensor through image sensor selector 150 and calculates a camera zoom factor when it receives a required zoom from an operator.  *Id.* ¶ 39. Golan's system facilitates "continuous electronic zoom capabilities with

IPR2020-00862
Patent 10,356,332 B2

uninterrupted imaging," which "is also maintained when switching back and forth between adjacently disposed image sensors." *Id.* ¶ 40.

### 2.    *Overview of Martin (Ex. 1006)*

Martin concerns a method for generating an autostereoscopic display by aligning a first parallax image and at least one other parallax image. Ex. 1006, code (57). By manipulating parallax images—two or more images with overlapping visual fields but different points of view—Martin's method creates a moving three-dimensional image without the use of special viewing aids, i.e., an autostereoscopic display. *Id.* at 1:16–20; 3:32–41. Martin's Figure 1, reproduced below, illustrates a method of capturing parallax images. *Id.* at 3:41–51.



**FIG. 1**

Figure 1 of Martin illustrates exemplary camera positions for generating parallax images. *Id.* at 3:17–18.

According to Martin, "a camera 10 may capture a first set of images and a camera 12 may capture a second set of images of a common scene 14 while being displaced from one another. The resulting sets of images from cameras 10 and 12 will be parallax images." *Id.* at 3:42–46. Martin

13

IPR2020-00862
Patent 10,356,332 B2

discloses generating a set of aligned parallax images by displaying alternating views of two or more parallax images at a desired view rate and manipulating the images such that at least a portion of the images are aligned with each other. *Id.* at 3:6–13. Figures 3a–3d, reproduced below, illustrate an alignment process.



FIG. 3a          FIG. 3b

FIG. 3c          FIG. 3d

Figures 3a–3d of Martin illustrate a transformation process for
aligning parallax images. *Id.* at 3:20–22.[13]

In Martin, "[t]he alignment matching process begins by selecting a reference image 30, as shown in FIG. 3a, from a set of parallax images. Once reference image 30 has been selected, other images 32, as shown in FIG. 3b, from the parallax image set can be aligned to reference image 30." *Id.* at 4:39–43. "Reference image 30 may include region of interest 34." *Id.* at 4:51. "Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34′ matches alignment with region 34, as illustrated in

---

[13] According to Petitioner, "[a] POSITA would have understood that element 34′ in FIG. 3b referring to a circle is a clerical error, and instead corresponds to the rectangle [corresponding to region 34]." Pet. 16 n.1.

IPR2020-00862
Patent 10,356,332 B2

FIG. 3d." *Id.* at 4:54–56. "The manipulation process may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation." *Id.* at 4:56–59.

Martin discloses that a computer may align the images using convergence points in the images. *Id.* at 5:6–11. "The computer may further perform pattern matching or feature extraction algorithms . . . to match alignment of regions of interest in the selected images at or near the selected convergence points." *Id.* at 5:11–28. The computer may continuously adjust the transformation parameters to achieve "critical alignment," corresponding "to a condition where the degree of alignment is sufficient to achieve a stable auto-stereoscopic display. Stability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58. Martin further discloses that the process may include "parallax image manipulations of sub-pixel resolution to achieve critical alignment . . . where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

### 3. *Overview of Togo (Ex. 1010)*

Togo is titled "Telephoto Imaging Device," and discloses improvements for "[d]igital cameras and imaging devices (cameras) of mobile terminal devices such as mobile phones" that "realize a zoom function by using a plurality of imaging modules made of a plurality of lenses with different focal lengths— that is, lenses of different fixed magnifications." Ex. 1010 ¶¶ 2, 7, code (54).

Togo describes switching between the respective imaging modules according to a magnification (zoom factor) set by a user. *Id.* ¶ 7. "For

15

IPR2020-00862
Patent 10,356,332 B2

example, in a configuration . . . with a wide-angle lens and . . . a telephoto lens, when a subject is at a short distance, an image . . . [from] the wide-angle lens, which has a short focal length, is switched to, and when the subject is at a long distance, an image . . . [from] the telephoto lens is switched to." *Id.* ¶ 8. "Small changes in magnification are realized by electronic zooming, which changes [to] a cutout region" of the switched-to image. *Id.*

Togo teaches a zoom digital camera with "[a] first imaging module 1 . . . for a wide-angle image" including a "wide angle lens system 7" and "a first imaging element 8 such as a CCD camera . . ." (a Wide imaging section). *Id.* ¶ 23. Togo's zoom digital camera also includes "[a] second imaging module 2 . . . for a telephoto image" including a "telephoto lens system 10" and "a second imaging element 11 such as a CCD camera" (a Tele imaging section). *Id.* ¶ 26.

### 4.    Independent Claim 1

Patent Owner explicitly contests Petitioner's showing as to motivation to combine, and the last limitation of claim 1 which recites "a camera controller . . . ," and presents secondary considerations of non-obviousness. We discuss Petitioner's contentions as to each limitation and Patent Owner's arguments below.

> *"A zoom digital camera comprising:*
>
> *a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;*
>
> *b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that*

16

> *is narrower than FOV_W and a Tele sensor, the Tele*
> *imaging section operative to provide Tele image*
> *data of the object or scene"*

Petitioner contends that the embodiment depicted in Figure 1 of Golan teaches "a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image." Pet. 32 (citing Ex. 1005 ¶¶ 3, 9, code (54); Ex. 1003 ¶¶ 66–70). Petitioner explains that Golan's image acquisition system includes, "tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* at 33 (citing Ex. 1005, 37, 39, Fig. 1; Ex. 1003 ¶ 63; Ex. 1001, 3:29).

Petitioner further contends that Golan teaches the claimed Wide imaging section and Tele imaging section. *Id.* at 34–38. Specifically, Petitioner argues Golan discloses "a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with FOV [Field of View] 142 (Wide field of view FOV) and a wide image sensor 112 (Wide sensor)." *Id.* at 34 (citing Ex. 1005 ¶¶ 36–37, Fig. 1; Ex. 1003 ¶ 72); *see id.* at 35 (citing Ex. 1001, 7:3–5; Ex. 1003 ¶¶ 73–78; Ex. 1005 ¶¶ 9, 36, 37, 43; Ex. 1017, Fig. 4.13, 48 (Jacobson photography textbook)). Petitioner also contends that Golan's zoom control sub-system 100 includes "a Tele imaging section that includes a tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV)." *Id.* at 36 (citing Ex. 1003 ¶ 82; Ex. 1005 ¶¶ 36, 37, code (57), Fig. 1); *see id.* at 37 (citing Ex. 1003 ¶¶ 83; Ex. 1005 ¶¶ 9, 36, 37, 39, 43). Petitioner further asserts that Golan discloses that "wide FOV 142 is substantially wider than

IPR2020-00862
Patent 10,356,332 B2

narrow FOV 140." *Id.* at 37 (quoting Ex. 1005 ¶ 43) (citing Ex. 1003 ¶ 78; Ex. 1005 ¶¶ 9, 37, Fig. 1) (emphasis omitted).

Patent Owner does not specifically address the preamble and the Wide and Tele imaging sections of claim 1. Having reviewed the cited evidence and Petitioner's contentions, we determine that Petitioner's contentions are sufficiently supported.[14]

> "c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein at a zoom factor (ZF) value greater than a zoom factor $ZF_T$=tangent $(FOV_{Wide})$/tangent $(FOV_{Tele})$, if the no-switching criterion is fulfilled the camera controller is further configured to output a zoom video output image that includes only digitally-zoomed Wide image data, and if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data."

Petitioner contends that "Golan's zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections for receiving a requested zoom and provides an acquired image frame with the requested zoom." Pet. 38–39 (citing Ex. 1003 ¶ 87–91); *see id.* at 39–40 (citing Ex. 1005, Figs. 1 and 2, claim 1, ¶¶ 48, 49; Ex. 1003 ¶¶ 88, 89).

Petitioner relies on the combination of Golan, Martin, and Togo to teach the claimed configuration of the camera controller. *Id.* at 39–54.

---

[14] We need not determine whether the preamble is limiting because Petitioner shows sufficiently that it is satisfied by the prior art.

IPR2020-00862
Patent 10,356,332 B2

Specifically, Petitioner contends that "Golan teaches a zoom switching setting that depends on the Wide and Tele fields of view, including a predetermined switch zoom factor $ZF_T$=tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)." *Id.* at 40 (citing Ex. 1003 ¶ 93).

Petitioner contends that "Golan describes that in an example, such a large lossless zooming range has a value of (Wide_FOV/Narrow_FOV)$^2$, which is provided by 'switching between the image sensors' and performing digital zoom to both Wide and Tele images." *Id.* at 41 (citing Ex. 1005 ¶ 9). Petitioner asserts "that [a] POSITA would have understood that the underlying geometric relationships and as such, would have understood that Golan's informal terminology, 'Wide_FOV/Narrow_FOV,' corresponds to . . . '*tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)*' as claimed." *Id.* 41. Petitioner further contends that

> Golan teaches selecting Wide image sensor and providing a zoom video output image including only Wide image data when a requested zoom factor value is less than the predetermined switch zoom factor $ZF_T$, and selecting Tele image sensor and providing a zoom video output image including only Tele image data when the requested zoom factor value is greater than the predetermined switch zoom factor $ZF_T$.

*Id.* at 43 (citing Ex. 1003 ¶ 104).

Petitioner contends that "Togo recognizes that 'by **switching between or compositing images** of a plurality of optical systems and a plurality of imaging elements joined to these optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized.'" *Id.* at 43–44 (quoting Ex. 1010 ¶¶ 2, 8; citing Ex. 1003 ¶ 107). Petitioner further contends that "Togo recognized that 'a telephoto imaging module with a long focal length is **less sharp at close distances** compared to a wide-

IPR2020-00862
Patent 10,356,332 B2

angle imaging module whose focal length is short.'" *Id.* at 44 (quoting Ex. 1010 ¶ 12). Further, Petitioner contends that Togo recognizes "[d]uring a zoom in operation, 'a switch is made from the wide-angle imaging module to the telephoto imaging module. However, at this time, if the subject is close, the **image quality degrades** due to the image being from the telephoto imaging module.'" *Id.* (quoting Ex. 1010 ¶ 13; citing Ex. 1003 ¶ 108).

Petitioner contends that "Togo's solution is for image control means 4 (a camera controller) to employ a no-telephoto **criterion** based on image quality." *Id.* (citing Ex. 1003 ¶ 109). For example, according to Petitioner "as shown in annotated FIG. 7 . . . one switching criterion is based on when '**the image quality** of the cutout image 22 of the wide-angle image becomes **poorer** than **the image quality** of the telephoto image 23.'" *Id.* at 44 (citing Ex. 1010 ¶ 66).

Petitioner also contends that "Togo describes an example image quality no-switching criterion to include that 'setting magnification X < A" or "setting magnification X ≥ A and the imaging distance Y ≤ B." *Id.* (quoting Ex. 1010 ¶¶ 61, 62).

Petitioner contends that Golan combined with Martin and Togo teach the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data." *Id.* at 49. Specifically, Petitioner contends that in addition to the disclosure discussed above, "[a] POSITA would have understood that in the combination, if the no-switching criterion is **not** fulfilled, switching from Wide image to Tele image as taught in Golan is performed, and the zoom video output image

IPR2020-00862
Patent 10,356,332 B2

includes only digitally-zoomed Tele image data." *Id.* at 49 (citing Ex. 1005 ¶¶ 9, 36, Fig. 1; Ex. 1010 Fig. 5(4); Ex. 1003 ¶ 119).

As to "transformed, digitally zoomed Tele image data," Petitioner contends further that "Martin teaches when switching between two successive images having different points of view, executing registration using critical alignment to register a succeeding image to a preceding image to generate **a transformed succeeding image** in video output images for a stable video display." *Id.* at 50 (citing Ex. 1003 ¶ 120).

Martin's Figure 3, reproduced as annotated by Petitioner below, illustrates registration between two images as part of Martin's critical alignment. *Id.* at 51 (citing e.g., Ex. 1006, 4:51–56).



Petitioner's annotated version of Martin's
Figures 3A–3D.[15]

---

[15] Petitioner apparently takes the position that element number 34′ should reference the rectangle, not the circle, in Martin's Figure 3b.

According to Petitioner, with respect to the annotated version of Martin's Figures 3A through 3D:

> A POSITA would have understood that Martin's critical alignment teaches determining correspondences between the coordinate systems of the two images from different points of view, which represent the registration between the two images (e.g., "represented by affine transformation . . . and/or any other desired transformation"), and therefore teaches executing registration of successive images for position matching in the ROI and generating a transformed succeeding image (e.g., transformed and shifted succeeding image 32 as in FIG. 3d above).

*Id.* at 52 (citing Ex. 1003 ¶ 124; Ex. 1009 ¶¶ 41, 42; Ex. 1013, Figs. 2.4, 6.2, Tables 2.1, 6.1, 33–35, 273–77; Ex. 1016, 137 (Xiong article on image registration methods)).  Petitioner further argues that "Martin teaches in critical alignment, the transformed succeeding image is used to achieve position matching of ROI between the preceding image and transformed succeeding image to the video output images when switching between the two images for providing stable video output images" and the critical alignment "changes with object distance of the ROI in a specific image, and is performed when switching between each pair of parallax images." *Id.* at 52 (citing Ex. 1003 ¶ 125; Ex. 1006, 7:36–51, 5:6–21).

Petitioner takes the position

> that in the digital camera of Golan, Togo, and Martin, after the no-switching criterion is not fulfilled, when switching from the Wide image (preceding image) to Tele image (succeeding image), a transformed digitally zoomed Tele image (transformed succeeding image as taught by Martin) is provided for smooth transition in the video output image, which renders obvious" the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video

IPR2020-00862
Patent 10,356,332 B2

> output image that includes only transformed, digitally zoomed
> Tele image data.

*Id.* at 53–54 (citing Ex. 1003 ¶ 128).

Below we address Patent Owner's arguments regarding this claim
limitation, the motivation to combine Golan and Martin, the motivation to
combine Golan, Martin, and Togo, and secondary considerations of non-
obviousness, respectively.

*Patent Owner's Arguments Regarding Claim Limitation of:*

*"[the camera controller …] configured to evaluate if a no-switching criterion
is fulfilled or not fulfilled, wherein at a zoom factor (ZF) value greater than a
zoom factor $ZF_T$=tangent ($FOV_{Wide}$)/tangent ($FOV_{Tele}$), if the no-switching
criterion is fulfilled the camera controller is further configured to output a
zoom video output image that includes only digitally-zoomed Wide image
data, and if the no-switching criterion is not fulfilled, the camera controller is
further configured to output a zoom video output image that includes only
transformed, digitally zoomed Tele image data"*

Patent Owner criticizes Petitioner's presentation as to claim 1,
suggesting Dr. Durand spends too many pages explaining errors in Golan's
paragraph 9 and does not explain how those errors would have affected a
person of ordinary skill's motivation to utilize Golan.  PO Resp. 36.  Patent
Owner appears to suggest, without explicitly arguing, that Golan's errors
would have discouraged one of ordinary skill from looking to Golan to
address the subject matter of the claims.  *Id.*  Because Patent Owner's
argument is unclear and poorly supported, we are unable to determine the
extent to which Patent Owner's argument undermines Petitioner's showing.

IPR2020-00862
Patent 10,356,332 B2

Patent Owner argues that Golan's teaching that "[t]he zoom control 130 selects an image acquisition device with the having a zoom more proximal to the requested zoom (Ex. 1005, ¶47)" is insufficient to support Petitioner's contentions as to claim 1. *Id.* at 37 (alteration in original). According to Patent Owner, "[a] POSITA would find the term 'proximal' far too nebulous and indeterminate to prescribe the specific threshold selection provided by the '332." *Id.*

Petitioner responds that "POSITA would have understood both Golan's teachings of up-transfer ZF with a switch zoom factor (e.g., at 6x in the 36x zoom range example) when zooming in, and that, in the context of Golan, the term 'proximal' in Golan [0047] is far from nebulous." Pet. Reply 11–12 (citing Ex. 1040 ¶¶ 63–65 (Durand reply declaration)). Golan explicitly discloses such thresholds. Ex. 1005 ¶¶ 7–9. Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that "Petitioner provides not [sic] evidence of Golan disclosing any non-switching criteria that would cause Golan to ***not*** 'select an image acquisition device . . . having a zoom more proximal to the requested zoom.'" PO Resp. 37 (citing Ex. 2001 ¶ 75) (second alteration in original). Nevertheless, Petitioner relies on Togo to teach this limitation of the claim.[16] Non-obviousness cannot be established by attacking the references individually when a challenge is predicated upon a combination of prior art disclosures. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097

---

[16] Petitioner asserts "Petitioner details why and how to combine Togo'[s] no-switching criterion based on image quality in the combination of Golan and Martin, and POSITA reading Golan would not have been discouraged from the combination." Pet. Reply 12.

IPR2020-00862
Patent 10,356,332 B2

(Fed. Cir. 1986).  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo's switching criteria is not "fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value," as required by claim 1.  PO Resp. 37–38 (quoting Ex. 2001 ¶ 77).  Rather, according to Patent Owner, "Togo's switching criteria are evaluated for a zoom setting regardless of whether the zoom factor was set in a continuously increasing, continuously decreasing or discretely specified manner."  *Id.*  Nevertheless, Petitioner relies on Golan to teach the continuous zoom aspect of this limitation of the claim.[17]  Non-obviousness cannot be established by attacking the references individually when a challenge is predicated upon a combination of prior art disclosures.  *See Merck & Co.*, 800 F.2d at 1097.  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo's alleged no switching criteria is not based on image quality.  PO Resp. 38.  Patent Owner relies on the following statement in Togo, that "***in the mobile terminal device of the present invention***, the photography distance Y between the photography subject and the mobile terminal device is estimated from an output signal of the autofocusing means or a control signal controlling the autofocusing means."  *Id.* at 38 (quoting Ex. 1010 ¶ 19).  Although Togo may use autofocus to estimate the distance, Petitioner contends Togo also "describes

---

[17] Petitioner asserts "Petitioner details why and how to combine Togo'[s] no-switching criterion based on image quality in the combination of Golan and Martin, and POSITA reading Golan would not have been discouraged from the combination."  Pet. Reply 12.

IPR2020-00862
Patent 10,356,332 B2

switching/no-switching based on comparing '**image qualities** of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21.'" Pet. Reply 15 (citing Pet 45–46; Ex. 1010 ¶¶ 66–67, Fig. 7 ("image qualities of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21 at the long distance (B) in FIG. 7 are compared."). Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo does not "perform image analysis using the disparity of corresponding wide-angle and telephoto pixels to estimate distance." PO Resp. 38–39. We find the claims do not recite "image analysis;" rather, the claims recite "image quality" which, as explained above, is used by Togo. Therefore, this argument does not undermine Petitioner's showing.

Finally, at to the limitation of "wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data," Patent Owner argues that the '332 patent "teaches away" from Maqrtin's us of parallax to create its autostereoscopic effect. *Id.* at 39–40 (citing Ex. 2001 ¶ 83; Ex. 1001, 7:46–48, 7:50–53; Pet. 50). We discuss this issue below in association with the arguments regarding the motivation to combine Golan and Martin.

Having reviewed the whole record including the cited evidence, Petitioner's contentions, and Patent Owner's arguments, we determine that Petitioner's contentions are sufficiently supported.

26

IPR2020-00862
Patent 10,356,332 B2

*Petitioner's Contentions Regarding the Rationale for Combining*
*Golan and Martin*

Petitioner contends a person of ordinary skill in the art would have
been motivated to apply Martin's teachings to Golan "to produce the
obvious, beneficial, and predictable results of a stable transition between
images from different points of view for providing continuous zoom video
output images." Pet. 17 (citing Ex. 1003 ¶¶ 45–50). Petitioner supports its
contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field
of endeavor pertaining to imaging systems generating video output images
using two imaging sections having different points of view." *Id.* at 18
(quoting Ex. 1003 ¶ 46).

*Second*, "they share a need to provide continuous video output images
when switching between images from imaging sections having different
points of view, for example, by using alignments having sub-pixel
accuracy." *Id.* at 18–19 (citing Ex. 1003 ¶ 54); *see id.* (citing Ex. 1005 ¶ 15;
Ex. 1006, 5:51–55, 5:59–6:5).

*Third*, Martin addresses these needs identified in Golan by providing
"critical alignment of an ROI [Region of Interest] in two images having
different points of view to calculate 'transformation parameters of subpixel
resolution' for position matching of the ROI to achieve a stable transition in
the continuous zoom video output images of the digital camera of Golan."
*Id.* at 19–20 (quoting Ex. 1006, 5:51–58) (citing Ex. 1003 ¶ 55; Ex. 1005
¶ 36).

*Fourth*, applying Martin to the teachings of Golan would have
required no more than combining "known elements according to known

27

IPR2020-00862
Patent 10,356,332 B2

methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control subsystem of Golan) to achieve the benefits of a stable transition in video output images described by Martin." *Id.* at 20. According to Petitioner, the combined teachings of Golan and Martin would have "produced operable results that are predictable." *Id*. (citing Ex. 1003 ¶ 49).

*Fifth*, Golan and Martin have a "shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections." *Id.* at 20 (citing Ex. 1003 ¶ 58). According to Petitioner,

> A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images.

*Id.* at 20–21.

*Discussion of Petitioner's Reasons to Combine Martin and Golan*

With respect to Petitioner's *third* and *fourth* reasons, we find that these reasons are sufficiently supported by the cited evidence. Golan teaches "a first image acquisition device having a first image sensor array coupled with a first lens having a first FOV, typically a wide FOV, and a first electronic zoom and "a second image acquisition device having a second image sensor array coupled with a second lens having a second FOV, typically a narrow FOV, and a second electronic zoom," and that the

28

"*calibration the alignment, between the first image sensor array and the second image sensor array*, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array." Ex. 1005 ¶¶ 14, 15 (emphasis added). Petitioner argues that the ordinarily skilled artisan would have been motivated "to incorporate Martin's teaching of *executing registration using critical alignment of ROI in two images having different points of view* to calculate 'transformation parameters of sub-pixel resolution' for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan." Pet. 19 (citing Ex. 1005 ¶ 36; Ex. 1006, 5:51–58; Ex. 1003 ¶ 57) (emphasis added). Petitioner presents evidence, Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *Id.* (citing-in-part Ex. 1007, 4:58–62, 10:2–5).

Martin teaches *aligning images*:

> Reference image 30 may include a region of interest 34. The same region of interest 34′, albeit as viewed from a different point of view, may appear in unaligned image 32. Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34′ matches alignment with region 34, as illustrated in FIG. 3d. The manipulation process may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation.

Ex. 1006, 4:51–59. Martin discloses that *critical alignment* "corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display," and that "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58. According to Martin, the

IPR2020-00862
Patent 10,356,332 B2

"alignment process is the use of parallax image manipulations of sub-pixel resolution to achieve critical alignment" and "the transformations for achieving critical alignment may proceed to a sub-pixel level where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

We determine that Martin's teaching of critical alignment that reduces positional differences in a region of interest does not conflict with Martin's teaching of producing or maintaining parallax artifacts in other portions of the image, based on the entirety of the record developed at trial. *See* Ex. 1006, 7:46–51 ("while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image").

Dr. Durand testifies that "a POSITA would have understood that Martin's teachings of critical alignment for stable transition between images of different points of view apply to electronic camera systems providing continuous zoom video output [i]mages as taught in Golan, regardless of whether a three dimensional illusion is provided." Ex. 1003 ¶ 54. Citing Ahiska (Ex. 1007), Border (Ex. 1009), Orimoto (Ex. 1014), and Hansen (Ex. 1019) to support his testimony, Durand further testifies that

> It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*, because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections for

30

IPR2020-00862
Patent 10,356,332 B2

> position matching (e.g., critical alignment of Martin) may be
> used.

*Id.* ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:63–2:1; Ex. 1019,

1059; Ex. 1009 ¶¶ 41, 42). The portion of Hansen (Ex. 1019) cited by Dr.

Durand addresses how extrinsic calibration errors occur and "a method to

recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019,

1059 (emphasis omitted). Orimoto discloses how misalignment occurs,

irrespective of "how exactly the dual lens camera has been conditioned and

adjusted by the manufacturer." Ex. 1014, 1:63–2:1. Border addresses image

registration as an alternative to correspondence (i.e., calibration). Ex. 1009

¶¶ 41, 42. And Ahiska discloses image registration or matching, when

calibration is insufficient, to provide a seamless transition between master

and slave cameras and "create the quality of a continuous zoom function."

Ex. 1007, 4:58–62, 10:2–5 ("[i]f calibration between the [wide-angle] master

and slave cameras is insufficient alone, image registration or matching can

be carried out," "transition[ing] between the master view and the slave view

as seamlessly as possible to create the quality of a continuous zoom

function").

Petitioner's *third* and *fourth* reasons for combining Golan and Martin

are supported by Dr. Durand's testimony quoted above, which is in turn

supported by Ahiska and Border. The portions of Border cited by Dr.

Durand address image registration as an alternative to correspondence (i.e.,

calibration). Ex. 1009 ¶¶ 41, 42. The portions of Ahiska cited by Dr.

Durand address the additional step of image registration or matching, when

calibration is insufficient, to provide a seamless transition between master

and slave cameras and "create the quality of a continuous zoom function."

31

IPR2020-00862
Patent 10,356,332 B2

Ex. 1007, 4:58–62, 10:2–5.  Thus, each of Border and Ahiska show a

relation between electronic calibration and registration.

*Patent Owner's Arguments Regarding Petitioner's Rationale for Combining*
*Golan and Martin*

As to Petitioner's proffered rationale for combining Golan and Martin,

Patent Owner contends that the "Golan and Martin references are

fundamentally dissimilar, address different problems, and prescribe different

techniques to address those different problems."  PO Resp. 30 (citing *Nichia*

*Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1340 (Fed. Cir. 2017)

(district court conclusion of no motivation to combine where the

combination of references relating to LED packages "describe[d] different

structures" and "address[ed] different problems")); *see id.* at 31–32 (citing

*Adidas AG v. Nike, Inc.,* 963 F.3d 1355, 1360 (Fed. Cir. 2020); Ex. 2015 ¶

66).  Patent Owner argues that "Golan teaches a preference that camera

calibration occur before zooming resulting in 'alignment offsets'" and

teaches that "[t]ypically, since the spatial offsets between wide image sensor

array 110 and tele image sensor array 112 are fixed, the electronic

calibration step is performed one time, after the manufacturing of the image

acquisition system and before the first use."  *Id.* at 28 (Ex. 1005 ¶ 44).

Patent Owner argues that "Martin, on the other hand, teaches away from

Golan with an 'exemplary embodiment' that uses 'convergence points' in

the two camera images to determine alignment that would continue to work

even if the position and orientation of the two cameras varied."  *Id.* (quoting

Ex. 1006, 5:6–21).

Patent Owner further argues that "[s]ince both Golan and Martin rely

on careful 'sub-pixel' alignment, these differences in alignment processing

would be critical, and it would not be obvious to a POSITA which choice to use for a hypothetical combined embodiment." *Id.* at 28. Patent Owner also argues "[a] POSITA would understand from Golan that its approach works better if the cameras can be as close as possible to minimize the differences in their points of view." *Id.* at 27 (citing Ex. 1005 ¶ 22). Patent Owner further argues "Martin on the other hand ***requires*** 'parallax images' that a POSITA would understand as images captured from necessarily different points-of-view." *Id.* (citing Ex. 1006, 3:56–60; Ex. 2001 ¶ 60).

Petitioner responds by distinguishing *Nichia*, arguing that "the relevant teachings of Golan and Martin address the same problem, and a relation between solutions of Golan and Martin was well-known and no alleged difference between the relevant teachings would require the alteration of Golan's principles of operation or render Golan inoperable." Pet. Reply 7 (citing *Nichia Corp.*, 855 F.3d at 1339; *Adidas AG*, 963 F.3d at 1358–159; Pet. 18–20; Ex. 1006, 2:49–50, 5:51–58). According to Petitioner, "for seamless transition between two images in continuous zoom video applications, when calibration between two cameras . . . is not sufficient alone . . . , image registration of two images from two imaging sections (e.g., critical alignment of Martin) may be used for position matching." Pet. 54–55 (citing Ex. 1007, 4:58–62; 10:2–5; Ex. 1014, 1:58–62; Ex. 1019, 1059; Ex. 1009 ¶¶ 41–42). Petitioner further contends that a "POSITA starting with Golan would have found it obvious to use Martin's critical alignment including registration to provide improved seamless transition." Pet. Reply 6 (citing Pet. 20–21).

We are not persuaded that Golan and Martin are "fundamentally dissimilar," because Golan and Martin both involve parallax effects caused

IPR2020-00862
Patent 10,356,332 B2

by two cameras with different fields of view and they both address a common problem—a discontinuity in images that are misaligned due to parallax from two different cameras—albeit in different contexts and with different techniques. *See* PO Resp. 21–31.

Martin also does not need to share a goal, objective, problem, or purpose in order to be combined with Golan. Golan and Martin are not incompatible with each other for having different objectives. *Intelligent Bio-Systems v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). Even assuming, *arguendo*, that Golan discloses reducing a parallax and Martin discloses the *opposite* (i.e., creating or maintaining a parallax)—this is not necessarily fatal to the combination of these references. Nonetheless, one of the problems noted by each of the references *is* shared in common between Golan and Martin, as discussed in the preceding paragraph. Thus, Patent Owner's "fundamentally dissimilar" argument does not undermine Petitioner's contentions.

Patent Owner also argues that "these differences in camera configurations [between Martin and Golan] teach away from each other." PO Resp. 28. Patent Owner also argues that the '332 patent "teaches away" from parallax, which Martin depends on. *Id.* at 40 (citing Ex. 2001 ¶ 84; Ex. 1001, 7:50–53). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1332 (Fed. Cir. 2008) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).

IPR2020-00862
Patent 10,356,332 B2

We are not persuaded that the invention claimed in the '332 patent or Golan teaches away from Martin because they do not discourage or lead one in a direction divergent from Martin's teachings relevant to "evaluat[ing] if a no-switching criterion is fulfilled or not fulfilled . . ." as recited in claim 1. In addition to providing an autostereoscopic display of 3D images using parallax images, Martin also discloses aligning these same parallax images using transformation parameters. *See* Ex. 1006, 5:38–42. Thus, Martin's teaching of critical alignment does not appear to be divergent from or incompatible with the scope of independent claim 1 *or* the objectives of the '332 patent. Nor is Martin incompatible with Golan for having a different objective. Petitioner need not show that Martin shares a common objective with Golan or the patent at issue. *Intelligent Bio-Systems*, 821 F.3d at 1367. Thus, Patent Owner's teaching away argument does not undermine Petitioner's contentions.

Patent Owner also argues that although Martin is for autostereoscopic display, there is no evidence in the record of a camera utilizing autostereoscopic visual perception. PO Resp. 24–25. Patent Owner contends "a POSITA would recognize Martin as a display system patent intended for post-processing images for display, whereas Golan is an image acquisition patent intended for pre-processing images in preparation for photographic image capture." *Id.* Nevertheless, we determine that Patent Owner does not explain sufficiently in its Patent Owner Response why Martin's critical alignment could not be used in Golan during image acquisition.

As discussed above, Petitioner, by contrast, presents evidence, i.e. Ahiska (Ex. 1007), that tends to show a relation between electronic

IPR2020-00862
Patent 10,356,332 B2

calibration and registration for position matching. *See* Pet. 20–21 (citing-in-part Ex. 1007, 4:58–62, 10:2–5 ("If calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out . . ." and "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function.")). Dr. Durand also cites Ahiska, in addition to other references, to support his testimony. Ex. 1003 ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:58–62 (Orimoto patent) (describing "image registration on the side of the manufacturer . . . to obtain the three dimensional image without noticing misalignment of the plural images"); Ex. 1019, 1059 (Hansen article) (describing how extrinsic calibration errors occur due to shock, vibration, thermal variation and cycling); Ex. 1009 ¶ 52 (explaining that registration between wide image 204 and telephoto image 206 is an alternative to correspondences preferably determined at the time of manufacturing)).

> Dr. Durand testifies that
>
> It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*, because of shocking, vibration, thermal variation, etc.), image registration of two images from two imaging sections for position matching (e.g., critical alignment of Martin) may be used.

*Id.* Dr. Durand's testimony quoted above is supported by some of the cited references. The cited portion of Hansen (Ex. 1019) addresses how extrinsic calibration errors occur and "a method to recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019, 1059 (emphasis omitted). The

IPR2020-00862
Patent 10,356,332 B2

cited portion of Orimoto (Ex. 1014) concerns image registration, at the manufacturer's end, to address misalignment of images. The quoted portion of Orimoto discloses how misalignment occurs, irrespective of "how exactly the dual lens camera has been conditioned and adjusted by the manufacturer." Ex. 1014, 1:63–2:1. The cited portions of Border (Ex. 1009) address image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. And the cited portions of Ahiska disclose image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5.

Thus, Petitioner has shown sufficiently that one or ordinary skill would have chosen to use registration such as occurs in Martin, in the system of Golan during acquisition.[18] Thus, Patent Owner's pre-processing versus post-processing argument does not undermine Petitioner's contentions.

Patent Owner further argues that "the core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: 'whether [a] skilled artisan would have plucked one reference out of the sea of prior art . . . and combined it with conventional [] elements to address

---

[18] Patent Owner asserts in its Sur-Reply that Petitioner's statement that Patent Owner's argument at pages 27–28 of the Patent Owner Response "would not have discouraged POSITA from applying Martin's critical alignment teachings in Golan" incorporates a nine-paragraph, 1163 word discussion from Dr. Durand into the Petitioner's Reply in violation of 37 C.F.R. § 42.6(a)(3)'s prohibition on incorporation by reference of arguments from expert declarations. PO Sur-Reply 6. We have reviewed the referenced section of the Reply and declaration and do not find that Petitioner violated the page limits or any other rules.

some need present in the field.'"  PO Resp. 24, 29 (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016)) (alterations in original).

Petitioner responds that the evidence of record does not indicate that there was a "sea" of other image registration or position matching patents or literature to choose from; rather it was a finite pool including Martin and Ahiska.  *See* Pet. Reply 6.  Petitioner further argues that it is not required to show why it chose one reference, in this case, Martin, over another.  *Id.* (citing *Infineum USA L.P. v. Chevron Oronite Co. LLC*, 2021 WL 210722, at *4 (Fed. Cir. 2021)).  We are persuaded that the evidence of record does not indicate that there were several alternatives that a POSITA could have chosen instead of Martin so as to establish a "sea" or "ocean" as Patent Owner contends, nor has Patent Owner shown Petitioner is relying on the concept of "combining known element to yield predictable results" under which a finite number of alternatives may be required.[19]  *See Fanduel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1346 (Fed. Cir. 2020) ("when the record shows a finite number of identified, predictable solutions to a design need that existed at the relevant time, which a person of ordinary skill in the

---

[19] We do not suggest that this is required.  *WBIP* was not concerned with showing that a particular reference could be found in the "sea." Rather, *WBIP* pointed out that one must show a rationale to combine instead of assuming that "a person of skill, [has] two (and only two) references sitting on the table in front of him." *WBIP,* 829 F.3d at 1337.  In other words, one does ***not*** need to show that there is something about the references relied on that is different than ***all*** other references in the sea ***nor*** does one need to show the sea is so small that the two references would be easily found (unless one is relying on combining known elements to yield predictable results).  *See Yeda Rsch. v. Mylan Pharms. Inc.,* 906 F.3d 1031, 1044–45 (Fed. Cir. 2018) (associating "sea" of prior art argument with concept of "a finite number of identified, predictable solutions").

IPR2020-00862
Patent 10,356,332 B2

art ha[d] a good reason to pursue, common sense can supply a motivation to combine") (citations and internal quotation marks omitted, alteration in original).

We are further persuaded that Petitioner need not explain why it chose Martin over another reference with similar teachings, or why its combination is superior. *See Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("It is thus improper to require West-Ward to prove that a person of ordinary skill would have selected everolimus over other prior art treatment methods."); *see also In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention."). Thus, Patent Owner's "sea" of references argument does not undermine Petitioner's contentions.

Patent Owner also argues that Durand's "analogous art" analysis is deficient because it fails to address whether Golan and Martin, separately, are "analogous" to the invention of the '332 patent, because it instead "only asserted that Golan and Martin were 'analogous' because they are both in 'the same field of endeavor.'" PO Sur-Reply 2.

Art is analogous when it is: (1) from the same field of endeavor as the claimed invention; and (2) if the art is not from the same field of endeavor, reasonably pertinent to the particular problem faced by the inventor. *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). In its Petition, Petitioner compares Golan and Martin to each other instead of the claimed invention. *See* Pet. 17–18. In its Reply, Petitioner rectifies the improper comparison and asserts that Golan and Martin are in the same field of endeavor as the

39

claimed invention: "pertaining to imaging systems including digital cameras generating video output images of the same scene from two imaging sections having different points of view."  Pet. Reply 3 (citing Pet. 18; Ex. 1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35; 5:51–55).[20] Also as discussed above, Petitioner asserts that Golan and Martin "are each pertinent to the problem addressed in the '332 Patent, namely, achieving 'a continuous, smooth zoom in video mode.'"  *Id.* (citing Ex. 1040 ¶ 32; Ex. 1001, 3:16–17; Pet. 18–19; Ex. 1005 ¶ 15; Ex. 1006, 5:51–55).

We are persuaded that Golan is in the same field of endeavor as the claimed invention because Golan describes performing digital zoom using a wide image sensor array and lens and a tele image sensor array and lens with the goal of providing "continuous electronic zoom with uninterrupted imaging."  *See* Ex. 1005 ¶ 15.  We are persuaded that Martin is reasonably pertinent to the problem faced by the inventor: reducing an image jump effect seen in video output images when switching between cameras that have different fields of view.  Both Golan and Martin have multiple cameras with differing fields of view.  Martin describes the problem in terms of its

---

[20] Petitioner properly replied to Patent Owner's criticism of its showing regarding analogous art.  *Dynamic Drinkware, LLC*, 800 F.3d at 1379 (finding an *inter partes* review petitioner has both the "burden of persuasion to prove unpatentability" and also "the initial burden of production," which "is a shifting burden, 'the allocation of which depends on where in the process of trial the issue arises.'  The burden of production may entail 'producing additional evidence and presenting persuasive argument based on new evidence or evidence already of record.'"); *see also Apple Inc. v. Qualcomm Inc.*, IPR2018-01245, Paper 39, 16 (PTAB Jan. 15, 2020) (citing *Drinkware* and finding a petitioner properly established a reference was analogous art for the first time in its Petitioner Reply).

solution: "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display" and "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." Ex. 1006, 5:53–58. Thus, Patent Owner's analogous argument does not undermine Petitioner's contentions.

As such, and for the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan and Martin is supported by sufficient rational underpinning, based on the entirety of the record developed at trial. *See KSR*, 550 at 418.

> *Petitioner's Rationale for Combining Golan, Martin, and Togo*

Petitioner contends that a person of ordinary skill in the art would have been motivated to apply Togo's teachings to Golan to "produce the obvious, beneficial, and predictable results of avoiding output image degradation when the quality of the telephoto image data would be degraded based on closeness of the subject as taught by Togo." Pet. 28–29 (citing Ex. 1003 ¶¶ 49–54). Petitioner supports its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field of endeavor pertaining to digital zoom camera systems including a camera controller operatively connected to wide and tele lens systems." *Id.* at 29–30 (citing Ex. 1003 ¶ 62).

*Second*, "the references share a need to provide output images of objects at various ranges with a compact imaging system." *Id.* at 30–31 (citing Ex. 1003 ¶ 63).

41

IPR2020-00862
Patent 10,356,332 B2

*Third*, "Golan's expressed desire to achieve 'continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array' would have motivated a POSITA to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged." *Id.* at 31 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 64).

*Fourth*, combining the teachings of Togo with the system of Golan "would have produced operable results that are predictable." *Id.* at 20.

We are persuaded by Petitioner's contentions that Golan's expressed desire to achieve continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array would have motivated a person of ordinary skill in the art to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged.

### *Patent Owner's Arguments Regarding Petitioner's Rationale for Combining Golan, Martin, and Togo*

Patent Owner argues "a POSITA reading Golan would not be motivated to combine it with Togo because the POSITA would not be aware from Golan of any issues regarding focus and subject depth. Ex. 2001 ¶67." PO Resp. 32. Patent Owner asserts that Golan "assumes both images are always in perfect focus." *Id.* Petitioner contends that a "POSITA would have understood the tele image degradation would be an issue for Golan, e.g., when capturing images of a subject at close distance in zoom-in operation using both Tele and Wide imaging system." Pet. Reply 8 (citing

42

IPR2020-00862
Patent 10,356,332 B2

Ex. 1040 ¶ 48).  Further, Petitioner contends that a "POSITA would have understood that Golan includes embodiments that focus subjects at various distances, including at close distance and the infinite, and would be motivated to resolve any associated issues using teachings in the art."  *Id.* at 8–9 (Ex. 1040 ¶ 49; Ex. 1005 ¶ 17, claims 3, 17).  We agree and thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that because Togo requires parallel optical axes "when the imaging distance (Y) to the subject is long (several tens of m), center positions of the wide-angle image 17 and the telephoto image are substantially equal" and "a function of correcting the center positions of the wide-angle image and the telephoto image as in patent literature 3 is unnecessary.  Ex. 1010, [0052]."  PO Resp. 34 (citing Ex. 2001, ¶ 69; Ex. 1010 ¶¶ 18, 38) (internal quotations omitted).  Patent Owner also argues "Martin teaches away from this requirement by specifying that '[a]dditionally, cameras ***10 and 12 need not be in any special alignment configuration*** to produce suitable parallax images for use with the present invention.'  *Id.* (citing Ex. 1006, 3:64–67 . . . ; Ex. 2001 ¶70)."  *Id.*  Patent Owner also points to Martin's teaching that "[previous] methods require the use of at least two ***carefully aligned*** cameras to capture images" and that alignment can be "cumbersome" and "difficult."  *Id.* at 34–35 (citing Ex. 1006, 2:19–59) (alteration in original).

We do not agree with Patent Owner's arguments, which are premised on a "physical" or "bodily" incorporation of limitations of one reference into the other.  This is not the standard.  *See In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review.").

IPR2020-00862
Patent 10,356,332 B2

The relevant inquiry is whether the claimed subject matter would have been obvious to those of ordinary skill in the art in light of the *combined teachings* of those references. *See In re Keller,* 642 F.2d 413, 425 (CCPA 1981). "Combining the *teachings* of references does not involve an ability to combine their specific structures." *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973). Rather than express obviousness as the physical incorporation of a structure from one reference into the structure of another reference, the prior art should be viewed as a combination of teachings from different sources, and the use of those teachings by one of ordinary skill in the art. *See KSR Int'l Co.*, 550 U.S. at 418(the conclusion of obviousness can be based on the interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art).

Petitioner contends "Togo's image-quality-based no-switching criterion teachings apply to the combination regardless of whether a distance between cameras is close or whether optical axes are parallel." Pet. Reply 10 (citing Ex. 1040 ¶ 52). Petitioner seeks only "to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged." Pet. 32 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 68). Thus, Patent Owner's argument does not undermine Petitioners showing

For the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan, Martin, and Togo is supported by sufficient rational underpinning. *See KSR*, 550 U.S. at 418. We are further persuaded that the cited evidence sufficiently supports Dr. Durand's testimony.

IPR2020-00862
Patent 10,356,332 B2

*Evidence of Secondary Considerations*

Patent Owner presents evidence of secondary considerations of non-obviousness.  PO Resp. 57–69.  As to licensing, Patent Owner presents evidence in the form of emails and its litigation complaint to show that "the licensing discussions between Petitioner and Patent Owner lasted over many years."  PO Resp. 62.  "Petitioner specifically asked Patent Owner for an 'option to license all of Corephotonics IP' in August 2016."  *Id.*  Patent Owner further notes that Petitioner "specifically asked for information about smooth transition technology."  *Id.* (citing Ex. 2007; Ex. 2011; Ex. 2012).  "The licensing discussions specifically would have encompassed the smooth transition technology," and a license to '332 patent.  *Id.*  These discussions, Patent Owner contends, establish "that there is a 'nexus' between the licensing negotiations between Patent Owner and Petitioner as [to] the claims of the '322 patent challenged by Petitioner in this proceeding."  *Id.* at 62–63.  Patent Owner also lists several companies that licensed Patent Owner's technology, and contends that this is "evidence of industry-wide respect for the patented technology."  *Id.* at 63–64 (citing Ex. 2001 ¶ 141).

As to industry praise, Patent Owner cites several articles that show it is an "industry leader in developing dual-camera designs and software technologies to power them."  PO Resp. 65–66.

Patent Owner asserts that the failure of others and "Petitioner's copying of Patent Owner's technologies, including the smooth transition techniques that Patent Owner demonstrated to Petitioner, is evidence of non-obviousness."  *Id.* at 68 (citing Ex. 2001 ¶ 150).  Patent Owner presents arguments with respect to the failure of Golan and Border inventors to achieve what is disclosed by the '322 patent.  *Id.* at 66–69.  Patent Owner

45

IPR2020-00862
Patent 10,356,332 B2

also asserts: "[t]hat Petitioner copied the invention of the '322 patent (among other Corephotonics technologies, which Petitioner also appears to have copied) is strongly implied by the course of conduct between the parties and the timing of Petitioner's announcement of their own version of 'smooth transition' in their iPhone 7 series in Fall of 2016." *Id.* at 68–69 (citing Ex. 2001 ¶ 150).

   *Analysis of Patent Owner's Evidence of Secondary Considerations*

   Objective indicia of non-obviousness (also referred to as secondary considerations) may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Objective indicia are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of non-obviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)); *see also ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). As the Federal Circuit explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features,

46

IPR2020-00862
Patent 10,356,332 B2

and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)).  On the other hand, the patentee is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process.  *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and the evidence of secondary considerations.  *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential).  We first consider whether a patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus.  *Id.*  If not, that "does not end the inquiry into secondary considerations;" "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'"  *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75).  Once a patent owner has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the challenger to adduce evidence showing that the objective indicia were due to extraneous factors other than the patented invention.  *Demaco*, 851 F.2d at 1392–93.

With regard to the first step of an analysis under *Fox Factory*, Patent Owner's evidence of secondary considerations is not tied to a specific product or technology that is disclosed and claimed in the '332 patent, for the reasons discussed below.  *See* Pet. Reply 24–25 (citing *Fox Factory*, 944 F.3d at 1374).

IPR2020-00862
Patent 10,356,332 B2

Patent Owner presents evidence of secondary considerations purporting to address at least: industry praise and licensing; commercial success; and failure of others and copying. *See* PO Resp. 56–69.

According to one of the emails submitted by Patent Owner, licensing negotiations with Petitioner involved not only the '332 patent, but all patents in Patent Owner's intellectual property portfolio. *Id.* at 62; Ex. 2010 (email chain between Corephotonics and Apple discussing an "option to license all of Corephotonics IP"). In the licensing context, the relevant inquiry is whether there is a nexus between the patent and the licensing activity itself, such that the factfinder can infer that the licensing "arose out of recognition and acceptance of the subject matter claimed" in the patent. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). To the extent that negotiations with Petitioner or any other licensee (*see* PO Resp. 63–64 (listing entities that have taken a license from Patent Owner)) were specific to the smooth transition technology Patent Owner mentions, Petitioner argues that "'smooth transition' [relied on by Patent Owner] refers to techniques used ***when switching***, in order to provide for a more seamless transition between the camera images" but, the "'332 claims recite evaluating a 'non-switching criterion,' to determine ***whether to switch*** between cameras, and depending on the evaluation, outputting the Wide image data or the Tele image data." Pet. Reply 26 (citing PO Resp. 57–58; Ex. 1001, 5:27–34, 7:41–56, claims 1, 12). Petitioner further argues that "Patent Owner fails to even discuss, let alone prove, whether any usage of 'smooth transition' is actually a reference to the *claimed* technique or merely *unclaimed* techniques described as 'smooth transition' in the '332 patent." *Id.* (citing Ex. 1040 ¶ 107). For the reasons that follow, we find that Petitioner has the better position.

IPR2020-00862
Patent 10,356,332 B2

In the '332 patent,

[a] "smooth transition" (ST) is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Ex. 1001, 7:50–60. At its broadest, "[a] 'smooth transition' . . . minimizes the jump effect," and as disclosed in the '332 patent, this encompasses position matching "only in the ROI region" and matching "scale brightness and color . . . for the entire output image area." *See id.* In other patents in the continuity chain of the '332 patent, "smooth transition" is similarly defined. *See* U.S. Patent No. 10,326,942 ("the '942 patent," 10:41–51). But this disclosure does not appear to address "evaluat[ing] if a no-switching criterion is fulfilled or not fulfilled, wherein at a zoom factor (ZF) value greater than a zoom factor $ZF_T$=tangent ($FOV_{Wide}$)/tangent ($FOV_{Tele}$), if the no-switching criterion is fulfilled the camera controller is further configured to output a zoom video output image that includes only digitally-zoomed Wide image data, and if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data," as required by independent claim 1 and similarly required by independent claim 13 of the '332 patent. That is, independent claim 1 recites a more specific invention than "smooth transition" as it is broadly defined in the '332 patent.

49

IPR2020-00862
Patent 10,356,332 B2

As Patent Owner discloses "smooth transition" in multiple patents, it is not clear what inventions the term encompasses. *See, e.g.*, Ex. 1001, 7:46–56; '942 patent, 10:41–51. Patent Owner's arguments, too, appear to imply that the inventions disclosed in more than one patent are encompassed by smooth transition technology. *See generally* PO Resp. 58–65. The '332 patent defines a smooth transition as a transition between cameras or POVs that minimizes the jump effect and teaches methods for achieving a smooth transition in video zoom mode, including position matching, to address the different spatial perspectives and viewing angles of each camera, as well as matching scale, brightness, and color. Ex. 1001, 7:50–60. With respect to the '332 patent specifically, Dr. Hart testifies that its "central innovation" is the "reduction of the image discontinuity in video output seen when a multi-aperture camera switches from one sensor to another during the zooming process *using registration and* position matching." Ex. 2001 ¶ 147 (emphasis added). Both Dr. Hart's characterization of the '332 patent's "central innovation" and the recitations of claim 1 are more particular than the broad definition of "smooth transition" in the '332 patent. Patent Owner's evidence of industry-wide praise and licensing, commercial success, as well as failure of others and copying is tied to, at its most specific, Patent Owner's smooth transition technology, which is defined more broadly than the invention recited in claim 1 of the '332 patent.

For example, as evidence of licensing negotiations, Patent Owner submits Exhibits 2011 and 2012, which discuss "Corephotonic's technologies and intellectual property, including 'software that fuses wide angle and telephoto video together,' 'sensor synchronization,' 'MIPI signaling and image processing requirements,' and 'image registration in

50
Appx124

IPR2020-00862
Patent 10,356,332 B2

GPU . . . .'"  Not only are these areas of technology not limited to the invention recited in claim 1, it is not entirely clear how, aside from image registration, they even relate to it.  Exhibit 2007 is an email chain discussing "a number of eleven 'top level deliverables'."  Those top level deliverables are not limited to the invention recited in claim 1.  Exhibit 2008 concerns smooth transitions and technical discussions between Petitioner and Patent Owner.  For the reasons discussed above, evidence tied to Patent Owner's smooth transition technology is not coextensive with the invention recited in claim 1 of the '332 patent.

As industry praise, Patent Owner cites several articles describing it as a "leader in multi-camera technology," "world-renowned leader in the mobile imaging space," a "leading supplie[r]" and a "'key player' in the computational photography market."  PO Resp. 64.  The praise is for Patent Owner, Corephotonics, as a company, not the specific invention recited in claim 1 of the '332 patent.  Similarly, Patent Owner's evidence of commercial success, which includes articles in Forbes.com, Globes.co.il, and Engadget.com concerning Samsung's purchase of Corephotonics, does not specifically address the invention recited in claim 1.  *Id.* at 65–66.

As evidence of failure of others, Patent Owner points to Golan's failure to "recognize the problem of discontinuities due to parallax which are present in such switching or the use of the position matching techniques and image registration techniques discussed in the '332 patent."  *Id.* at 67 (citing Ex. 2001 ¶ 148).  Patent Owner also points to Border's purported failure to "recognize the need for a 'continuous' zoom or 'smooth transition' between sensors or," "the need to provide a 'continuous zoom video output.'"  *Id.* at 67–68 (citing Ex. 2001 ¶ 149).  We do not consider Golan's and Border's

51

IPR2020-00862
Patent 10,356,332 B2

lack of disclosure on this specific problem, even if it is a failure to recognize the problem, sufficient evidence of failure of others to solve the problem. Failure of other requires "that, notwithstanding knowledge of the references, the art *tried and failed* to solve the problem." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1338 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (emphasis added). Nevertheless, even if Patent Owner's argument about Golan and Border is relevant, neither reference has been shown to support failure of others.

For the reasons discussed above, the evidence presented is not sufficiently tied to, or coextensive with the invention of claim 1 in the '332 patent in particular. We further determine that, presenting evidence that is tied to "smooth transition" instead of the invention recited in claim 1 as Patent Owner does, does not establish that any of the evidence is coextensive with the invention recited in claim 1 of the '332 patent.

In view of step 1 of the analysis under *Fox Factory*, we move to step 2 and determine whether Patent Owner's evidence of secondary considerations is "the direct result of the unique characteristics of the claimed invention." *Fox Factory*, 944 F.3d at 1373–75. Patent Owner is not entitled to a presumption of nexus where the relevant product embodies at least two patented inventions, and the burden remains on Patent Owner to show that the claimed secondary considerations were due to the invention claimed in the patent at issue here. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 593 F.3d 1289, 1299 (Fed. Cir. 2010).

Applying *Therasense*, the Federal Circuit explained that allowing a presumption in such a situation would not be "consistent with *Demaco*'s explanation that nexus cannot be presumed where, for example, 'the

patented invention is only a component of a commercially successful machine or process.'" *See Fox Factory*, 944 F.3d at 1377 (citing *Demaco*, 851 F.2d at 1392) (rejecting a patent owner's "attempt to reduce the coextensiveness requirement to an inquiry into whether the patent claims broadly cover the product that is the subject of the evidence of secondary considerations").

For reasons substantially similar to those discussed above, we determine that none of the evidence presented is "the direct result of the unique characteristics of the claimed invention," because Patent Owner's evidence is only as particular as discussing smooth transition technology, which we determine above is broader than and thus, not coextensive with the invention recited in claim 1 of the '332 patent. *See Fox Factory*, 944 F.3d at 1373–75. It is further unclear that any of the industry-wide praise and articles resulted from the preeminence of the invention recited in claim 1 of the '332 patent.

Because the same evidence of secondary considerations cannot be presumed to be attributable to two or more different features, Patent Owner retains the burden of proving the degree to which the evidence tied to "smooth transition" technology is attributable to the invention recited in the challenged claims. *Fox Factory*, 944 F.3d at 1378 (citing *Therasense*, 593 F.3d at 1299; *WMS Gaming, Inc. v. Int'l. Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)); *see also Lectrosonics*, Paper 33 at 34–35.

Some of the exact same evidence and arguments submitted in the present proceeding has also been submitted in IPR2020-00905—Petitioner contends that "Patent Owner's reliance on the same underlying allegations in other PTAB proceedings involving different patents of different scope casts

IPR2020-00862
Patent 10,356,332 B2

considerable doubt on [Patent Owner's] argument." Pet. Reply 25 (citing IPR2020-00905, Paper 15, 41, (contending that licensing discussions "specifically would have encompassed lens design and image fusion technology" in addition to smooth transition technology)). This is despite the fact that independent claim 1 of U.S. Patent No. 10,225,479 ("the '479 patent) in IPR2020-00905 recites a different invention from that of the inventions recited in independent claims 1 and 12 of the '332 patent. Independent claim 1 of the '479 patent recites, *inter alia*, "a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms and to process the Wide and Tele images to create a fused image." Independent claim 23 of the '479 patent recites substantially similar features. Neither claim includes "evaluat[ing] if a no switching criterion is fulfilled or not fulfilled" as in the inventions of claims 1 and 12 of the '332 patent. The '479 and the '332 patents do not claim the same inventions. *See generally Fox Factory*, 944 F.3d at 1377 (rejecting the argument that a presumption should exist where the two patents at issue are related). In this case, the '479 and '332 patents have claims that address different aspects of smooth transition technology.

We are not persuaded that Patent Owner has met its burden to establish a nexus between the merits of the claimed invention and the submitted evidence relating to industry-wide praise and licensing, commercial success, as well as failure of others and copying. Absent a nexus, we determine that Patent Owner's evidence of objective indicia does not weigh in favor of non-obviousness.

*Summary – Claim 1*

54

IPR2020-00862
Patent 10,356,332 B2

We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan, Martin, and Togo and the other cited evidence and we are persuaded that the proposed combination teaches the limitations recited in independent claim 1 as set forth above. Petitioner's rationales for combining Golan and Martin and Golan, Martin, and Togo are set forth earlier in this Section, and is determined to be supported by sufficient rational underpinning for at least the reasons set forth above. Patent Owner's contentions regarding secondary considerations of non-obviousness are set forth above and, as discussed, do not weigh in favor of non-obviousness because Patent Owner has not established a nexus between the claimed invention and the cited evidence. For the foregoing reasons, we conclude Petitioner establishes unpatentability of independent claim 1 over Golan and Martin by a preponderance of the evidence.

Accordingly, we are persuaded that Petitioner demonstrates the unpatentability of claim 1 over the combination of Golan, Martin, and Togo by a preponderance of the evidence.

### 5.    *Independent Claim 13*

Independent claim 13 recites a method for providing a digital video output in a multiple aperture zoom digital camera similar to that recited in independent claim 1. Ex. 1001, 13:28–40.

Petitioner's arguments for independent claim 13 refer, in large part, to its arguments for independent claim 1. *See* Pet. 57–58.

Patent Owner does not present separate arguments for independent claim 13. *See generally* Prelim. Resp. For substantially the same reasons discussed in section III.D.4, we are persuaded that Petitioner sufficiently

demonstrates the unpatentability of claim 13 over the combination of Golan, Martin, and Togo by a preponderance of the evidence.

### 6.    Dependent Claims 2, 9, 14, and 21–22

Patent Owner does not present separate arguments for claims 2, and 9. *See generally* PO Resp. We have reviewed Petitioner's arguments and evidence concerning claims 2, 9, 14, and 21–22 and are persuaded that Petitioner sufficiently demonstrates by a preponderance of the evidence the unpatentability of these claims over the combination of Golan, Martin, and Togo. *See* Pet. 54, 56–57.

### 7.    Dependent Claims 5 and 17

Claims 5 and 17, which depend from claims 1 and 13 respectively, further recite "wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image." Ex. 1001, 12:65–67, 14:12–14.

Patent Owner asserts that "a POSITA would understand the plain and ordinary meaning of 'effective resolution,' as illuminated by the '332 and its description of an 'effective resolution score' utilizing image analysis of image sensor data. PO Resp. 41 (citing Ex. 2001, ¶ 88; Ex. 1001 at 6:4–24). Patent Owner essentially asks us to construe "effective resolution" as requiring calculation of an "effective resolution score" as defined in the Specification of the '332 patent.  Limitations in the specification must not be read into the claims absent lexicography or disclaimer/disavowal.  *Hill-Rom Services, Inc. v. Stryker Corp.,* 755 F.3d 1367, 1371 (Fed. Cir. 2014).  We find neither lexicography nor disavowal here.

Petitioner responds to this implicit construction by contending that "the plain and ordinary meaning of 'effective resolution' means the degree

IPR2020-00862
Patent 10,356,332 B2

of detail, which may be measured by image quality including blurriness and sharpness—a meaning supported by undisputed evidence." Pet. Reply 17 (citing Pet. 56; Ex. 1017, 80–81; Ex. 1020, 7:15–17; Ex. 1003 ¶ 135). Petitioner relies on Jacobson (Ex. 1017), which determines resolution by calculating "resolving power," and Shabatay (Ex. 1020) which defines resolution using "spatial frequencies."

Neither party proposed a construction in its initial briefing for "effective resolution." Petitioner has not explained how its construction of "effective resolution" as image quality including blurriness and sharpness is supported by resolving power and determining spatial frequencies as recited in Jacobson and Shabatay.

We decline to agree with Patent Owner's implicit request to limit effective resolution to calculating an effective resolution score nor with Petitioner's implicit definition as resolving power involving spatial frequencies. There is no indication that the patentee intended to limit the claim in that way or redefine effective resolution to be something that can only be determined by an effective resolution score.

The effective resolution score in the '332 patent does include a measure of sharpness which tends to support Petitioner's construction that sharpness and blurriness, are a part of "effective resolution." Ex. 1001, 6:20–23 ("The effective resolution score can be derived from a combination of the sharpness scores and edge scores."). We construe "effective resolution" as image quality including but not limited to blurriness and sharpness.

Petitioner relies on Togo's disclosure doing a comparison based on blurriness and sharpness but does not explain how the comparison would be

done or on what calculations (or strict derivation) it would be based.  Pet. 56 (citing Ex. 1010, code (57) ¶¶ 11, 12 ("[t]elephoto imaging module with a long focal length is less sharp at close distances compared to a wide-angle imaging module whose focal length is short"), 57 ("a telephoto image 23 is blurry"), 50 ("Note that because image quality depends on a performance of a lens system that is used and the like, theoretically strict derivation is difficult.")).  Nevertheless, the patentee drafted the claim broadly to require only an "effective resolution" of one image to be lower than the effective resolution of another rather than an effective resolution score lower than another image's effective resolution score.  Thus, we determine that Togo teaches the limitation to "an effective resolution of the Tele image being lower than an effective resolution of the Wide image."  *See id.* at 55–56.

We have reviewed Petitioner's arguments and evidence concerning claims 5 and 17 and are persuaded that Petitioner sufficiently demonstrates by a preponderance of the evidence the unpatentability of these claims over the combination of Golan, Martin, and Togo.  *See id.* at 55–57.

### E.    Obviousness over Golan, Martin, Togo, and Levey

#### 1.    Overview of Levey (Ex. 1015)

Levey concerns digital cameras and automatically selecting a photography mode.  Ex. 1015 ¶ 2.  In Levey, a user can select between different photography modes by "single button activation," instead of interacting with a multi-step menu selection process—this reduces the amount of user input required to select the photography mode.  *Id.* ¶ 18.

Case: 22-1455    Document: 30-1    Page: 151    Filed: 12/23/2022

IPR2020-00862
Patent 10,356,332 B2

### 2.    *Dependent Claim 10*

Claim 10, which depends from claim 1, recites "wherein the user

inputs include a zoom factor, a camera mode and a region of interest."  Ex.

1001, 13:18–19.

According to Petitioner,

> First, as discussed at [8.1], Golan teaches that the camera
> controller includes a user control module for receiving user
> inputs and a sensor control module for configuring each sensor
> to acquire the Wide and Tele image data based on the user
> inputs, where in the user inputs include a zoom factor. (APPL-
> 1003), ¶157.
> Second, Levey describes "a photography mode user
> interface for selecting between a plurality of photography
> modes," and configuring its image sensor using associated
> image capture settings. (APPL-1015), Abstract, [0045], [0057],
> [0070][, ][0039], [0041], [0070]-[0071]; (APPL-1003), ¶158.

Pet. 60–61 (emphases omitted).  As one reason for combining Golan,

Martin, and Levey, Petitioner contends that

> a POSITA would have been motivated to incorporate Levey's
> teachings in the dual-aperture zoom digital camera of Golan
> combined with Martin to produce the obvious, beneficial, and
> predictable results of providing a plurality of camera modes "that
> can be selected by the user to control various elements of the
> image capture process and the image processing chain.

*Id.* at 59 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶ 153).

A portion of Martin cited by the Petition describes that "while

displaying the images, aligning **a user-selected region of interest**

associated with the first image with a corresponding region of interest of the

second image such that said region of interest of the first image occupies in

the display the same location as the region of interest in the second image."

Ex. 1006, 7:36–51 (emphasis added); Ex. 1003 ¶ 157.  A portion of Levey

59

Appx133

IPR2020-00862
Patent 10,356,332 B2

cited by the Petition discloses that "[m]ost digital cameras have a variety of photography modes that can be selected by the user to control various elements of the image capture process and the image processing chain." Ex. 1015 ¶ 4. Levey further discloses determining "image capture settings such as the exposure index, the lens F/# [F number], the exposure time and the electronic flash setting, as well as other user settings 175, such as those discussed with reference to FIG. 2," with respect to an automatic mode. *Id.* ¶ 70. As an example, Levey discloses, in a portion cited by the Petition, that "if a user is capturing images at a soccer game, they would typically set the camera to operate in a sport photography mode" which "would generally choose appropriate image capture settings to minimize the motion blur associated with moving subjects." *Id.* ¶ 71.

Patent Owner argues because Levey uses a preview setting that is of lower quality "a POSITA would thus not be motivated to apply Levey's teaching to the task of selecting an appropriate lens based on a zoom setting for use in the preview window." Ex. 2001 ¶ 98. However, a portion of Levey cited in the Petition recites that the image sensor is actuated by a timing generator "when capturing video images ***and also*** when previewing a still image." Ex. 1015 ¶ 39 (emphasis added). Patent Owner has not explained sufficiently why Levey is limited to a preview mode.

Patent Owner also argues Levey's preview mode is not appropriate for "the task of selecting an appropriate lens based on a zoom setting. Claim 9 is not limited to the task of selecting an appropriate lens based on a zoom setting and Patent Owner has not explained sufficiently why claim 9 would be limited to such a task.

IPR2020-00862
Patent 10,356,332 B2

Patent Owner argues that a person of ordinary skill in that art would be familiar with photography.  We analyze this claim under that level of skill and, below, without Patent Owner's proposed familiarity with photography. Under that level of skill Patent Owner argues

> a POSITA that had additional knowledge, skill and experience in photography would understand that for each and every individual example of a photography mode enumerated by Levey, the photographer may want to access multiple settings of the preview display for framing a shot.  For example, each photography mode enumerated by Levey may be executed using a wide-angle or telephoto zoom setting, as the choice of photography mode is independent of the choice of framing.

PO Resp. 44–45 (citing Ex. 2001 ¶¶ 100; Ex. 2003).  Patent Owner has not explained sufficiently why the distinction between framing and photography mode would mean that one of ordinary skill would not have wanted both options available on a dual lens camera.  We are persuaded by Petitioner's contention that one of ordinary skill would have been motivated to have both features.  Pet. 59–61 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶¶ 151–156).

Patent Owner also argues "Petitioner seeks to intermix Levey's 'photography mode' with Levey's 'camera mode' since Levey's user input innovation is used to control *photography mode,* not *camera mode* as required by Claim 9."  PO Resp. 47.  To the extent Patent Owner is correct that photography mode is different than camera mode, Patent Owner has not explained sufficiently how that difference would have prevented the use of Levey's user input with camera modes.  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues "A POSITA would not necessarily be familiar with photography and would therefore not necessarily understand

IPR2020-00862
Patent 10,356,332 B2

how settings involving the preview display used for framing shots would be related to the settings used for a 'photography mode.'" *Id.* at 44. Again, regardless of one of ordinary skill's knowledge of a preview display used for framing shots, he or she would either have recognized the photography modes as camera modes as claimed or recognized that Levey's user input for adjusting photography modes could be combined with Golan's and Martin's user controls.

Patent Owner also repeats its argument that Martin involves post-acquisition activity and the '332 patent involves pre-processing activity. Specifically, Patent Owner argues "the '332 [patent] discloses the selection of a region of interest ***before*** the still image is acquired whereas Martin discloses the selection of a region of interest ***after*** the images used for autostereoscopic display have been acquired." *Id.* at 48. We rejected this argument above at Section III.D.4. Nevertheless, the claims do not distinguish pre-acquisition and post-acquisition and Patent Owner has not explained sufficiently why pre-acquisition and post-acquisition are incompatible such that they cannot be combined or undermine the reasons for combining presented by Petitioner. Thus, Patent Owner's argument does not undermine Petitioner's showing. We are persuaded by Petitioner's contention that Martin describes that "aligning **a user-selected region of interest associated** with the first image with a corresponding region of interest of the second image." Pet. 61 (quoting Ex. 1006, 7:36–51; citing Ex. 1003 ¶ 157).

We are persuaded that Golan discloses the user control module and the sensor control module in the claimed camera controller, Martin discloses "a user-selected region of interest," and Levey discloses "wherein the user

IPR2020-00862
Patent 10,356,332 B2

inputs include a zoom factor, a camera mode and a region of interest" based on the cited portions of Golan and Levey. We are persuaded also that Petitioner's rationale for combining Golan, Martin, Togo, and Levey is supported by sufficient rational underpinning, based on the entirety of the record developed at trial. *See KSR*, 550 at 418. Accordingly, we are persuaded the combination of Golan, Martin, and Levey teaches the limitations recited in claims 10. Thus, we are persuaded that Petitioner has shown, by a preponderance of the evidence, the unpatentability of these claims over the combination of Golan, Martin, Togo and Levey.

### F.    *Obviousness over Golan, Martin, Togo, and Border*

#### 1.    *Overview of Border (Ex. 1009)*

Border describes providing a digital camera with an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range." Ex. 1009 ¶ 10. As shown in Figure 5 of Border, reproduced below, the processor of a digital camera includes an image compositor 202 to form a composite image 208 using the two images, wide image 204 and telephoto image 206 of the same scene, that are captured using lenses having different focal lengths. *Id.* ¶ 70.

IPR2020-00862
Patent 10,356,332 B2



*FIG. 5*

As seen in Figure 5, above, the image registration determiner 212
determines the registration between the wide image 204 and the telephoto
image 206, so that the two images are matched to "locate the high-resolution
image accurately into the low-resolution image and then stitched into place
so the edge between the two images in the composite image is not
discernible." *Id.* ¶ 29, Fig. 5. Border goes on to explain that in the context
of Figure 5, telephoto image 206 captures a smaller portion of the scene, but
with greater resolution than wide image 204. *Id.* ¶ 36.

Border also describes that an image resampler 214 of the processor
produces the composite image 208 based on a zoom amount Z specifying the
desired relative zoom amount of the produced composite image 208.
*Id.* ¶ 43. Specifically, Border explains that the composite image 208 is
generated from the two images and that the resulting composite image is
produced differently for different zoom amount values, such as Z=1,
1<Z<M, and Z=M, where M is the relative magnification ratio M of the
telephoto image 206 to the wide image 204. *Id.* ¶¶ 29, 44.

IPR2020-00862
Patent 10,356,332 B2

### 2. *Dependent Claims 12 and 21*

Claim 12, which depends from claim 1, further recites "wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view." Ex. 1001, 13:23–27. Claim 21, which depends from claim 13, further recites essentially the same features. *Id.* at 14:28–33.

According to Petitioner,

> Border describes providing a digital camera include lenses having different focal lengths for an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range."

> As shown in Figure 5 of Border . . . , the processor of the digital camera includes an image compositor 202 to form a composite image 208 using the two images, wide image 204 and telephoto image 206.

Pet. 62–63 (citing Ex. 1003 ¶¶ 160–163) (emphases omitted) (citations omitted). Petitioner contends that

> [a] POSITA would have been motivated to apply Border's teachings of combining in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view in the digital camera of Golan combined with Martin and Togo to achieve the benefit of 'a zoomed image with high resolution throughout the zoom range and improved image quality' in still mode as taught by Border.

*Id.* at 64 (citing Ex. 1009, code (57); Ex. 1003 ¶¶ 164–167). Petitioner contends that in its combination

> Golan's zoom control sub-system 100 (as applied in combination with Martin and Togo is adapted to apply Border's teaching of

65

IPR2020-00862
Patent 10,356,332 B2

> still mode operation in which wide image and telephoto image
> are combined, which for zoom amounts between 1 and M (a
> relative magnification ratio of Tele image to Wide image), uses
> registration information to transform coordinates of the telephoto
> image to the wide image and produces a composite image having
> the point of view of the wide image.

*Id.* at 69.

Patent Owner argues that none of Golan, Togo, and Border creates a
fused image from a particular point of view.  PO Resp. 49–51.  Patent
Owner does not offer a construction of the term "point of view."  Patent
Owner implies that "distortion" is required to change a point of view.  *Id.*
Patent Owner has not cited to evidence explaining sufficiently what
distortions are required or why translation and rotation are not enough to
change a point of view.  We are persuaded by Petitioner's contention that
Border teaches using registration information to transform coordinates of the
telephoto image to the wide image and produces a composite image having
the point of view of the wide image.[21]

Patent Owner also does not offer a construction for the term "fused."
Patent Owner argues that Border results in an image "consist[ing] of a
quadrilateral portion from the telephoto point of view surrounded by a
remaining image portion from the wide-angle point of view."  *Id.* at 50.
Even if we agree with Patent Owner's characterization of Border, Patent

---

[21] In an appeal of a related IPR, a similar argument regarding whether a
related patent required resolving occlusions cause by different points of view
was rejected by the Federal Circuit.  *Apple Inc. v. Corephotonics Ltd.*,
IPR2018-01133, Paper 34 (PTAB Dec. 2, 2019), *aff'd* 857 F. App'x 641
(Fed. Cir. 2021) (nonprecedential).  That similar argument was based in part
on the essentially the same "rectification" and/or distortion process argued
by Patent Owner in this IPR.  *Id.*

66

IPR2020-00862
Patent 10,356,332 B2

Owner has not explained sufficiently how such a combination of the Wide
and Tele images would not be considered as being from the Wide point of
view based on the transformation of coordinates that was done. *See* Pet. 70.

Patent Owner also suggests that "fus[ing]" as claimed requires
"rectification" as shown in Figure 3C of the '332 patent and excludes any
parallax. PO Resp. 51–53. Patent Owner implicitly argues that a limitation
to rectification should be read into the claims. Notwithstanding the
importance of a specification, limitations in the specification must not be
read into the claims absent lexicography or disclaimer/disavowal. *Hill-Rom
Services, Inc.*, 755 F.3d at 1371. Thus, absent a clear disavowal or
alternative lexicography by a patentee, he or she "is free to choose a broad
term and expect to obtain the full scope of its plain and ordinary meaning."
*Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir.
2012).

We decline to require the rectification process in order to fuse two
images to a particular point of view as claimed. *See* Pet. Reply. 21. Thus,
Patent Owner's argument does not undermine Petitioner's showing. We are
persuaded by Petitioner's reliance on Border's use of registration
information to transform coordinates of the telephoto image to the wide
image and produce a composite image having the point of view of the wide
image. *See* Pet. 69.

We have reviewed the cited portions of Border and are persuaded the
combination of Golan, Martin, Togo, and Border teaches the limitations
recited in claims 12 and 21. We are further persuaded that Petitioner's
rationale for combining Golan, Martin, Togo, and Border is supported by
sufficient rational underpinning. Accordingly, we are persuaded Petitioner

IPR2020-00862
Patent 10,356,332 B2

has shown, by a preponderance of the evidence, the unpatentability of these claims over the combination of Golan, Martin, Togo and Border.

      G.     *Obviousness over Golan, Martin, Togo, and Parulski*

          *1.     Overview of Parulski (Ex. 1008)*

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex. 1008, 1:8–10.  In one embodiment, an image capture assembly can be a digital camera that includes two image capture stages.  *See id.* at 12:36–45. The two image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes, and the other is used for capturing an image.  *Id.* at 8:9–13.  This allows for improved imaging capability without unduly increasing the size or cost of the digital camera.  *Id.* at 8:13–16.  In one example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens.  *Id.* at 23:28–40.  An image processor that "may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface . . . ." *Id.* at 23:54–56.

          *2.     Dependent Claims 11 and 22*

Claim 11, which depends from claim 1, further recites "wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1." Ex. 1001, 13:10–13.

Petitioner contends "[a] POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ('less than unit')." Pet. 75 (citing Ex. 1003 ¶ 187).  Petitioner

68

IPR2020-00862
Patent 10,356,332 B2

further contends that to the extent that Patent Owner argues that Golan does not explicitly describe tele lens 120 as a telephoto lens as claimed, it would have been obvious to a POSITA to implement Golan's tele lens 120 with "a fixed focal length **telephoto lens**" having TTL/EFL smaller than 1 as taught in Parulski for the benefit of a "very small figure." *Id.* at 76 (citing Ex. 1008, 23:38, 24:20–21; Ex. 1003 ¶ 188).

As rationale for combining, Petitioner contends that a POSITA would have been motivated to apply Parulski's teachings of, in still mode, combining Wide and Tele image data only in focused areas to generate a fused output image in the system of Golan combined with Martin and Togo for the benefit of a fused output image having a broadened depth of field, at a predefined range of ZF values (e.g., the large lossless zooming range described in Golan) in such a digital camera. *Id.* at 74 (citing Ex. 1008, 28:52–53, 29:4–7, 30:17–20; Ex. 1003 ¶¶ 181–185).

Patent Owner argues

> Petitioner confuses the fusion disclosed by Golan, used to fuse the color of a low-resolution image with the detail of a high-resolution monochromatic image, with block 514 of Parulski that uses an 'enhancement signal' to 'sharpen portions of the primary still image that are positioned near the secondary focus distance.' Ex. 2001, ¶121; Ex. 1003, ¶183; Ex. 1008, 22:40-42. Parulski lacks sufficient disclosure for a POSITA to understand what source of 'enhancement signal' was available from the combination of Golan, Martin and Togo. Togo estimates the distance to the subject, but this distance is a single value for the entire pair of wide-angle and telephoto images and does not indicate which pixels from which image should be used. Ex. 2001, ¶121.

PO Resp. 54. As to Golan and Parulski, Petitioner contends a person of ordinary skill "would have been motivated to apply Parulski's teachings of

69

IPR2020-00862
Patent 10,356,332 B2

still mode fusion to a still mode of Golan, while in video mode, maintaining Golan's design choice of video switching (e.g., for the benefit of reduced computation power of video switching over video fusion)." Pet. Reply 21–22 (citing Pet. 73) (emphasis omitted). We agree and adopt and rely on Petitioner's contentions explained above. As to Togo's estimate of distance and Border's enhancement signal, we do not find this argument persuasive because it is directed to bodily incorporation and not to what the combined teachings would have suggested to one of skill in the art. *Keller*, 642 F.2d at 425; Pet. Reply 22.

We are persuaded that the cited portions of Golan, Martin, Togo, and Parulski teach the limitations recited in claim 10. We are also persuaded that the ordinarily skilled artisan would have combined Golan, Martin, and Parulski.

Claim 22, which depends from claim 13, further recites "the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image includes configuring the camera controller to combine Wide and Tele image data only in focused areas." Ex. 1001, 14:34–39.

Petitioner contends that "Golan's zoom control sub-system 100 (as applied in combination with Martin and Togo in claim 13) is adapted to apply Parulski's teaching of still mode operation in which wide image and telephoto image are combined only in focused areas, which for a predetermined lossless zooming range, produces a fused output image having a broadened depth of field." Pet. 79 (citing Ex. 1003 ¶¶ 192–196). We are persuaded that the cited portions of Golan, Martin, Togo, and Parulski teach the limitations recited in claim 20.

70
Appx144

IPR2020-00862
Patent 10,356,332 B2

Patent Owner also argues that it would require "undue experimentation" to combine the references because "Parulski does not disclose this 'enhancement signal,' nor does Parulski disclose how this enhancement signal is used to sharpen pixels in the primary still image." PO Resp. 55. To the extent that Patent Owner argues that Border is not enabled, "[i]n general, a prior art reference asserted under § 103 does not necessarily have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to the obviousness inquiry." *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993 F.3d 1374, 1380 (Fed. Cir. 2021).

Additionally, we do not find Patent Owner's argument regarding combining the enhancement signal of Parulski with Golan and Martin persuasive because it is directed to bodily incorporation and not to what the combined teachings would have suggested to one of skill in the art. *Keller*, 642 F.2d at 425; Pet. Reply 23. As to the feasibility of the combination, we credit Dr. Durand's testimony that the combination would have been within the ordinary skill in the art. Ex. 1003 ¶¶ 192–196; Ex. 1040 ¶ 101.

Patent Owner also argues

> Parulski['s] "broadened depth of field" that Petitioner points to addresses an entirely different issue than the one addressed and required by Claim 22. Ex. 2001, ¶128. In light of the specification, a POSITA would understand Claim 22 "focus" in the context of "[t]he ROI is the region of interest on which both cameras are focused on." Ex. 1001, 6:54-55. This region of interest is used specifically for the fusion of Wide and Tele images. " . . . [T]he position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area." *Id*. at 7:54-56. A POSITA would understand Claim 22 "to combine . . . *at least some* of the Wide and Tele image data to provide a *fused* output image includes configuring the camera controller to **combine Wide and Tele**

71

IPR2020-00862
Patent 10,356,332 B2

> *image data only in focused areas*" (emphasis added). In other words, a POSITA reading claim 20 in light of the '332 specification would understand the requirement to only fuse (transform to the same point of view) the same portion of the Wide and Tele images only where ***both*** were in focus. Dr. Durand uses Parulski to show how one might combine portions of images together where ***either*** was in focus. Ex. 2001, ¶128.

PO Resp. 55–56. Petitioner responds

> PO's reliance upon "position matching [] achieved only in the ROI region" (POR, 56 citing '332 Patent 7:54-56) is inapposite because that description is for 'Video Mode Operation/Function,' not for still mode as claimed. (APPL-1001), 7:40-56. On the contrary, the '332 Patent describes under "**Still Mode** Operation/Function' that image processing 'fuses the wide and the Tele images to . . . **provide wide dynamic range**," '332, 7:18-34, which is consistent with the issue addressed by Parulski's fusion to provide 'broadened depth of field.' APPL-1040, ¶102.

Pet. Reply 23 (alterations in original). We agree with Petitioner that Petitioner's contentions in the Petition rely on the still mode function and thus, Patent Owner's argument does not undermine Petitioner's showing.

For the foregoing reasons, we are persuaded the combination of Golan, Martin, and Parulski teaches the limitations recited in claims 11 and 22. We are further persuaded that Petitioner's rationale for combining Golan, Martin, Togo, and Parulski is supported by sufficient rational underpinning. Accordingly, Petitioner has shown by a preponderance of the evidence the unpatentability of these claims over Golan, Martin, Togo, and Parulski.

## IV.    CONCLUSION

For the foregoing reasons, we conclude that Petitioner has established unpatentability of: claims 1–4, 8, 12, and 15 over Golan, Martin, and Togo;

IPR2020-00862
Patent 10,356,332 B2

claim 9 over Golan, Martin, Togo, and Levey; claims 11 and 19 over Golan, Martin, Togo, and Border; and claims 10 and 20 over Golan, Martin, Togo, and Parulski.[22]  Our conclusions regarding the challenged claims are summarized below:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 5, 9, 13, 14, 17 | 103 | Golan, Martin, Togo | 1, 2, 5, 9, 13, 14, 17 | |
| 10 | 103 | Golan, Martin, Togo, Levey | 10 | |
| 12, 21 | 103 | Golan, Martin, Togo, Border | 12, 21 | |
| 11, 22 | 103 | Golan, Martin, Togo, Parulski | 11, 22 | |
| **Overall Outcome** | | | 1, 2, 5, 9–14, 17, 21, 22 | |

V.     ORDER

In consideration of the foregoing, it is hereby:

---

[22] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

73

IPR2020-00862
Patent 10,356,332 B2

ORDERED that claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent are determined to be unpatentable; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

74

IPR2020-00862
Patent 10,356,332 B2

PETITIONER:

David W. O'Brien
Andrew S. Ehmke
Hong Shi
HAYNES AND BOONE, LLP
david.obrien.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
hong.shi.ipr@haynesboone.com

PATENT OWNER:

Neil A. Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com



US010230898B2

(12) **United States Patent**
Cohen et al.

(10) Patent No.: **US 10,230,898 B2**
(45) Date of Patent: **Mar. 12, 2019**

(54) **DUAL APERTURE ZOOM CAMERA WITH VIDEO SUPPORT AND SWITCHING / NON-SWITCHING DYNAMIC CONTROL**

(71) Applicant: **Corephotonics Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Noy Cohen**, Tel-Aviv (IL); **Oded Gigushinski**, Herzlia (IL); **Nadav Geva**, Tel-Aviv (IL); **Gal Shabtay**, Tel-Aviv (IL); **Ester Ashkenazi**, Modi'in (IL); **Ruthy Katz**, Tel Aviv (IL); **Ephraim Goldenberg**, Ashdod (IL)

(73) Assignee: **Corephotonics Ltd.**, Tel Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/324,720**

(22) PCT Filed: **Jun. 26, 2016**

(86) PCT No.: **PCT/IB2016/053803**
§ 371 (c)(1),
(2) Date: **Jan. 8, 2017**

(87) PCT Pub. No.: **WO2017/025822**
PCT Pub. Date: **Feb. 16, 2017**

(65) **Prior Publication Data**
US 2018/0184010 A1    Jun. 28, 2018

**Related U.S. Application Data**

(60) Provisional application No. 62/204,667, filed on Aug. 13, 2015.

(51) **Int. Cl.**
*H04N 5/232* (2006.01)
*H04N 5/225* (2006.01)

(52) **U.S. Cl.**
CPC ....... *H04N 5/23296* (2013.01); *H04N 5/2258* (2013.01); *H04N 5/23216* (2013.01); *H04N 5/23245* (2013.01)

(58) **Field of Classification Search**
CPC ............. H04N 5/23296; H04N 5/2258; H04N 5/23216; H04N 5/23245
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,199,785 A    4/1980    McCullough et al.
5,005,083 A    4/1991    Grage et al.
(Continued)

FOREIGN PATENT DOCUMENTS

CN    101276415 A    10/2008
CN    102739949 A    10/2012
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion issued in relation to PCT patent application PCT/IB2016/053803 dated Jun. 26, 2016, 9 pages.
(Continued)

*Primary Examiner* — Nhan T Tran
(74) *Attorney, Agent, or Firm* — Nathan & Associates; Menachem Nathan

(57) **ABSTRACT**

A dual-aperture zoom digital camera operable in both still and video modes. The camera includes Wide and Tele imaging sections with respective lens/sensor combinations and image signal processors and a camera controller operatively coupled to the Wide and Tele imaging sections. The Wide and Tele imaging sections provide respective image data. The controller is configured to output, in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value, a zoom video output image that includes
(Continued)





**US 10,230,898 B2**

Page 2

only Wide image data or only Tele image data, depending on whether a no-switching criterion is fulfilled or not.

**20 Claims, 5 Drawing Sheets**

(56)　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,032,917 | A | 7/1991 | Aschwanden |
| 5,051,830 | A | 9/1991 | von Hoessle |
| 5,248,971 | A | 9/1993 | Mandl |
| 5,287,093 | A | 2/1994 | Amano et al. |
| 5,436,660 | A | 7/1995 | Sakamoto |
| 5,444,478 | A | 8/1995 | Lelong et al. |
| 5,459,520 | A | 10/1995 | Sasaki |
| 5,657,402 | A | 8/1997 | Bender et al. |
| 5,682,198 | A | 10/1997 | Katayama et al. |
| 5,710,670 | A | 1/1998 | Ohno |
| 5,768,443 | A | 6/1998 | Michael et al. |
| 5,926,190 | A | 7/1999 | Turkowski et al. |
| 5,940,641 | A | 8/1999 | McIntyre et al. |
| 5,982,951 | A | 11/1999 | Katayama et al. |
| 6,101,334 | A | 8/2000 | Fantone |
| 6,104,432 | A | 8/2000 | Nakamura et al. |
| 6,128,416 | A | 10/2000 | Oura |
| 6,148,120 | A | 11/2000 | Sussman |
| 6,208,765 | B1 | 3/2001 | Bergen |
| 6,268,611 | B1 | 7/2001 | Pettersson et al. |
| 6,549,215 | B2 | 4/2003 | Jouppi |
| 6,611,289 | B1 | 8/2003 | Yu et al. |
| 6,643,416 | B1 | 11/2003 | Daniels et al. |
| 6,650,368 | B1 | 11/2003 | Doron |
| 6,680,748 | B1 | 1/2004 | Monti |
| 6,714,665 | B1 | 3/2004 | Hanna et al. |
| 6,724,421 | B1 | 4/2004 | Glatt |
| 6,738,073 | B2 | 5/2004 | Park et al. |
| 6,741,250 | B1 | 5/2004 | Furlan et al. |
| 6,750,903 | B1 | 6/2004 | Miyatake et al. |
| 6,778,207 | B1 | 8/2004 | Lee et al. |
| 7,002,583 | B2 | 2/2006 | Rabb, III |
| 7,015,954 | B1 | 3/2006 | Foote et al. |
| 7,038,716 | B2 | 5/2006 | Klein et al. |
| 7,199,348 | B2 | 4/2007 | Olsen et al. |
| 7,206,136 | B2 | 4/2007 | Labaziewicz et al. |
| 7,248,294 | B2 | 7/2007 | Slatter |
| 7,256,944 | B2 | 8/2007 | Labaziewicz et al. |
| 7,305,180 | B2 | 12/2007 | Labaziewicz et al. |
| 7,339,621 | B2 | 3/2008 | Fortier |
| 7,346,217 | B1 | 3/2008 | Gold, Jr. |
| 7,365,793 | B2 | 4/2008 | Cheatle et al. |
| 7,411,610 | B2 | 8/2008 | Doyle |
| 7,424,218 | B2 | 9/2008 | Baudisch et al. |
| 7,509,041 | B2 | 3/2009 | Hosono |
| 7,533,819 | B2 | 5/2009 | Barkan et al. |
| 7,619,683 | B2 | 11/2009 | Davis |
| 7,738,016 | B2 | 6/2010 | Toyofuku |
| 7,880,776 | B2 | 2/2011 | LeGall et al. |
| 7,918,398 | B2 | 4/2011 | Li et al. |
| 7,964,835 | B2 | 6/2011 | Olsen et al. |
| 7,978,239 | B2 | 7/2011 | Deever et al. |
| 8,115,825 | B2 | 2/2012 | Culbert et al. |
| 8,149,327 | B2 | 4/2012 | Lin et al. |
| 8,154,610 | B2 | 4/2012 | Jo et al. |
| 8,238,695 | B1 | 8/2012 | Davey et al. |
| 8,274,552 | B2 | 9/2012 | Dahi et al. |
| 8,390,729 | B2 | 3/2013 | Long et al. |
| 8,391,697 | B2 | 3/2013 | Cho et al. |
| 8,400,555 | B1 | 3/2013 | Georgiev et al. |
| 8,401,276 | B1 | 3/2013 | Choe et al. |
| 8,439,265 | B2 | 5/2013 | Ferren et al. |
| 8,446,484 | B2 | 5/2013 | Muukki et al. |
| 8,483,452 | B2 | 7/2013 | Ueda et al. |
| 8,514,491 | B2 | 8/2013 | Duparre |
| 8,547,389 | B2 | 10/2013 | Hoppe et al. |
| 8,553,106 | B2 | 10/2013 | Scarff |

| | | | | |
|---|---|---|---|---|
| 8,587,691 | B2 | 11/2013 | Takane | |
| 8,619,148 | B1 | 12/2013 | Watts et al. | |
| 8,803,990 | B2 | 8/2014 | Smith | |
| 8,976,255 | B2 | 3/2015 | Matsuoto et al. | |
| 9,019,387 | B2 | 4/2015 | Nakano | |
| 9,025,073 | B2 | 5/2015 | Attar et al. | |
| 9,025,077 | B2 | 5/2015 | Attar et al. | |
| 9,041,835 | B2 | 5/2015 | Honda | |
| 9,137,447 | B2 | 9/2015 | Shibuno | |
| 9,185,291 | B1 | 11/2015 | Shabtay et al. | |
| 9,215,377 | B2 | 12/2015 | Sokeila et al. | |
| 9,215,385 | B2 | 12/2015 | Luo | |
| 9,270,875 | B2 | 2/2016 | Brisedoux et al. | |
| 9,286,680 | B1 | 3/2016 | Jiang et al. | |
| 9,344,626 | B2 | 5/2016 | Silverstein et al. | |
| 9,360,671 | B1 | 6/2016 | Zhou | |
| 9,369,621 | B2 | 6/2016 | Malone et al. | |
| 9,413,930 | B2 | 8/2016 | Geerds | |
| 9,413,984 | B2 | 8/2016 | Attar et al. | |
| 9,420,180 | B2 | 8/2016 | Jin | |
| 9,438,792 | B2 | 9/2016 | Nakada et al. | |
| 9,485,432 | B1 | 11/2016 | Medasani et al. | |
| 9,578,257 | B2 | 2/2017 | Attar et al. | |
| 9,618,748 | B2 | 4/2017 | Munger et al. | |
| 9,681,057 | B2 | 6/2017 | Attar et al. | |
| 9,723,220 | B2 | 8/2017 | Sugie | |
| 9,736,365 | B2 | 8/2017 | Laroia | |
| 9,736,391 | B2 | 8/2017 | Du et al. | |
| 9,800,798 | B2 | 10/2017 | Ravirala et al. | |
| 9,851,803 | B2 | 12/2017 | Fisher et al. | |
| 9,894,287 | B2 | 2/2018 | Qian et al. | |
| 9,900,522 | B2 | 2/2018 | Lu | |
| 2002/0005902 | A1 | 1/2002 | Yuen | |
| 2002/0063711 | A1 | 5/2002 | Park et al. | |
| 2002/0122113 | A1 | 9/2002 | Foote | |
| 2002/0030729 | A1 | 2/2003 | Prentice et al. | |
| 2003/0093805 | A1 | 5/2003 | Gin | |
| 2003/0160886 | A1 | 8/2003 | Misawa et al. | |
| 2003/0017930 | A1 | 9/2003 | Bittner | |
| 2003/0202113 | A1 | 10/2003 | Yoshikawa | |
| 2004/0008773 | A1 | 1/2004 | Itokawa | |
| 2004/0017386 | A1 | 1/2004 | Liu et al. | |
| 2004/0027367 | A1 | 2/2004 | Pilu | |
| 2004/0061788 | A1 | 4/2004 | Bateman | |
| 2004/0240052 | A1 | 12/2004 | Minefuji et al. | |
| 2005/0013509 | A1 | 1/2005 | Samadani | |
| 2005/0046740 | A1 | 3/2005 | Davis | |
| 2005/0157184 | A1 | 7/2005 | Nakanishi et al. | |
| 2005/0200718 | A1 | 9/2005 | Lee | |
| 2006/0054782 | A1 | 3/2006 | Olsen et al. | |
| 2006/0056056 | A1 | 3/2006 | Ahiska et al. | |
| 2006/0125937 | A1 | 6/2006 | LeGall et al. | |
| 2006/0170793 | A1 | 8/2006 | Pasquarette et al. | |
| 2006/0175549 | A1 | 8/2006 | Miller et al. | |
| 2006/0187310 | A1 | 8/2006 | Janson et al. | |
| 2006/0187322 | A1 | 8/2006 | Janson et al. | |
| 2006/0187338 | A1 | 8/2006 | May et al. | |
| 2007/0024737 | A1 | 2/2007 | Nakamura et al. | |
| 2007/0025713 | A1* | 2/2007 | Hosono | H04N 5/2259 |
| | | | | 396/72 |
| 2007/0177025 | A1 | 8/2007 | Kopet et al. | |
| 2007/0182833 | A1* | 8/2007 | Toyofuku | H04N 5/232 |
| | | | | 348/240.3 |
| 2007/0188653 | A1 | 8/2007 | Pollock et al. | |
| 2007/0189386 | A1 | 8/2007 | Imagawa et al. | |
| 2007/0257184 | A1 | 11/2007 | Olsen et al. | |
| 2007/0285550 | A1 | 12/2007 | Son | |
| 2008/0017557 | A1 | 1/2008 | Witdouck | |
| 2008/0024614 | A1 | 1/2008 | Li et al. | |
| 2008/0025634 | A1 | 1/2008 | Border et al. | |
| 2008/0030592 | A1 | 2/2008 | Border et al. | |
| 2008/0030611 | A1 | 2/2008 | Jenkins | |
| 2008/0084484 | A1 | 4/2008 | Ochi et al. | |
| 2008/0117316 | A1 | 5/2008 | Orimoto | |
| 2008/0218611 | A1 | 9/2008 | Paurlski et al. | |
| 2008/0218612 | A1 | 9/2008 | Border et al. | |
| 2008/0218613 | A1 | 9/2008 | Janson et al. | |
| 2008/0219654 | A1 | 9/2008 | Border et al. | |
| 2009/0086074 | A1 | 4/2009 | Li et al. | |

**US 10,230,898 B2**

Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0102950 A1 | 4/2009 | Ahiska | |
| 2009/0122195 A1 | 5/2009 | Van Baar et al. | |
| 2009/0122406 A1 | 5/2009 | Rouvinen et al. | |
| 2009/0128644 A1 | 5/2009 | Camp et al. | |
| 2009/0219547 A1 | 9/2009 | Kauhanen et al. | |
| 2009/0252484 A1 | 10/2009 | Hasuda et al. | |
| 2009/0295949 A1 | 12/2009 | Ojala | |
| 2010/0013906 A1 | 1/2010 | Border et al. | |
| 2010/0060746 A9 | 3/2010 | Olsen et al. | |
| 2010/0103194 A1 | 4/2010 | Chen et al. | |
| 2010/0238327 A1 | 9/2010 | Griffith et al. | |
| 2010/0277619 A1* | 11/2010 | Scarff | H04N 5/2258 |
| | | | 348/240.1 |
| 2011/0064327 A1 | 3/2011 | Dagher et al. | |
| 2011/0080487 A1 | 4/2011 | Venkataraman et al. | |
| 2011/0128288 A1 | 6/2011 | Petrou et al. | |
| 2011/0164172 A1 | 7/2011 | Shintani et al. | |
| 2011/0229054 A1 | 9/2011 | Weston et al. | |
| 2011/0234853 A1 | 9/2011 | Hayashi et al. | |
| 2011/0242286 A1 | 10/2011 | Pace et al. | |
| 2011/0242355 A1 | 10/2011 | Goma et al. | |
| 2012/0026366 A1 | 2/2012 | Golan et al. | |
| 2012/0069235 A1 | 3/2012 | Imai | |
| 2012/0075489 A1 | 3/2012 | Nishihara | |
| 2012/0105579 A1 | 5/2012 | Jeon et al. | |
| 2012/0196648 A1 | 8/2012 | Havens et al. | |
| 2012/0229663 A1 | 9/2012 | Nelson et al. | |
| 2012/0249815 A1 | 10/2012 | Bohn et al. | |
| 2012/0287315 A1 | 11/2012 | Huang et al. | |
| 2013/0002928 A1 | 1/2013 | Imai | |
| 2013/0093842 A1 | 4/2013 | Yahata | |
| 2013/0135445 A1 | 5/2013 | Dahi et al. | |
| 2013/0182150 A1 | 7/2013 | Asakura | |
| 2013/0201360 A1 | 8/2013 | Song | |
| 2013/0202273 A1 | 8/2013 | Ouedraogo et al. | |
| 2013/0235224 A1 | 9/2013 | Park et al. | |
| 2013/0250150 A1 | 9/2013 | Malone et al. | |
| 2013/0258044 A1 | 10/2013 | Betts-LaCroix | |
| 2013/0321668 A1 | 12/2013 | Kamath | |
| 2014/0049615 A1 | 2/2014 | Uwagawa | |
| 2014/0118584 A1 | 5/2014 | Lee et al. | |
| 2014/0192238 A1 | 7/2014 | Attar et al. | |
| 2014/0192253 A1 | 7/2014 | Laroia | |
| 2014/0253693 A1* | 9/2014 | Shikata | H04N 5/23245 |
| | | | 348/47 |
| 2014/0267834 A1* | 9/2014 | Aoki | H04N 5/23296 |
| | | | 348/240.1 |
| 2014/0313316 A1 | 10/2014 | Olsson et al. | |
| 2014/0362242 A1 | 12/2014 | Takizawa | |
| 2015/0085174 A1* | 3/2015 | Shabtay | H04N 5/23296 |
| | | | 348/336 |
| 2015/0092066 A1 | 4/2015 | Geiss et al. | |
| 2015/0154776 A1 | 6/2015 | Zhang et al. | |
| 2015/0195458 A1 | 7/2015 | Nakayama et al. | |
| 2015/0215516 A1 | 7/2015 | Dolgin | |
| 2015/0237280 A1 | 8/2015 | Choi et al. | |
| 2015/0242994 A1 | 8/2015 | Shen | |
| 2015/0244942 A1 | 8/2015 | Shabtay et al. | |
| 2015/0271471 A1 | 9/2015 | Hsieh et al. | |
| 2015/0334309 A1 | 11/2015 | Peng et al. | |
| 2016/0044250 A1 | 2/2016 | Shabtay et al. | |
| 2016/0154202 A1 | 6/2016 | Wippermann et al. | |
| 2016/0212358 A1 | 7/2016 | Shikata | |
| 2016/0241793 A1* | 8/2016 | Ravirala | H04N 5/23296 |

| | | | |
|---|---|---|---|
| 2016/0301840 A1 | 10/2016 | Du et al. | |
| 2016/0353012 A1 | 12/2016 | Kao et al. | |
| 2017/0019616 A1 | 1/2017 | Zhu et al. | |
| 2017/0214846 A1 | 7/2017 | Du et al. | |
| 2017/0214866 A1 | 7/2017 | Zhu et al. | |
| 2017/0289458 A1 | 10/2017 | Song et al. | |
| 2018/0150973 A1 | 5/2018 | Tang et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 103024272 A | 4/2013 | |
| EP | 2523450 A1 | 11/2012 | |
| JP | 04211230 A | 8/1992 | |
| JP | H07318864 A | 12/1995 | |
| JP | 08271976 A | 10/1996 | |
| JP | 2003298920 A | 10/2003 | |
| JP | 2005099265 A | 4/2005 | |
| JP | 2006238325 A | 9/2006 | |
| JP | 2007228006 A | 9/2007 | |
| JP | 2007306282 A | 11/2007 | |
| JP | 2013106289 A | 5/2013 | |
| KR | 20100008936 A | 1/2010 | |
| KR | 20140014787 A | 2/2014 | |
| KR | 101477178 B1 | 12/2014 | |
| WO | 2014199338 A2 | 12/2014 | |

OTHER PUBLICATIONS

Statistical Modeling and Performance Characterization of a Real-Time Dual Camera Surveillance System, Greienhagen et al., Publisher: IEEE, 2000, 8 pages.
A 3MPixel Multi-Aperture Image Sensor with 0.7 μm Pixels in 0.11 μm CMOS, Fife et al., Stanford University, 2008, 3 pages.
Dual camera intelligent sensor for high definition 360 degrees surveillance, Scotti et al., Publisher: IET, May 9, 2000, 8 pages.
Dual-sensor foveated imaging system, Hua et al., Publisher: Optical Society of America, Jan. 14, 2008, 11 pages.
Defocus Video Matting, McGuire et al., Publisher: ACM SIGGRAPH, Jul. 31, 2005, 11 pages.
Compact multi-aperture imaging with high angular resolution, Santacana et al., Publisher: Optical Society of America, 2015, 10 pages.
Multi-Aperture Photography, Green et al., Publisher: Mitsubishi Electric Research Laboratories, Inc., Jul. 2007, 10 pages.
Multispectral Bilateral Video Fusion, Bennett et al., Publisher: IEEE, May 2007, 10 pages.
Super-resolution imaging using a camera array, Santacana et al., Publisher: Optical Society of America, 2014, 6 pages.
Optical Splitting Trees for High-Precision Monocular Imaging, McGuire et al., Publisher: IEEE, 2007, 11 pages.
High Performance Imaging Using Large Camera Arrays, Wilburn et al., Publisher: Association for Computing Machinery, Inc., 2005, 12 pages.
Real-time Edge-Aware Image Processing with the Bilateral Grid, Chen et al., Publisher: ACM SIGGRAPH, 9 pages.
Superimposed multi-resolution imaging, Caries et al., Publisher: Optical Society of America, 2017, 13 pages.
Viewfinder Alignment, Adams et al., Publisher: Eurographics, 2008, 10 pages.
Dual-Camera System for Multi-Level Activity Recognition, Bodor et al., Publisher: IEEE, Oct. 2014, 6 pages.
Engineered to the task: Why camera-phone cameras are different, Giles Humpston, Publisher: Solid State Technology, Jun. 2009, 3 pages.

* cited by examiner



FIG. 1A



FIG. 1B

APPL-1001 / Page 4 of 15



FIG. 2

APPL-1001 / Page 5 of 15



Choose sensor(s) to be operational
302
Optionally, calculate color balance if two (Wide and Tele) images are provided by the two sensors.
304
Optionally, apply calculated color balance in one of the images
306
Optionally, perform registration between the Wide and Tele images to output a transformation coefficient
308
Set an AF position using the transformation coefficient
310
Process an output of any of steps 302-308 to obtain a processed image
312
Resample the processed image according to the transformation coefficient, requested ZF, and output video resolution
314

FIG. 3A



FIG. 3B

FIG. 3C



FIG. 4

APPL-1001 / Page 8 of 15

US 10,230,898 B2

1

## DUAL APERTURE ZOOM CAMERA WITH VIDEO SUPPORT AND SWITCHING / NON-SWITCHING DYNAMIC CONTROL

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a 371 application from international patent application PCT/IB2016/053803 filed Jun. 26, 2016, and is related to and claims priority from U.S. Provisional Patent Application No. 62/204,667 filed Aug. 13, 2015 which is expressly incorporated herein by reference in its entirety.

### FIELD

Embodiments disclosed herein relate in general to digital cameras and in particular to zoom digital cameras with video capabilities.

### BACKGROUND

Digital camera modules are currently being incorporated into a variety of host devices. Such host devices include cellular telephones, personal data assistants (PDAs), computers, and so forth. Consumer demand for digital camera modules in host devices continues to grow.

Host device manufacturers prefer digital camera modules to be small, so that they can be incorporated into the host device without increasing its overall size. Further, there is an increasing demand for such cameras to have higher-performance characteristics. One such characteristic possessed by many higher-performance cameras (e.g., standalone digital still cameras) is the ability to vary the focal length of the camera to increase and decrease the magnification of the image. This ability, typically accomplished with a zoom lens, is known as optical zooming. "Zoom" is commonly understood as a capability to provide different magnifications of the same scene and/or object by changing the focal length of an optical system, with a higher level of zoom associated with greater magnification and a lower level of zoom associated with lower magnification. Optical zooming is typically accomplished by mechanically moving lens elements relative to each other. Such zoom lenses are typically more expensive, larger and less reliable than fixed focal length lenses. An alternative approach for approximating the zoom effect is achieved with what is known as digital zooming. With digital zooming, instead of varying the focal length of the lens, a processor in the camera crops the image and interpolates between the pixels of the captured image to create a magnified but lower-resolution image.

Attempts to use multi-aperture imaging systems to approximate the effect of a zoom lens are known. A multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "cameras"). Each camera includes one or more lenses and/or other optical elements which define an aperture such that received electro-magnetic radiation is imaged by the optical sub-system and a resulting image is directed towards a two-dimensional (2D) pixelated image sensor region. The image sensor (or simply "sensor") region is configured to receive the image and to generate a set of image data based on the image. The digital camera may be aligned to receive electromagnetic radiation associated with scenery having a given set of one or more objects. The set of image data may be represented as digital image data, as well known in the art. Hereinafter in this description,

2

"image" "image data" and "digital image data" may be used interchangeably. Also, "object" and "scene" may be used interchangeably. As used herein, the term "object" is an entity in the real world imaged to a point or pixel in the image.

Multi-aperture imaging systems and associated methods are described for example in US Patent Publications No. 2008/0030592, 2010/0277619 and 2011/0064327. In US 2008/0030592, two sensors are operated simultaneously to capture an image imaged through an associated lens. A sensor and its associated lens form a lens/sensor combination. The two lenses have different focal lengths. Thus, even though each lens/sensor combination is aligned to look in the same direction, each combination captures an image of the same subject but with two different fields of view (FOV). One sensor is commonly called "Wide" and the other "Tele". Each sensor provides a separate image, referred to respectively as "Wide" (or "W") and "Tele" (or "T") images. A W-image reflects a wider FOV and has lower resolution than the T-image. The images are then stitched (fused) together to form a composite ("fused") image. In the composite image, the central portion is formed by the relatively higher-resolution image taken by the lens/sensor combination with the longer focal length, and the peripheral portion is formed by a peripheral portion of the relatively lower-resolution image taken by the lens/sensor combination with the shorter focal length. The user selects a desired amount of zoom and the composite image is used to interpolate values from the chosen amount of zoom to provide a respective zoom image. The solution offered by US 2008/0030592 requires, in video mode, very large processing resources in addition to high frame rate requirements and high power consumption (since both cameras are fully operational).

US 2010/0277619 teaches a camera with two lens/sensor combinations, the two lenses having different focal lengths, so that the image from one of the combinations has a FOV approximately 2-3 times greater than the image from the other combination. As a user of the camera requests a given amount of zoom, the zoomed image is provided from the lens/sensor combination having a FOV that is next larger than the requested FOV. Thus, if the requested FOV is less than the smaller FOV combination, the zoomed image is created from the image captured by that combination, using cropping and interpolation if necessary. Similarly, if the requested FOV is greater than the smaller FOV combination, the zoomed image is created from the image captured by the other combination, using cropping and interpolation if necessary. The solution offered by US 2010/0277619 leads to parallax artifacts when moving to the Tele camera in video mode.

In both US 2008/0030592 and US 2010/0277619, different focal length systems cause matching Tele and Wide FOVs to be exposed at different times using CMOS sensors. This degrades the overall image quality. Different optical F numbers ("F/#") cause image intensity differences. Working with such a dual sensor system requires double bandwidth support, i.e. additional wires from the sensors to the following HW component. Neither US 2008/0030592 nor US 2010/0277619 deal with registration errors.

US 2011/0064327 discloses multi-aperture imaging systems and methods for image data fusion that include providing first and second sets of image data corresponding to an imaged first and second scene respectively. The scenes overlap at least partially in an overlap region, defining a first collection of overlap image data as part of the first set of image data, and a second collection of overlap image data as part of the second set of image data. The second collection

US 10,230,898 B2

3

of overlap image data is represented as a plurality of image data cameras such that each of the cameras is based on at least one characteristic of the second collection, and each camera spans the overlap region. A fused set of image data is produced by an image processor, by modifying the first collection of overlap image data based on at least a selected one of, but less than all of, the image data cameras. The systems and methods disclosed in this application deal solely with fused still images.

None of the known art references provide a thin (e.g. fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses, the camera configured to operate in both still mode and video mode to provide still and video images, wherein the camera configuration does not use any fusion to provide a continuous, smooth zoom in video mode.

Therefore there is a need for, and it would be advantageous to have thin digital cameras with optical zoom operating in both video and still mode that do not suffer from commonly encountered problems and disadvantages, some of which are listed above.

SUMMARY

Embodiments disclosed herein teach the use of dual-aperture (also referred to as dual-lens or two-sensor) optical zoom digital cameras. The cameras include two cameras, a Wide camera and a Tele camera, each camera including a fixed focal length lens, an image sensor and an image signal processor (ISP). The Tele camera is the higher zoom camera and the Wide camera is the lower zoom camera. In some embodiments, the thickness/effective focal length (EFL) ratio of the Tele lens is smaller than about 1. The image sensor may include two separate 2D pixelated sensors or a single pixelated sensor divided into at least two areas. The digital camera can be operated in both still and video modes. In video mode, optical zoom is achieved "without fusion", by, in some embodiments, switching between the W and T images to shorten computational time requirements, thus enabling high video rate. To avoid discontinuities in video mode, the switching includes applying additional processing blocks, which include in some embodiments image scaling and shifting. In some embodiments, when a no-switching criterion is fulfilled, optical zoom is achieved in video mode without switching.

As used herein, the term "video" refers to any camera output that captures motion by a series of pictures (images), as opposed to "still mode" that friezes motion. Examples of "video" in cellphones and smartphones include "video mode" or "preview mode".

In order to reach optical zoom capabilities, a different magnification image of the same scene is captured (grabbed) by each camera, resulting in FOV overlap between the two cameras. Processing is applied on the two images to fuse and output one fused image in still mode. The fused image is processed according to a user zoom factor request. As part of the fusion procedure, up-sampling may be applied on one or both of the grabbed images to scale it to the image grabbed by the Tele camera or to a scale defined by the user. The fusion or up-sampling may be applied to only some of the pixels of a sensor. Down-sampling can be performed as well if the output resolution is smaller than the sensor resolution.

The cameras and associated methods disclosed herein address and correct many of the problems and disadvantages of known dual-aperture optical zoom digital cameras. They

4

provide an overall zoom solution that refers to all aspects: optics, algorithmic processing and system hardware (HW).

In a dual-aperture camera image plane, as seen by each camera (and respective image sensor), a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV). The system output image can have the shape and position of either camera image or the shape or position of a combination thereof. If the output image retains the Wide image shape then it has the Wide perspective POV. If it retains the Wide camera position then it has the Wide position POV. The same applies for Tele images position and perspective. As used in this description, the perspective POV may be of the Wide or Tele cameras, while the position POV may shift continuously between the Wide and Tele cameras. In fused images, it is possible to register Tele image pixels to a matching pixel set within the Wide image pixels, in which case the output image will retain the Wide POV ("Wide fusion"). Alternatively, it is possible to register Wide image pixels to a matching pixel set within the Tele image pixels, in which case the output image will retain the Tele POV ("Tele fusion"). It is also possible to perform the registration after either camera image is shifted, in which case the output image will retain the respective Wide or Tele perspective POV.

In an exemplary embodiment, there is provided a zoom digital camera comprising a Wide imaging section that includes a fixed focal length Wide lens with a Wide FOV and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene, a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene, and a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to evaluate a no-switching criterion determined by inputs from both Wide and Tele image data, and, if the no-switching criterion is fulfilled, to output a zoom video output image that includes only Wide image data in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value.

In an exemplary embodiment there is provided a method for obtaining zoom images of an object or scene using a digital camera, comprising the steps of providing in the digital camera a Wide imaging section having a Wide lens with a Wide FOV and a Wide sensor, a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, and a camera controller operatively coupled to the Wide and Tele imaging sections, and configuring the camera controller to evaluate a no-switching criterion determined by inputs from both Wide and Tele image data, and, if the no-switching criterion is fulfilled, to output a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value.

In some exemplary embodiments, the no-switching criterion includes a shift between the Wide and Tele images calculated by global registration, the shift being greater than a first threshold.

In some exemplary embodiments, the no-switching criterion includes a disparity range calculated by global registration, the disparity range being greater than a second threshold.

In some exemplary embodiments, the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.

APPL-1001 / Page 10 of 15

US 10,230,898 B2

5

In some exemplary embodiments, the no-switching criterion includes a number of corresponding features in the Wide and Tele images being smaller than a third threshold.

In some exemplary embodiments, the no-switching criterion includes a majority of objects imaged in an overlap area of the Wide and Tele images being calculated to be closer to the camera than a first threshold distance.

In some exemplary embodiments, the no-switching criterion includes some objects imaged in an overlap area of the Wide and Tele images being calculated to be closer than a second threshold distance while other objects imaged in the overlap area of the Wide and Tele images being calculated to be farther than a third distance threshold.

In some exemplary embodiments, the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs.

In some exemplary embodiments, the user inputs include a zoom factor, a camera mode and a region of interest.

In some exemplary embodiments, the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1. For a definition of TTL and EFL see e.g. co-assigned US published patent application No. 20150244942.

In some exemplary embodiments, if the no-switching criterion is not fulfilled, the camera controller is further configured to output video output images with a smooth transition when switching between the lower ZF value and the higher ZF value or vice versa, wherein at the lower ZF value the output image is determined by the Wide sensor, and wherein at the higher ZF value the output image is determined by the Tele sensor.

In some exemplary embodiments, the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.

BRIEF DESCRIPTION OF THE DRAWINGS

Non-limiting examples of embodiments disclosed herein are described below with reference to figures attached hereto that are listed following this paragraph. Identical structures, elements or parts that appear in more than one figure are generally labeled with a same numeral in all the figures in which they appear. The drawings and descriptions are meant to illuminate and clarify embodiments disclosed herein, and should not be considered limiting in any way.

FIG. 1A shows schematically a block diagram illustrating an exemplary dual-aperture zoom imaging system disclosed herein;

FIG. 1B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. 1A;

FIG. 2 shows an example of a Wide sensor, a Tele sensor and their respective FOVs;

FIG. 3A shows an embodiment of an exemplary method disclosed herein for acquiring a zoom image in video/preview mode;

FIG. 3B shows exemplary feature points in an object;

FIG. 3C shows schematically a known rectification process;

FIG. 4 shows a graph illustrating an effective resolution zoom factor.

6

DETAILED DESCRIPTION

Definitions:

Sharpness score: the gradients (dx, dy) of the image are compared (through subtraction) to the gradients of its low pass filtered version. A higher difference indicates a sharper original image. The result of this comparison is normalized with respect to the average variations (for example, sum of absolute gradients) of the original image, to obtain an absolute sharpness score.

Edge score: for each image, the edges are found (for example, using Canny edge detection) and the average intensity of gradients along them is calculated, for example, by calculating the magnitude of gradients (dx, dy) for each edge pixel, summing the results and dividing by the total number of edge pixels. The result is the edge score.

Effective resolution score: this score is calculated only in a region of interest (ROI) and provides a good indication of the effective resolution level in the image. As used herein, "ROI" is a user-defined sub-region of the image that may be exemplarily 4% or less of the image area. The effective resolution score can be derived from a combination of the sharpness scores and edge scores for each image, for example by normalizing both to be between [0, 1] and by taking their average.

FIG. 1A shows schematically a block diagram illustrating an exemplary embodiment of a dual-aperture zoom imaging system (also referred to simply as "dual-camera" or "dual-aperture camera") disclosed herein and numbered 100. Dual-aperture camera 100 comprises a Wide imaging section ("Wide camera") that includes a Wide lens block 102, a Wide image sensor 104 and a Wide image processor 106. Dual-aperture camera 100 further comprises a Tele imaging section ("Tele camera") that includes a Tele lens block 108, a Tele image sensor 110 and a Tele image processor 112. The image sensors may be physically separate or may be part of a single larger image sensor. The Wide sensor pixel size can be equal to or different from the Tele sensor pixel size. Dual-aperture camera 100 further comprises a camera fusion processing core (also referred to as "controller") 114 that includes a sensor control module 116, a user control module 118, a video processing module 126 and a capture processing module 128, all operationally coupled to sensor control block 116. User control module 118 comprises an operational mode function 120, a ROI function 122 and a zoom factor (ZF) function 124.

Sensor control module 116 is connected to the two (Wide and Tele) cameras and to the user control module 118 and used to choose, according to the zoom factor, which of the sensors is operational and to control the exposure mechanism and the sensor readout. Mode choice function 120 is used for choosing capture/video modes. ROI function 122 is used to choose a region of interest. The ROI is the region on which both cameras are focused on. Zoom factor function 124 is used to choose a zoom factor. Video processing module 126 is connected to mode choice function 120 and used for video processing. It is configurable to evaluate a no-switching criterion determined by inputs from both Wide and Tele image data and to make a decision regarding video output. Specifically, upon evaluation of a no-switching criterion, if the no-switching criterion is fulfilled, module 126 is configurable to output a zoom video output image that includes only Wide image data in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value. If the no-switching criterion is not fulfilled, module 126 is configurable to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view. Still processing module 128 is connected to the mode choice function 120 and used for

US 10,230,898 B2

7

high image quality still mode images. The video processing module is applied when the user desires to shoot in video mode. The capture processing module is applied when the user wishes to shoot still pictures.

FIG. 1B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. 1A. Exemplary dimensions: Wide lens TTL=4.2 mm and EFL=3.5 mm; Tele lens TTL=6 mm and EFL=7 mm; both Wide and Tele sensors $\frac{1}{3}$ inch; external dimensions of Wide and Tele cameras: width (w) and length (1)=8.5 mm and height (h)=6.8 mm; distance "d" between camera centers=10 mm.

Following is a detailed description and examples of different methods of use of dual-aperture camera 100.

Still Mode Operation/Function

In still camera mode, the obtained image is fused from information obtained by both cameras at all zoom levels, see FIG. 2, which shows a Wide sensor 202 and a Tele sensor 204 and their respective FOVs. Exemplarily, as shown, the Tele sensor FOV is half the Wide sensor FOV. The still camera mode processing includes two stages: the first stage includes setting HW settings and configuration, where a first objective is to control the sensors in such a way that matching FOVs in both images (Tele and Wide) are scanned at the same time, a second objective is to control the relative exposures according to the lens properties, and a third objective is to minimize the required bandwidth from both sensors for the ISPs. The second stage includes image processing that fuses the Wide and the Tele images to achieve optical zoom, improves SNR and provides wide dynamic range.

FIG. 3A shows image line numbers vs. time for an image section captured by CMOS sensors. A fused image is obtained by line (row) scans of each image. To prevent matching FOVs in both sensors to be scanned at different times, a particular configuration is applied by the camera controller on both image sensors while keeping the same frame rate. The difference in FOV between the sensors determines the relationship between the rolling shutter time and the vertical blanking time for each sensor.

Video Mode Operation/Function

Smooth Transition

When a dual-aperture camera switches the camera output between cameras or points of view, a user will normally see a "jump" (discontinuous) image change. However, a change in the zoom factor for the same camera and POV is viewed as a continuous change. A "smooth transition" (ST) is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Zoom-in and Zoom-Out in Video Mode

In video mode, sensor oversampling is used to enable continuous and smooth zoom experience. Processing is applied to eliminate the changes in the image during cross-over from one camera to the other. Zoom from 1 to $Z_{switch}$ is performed using the Wide sensor only. From $Z_{switch}$ and on, it is performed mainly by the Tele sensor. To prevent "jumps" (roughness in the image), switching to the Tele image is done using a zoom factor which is a bit higher ($Z_{switch}+\Delta Zoom$) than $Z_{switch}$. $\Delta Zoom$ is determined according to the system's properties and is different for cases where

8

zoom-in is applied and cases where zoom-out is applied ($\Delta Zoom_{in} \neq \Delta Zoom_{out}$). This is done to prevent residual jumps artifacts to be visible at a certain zoom factor. The switching between sensors, for an increasing zoom and for decreasing zoom, is done on a different zoom factor.

The zoom video mode operation includes two stages: (1) sensor control and configuration and (2) image processing. In the range from 1 to $Z_{switch}$ only the Wide sensor is operational, external power can be supplied only to this sensor. Similar conditions hold for a Wide AF mechanism. From $Z_{switch}+\Delta Zoom$ to $Z_{max}$ only the Tele sensor is operational, hence, power is supplied only to this sensor. Similarly, only the Tele sensor is operational and power is supplied only to it for a Tele AF mechanism. Another option is that the Tele sensor is operational and the Wide sensor is working in low frame rate. From $Z_{switch}$ to $Z_{switch}+\Delta Zoom$, both sensors are operational.

Zoom-in: at low ZF up to slightly above $ZF_T$ (the zoom factor that enables switching between Wide and Tele outputs) the output image is the digitally zoomed, unchanged Wide camera output. $ZF_T$ is defined as follows:

$$ZF_T = Tan(FOV_{Wide})/Tan(FOV_{Tele})$$

where Tan refers to "tangent", while $FOV_{Wide}$ and $FOV_{Tele}$ refer respectively to the Wide and Tele lens fields of view (in degrees). As used herein, the FOV is measured from the center axis to the corner of the sensor (i.e. half the angle of the normal definition). Switching cannot take place below $ZF_T$ and it can above it.

In some embodiments for the up-transfer ZF, as disclosed in co-invented and co-owned U.S. Pat. No. 9,185,291, the output is a transformed Tele camera output, where the transformation is performed by a global registration (GR) algorithm to achieve smooth transition. As used herein "global registration" refers to an action for which the inputs are the Wide and Tele images. The Wide image is cropped to display the same FOV as the Tele image. The Tele image is passed through a low pass filter (LPF) and resized to make its appearance as close as possible to the Wide image (lower resolution and same pixel count). The outputs of GR are corresponding feature point pairs in the images along with their disparities, and parameters for differences between the images, i.e. shift and scale. As used herein, "feature point" refers to a point such as points 10a-d in FIG. 3B and refers to a point (pixel) of interest on an object in an image. For purposes set forth in this description, a feature point should be reproducible and invariant to changes in image scale, noise and illumination. Such points usually lie on corners or other high-contrast regions of the object.

Stages of Global Registration

In some exemplary embodiments, global registration may be performed as follows:

1. Find interest points (features) in each image separately by filtering it with, exemplarily, a Difference of Gaussians filter, and finding local extrema on the resulting image.

2. Find feature correspondences (features in both images that describe the same point in space) in a "matching" process. These are also referred to as "feature pairs", "correspondence pairs" or "matching pairs". This is done by comparing each feature point from one (Tele or Wide) image (referred to hereinafter as "image 1") to all feature points in that region from the other (respectively Wide or Tele) image (referred to hereinafter as "image 2"). The features are compared only within their group of minima/maxima, using patch normalized cross-correlation. As used herein, "patch" refers to a group of neighboring pixels around an origin pixel.

APPL-1001 / Page 12 of 15

US 10,230,898 B2

9                                                                                    10

3. The normalized cross correlation of two image patches t(x,y) and f(x,y) is

$$\frac{1}{n}\sum_{x,y}\frac{(f(x,\,y)-\bar{f})(t(x,\,y)-\bar{t})}{\sigma_f\sigma_t}$$

where n is the number of pixels in both patches, $\bar{t}$ is the average of f and $\sigma_f$ is the standard deviation of f. A match for a feature point from image 1 is only confirmed if its correlation score is much higher (for example, ×1.2) than the next-best matching feature from image 2.

4. Find the disparity between each pair of corresponding features (also referred to as "matching pair") by subtracting their x and y coordinate values.

5. Filter bad matching points:

a. Following the matching process, matches that include feature points from image 2 that were matched to more than one feature from image 1 are discarded.

b. Matching pairs whose disparity is inconsistent with the other matching pairs are discarded. For example, if there is one corresponding pair which whose disparity is lower or higher than the others by 20 pixels.

6. The localization accuracy for matched points from image 2 is refined by calculating a correlation of neighboring pixel patches from image 2 with the target patch (the patch around the current pixel (of the current matching pair) from image 1, modeling the results as a parabola and finding its maximum.

7. Rotation and fine scale differences are calculated between the two images according to the matching points (for example, by subtracting the center of mass from each set of points, i.e. the part of the matching points belonging to either the Wide or the Tele image, and solving a least squares problem).

8. After compensating for these differences, since the images were rectified, the disparity in the Y axis should be close to 0. Matching points that do not fit this criterion are discarded. A known rectification process is illustrated in FIG. 3C.

9. Finally, the remaining matching points are considered true and the disparities for them are calculated. A weighted average of the disparity is taken as the shift between both images. The maximum difference between disparity values is taken as the disparity range.

10. At various stages during GR, if there are not enough feature/matching points remaining, the GR is stopped and returns a failure flag.

In addition, it is possible to find range calibration to the rectification process by finding the shiftI=shift for objects at infinity and defining shiftD=shift−shiftI and disparity D=disparity−shiftI. We then calculate

$$\text{object distance} = \frac{focalLength \cdot \text{baseline}}{disparityD \cdot pixelSize}.$$

where "baseline" is the distance between cameras.

Returning now to the Zoom-in process, in some embodiments, for higher ZF than the up-transfer ZF, the output is the transformed Tele camera output, digitally zoomed. However, in other embodiments, for higher ZF than the up-transfer ZF, there will be no switching from the Wide to the Tele camera output, i.e. the output will be from the Wide camera, digitally zoomed. This "no switching" process is described next.

No Switching

Switching from the Wide camera output to the transformed Tele camera output will be performed unless some special condition (criterion), determined based on inputs obtained from the two camera images, occurs. In other words, switching will not be performed only if at least one of the following no-switching criteria is fulfilled:

1. if the shift calculated by GR is greater than a first threshold, for example 50 pixels.

2. if the disparity range calculated by GR is greater than a second threshold, for example 20 pixels, because in this case there is no global shift correction that will suppress movement/jump for all objects distances (smooth transition is impossible for all objects).

3. if the effective resolution source of the Tele image is lower than that of the Wide image. In this case, there is no point in performing the transition because no value (i.e. resolution) is gained. Smooth transition is possible but undesirable.

4. if the GR fails, i.e. if the number of matching pairs found is less than a third threshold, for example 20 matching pairs.

5. if, for example, that are imaged onto the overlap area are calculated to be closer than a first threshold distance, for example 30 cm, because this can result in a large image shift to obtain ST.

6. if some objects (for example two objects) that are imaged in the overlap area are calculated to be closer than a second threshold distance, for example 50 cm, while other objects (for example two objects) are calculated to be farther than a third threshold distance for example 10 m. The reason is that the shift between an object position in the Wide and Tele cameras is object distance dependent, where the closer the objects the larger the shift, so an image containing significantly close and far objects cannot be matched by simple transformation (shift scale) to be similar and thus provide ST between cameras.

Zoom-out: at high ZF down to slightly below $Z_{FT}$, the output image is the digitally zoomed transformed Tele camera output. For the down-transfer ZF, the output is a shifted Wide camera output, where the Wide shift correction is performed by the GR algorithm to achieve smooth transition, i.e. with no jump in the ROI region. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

Note that if a no-switching criterion is not fulfilled, then the camera will output without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, the video output images being provided with a smooth transition when switching between the lower ZF value and the higher ZF value or vice versa, wherein at the lower ZF value the output resolution is determined by the Wide sensor, and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

FIG. 3A shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode for 3 different zoom factor (ZF) ranges: (a) ZF range=1: $Z_{switch}$; (b) ZF range=$Z_{switch}$: $Z_{switch}$ ΔZoom$_{in}$: and (c) Zoom factor range=$Z_{switch}$+ΔZoom$_{in}$; $Z_{max}$. The description is with reference to a graph of effective resolution vs. zoom factor (FIG. 4). In step 302, sensor control module 116 chooses (directs) the sensor (Wide, Tele or both) to be operational. Specifically, if the ZF range=1:$Z_{switch}$, module 116 directs the Wide sensor to be operational and the Tele sensor to be non-operational. If the ZF range is $Z_{switch}$; $Z_{switch}$+ΔZoom$_{in}$,

US 10,230,898 B2

11

module **116** directs both sensors to be operational and the zoom image is generated from the Wide sensor. If the ZF range is $Z_{switch}+\Delta Zoom_{in}$: $Z_{max}$, module **116** directs the Wide sensor to be non-operational and the Tele sensor to be operational. After the sensor choice in step **302**, all following actions are performed in video processing core **126**. Optionally, in step **304**, color balance is calculated if two images are provided by the two sensors. Optionally yet, in step **306**, the calculated color balance is applied in one of the images (depending on the zoom factor). Further optionally, in step **308**, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient can be used to set an AF position in step **310**. In step **312**, an output of any of steps **302-308** is applied on one of the images (depending on the zoom factor) for image signal processing that may include denoising, demosaicing, sharpening, scaling, etc. In step **314**, the processed image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p). To avoid a transition point to be executed at the same ZF, $\Delta Zoom$ can change while zooming in and while zooming out. This will result in hysteresis in the sensor switching point.

In more detail, for ZF range 1: $Z_{switch}$, for ZF<$Z_{switch}$, the Wide image data is transferred to the ISP in step **312** and resampled in step **314**. For ZF range=$Z_{switch}$: $Z_{switch}+\Delta Zoom_{in}$, both sensors are operational and the zoom image is generated from the Wide sensor. The color balance is calculated for both images according to a given ROI. In addition, for a given ROI, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient is used to set an AF position. The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of pixel movements between matching points in the images. This movement can be translated into depth and the depth can be translated into an AF position. This enables to set the AF position by only analyzing two images (Wide and Tele). The result is fast focusing.

Both color balance ratios and transformation coefficient are used in the ISP step. In parallel, the Wide image is processed to provide a processed image, followed by resampling. For ZF range=$Z_{switch}+\Delta Zoom_{in}$: $Z_{max}$, and for Zoom factor>$Z_{switch}+\Delta Zoom_{in}$, the color balance calculated previously is now applied on the Tele image. The Tele image data is transferred to the ISP in step **312** and resampled in step **314**. To eliminate crossover artifacts and to enable smooth transition to the Tele image, the processed Tele image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p).

FIG. **4** shows the effective resolution as a function of the zoom factor for a zoom-in case and for a zoom-out case $\Delta Zoom_{up}$ is set when one zooms in, and $\Delta Zoom_{down}$ is set when one zooms out. Setting $\Delta Zoom_{up}$ to be different from $\Delta Zoom_{down}$ will result in transition between the sensors to be performed at different zoom factor ("hysteresis") when zoom-in is used and when zoom-out is used. This hysteresis phenomenon in the video mode results in smooth continuous zoom experience.

In conclusion, dual aperture optical zoom digital cameras and associate methods disclosed herein reduce the amount of processing resources, lower frame rate requirements, reduce power consumption, remove parallax artifacts and provide

12

continuous focus (or provide loss of focus) when changing from Wide to Tele in video mode. They provide a dramatic reduction of the disparity range and avoid false registration in capture mode. They reduce image intensity differences and enable work with a single sensor bandwidth instead of two, as in known cameras.

All patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present disclosure.

While this disclosure has been described in terms of certain embodiments and generally associated methods, alterations and permutations of the embodiments and methods will be apparent to those skilled in the art. The disclosure is to be understood as not limited to the specific embodiments described herein, but only by the scope of the appended claims.

What is claimed is:

**1**. A zoom digital camera comprising:

a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view (FOV) and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;

b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and

c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

**2**. The camera of claim **1**, wherein the no-switching criterion includes a shift between the Wide and Tele images calculated by global registration, the shift being greater than a first threshold.

**3**. The camera of claim **1**, wherein the no-switching criterion includes a disparity range calculated by global registration, the disparity range being greater than a second threshold.

**4**. The camera of claim **1**, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.

**5**. The camera of claim **1**, wherein the no-switching criterion includes a number of corresponding features in the Wide and Tele images being smaller than a third threshold.

**6**. The camera of claim **1**, wherein the no-switching criterion includes a majority of objects imaged in an overlap area of the Wide and Tele images being calculated to be closer to the camera than a first threshold distance.

**7**. The camera of claim **1**, wherein the no-switching criterion includes some objects imaged in an overlap area of the Wide and Tele images being calculated to be closer than a second threshold distance while other objects imaged in

US 10,230,898 B2

13 | 14

the overlap area of the Wide and Tele images being calculated to be farther than a third distance threshold.

**8**. The camera of claim **1**, wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs.

**9**. The camera of claim **8**, wherein the user inputs include a zoom factor, a camera mode and a region of interest.

**10**. The camera of claim **1**, wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1.

**11**. The camera of claim **1**, wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.

**12**. A method for obtaining zoom images of an object or scene using a digital camera, comprising the steps of:

a) providing in the digital camera a Wide imaging section having a Wide lens with a Wide field of view (FOV) and a Wide sensor, a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, and a camera controller operatively coupled to the Wide and Tele imaging sections; and

b) configuring the camera controller to evaluate if a no-switching criterion is fulfilled or not fulfilled, and, if the no-switching criterion is fulfilled, configuring the camera controller to output at a zoom factor (ZF) higher than an up-transfer ZF a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value, or if the no-switching criterion is not fulfilled, configuring the camera controller to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

**13**. The method of claim **12**, wherein the no-switching criterion includes a shift between the Wide and Tele images calculated by global registration, the shift being greater than a first threshold.

**14**. The method of claim **12**, wherein the no-switching criterion includes a disparity range calculated by global registration, the disparity range being greater than a second threshold.

**15**. The method of claim **12**, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.

**16**. The method of claim **12**, wherein the no-switching criterion includes a number of corresponding features in the Wide and Tele images being smaller than a third threshold.

**17**. The method of claim **12**, wherein the no-switching criterion includes a majority of objects imaged in an overlap area of the Wide and Tele images being calculated to be closer to the camera than a first threshold distance.

**18**. The method of claim **12**, wherein the no-switching criterion includes some objects imaged in an overlap area of the Wide and Tele images being calculated to be closer than a second threshold distance while other objects imaged in the overlap area of the Wide and Tele images being calculated to be farther than a third threshold distance.

**19**. The method of claim **12**, further comprising the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.

**20**. The method of claim **12**, wherein the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image includes configuring the camera controller to combine Wide and Tele image data only in focused areas.

\* \* \* \* \*



US010356332B2

(12) **United States Patent**     (10) **Patent No.:**    **US 10,356,332 B2**
Cohen et al.     (45) **Date of Patent:**    **Jul. 16, 2019**

(54) **DUAL APERTURE ZOOM CAMERA WITH VIDEO SUPPORT AND SWITCHING / NON-SWITCHING DYNAMIC CONTROL**

(71) Applicant: **Corephotonics Ltd.**, Tel-Aviv (IL)

(72) Inventors: **Noy Cohen**, Tel-Aviv (IL); **Oded Gigushinski**, Herzlia (IL); **Nadav Geva**, Tel-Aviv (IL); **Gal Shabtay**, Tel-Aviv (IL); **Ester Ashkenazi**, Modi'in (IL); **Ruthy Katz**, Tel Aviv (IL); **Ephraim Goldenberg**, Ashdod (IL)

(73) Assignee: **Corephotonics Ltd.**, Tel Aviv (IL)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/241,505**

(22) Filed: **Jan. 7, 2019**

(65) **Prior Publication Data**

US 2019/0158753 A1     May 23, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/324,720, filed as application No. PCT/IB2016/053803 on Jun. 26, 2016.

(Continued)

(51) **Int. Cl.**
*H04N 5/225* (2006.01)
*H04N 5/232* (2006.01)

(52) **U.S. Cl.**
CPC ....... *H04N 5/23296* (2013.01); *H04N 5/2258* (2013.01); *H04N 5/23216* (2013.01); *H04N 5/23245* (2013.01)

(58) **Field of Classification Search**
CPC ............. H04N 5/23296; H04N 5/2258; H04N 5/23216; H04N 5/23245
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,199,785 A    4/1980    McCullough et al.
5,005,083 A    4/1991    Grage et al.

(Continued)

FOREIGN PATENT DOCUMENTS

CN    101276415 A    10/2008
CN    102739949 A    10/2012

(Continued)

OTHER PUBLICATIONS

Statistical Modeling and Performance Characterization of a Real-Time Dual Camera Surveillance System, Greienhagen et al., Publisher: IEEE, 2000, 8 pages.

(Continued)

*Primary Examiner* — Nhan T Tran
(74) *Attorney, Agent, or Firm* — Natha & Associates; Menachem Nathan

(57)    **ABSTRACT**

A dual-aperture zoom digital camera operable in both still and video modes. The camera includes Wide and Tele imaging sections with respective lens/sensor combinations and image signal processors and a camera controller operatively coupled to the Wide and Tele imaging sections. The Wide and Tele imaging sections provide respective image data. The controller is configured to output, in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value, a zoom video output image that includes only Wide image data or only Tele image data, depending on whether a no-switching criterion is fulfilled or not.

**22 Claims, 5 Drawing Sheets**





**US 10,356,332 B2**

Page 2

**Related U.S. Application Data**

(60) Provisional application No. 62/204,667, filed on Aug. 13, 2015.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,032,917 A | 7/1991 | Aschwanden | |
| 5,051,830 A | 9/1991 | von Hoessle | |
| 5,248,971 A | 9/1993 | Mandl | |
| 5,287,093 A | 2/1994 | Amano et al. | |
| 5,394,520 A | 2/1995 | Hall | |
| 5,436,660 A | 7/1995 | Sakamoto | |
| 5,444,478 A | 8/1995 | Lelong et al. | |
| 5,459,520 A | 10/1995 | Sasaki | |
| 5,657,402 A | 8/1997 | Bender et al. | |
| 5,682,198 A | 10/1997 | Katayama et al. | |
| 5,768,443 A | 6/1998 | Michael et al. | |
| 5,926,190 A | 7/1999 | Turkowski et al. | |
| 5,940,641 A | 8/1999 | McIntyre et al. | |
| 5,982,951 A | 11/1999 | Katayama et al. | |
| 6,101,334 A | 8/2000 | Fantone | |
| 6,128,416 A | 10/2000 | Oura | |
| 6,148,120 A | 11/2000 | Sussman | |
| 6,208,765 B1 | 3/2001 | Bergen | |
| 6,268,611 B1 | 7/2001 | Pettersson et al. | |
| 6,549,215 B2 | 4/2003 | Jouppi | |
| 6,611,289 B1 | 8/2003 | Yu et al. | |
| 6,643,416 B1 | 11/2003 | Daniels et al. | |
| 6,650,368 B1 | 11/2003 | Doron | |
| 6,680,748 B1 | 1/2004 | Monti | |
| 6,714,665 B1 | 3/2004 | Hanna et al. | |
| 6,724,421 B1 | 4/2004 | Glatt | |
| 6,738,073 B2 | 5/2004 | Park et al. | |
| 6,741,250 B1 | 5/2004 | Furlan et al. | |
| 6,750,903 B1 | 6/2004 | Miyatake et al. | |
| 6,778,207 B1 | 8/2004 | Lee et al. | |
| 7,002,583 B2 | 2/2006 | Rabb, III | |
| 7,015,954 B1 | 3/2006 | Foote et al. | |
| 7,038,716 B2 | 5/2006 | Klein et al. | |
| 7,199,348 B2 | 4/2007 | Olsen et al. | |
| 7,206,136 B2 | 4/2007 | Labaziewicz et al. | |
| 7,248,294 B2 | 7/2007 | Slatter | |
| 7,256,944 B2 | 8/2007 | Labaziewicz et al. | |
| 7,305,180 B2 | 12/2007 | Labaziewicz et al. | |
| 7,339,621 B2 | 3/2008 | Fortier | |
| 7,346,217 B1 | 3/2008 | Gold, Jr. | |
| 7,365,793 B2 | 4/2008 | Cheatle et al. | |
| 7,411,610 B2 | 8/2008 | Doyle | |
| 7,424,218 B2 | 9/2008 | Baudisch et al. | |
| 7,509,041 B2 | 3/2009 | Hosono | |
| 7,533,819 B2 | 5/2009 | Barkan et al. | |
| 7,619,683 B2 | 11/2009 | Davis | |
| 7,738,016 B2 | 6/2010 | Toyofuku | |
| 7,773,121 B1 | 8/2010 | Huntsberger et al. | |
| 7,880,776 B2 | 2/2011 | LeGall et al. | |
| 7,918,398 B2 | 4/2011 | Li et al. | |
| 7,964,835 B2 | 6/2011 | Olsen et al. | |
| 7,978,239 B2 | 7/2011 | Deever et al. | |
| 8,115,825 B2 | 2/2012 | Culbert et al. | |
| 8,149,327 B2 | 4/2012 | Lin et al. | |
| 8,154,610 B2 | 4/2012 | Jo et al. | |
| 8,238,695 B1 | 8/2012 | Davey et al. | |
| 8,274,552 B2 | 9/2012 | Dahi et al. | |
| 8,390,729 B2 | 3/2013 | Long et al. | |
| 8,391,697 B2 | 3/2013 | Cho et al. | |
| 8,400,555 B1 | 3/2013 | Georgiev et al. | |
| 8,439,265 B2 | 5/2013 | Ferren et al. | |
| 8,446,484 B2 | 5/2013 | Muukki et al. | |
| 8,483,452 B2 | 7/2013 | Ueda et al. | |
| 8,514,491 B2 | 8/2013 | Duparre | |
| 8,547,389 B2 | 10/2013 | Hoppe et al. | |
| 8,553,106 B2 | 10/2013 | Scarff | |
| 8,587,691 B2 | 11/2013 | Takane | |
| 8,619,148 B1 | 12/2013 | Watts et al. | |
| 8,803,990 B2 | 8/2014 | Smith | |
| 8,896,655 B2 | 11/2014 | Mauchly et al. | |

| | | | |
|---|---|---|---|
| 8,976,255 B2 | 3/2015 | Matsuoto et al. | |
| 9,019,387 B2 | 4/2015 | Nakano | |
| 9,025,073 B2 | 5/2015 | Attar et al. | |
| 9,025,077 B2 | 5/2015 | Attar et al. | |
| 9,041,835 B2 | 5/2015 | Honda | |
| 9,137,447 B2 | 9/2015 | Shibuno | |
| 9,185,291 B1 * | 11/2015 | Shabtay ........... H04N 5/2258 | |
| 9,215,377 B2 | 12/2015 | Sokeila et al. | |
| 9,215,385 B2 | 12/2015 | Luo | |
| 9,270,875 B2 | 2/2016 | Brisedoux et al. | |
| 9,286,680 B1 | 3/2016 | Jiang et al. | |
| 9,344,626 B2 | 5/2016 | Silverstein et al. | |
| 9,360,671 B1 | 6/2016 | Zhou | |
| 9,369,621 B2 | 6/2016 | Malone et al. | |
| 9,413,930 B2 | 8/2016 | Geerds | |
| 9,413,984 B2 | 8/2016 | Attar et al. | |
| 9,420,180 B2 | 8/2016 | Jin | |
| 9,438,792 B2 | 9/2016 | Nakada et al. | |
| 9,485,432 B1 | 11/2016 | Medasani et al. | |
| 9,578,257 B2 | 2/2017 | Attar et al. | |
| 9,618,748 B2 | 4/2017 | Munger et al. | |
| 9,681,057 B2 | 6/2017 | Attar et al. | |
| 9,723,220 B2 | 8/2017 | Sugie | |
| 9,736,365 B2 | 8/2017 | Laroia | |
| 9,736,391 B2 | 8/2017 | Du et al. | |
| 9,768,310 B2 | 9/2017 | Ahn et al. | |
| 9,800,798 B2 | 10/2017 | Ravirala et al. | |
| 9,851,803 B2 | 12/2017 | Fisher et al. | |
| 9,894,287 B2 | 2/2018 | Qian et al. | |
| 9,900,522 B2 | 2/2018 | Lu | |
| 9,927,600 B2 | 3/2018 | Goldenberg et al. | |
| 2002/0005902 A1 | 1/2002 | Yuen | |
| 2002/0063711 A1 | 5/2002 | Park et al. | |
| 2002/0075258 A1 | 6/2002 | Park et al. | |
| 2002/0122113 A1 | 9/2002 | Foote | |
| 2003/0030729 A1 | 2/2003 | Prentice et al. | |
| 2003/0093805 A1 | 5/2003 | Gin | |
| 2003/0160886 A1 | 8/2003 | Misawa et al. | |
| 2003/0202113 A1 | 10/2003 | Yoshikawa | |
| 2004/0008773 A1 | 1/2004 | Itokawa | |
| 2004/0017386 A1 | 1/2004 | Liu et al. | |
| 2004/0027367 A1 | 2/2004 | Pilu | |
| 2004/0061788 A1 | 4/2004 | Bateman | |
| 2004/0240052 A1 | 12/2004 | Minefuji et al. | |
| 2005/0013509 A1 | 1/2005 | Samadani | |
| 2005/0046740 A1 | 3/2005 | Davis | |
| 2005/0157184 A1 | 7/2005 | Nakanishi et al. | |
| 2005/0200718 A1 | 9/2005 | Lee | |
| 2006/0054782 A1 | 3/2006 | Olsen et al. | |
| 2006/0056056 A1 | 3/2006 | Ahiska et al. | |
| 2006/0125937 A1 | 6/2006 | LeGall et al. | |
| 2006/0170793 A1 | 8/2006 | Pasquarette et al. | |
| 2006/0175549 A1 | 8/2006 | Miller et al. | |
| 2006/0187310 A1 | 8/2006 | Janson et al. | |
| 2006/0187322 A1 | 8/2006 | Janson et al. | |
| 2006/0187338 A1 | 8/2006 | May et al. | |
| 2007/0024737 A1 | 2/2007 | Nakamura et al. | |
| 2007/0025713 A1 * | 2/2007 | Hosono ............ G03B 17/12 396/72 | |
| 2007/0177025 A1 | 8/2007 | Kopet et al. | |
| 2007/0182833 A1 * | 8/2007 | Toyofuku .............. H04N 5/232 348/240.3 | |
| 2007/0188653 A1 | 8/2007 | Pollock et al. | |
| 2007/0189386 A1 | 8/2007 | Imagawa et al. | |
| 2007/0257184 A1 | 11/2007 | Olsen et al. | |
| 2007/0285550 A1 | 12/2007 | Son | |
| 2008/0017557 A1 | 1/2008 | Witdouck | |
| 2008/0024614 A1 | 1/2008 | Li et al. | |
| 2008/0025634 A1 | 1/2008 | Border et al. | |
| 2008/0030592 A1 | 2/2008 | Border et al. | |
| 2008/0030611 A1 | 2/2008 | Jenkins | |
| 2008/0084484 A1 | 4/2008 | Ochi et al. | |
| 2008/0117316 A1 | 5/2008 | Orimoto | |
| 2008/0218611 A1 | 9/2008 | Parulski et al. | |
| 2008/0218612 A1 | 9/2008 | Border et al. | |
| 2008/0218613 A1 | 9/2008 | Janson et al. | |
| 2008/0219654 A1 | 9/2008 | Border et al. | |
| 2009/0086074 A1 | 4/2009 | Li et al. | |
| 2009/0122195 A1 | 5/2009 | Van Baar et al. | |

**US 10,356,332 B2**

Page 3

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0122406 A1 | 5/2009 | Rouvinen et al. | |
| 2009/0128644 A1 | 5/2009 | Camp et al. | |
| 2009/0219547 A1 | 9/2009 | Kauhanen et al. | |
| 2009/0252484 A1 | 10/2009 | Hasuda et al. | |
| 2009/0295949 A1 | 12/2009 | Ojala | |
| 2010/0013906 A1 | 1/2010 | Border et al. | |
| 2010/0020221 A1 | 1/2010 | Tupman et al. | |
| 2010/0060746 A9 | 3/2010 | Olsen et al. | |
| 2010/0103194 A1 | 4/2010 | Chen et al. | |
| 2010/0238327 A1 | 9/2010 | Griffith et al. | |
| 2010/0277610 A1* | 11/2010 | Scarff | H04N 5/2258 |
| | | | 348/240.1 |
| 2010/0283842 A1 | 11/2010 | Guissin et al. | |
| 2011/0064327 A1 | 3/2011 | Dagher et al. | |
| 2011/0080487 A1 | 4/2011 | Venkataraman et al. | |
| 2011/0128288 A1 | 6/2011 | Petrou et al. | |
| 2011/0164172 A1 | 7/2011 | Shintani et al. | |
| 2011/0229054 A1 | 9/2011 | Weston et al. | |
| 2011/0234853 A1 | 9/2011 | Hayashi et al. | |
| 2011/0234881 A1 | 9/2011 | Wakabayashi et al. | |
| 2011/0242286 A1 | 10/2011 | Pace et al. | |
| 2011/0242355 A1 | 10/2011 | Goma et al. | |
| 2012/0026366 A1 | 2/2012 | Golan et al. | |
| 2012/0062780 A1 | 3/2012 | Morihisa | |
| 2012/0069235 A1 | 3/2012 | Imai | |
| 2012/0075489 A1 | 3/2012 | Nishihara | |
| 2012/0105579 A1 | 5/2012 | Jeon et al. | |
| 2012/0196648 A1 | 8/2012 | Havens et al. | |
| 2012/0229663 A1 | 9/2012 | Nelson et al. | |
| 2012/0249815 A1 | 10/2012 | Bohn et al. | |
| 2012/0287315 A1 | 11/2012 | Huang et al. | |
| 2012/0320467 A1 | 12/2012 | Baik et al. | |
| 2013/0002928 A1 | 1/2013 | Imai | |
| 2013/0093842 A1 | 4/2013 | Yahata | |
| 2013/0135445 A1 | 5/2013 | Dahi et al. | |
| 2013/0182150 A1 | 7/2013 | Asakura | |
| 2013/0201360 A1 | 8/2013 | Song | |
| 2013/0202273 A1 | 8/2013 | Ouedraogo et al. | |
| 2013/0235224 A1 | 9/2013 | Park et al. | |
| 2013/0250150 A1 | 9/2013 | Malone et al. | |
| 2013/0258044 A1 | 10/2013 | Betts-LaCroix | |
| 2013/0321668 A1 | 12/2013 | Kamath | |
| 2014/0049615 A1 | 2/2014 | Uwagawa | |
| 2014/0118584 A1 | 5/2014 | Lee et al. | |
| 2014/0192238 A1 | 7/2014 | Attar et al. | |
| 2014/0192253 A1 | 7/2014 | Laroia | |
| 2014/0253693 A1 | 9/2014 | Shikata | H04N 1/2112 |
| | | | 348/47 |
| 2014/0267834 A1* | 9/2014 | Aoki | H04N 5/23296 |
| | | | 348/240.1 |
| 2014/0313316 A1 | 10/2014 | Olsson et al. | |
| 2014/0362242 A1 | 12/2014 | Takizawa | |
| 2015/0002683 A1 | 1/2015 | Hu et al. | |
| 2015/0042870 A1 | 2/2015 | Chan et al. | |
| 2015/0085174 A1* | 3/2015 | Shabtay | H04N 5/23296 |
| | | | 348/336 |
| 2015/0092066 A1 | 4/2015 | Geiss et al. | |
| 2015/0154776 A1 | 6/2015 | Zhang et al. | |
| 2015/0162048 A1 | 6/2015 | Hirata et al. | |
| 2015/0195458 A1 | 7/2015 | Nakayama et al. | |
| 2015/0215516 A1 | 7/2015 | Dolgin | |
| 2015/0237280 A1 | 8/2015 | Choi et al. | |
| 2015/0242994 A1 | 8/2015 | Shen | |
| 2015/0271471 A1 | 9/2015 | Hsieh et al. | |
| 2015/0316744 A1 | 11/2015 | Chen | |
| 2015/0334309 A1 | 11/2015 | Peng et al. | |
| 2016/0044250 A1 | 2/2016 | Shabtay et al. | |
| 2016/0070088 A1 | 3/2016 | Koguchi | |
| 2016/0154202 A1 | 6/2016 | Wippermann et al. | |
| 2016/0154204 A1 | 6/2016 | Lim et al. | |
| 2016/0212358 A1 | 7/2016 | Shikata | |
| 2016/0241793 A1* | 8/2016 | Ravirala | H04N 5/247 |
| 2016/0301840 A1 | 10/2016 | Du et al. | |
| 2016/0353012 A1 | 12/2016 | Kao et al. | |
| 2017/0019616 A1 | 1/2017 | Zhu et al. | |
| 2017/0214846 A1 | 7/2017 | Du et al. | |
| 2017/0214866 A1 | 7/2017 | Zhu et al. | |
| 2017/0289458 A1 | 10/2017 | Song et al. | |
| 2018/0126074 A1 | 5/2018 | Avivi et al. | |
| 2018/0150973 A1 | 5/2018 | Tang et al. | |
| 2018/0241922 A1 | 8/2018 | Baldwin et al. | |
| 2018/0295292 A1 | 10/2018 | Lee et al. | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 103024272 A | 4/2013 | |
| EP | 1536633 A1 | 6/2005 | |
| EP | 2523450 A1 | 11/2012 | |
| JP | 04211230 A | 8/1992 | |
| JP | H07318864 A | 12/1995 | |
| JP | 08271976 A | 10/1996 | |
| JP | 2003298920 A | 10/2003 | |
| JP | 2004133054 A | 4/2004 | |
| JP | 2005099265 A | 4/2005 | |
| JP | 2006238325 A | 9/2006 | |
| JP | 2007228006 A | 9/2007 | |
| JP | 2007306282 A | 11/2007 | |
| JP | 2008076485 A | 4/2008 | |
| JP | 2013106289 A | 5/2013 | |
| KR | 20100008936 A | 1/2010 | |
| KR | 20140014787 A | 2/2014 | |
| KR | 101477178 B1 | 12/2014 | |
| WO | WO-2014199338 A2* | 12/2014 | H04N 5/2258 |

OTHER PUBLICATIONS

A 3MPixel Multi-Aperture Image Sensor with 0.7μm Pixels in 0.11μm CMOS, Fife et al., Stanford University, 2008, 3 pages.

Dual camera intelligent sensor for high definition 360 degrees surveillance, Scotti et al., Publisher: IET, May 9, 2000, 8 pages.

Dual-sensor foveated imaging system, Hua et al., Publisher: Optical Society of America, Jan. 14, 2008, 11 pages.

Defocus Video Matting, McGuire et al., Publisher: ACM SIG-GRAPH, Jul. 31, 2005, 11 pages.

Compact multi-aperture imaging with high angular resolution, Santacana et al., Publisher: Optical Society of America, 2015, 10 pages.

Multi-Aperture Photography, Green et al., Publisher: Mitsubishi Electric Research Laboratories, Inc., Jul. 2007, 10 pages.

Multispectral Bilateral Video Fusion, Bennett et al., Publisher: IEEE, May 2007, 10 pages.

Super-resolution imaging using a camera array, Santacana et al., Publisher: Optical Society of America, 2014, 6 pages.

Optical Splitting Trees for High-Precision Monocular Imaging, McGuire et al., Publisher: IEEE, 2007, 11 pages.

High Performance Imaging Using Large Camera Arrays, Wilburn et al., Publisher: Association for Computing Machinery, Inc., 2005, 12 pages.

Real-time Edge-Aware Image Processing with the Bilateral Grid, Chen et al., Publisher: ACM SIGGRAPH, 2007, 9 pages.

Superimposed multi-resolution imaging, Carles et al., Publisher: Optical Society of America, 2017, 13 pages.

Viewfinder Alignment, Adams et al., Publisher: Eurographics, 2008, 10 pages.

Dual-Camera System for Multi-Level Activity Recognition, Bodor et al., Publisher: IEEE, Oct. 2014, 6 pages.

Engineered to the task: Why camera-phone cameras are different, Giles Humpston, Publisher: Solid State Technology, Jun. 2009, 3 pages.

* cited by examiner



FIG. 1A



FIG. 1B

APPL-1001 / Page 4 of 15



FIG. 2

APPL-1001 / Page 5 of 15



Choose sensor(s) to be operational
**302**

Optionally, calculate color balance if
two (Wide and Tele) images are
provided by the two sensors.
**304**

Optionally, apply calculated color
balance in one of the images
**306**

Optionally, perform registration
between the Wide and Tele images to
output a transformation coefficient
**308**

Set an AF position using the
transformation coefficient
**310**

Process an output of any of steps
**302-308** to obtain a processed image
**312**

Resample the processed image
according to the transformation
coefficient, requested ZF, and output
video resolution
**314**

FIG. 3A

APPL-1001 / Page 6 of 15



FIG. 3B



FIG. 3C

APPL-1001 / Page 7 of 15



FIG. 4

APPL-1001 / Page 8 of 15

US 10,356,332 B2

**1**

## DUAL APERTURE ZOOM CAMERA WITH VIDEO SUPPORT AND SWITCHING / NON-SWITCHING DYNAMIC CONTROL

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/324,720 filed Jan. 8, 2017 (now allowed), which was a 371 application from international patent application PCT/IB2016/053803 filed Jun. 26, 2016, and is related to and claims priority from U.S. Provisional Patent Application No. 62/204,667 filed Aug. 13, 2015 which is expressly incorporated herein by reference in its entirety.

### FIELD

Embodiments disclosed herein relate in general to digital cameras and in particular to zoom digital cameras with video capabilities.

### BACKGROUND

Digital camera modules are currently being incorporated into a variety of host devices. Such host devices include cellular telephones, personal data assistants (PDAs), computers, and so forth. Consumer demand for digital camera modules in host devices continues to grow.

Host device manufacturers prefer digital camera modules to be small, so that they can be incorporated into the host device without increasing its overall size. Further, there is an increasing demand for such cameras to have higher-performance characteristics. One such characteristic possessed by many higher-performance cameras (e.g., standalone digital still cameras) is the ability to vary the focal length of the camera to increase and decrease the magnification of the image. This ability, typically accomplished with a zoom lens, is known as optical zooming. "Zoom" is commonly understood as a capability to provide different magnifications of the same scene and/or object by changing the focal length of an optical system, with a higher level of zoom associated with greater magnification and a lower level of zoom associated with lower magnification. Optical zooming is typically accomplished by mechanically moving lens elements relative to each other. Such zoom lenses are typically more expensive, larger and less reliable than fixed focal length lenses. An alternative approach for approximating the zoom effect is achieved with what is known as digital zooming. With digital zooming, instead of varying the focal length of the lens, a processor in the camera crops the image and interpolates between the pixels of the captured image to create a magnified but lower-resolution image.

Attempts to use multi-aperture imaging systems to approximate the effect of a zoom lens are known. A multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "cameras"). Each camera includes one or more lenses and/or other optical elements which define an aperture such that received electro-magnetic radiation is imaged by the optical sub-system and a resulting image is directed towards a two-dimensional (2D) pixelated image sensor region. The image sensor (or simply "sensor") region is configured to receive the image and to generate a set of image data based on the image. The digital camera may be aligned to receive electromagnetic radiation associated with scenery having a given set of one or more objects. The set of image data may be represented as digital image data, as

**2**

well known in the art. Hereinafter in this description, "image" "image data" and "digital image data" may be used interchangeably. Also, "object" and "scene" may be used interchangeably. As used herein, the term "object" is an entity in the real world imaged to a point or pixel in the image.

Multi-aperture imaging systems and associated methods are described for example in US Patent Publications No. 2008/0030592, 2010/0277619 and 2011/0064327. In US 2008/0030592, two sensors are operated simultaneously to capture an image imaged through an associated lens. A sensor and its associated lens form a lens/sensor combination. The two lenses have different focal lengths. Thus, even though each lens/sensor combination is aligned to look in the same direction, each combination captures an image of the same subject but with two different fields of view (FOV). One sensor is commonly called "Wide" and the other "Tele". Each sensor provides a separate image, referred to respectively as "Wide" (or "W") and "Tele" (or "T") images. A W-image reflects a wider FOV and has lower resolution than the T-image. The images are then stitched (fused) together to form a composite ("fused") image. In the composite image, the central portion is formed by the relatively higher-resolution image taken by the lens/sensor combination with the longer focal length, and the peripheral portion is formed by a peripheral portion of the relatively lower-resolution image taken by the lens/sensor combination with the shorter focal length. The user selects a desired amount of zoom and the composite image is used to interpolate values from the chosen amount of zoom to provide a respective zoom image. The solution offered by US 2008/0030592 requires, in video mode, very large processing resources in addition to high frame rate requirements and high power consumption (since both cameras are fully operational).

US 2010/0277619 teaches a camera with two lens/sensor combinations, the two lenses having different focal lengths, so that the image from one of the combinations has a FOV approximately 2-3 times greater than the image from the other combination. As a user of the camera requests a given amount of zoom, the zoomed image is provided from the lens/sensor combination having a FOV that is next larger than the requested FOV. Thus, if the requested FOV is less than the smaller FOV combination, the zoomed image is created from the image captured by that combination, using cropping and interpolation if necessary. Similarly, if the requested FOV is greater than the smaller FOV combination, the zoomed image is created from the image captured by the other combination, using cropping and interpolation if necessary. The solution offered by US 2010/0277619 leads to parallax artifacts when moving to the Tele camera in video mode.

In both US 2008/0030592 and US 2010/0277619, different focal length systems cause matching Tele and Wide FOVs to be exposed at different times using CMOS sensors. This degrades the overall image quality. Different optical F numbers ("F/#") cause image intensity differences. Working with such a dual sensor system requires double bandwidth support, i.e. additional wires from the sensors to the following HW component. Neither US 2008/0030592 nor US 2010/0277619 deal with registration errors.

US 2011/0064327 discloses multi-aperture imaging systems and methods for image data fusion that include providing first and second sets of image data corresponding to an imaged first and second scene respectively. The scenes overlap at least partially in an overlap region, defining a first collection of overlap image data as part of the first set of image data, and a second collection of overlap image data as

APPL-1001 / Page 9 of 15

US 10,356,332 B2

**3**

part of the second set of image data. The second collection of overlap image data is represented as a plurality of image data cameras such that each of the cameras is based on at least one characteristic of the second collection, and each camera spans the overlap region. A fused set of image data is produced by an image processor, by modifying the first collection of overlap image data based on at least a selected one of, but less than all of, the image data cameras. The systems and methods disclosed in this application deal solely with fused still images.

None of the known art references provide a thin (e.g. fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses, the camera configured to operate in both still mode and video mode to provide still and video images, wherein the camera configuration does not use any fusion to provide a continuous, smooth zoom in video mode.

Therefore there is a need for, and it would be advantageous to have thin digital cameras with optical zoom operating in both video and still mode that do not suffer from commonly encountered problems and disadvantages, some of which are listed above.

SUMMARY

Embodiments disclosed herein teach the use of dual-aperture (also referred to as dual-lens or two-sensor) optical zoom digital cameras. The cameras include two cameras, a Wide camera and a Tele camera, each camera including a fixed focal length lens, an image sensor and an image signal processor (ISP). The Tele camera is the higher zoom camera and the Wide camera is the lower zoom camera. In some embodiments, the thickness/effective focal length (EFL) ratio of the Tele lens is smaller than about 1. The image sensor may include two separate 2D pixelated sensors or a single pixelated sensor divided into at least two areas. The digital camera can be operated in both still and video modes. In video mode, optical zoom is achieved "without fusion", by, in some embodiments, switching between the W and T images to shorten computational time requirements, thus enabling high video rate. To avoid discontinuities in video mode, the switching includes applying additional processing blocks, which include in some embodiments image scaling and shifting. In some embodiments, when a no-switching criterion is fulfilled, optical zoom is achieved in video mode without switching.

As used herein, the term "video" refers to any camera output that captures motion by a series of pictures (images), as opposed to "still mode" that friezes motion. Examples of "video" in cellphones and smartphones include "video mode" or "preview mode".

In order to reach optical zoom capabilities, a different magnification image of the same scene is captured (grabbed) by each camera, resulting in FOV overlap between the two cameras. Processing is applied on the two images to fuse and output one fused image in still mode. The fused image is processed according to a user zoom factor request. As part of the fusion procedure, up-sampling may be applied on one or both of the grabbed images to scale it to the image grabbed by the Tele camera or to a scale defined by the user. The fusion or up-sampling may be applied to only some of the pixels of a sensor. Down-sampling can be performed as well if the output resolution is smaller than the sensor resolution.

The cameras and associated methods disclosed herein address and correct many of the problems and disadvantages of known dual-aperture optical zoom digital cameras. They

**4**

provide an overall zoom solution that refers to all aspects: optics, algorithmic processing and system hardware (HW).

In a dual-aperture camera image plane, as seen by each camera (and respective image sensor), a given object will be shifted and have different perspective (shape). This is referred to as point-of-view (POV). The system output image can have the shape and position of either camera image or the shape or position of a combination thereof. If the output image retains the Wide image shape then it has the Wide perspective POV. If it retains the Wide position POV. The same applies for Tele images position and perspective. As used in this description, the perspective POV may be of the Wide or Tele cameras, while the position POV may shift continuously between the Wide and Tele cameras. In fused images, it is possible to register Tele image pixels to a matching pixel set within the Wide image pixels, in which case the output image will retain the Wide POV ("Wide fusion"). Alternatively, it is possible to register Wide image pixels to a matching pixel set within the Tele image pixels, in which case the output image will retain the Tele POV ("Tele fusion"). It is also possible to perform the registration after either camera image is shifted, in which case the output image will retain the respective Wide or Tele perspective POV.

In an exemplary embodiment, there is provided a zoom digital camera comprising a Wide imaging section that includes a fixed focal length Wide lens with a Wide FOV and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene, a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene, and a camera controller operatively coupled to the Wide and Tele imaging sections, the camera controller configured to evaluate a no-switching criterion determined by inputs from both Wide and Tele image data, and, if the no-switching criterion is fulfilled, to output a zoom output image that includes only Wide image data in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value.

In an exemplary embodiment there is provided a method for obtaining zoom images of an object or scene using a digital camera, comprising the steps of providing in the digital camera a Wide imaging section having a Wide lens with a Wide FOV and a Wide sensor, a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, and a camera controller operatively coupled to the Wide and Tele imaging sections, and configuring the camera controller to evaluate a no-switching criterion determined by inputs from both Wide and Tele image data, and, if the no-switching criterion is fulfilled, to output a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value.

In some exemplary embodiments, the no-switching criterion includes a shift between the Wide and Tele images calculated by global registration, the shift being greater than a first threshold.

In some exemplary embodiments, the no-switching criterion includes a disparity range calculated by global registration, the disparity range being greater than a second threshold.

In some exemplary embodiments, the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.

APPL-1001 / Page 10 of 15

US 10,356,332 B2

5

In some exemplary embodiments, the no-switching criterion includes a number of corresponding features in the Wide and Tele images being smaller than a third threshold.

In some exemplary embodiments, the no-switching criterion includes a majority of objects imaged in an overlap area of the Wide and Tele images being calculated to be closer to the camera than a first threshold distance.

In some exemplary embodiments, the no-switching criterion includes some objects imaged in an overlap area of the Wide and Tele images being calculated to be closer than a second threshold distance while other objects imaged in the overlap area of the Wide and Tele images being calculated to be farther than a third distance threshold.

In some exemplary embodiments, the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs.

In some exemplary embodiments, the user inputs include a zoom factor, a camera mode and a region of interest.

In some exemplary embodiments, the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1. For a definition of TTL and EFL see e.g. co-assigned US published patent application No. 20150244942.

In some exemplary embodiments, if the no-switching criterion is not fulfilled, the camera controller is further configured to output video output images with a smooth transition when switching between the lower ZF value and the higher ZF value or vice versa, wherein at the lower ZF value the output image is determined by the Wide sensor, and wherein at the higher ZF value the output image is determined by the Tele sensor.

In some exemplary embodiments, the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.

### BRIEF DESCRIPTION OF THE DRAWINGS

Non-limiting examples of embodiments disclosed herein are described below with reference to figures attached hereto that are listed following this paragraph. Identical structures, elements or parts that appear in more than one figure are generally labeled with a same numeral in all the figures in which they appear. The drawings and descriptions are meant to illuminate and clarify embodiments disclosed herein, and should not be considered limiting in any way.

FIG. **1**A shows schematically a block diagram illustrating an exemplary dual-aperture zoom imaging system disclosed herein;

FIG. **1**B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. **1**A;

FIG. **2** shows an example of a Wide sensor, a Tele sensor and their respective FOVs;

FIG. **3**A shows an embodiment of an exemplary method disclosed herein for acquiring a zoom image in video/preview mode;

FIG. **3**B shows exemplary feature points in an object;

FIG. **3**C shows schematically a known rectification process;

FIG. **4** shows a graph illustrating an effective resolution zoom factor.

6

### DETAILED DESCRIPTION

#### Definitions

Sharpness score: the gradients (dx, dy) of the image are compared (through subtraction) to the gradients of its low pass filtered version. A higher difference indicates a sharper original image. The result of this comparison is normalized with respect to the average variations (for example, sum of absolute gradients) of the original image, to obtain an absolute sharpness score.

Edge score: for each image, the edges are found (for example, using Canny edge detection) and the average intensity of gradients along them is calculated, for example, by calculating the magnitude of gradients (dx, dy) for each edge pixel, summing the results and dividing by the total number of edge pixels. The result is the edge score.

Effective resolution score: this score is calculated only in a region of interest (ROI) and provides a good indication of the effective resolution level in the image. As used herein, "ROI" is a user-defined sub-region of the image that may be exemplarily 4% or less of the image area. The effective resolution score can be derived from a combination of the sharpness scores and edge scores for each image, for example by normalizing both to be between [0, 1] and by taking their average.

FIG. **1**A shows schematically a block diagram illustrating an exemplary embodiment of a dual-aperture zoom imaging system (also referred to simply as "dual-camera" or "dual-aperture camera") disclosed herein and numbered **100**. Dual-aperture camera **100** comprises a Wide imaging section ("Wide camera") that includes a Wide lens block **102**, a Wide image sensor **104** and a Wide image processor **106**. Dual-aperture camera **100** further comprises a Tele imaging section ("Tele camera") that includes a Tele lens block **108**, a Tele image sensor **110** and a Tele image processor **112**. The image sensors may be physically separate or may be part of a single larger image sensor. The Wide sensor pixel size can be equal to or different from the Tele sensor pixel size. Dual-aperture camera **100** further comprises a camera fusion processing core (also referred to as "controller") **114** that includes a sensor control module **116**, a user control module **118**, a video processing module **126** and a capture processing module **128**, all operationally coupled to sensor control block **110**. User control module **118** comprises an operational mode function **120**, a ROI function **122** and a zoom factor (ZF) function **124**.

Sensor control module **116** is connected to the two (Wide and Tele) cameras and to the user control module **118** and used to choose, according to the zoom factor, which of the sensors is operational and to control the exposure mechanism and the sensor readout. Mode choice function **120** is used for choosing capture/video modes. ROI function **122** is used to choose a region of interest. The ROI is the region on which both cameras are focused on. Zoom factor function **124** is used to choose a zoom factor. Video processing module **126** is connected to mode choice function **120** and used for video processing. It is configurable to evaluate a no-switching criterion determined by inputs from both Wide and Tele image data and to make a decision regarding video output. Specifically, upon evaluation of a no-switching criterion, if the no-switching criterion is fulfilled, module **126** is configurable to output a zoom video output image that includes only Wide image data in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value. If the no-switching criterion is not fulfilled, module **126** is configurable to combine in still mode, at a predefined

APPL-1001 / Page 11 of 15

7

8

range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view. Still processing module **128** is connected to the mode choice function **120** and used for high image quality still mode images. The video processing module is applied when the user desires to shoot in video mode. The capture processing module is applied when the user wishes to shoot still pictures.

FIG. 1B is a schematic mechanical diagram of the dual-aperture zoom imaging system of FIG. **1**A. Exemplary dimensions: Wide lens TTL=4.2 mm and EFL=3.5 mm; Tele lens TTL=6 mm and EFL=7 mm; both Wide and Tele sensors ⅓ inch; external dimensions of Wide and Tele cameras: width (w) and length (1)=8.5 mm and height (h)=6.8 mm; distance "d" between camera centers=10 mm.

Following is a detailed description and examples of different methods of use of dual-aperture camera **100**.

Still Mode Operation/Function

In still camera mode, the obtained image is fused from information obtained by both cameras at all zoom levels, see FIG. **2**, which shows a Wide sensor **202** and a Tele sensor **204** and their respective FOVs. Exemplarily, as shown, the Tele sensor FOV is half the Wide sensor FOV. The still camera mode processing includes two stages: the first stage includes setting HW settings and configuration, where a first objective is to control the sensors in such a way that matching FOVs in both images (Tele and Wide) are scanned at the same time, a second objective is to control the relative exposures according to the lens properties, and a third objective is to minimize the required bandwidth from both sensors for the ISPs. The second stage includes image processing that fuses the Wide and the Tele images to achieve optical zoom, improves SNR and provides wide dynamic range.

FIG. **3**A shows image line numbers vs. time for an image section captured by CMOS sensors. A fused image is obtained by line (row) scans of each image. To prevent matching FOVs in both sensors to be scanned at different times, a particular configuration is applied by the camera controller on both image sensors while keeping the same frame rate. The difference in FOV between the sensors determines the relationship between the rolling shutter time and the vertical blanking time for each sensor.

Video Mode Operation/Function

Smooth Transition

When a dual-aperture camera switches the camera output between cameras or points of view, a user will normally see a "jump" (discontinuous) image change. However, a change in the zoom factor for the same camera and POV is viewed as a continuous change. A "smooth transition" (ST) is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Zoom-in and Zoom-Out in Video Mode

In video mode, sensor oversampling is used to enable continuous and smooth zoom experience. Processing is applied to eliminate the changes in the image during cross-over from one camera to the other. Zoom from 1 to $Z_{switch}$ is performed using the Wide sensor only. From $Z_{switch}$ and on, it is performed mainly by the Tele sensor. To prevent

"jumps" (roughness in the image), switching to the Tele image is done using a zoom factor which is a bit higher ($Z_{switch}+\Delta$Zoom) than $Z_{switch}$. $\Delta$Zoom is determined according to the system's properties and is different for cases where zoom-in is applied and cases where zoom-out is applied ($\Delta Zoom_{in}$, $\Delta Zoom_{out}$). This is done to prevent residual jumps artifacts to be visible at a certain zoom factor. The switching between sensors, for an increasing zoom and for decreasing zoom, is done on a different zoom factor.

The zoom video mode operation includes two stages: (1) sensor control and configuration and (2) image processing. In the range from 1 to $Z_{switch}$, only the Wide sensor is operational, hence, power can be supplied only to this sensor. Similar conditions hold for a Wide AF mechanism. From $Z_{switch}+\Delta$Zoom to $Z_{max}$ only the Tele sensor is operational, hence, power is supplied only to this sensor. Similarly, only the Tele sensor is operational and power is supplied only to it for a Tele AF mechanism. Another option is that the Tele sensor is operational and the Wide sensor is working in low frame rate. From $Z_{switch}$ to $Z_{switch}+\Delta$Zoom, both sensors are operational.

Zoom-in:

at low ZF up to slightly above $ZF_T$ (the zoom factor that enables switching between Wide and Tele outputs) the output image is the digitally zoomed, unchanged Wide camera output. $ZF_T$ is defined as follows:

$$ZF_T=\text{Tan}(FOV_{Wide})/\text{Tan}(FOV_{Tele})$$

where Tan refers to "tangent", while $FOV_{Wide}$ and $FOV_{Tele}$ refer respectively to the Wide and Tele lens fields of view (in degrees). As used herein, the FOV is measured from the center axis to the corner of the sensor (i.e. half the angle of the normal definition). Switching cannot take place below $ZF_T$ and it can above it.

In some embodiments for the up-transfer ZF, as disclosed in co-invented and co-owned U.S. Pat. No. 9,185,291, the output is a transformed Tele camera output, where the transformation is performed by a global registration (GR) algorithm to achieve smooth transition. As used herein "global registration" refers to an action for which the inputs are the Wide and Tele images. The Wide image is cropped to display the same FOV as the Tele image. The Tele image is passed through a low pass filter (LPF) and resized to make its appearance as close as possible to the Wide image (lower resolution and same pixel count). The outputs of GR are corresponding feature point pairs in the images along with their disparities, and parameters for differences between the images, i.e. shift and scale. As used herein, "feature point" refers to a point such as points **10**a-d in FIG. **3**B and refers to a point (pixel) of interest on an object in an image. For purposes set forth in this description, a feature point should be reproducible and invariant to changes in image scale, noise and illumination. Such points usually lie on corners or other high-contrast regions of the object.

Stages of Global Registration

In some exemplary embodiments, global registration may be performed as follows:

1. Find interest points (features) in each image separately by filtering it with, exemplarily, a Difference of Gaussians filter, and finding local extrema on the resulting image.

2. Find feature correspondences (features in both images that describe the same point in space) in a "matching" process. These are also referred to as "feature pairs", "correspondence pairs" or "matching pairs". This is done by comparing each feature point from one (Tele or Wide) image (referred to hereinafter as "image 1") to all feature points in that region from the other (respectively Wide or Tele) image

APPL-1001 / Page 12 of 15

US 10,356,332 B2

9

(referred to hereinafter as "image 2"). The features are compared only within their group of minima/maxima, using patch normalized cross-correlation. As used herein, "patch" refers to a group of neighboring pixels around an origin pixel.

3. The normalized cross correlation of two image patches t(x,y) and f(x,y) is

$$\frac{1}{n}\sum_{x,y}\frac{(f(x, y) - \overline{f})(t(x, y) - \overline{t})}{\sigma_f\sigma_t}$$

where n is the number of pixels in both patches, $\overline{t}$ is the average of f and $\sigma_f$ is the standard deviation of f. A match for a feature point from image 1 is only confirmed if its correlation score is much higher (for example, x1.2) than the next-best matching feature from image 2.

4. Find the disparity between each pair of corresponding features (also referred to as "matching pair") by subtracting their x and y coordinate values.

5. Filter bad matching points:

   a. Following the matching process, matches that include feature points from image 2 that were matched to more than one feature from image 1 are discarded.

   b. Matching pairs whose disparity is inconsistent with the other matching pairs are discarded. For example, if there is one corresponding pair which whose disparity is lower or higher than the others by 20 pixels.

6. The localization accuracy for matched points from image 2 is refined by calculating a correlation of neighboring pixel patches from image 2 with the target patch (the patch around the current pixel (of the current matching pair) from image 1, modeling the results as a parabola and finding its maximum.

7. Rotation and fine scale differences are calculated between the two images according to the matching points (for example, by subtracting the center of mass from each set of points, i.e. the part of the matching points belonging to either the Wide or the Tele image, and solving a least squares problem).

8. After compensating for these differences, since the images were rectified, the disparity in the Y axis should be close to 0. Matching points that do not fit this criterion are discarded. A known rectification process is illustrated in FIG. 3C.

9. Finally, the remaining matching points are considered true and the disparities for them are calculated. A weighted average of the disparity is taken as the shift between both images. The maximum difference between disparity values is taken as the disparity range.

10. At various stages during GR, if there are not enough feature/matching points remaining, the GR is stopped and returns a failure flag.

In addition, it is possible to find range calibration to the rectification process by finding the shiftI=shift for objects at infinity and defining shiftD=shift-shiftI and disparity D=disparity-shiftI. We then calculate

$$\text{object distance} = \frac{focalLength \cdot baseline}{disparityD \cdot pixelSize},$$

where "baseline" is the distance between cameras.

Returning now to the Zoom-in process, in some embodiments, for higher ZF than the up-transfer ZF the output is the transformed Tele camera output, digitally zoomed. How-

10

ever, in other embodiments for higher ZF than the up-transfer ZF there will be no switching from the Wide to the Tele camera output, i.e. the output will be from the Wide camera, digitally zoomed. This "no switching" process is described next.

No Switching

Switching from the Wide camera output to the transformed Tele camera output will be performed unless some special condition (criterion), determined based on inputs obtained from the two camera images, occurs. In other words, switching will not be performed only if at least one of the following no-switching criteria is fulfilled:

1. if the shift calculated by GR is greater than a first threshold, for example 50 pixels.

2. if the disparity range calculated by GR is greater than a second threshold, for example 20 pixels, because in this case there is no global shift correction that will suppress movement/jump for all objects distances (smooth transition is impossible for all objects).

3. if the effective resolution score of the Tele image is lower than that of the Wide image. In this case, there is no point in performing the transition because no value (i.e. resolution) is gained. Smooth transition is possible but undesirable.

4. if the GR fails, i.e. if the number of matching pairs found is less than a third threshold, for example 20 matching pairs.

5. if, for example, that are imaged onto the overlap area are calculated to be closer than a first threshold distance, for example 30 cm, because this can result in a large image shift to obtain ST.

6. if some objects (for example two objects) that are imaged in the overlap area are calculated to be closer than a second threshold distance, for example 50 cm, while other objects (for example two objects) are calculated to be farther than a third threshold distance for example 10 m. The reason is that the shift between an object position in the Wide and Tele cameras is object distance dependent, where the closer the objects the larger the shift, so an image containing significantly close and far objects cannot be matched by simple transformation (shift scale) to be similar and thus provide ST between cameras.

Zoom-Out:

At high ZF down to slightly below $Z_{FT}$, the output image is the digitally zoomed transformed Tele camera output. For the down-transfer ZF, the output is a shifted Wide camera output, where the Wide shift correction is performed by the GR algorithm to achieve smooth transition, i.e. with no jump in the ROI region. For lower (than the down-transfer) ZF, the output is basically the down-transfer ZF output digitally zoomed but with gradually smaller Wide shift correction, until for ZF=1 the output is the unchanged Wide camera output.

Note that if a no-switching criterion is not fulfilled, then the camera will output without fusion continuous zoom video mode output images of the object or scene, each output image having a respective output resolution, the video output images being provided with a smooth transition when switching between the lower ZF value and the higher ZF value or vice versa, wherein at the lower ZF value the output resolution is determined by the Wide sensor, and wherein at the higher ZF value the output resolution is determined by the Tele sensor.

FIG. 3A shows an embodiment of a method disclosed herein for acquiring a zoom image in video/preview mode for 3 different zoom factor (ZF) ranges: (a) ZF range=1: $Z_{switch}$; (b) ZF range=$Z_{switch}$:$Z_{switch}$+$\Delta$Zoom$_{in}$; and (c) Zoom factor range=$Z_{switch}$+$\Delta$Zoom$_{in}$:$Z_{max}$. The description

US 10,356,332 B2

| 11 | 12 |

is with reference to a graph of effective resolution vs. zoom factor (FIG. **4**). In step **302**, sensor control module **116** chooses (directs) the sensor (Wide, Tele or both) to be operational. Specifically, if the ZF range=1:$Z_{switch}$, module **116** directs the Wide sensor to be operational and the Tele sensor to be non-operational. If the ZF range is $Z_{switch}$: $Z_{switch}+\Delta Zoom_{in}$, module **116** directs both sensors to be operational and the zoom image is generated from the Wide sensor. If the ZF range is $Z_{switch}+\Delta Zoom_{in}$:$Z_{max}$, module **116** directs the Wide sensor to be non-operational and the Tele sensor to be operational. After the sensor choice in step **302**, all following actions are performed in video processing core **126**. Optionally, in step **304**, color balance is calculated if two images are provided by the two sensors. Optionally yet, in step **306**, the calculated color balance is applied in one of the images (depending on the zoom factor). Further optionally, in step **308**, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient can be used to set an AF position in step **310**. In step **312**, an output of any of steps **302-308** is applied on one of the images (depending on the zoom factor) for image signal processing that may include denoising, demosaicing, sharpening, scaling, etc. In step **314**, the processed image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p). To avoid a transition point to be executed at the same ZF, $\Delta Zoom$ can change while zooming in and while zooming out. This will result in hysteresis in the sensor switching point.

In more detail, for ZF range 1:$Z_{switch}$, for ZF<$Z_{switch}$, the Wide image data is transferred to the ISP in step **312** and resampled in step **314**. For ZF range=$Z_{switch}$:$Z_{switch}+\Delta Zoom_{in}$, both sensors are operational and the zoom image is generated from the Wide sensor. The color balance is calculated for both images according to a given ROI. In addition, for a given ROI, registration is performed between the Wide and Tele images to output a transformation coefficient. The transformation coefficient is used to set an AF position. The transformation coefficient includes the translation between matching points in the two images. This translation can be measured in a number of pixels. Different translations will result in a different number of pixel movements between matching points in the images. This movement can be translated into depth and the depth can be translated into an AF position. This enables to set the AF position by only analyzing two images (Wide and Tele). The result is fast focusing.

Both color balance ratios and transformation coefficient are used in the ISP step. In parallel, the Wide image is processed to provide a processed image, followed by resampling. For ZF range=$Z_{switch}+\Delta Zoom_{in}$:$Z_{max}$ and for Zoom factor>$Z_{switch}$, +$\Delta Zoom_{in}$, the color balance calculated previously is now applied on the Tele image. The Tele image data is transferred to the ISP in step **312** and resampled in step **314**. To eliminate crossover artifacts and to enable smooth transition to the Tele image, the processed Tele image is resampled according to the transformation coefficient, the requested ZF (obtained from zoom function **124**) and the output video resolution (for example 1080p).

FIG. **4** shows the effective resolution as a function of the zoom factor for a zoom-in case and for a zoom-out case $\Delta Zoom_{up}$ is set when one zooms in, and $\Delta Zoom_{down}$ is set when one zooms out. Setting $\Delta Zoom_{up}$ to be different from $\Delta Zoom_{down}$ will result in transition between the sensors to be performed at different zoom factor ("hysteresis") when

zoom-in is used and when zoom-out is used. This hysteresis phenomenon in the video mode results in smooth continuous zoom experience.

In conclusion, dual aperture optical zoom digital cameras and associate methods disclosed herein reduce the amount of processing resources, lower frame rate requirements, reduce power consumption, remove parallax artifacts and provide continuous focus (or provide loss of focus) when changing from Wide to Tele in video mode. They provide a dramatic reduction of the disparity range and avoid false registration in capture mode. They reduce image intensity differences and enable work with a single sensor bandwidth instead of two, as in known cameras.

All patent applications mentioned in this specification are herein incorporated in their entirety by reference into the specification, to the same extent as if each individual patent application was specifically and individually indicated to be incorporated herein by reference. In addition, citation or identification of any reference in this application shall not be construed as an admission that such reference is available as prior art to the present disclosure.

While this disclosure has been described in terms of certain embodiments and generally associated methods, alterations and permutations of the embodiments and methods will be apparent to those skilled in the art. The disclosure is to be understood as not limited by the specific embodiments described herein, but only by the scope of the appended claims.

What is claimed is:

1. A dual-aperture zoom digital camera comprising:
 a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;
 b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and
 c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein at a zoom factor (ZF) value greater than a zoom factor $ZF_T$=tangent ($FOV_{Wide}$)/tangent (FO-$V_{Tele}$), if the no-switching criterion is fulfilled the camera controller is further configured to output a zoom video output image that includes only digitally-zoomed Wide image data, and if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

2. The camera of claim **1**, wherein the ZF value expresses a maximal zoom Zmax.

3. The camera of claim **1**, wherein the no-switching criterion includes a shift between the Wide and Tele images calculated by global registration, the shift being greater than a first threshold.

4. The camera of claim **1**, wherein the no-switching criterion includes a disparity range calculated by global registration, the disparity range being greater than a second threshold.

5. The camera of claim **1**, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.

US 10,356,332 B2

13

**6**. The camera of claim **1**, wherein the no-switching criterion includes a number of corresponding features in the Wide and Tele images being smaller than a third threshold.

**7**. The camera of claim **1**, wherein the no-switching criterion includes a majority of objects imaged in an overlap area of the Wide and Tele images being calculated to be closer to the camera than a first threshold distance.

**8**. The camera of claim **1**, wherein the no-switching criterion includes some objects imaged in an overlap area of the Wide and Tele images being calculated to be closer than a second threshold distance while other objects imaged in the overlap area of the Wide and Tele images being calculated to be farther than a first distance threshold.

**9**. The camera of claim **1**, wherein the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs.

**10**. The camera of claim **9**, wherein the user inputs include a zoom factor, a camera mode and a region of interest.

**11**. The camera of claim **1**, wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1.

**12**. The camera of claim **1**, wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.

**13**. A method for obtaining zoom images of an object or scene using a dual-aperture zoom digital camera, comprising:

a) configuring a camera controller to evaluate if a no-switching criterion is fulfilled or not fulfilled;

b) if the no-switching criterion is fulfilled, configuring the camera controller to output at a zoom factor (ZF) higher than a zoom factor $ZF_T$=tangent $(FOV_{Wide})$/ tangent $(FOV_{Tele})$ a zoom video output image that includes only digitally-zoomed Wide image data; and

c) if the no-switching criterion is not fulfilled, configuring the camera controller to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

14

**14**. The method of claim **13**, wherein the ZF value expresses a maximal zoom Zmax.

**15**. The method of claim **13**, wherein the no-switching criterion includes a shift between the Wide and Tele images calculated by global registration, the shift being greater than a first threshold.

**16**. The method of claim **13**, wherein the no-switching criterion includes a disparity range calculated by global registration, the disparity range being greater than a second threshold.

**17**. The method of claim **13**, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.

**18**. The method of claim **13**, wherein the no-switching criterion includes a number of corresponding features in the Wide and Tele images being smaller than a third threshold.

**19**. The method of claim **13**, wherein the no-switching criterion includes a majority of objects imaged in an overlap area of the Wide and Tele images being calculated to be closer to the camera than a first threshold distance.

**20**. The method of claim **13**, wherein the no-switching criterion includes some objects imaged in an overlap area of the Wide and Tele images being calculated to be closer than a second threshold distance while other objects imaged in the overlap area of the Wide and Tele images being calculated to be farther than a third threshold distance.

**21**. The method of claim **13**, further comprising the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.

**22**. The method of claim **13**, wherein the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image includes configuring the camera controller to combine Wide and Tele image data only in focused areas.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**COREPHOTONICS, LTD.,**
**Patent Owner/Appellant**

**Appeal Nos. 2022-1455[1]**

**v.**                                                                    **2022-1456**

**APPLE INC.,**
**Petitioner/Appellee**

**Proceeding Nos.: IPR2020-00861 and IPR2020-00862**

_____

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely

filed February 8, 2022, in the United States Patent and Trademark Office in connection with the

above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day

being forwarded to the Federal Circuit.


Respectfully submitted,

Date:  March 21, 2022


By: *Macia L. Fletcher*

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035


Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

---

[1] Appeal No. 2022-1455 (Lead) is consolidated with Appeal No. 2022-1456 (Member Case) pursuant to Court Order (Dkt. No. 2) and Note to File (Dkt. No. 3) dated February 17, 2022.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant

and Appellee this 21st day of March, 2022, as follows:

| PATENT OWNER: | PETITIONER: |
|---|---|
| Marc A. Fenster<br>Neil Rubin<br>James S. Tsuei<br>RUSS AUGUST & KABAT<br>mafenster@raklaw.com<br>nrubin@raklaw.com<br>jtsuei@raklaw.com | Erin Marie Boyd Leach<br>Mark S. Davies<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>eleach@orrick.com<br>mark.davies@orrick.com |

By: _Macia L. Fletcher_

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

**March 21, 2022**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case:  IPR2020-00861**
**Patent No. 10,230,898 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



**Prosecution History ~ IPR2020-00861**

| Date | Document |
|---|---|
| 5/6/2020 | Petition for Inter Partes Review |
| 5/6/2020 | Petitioner's Power of Attorney |
| 5/8/2020 | Patent Owner's Power of Attorney |
| 5/8/2020 | Patent Owner's Mandatory Notices |
| 6/11/2020 | Notice of Filing Date Accorded to Petition |
| 9/11/2020 | Patent Owner's Preliminary Response |
| 12/9/2020 | Decision - Institution of Inter Partes Review |
| 12/9/2020 | Scheduling Order |
| 2/10/2021 | Patent Owner's Updated Power of Attorney |
| 2/10/2021 | Patent Owner's Updated Mandatory Notices |
| 2/12/2021 | Notice of Deposition - Durand, Ph.D. |
| 3/2/2021 | Petitioner's Updated Mandatory Notices |
| 3/2/2021 | Patent Owner's Response (Private) |
| 3/2/2021 | Patent Owner's Response (Redacted Version) |
| 3/3/2021 | Patent Owner's Corrected Motion to File Under Seal and for Entry of Protective Order |
| 5/7/2021 | Notice of Deposition - Hart, Ph.D. |
| 5/11/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/2/2021 | Unopposed Motion for Pro Hac Vice Admission - Fenster and Tsuei |
| 6/4/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/10/2021 | Order - Pro Hac Vice Admission - Fenster and Tsuei |
| 6/11/2021 | Petitioner's Reply (Private) |
| 6/11/2021 | Petitioner's Reply |
| 6/11/2021 | Petitioner's Motion to Seal |
| 6/17/2021 | Notice of Deposition - Durand, Ph.D. |
| 7/23/2021 | Patent owner's Sur-Reply |
| 7/23/2021 | Patent Owner's Sur-Reply |
| 7/27/2021 | Patent Owner's Request for Oral Argument |
| 7/27/2021 | Petitioner's Request for Oral Argument |
| 7/30/2021 | Patent Owner's Updated Mandatory Notices |
| 7/30/2021 | Petitioner's Objections to Patent Owner's Sur-Reply Exhibits |
| 8/17/2021 | Petitioner's Motion to Exclude Evidence |
| 8/26/2021 | Order - Parties Requests for a Trial Hearing |
| 8/30/2021 | Joint Stipulation to Alternative Schedule for Exchanging Demonstratives and Request to Modify Schedule |
| 12/6/2021 | Oral Hearing Transcript |
| 12/7/2021 | Final Written Decision |
| 1/31/2022 | Petitioner's Corrected Motion to Seal |
| 1/31/2022 | Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Durand, Ph.D. Declaration in Support of Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Transcript of Hart Deposition (Public Copy) |
| 2/1/2022 | Patent Owner's Corrected Motion to File Under Seal |
| 2/1/2022 | Patent Owner's Response (Confidential) |

**Prosecution History ~ IPR2020-00861**

| Date | Document |
|---|---|
| 2/1/2022 | Patent Owner's Response (Redacted) |

**U.S. DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

**March 21, 2022**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case:  IPR2020-00862**
**Patent No. 10,356,332 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



**Prosecution History ~ IPR2020-00862**

| Date | Document |
|------|----------|
| 5/6/2020 | Petition for Inter Partes Review |
| 5/6/2020 | Petitioner's Power of Attorney |
| 5/8/2020 | Patent Owner's Power of Attorney |
| 5/8/2020 | Patent Owner's Mandatory Notices |
| 6/11/2020 | Notice of Filing Date Accorded to Petition |
| 9/11/2020 | Patent Owner's Preliminary Response |
| 12/9/2020 | Decision - Institution of Inter Partes Review |
| 12/9/2020 | Scheduling Order |
| 2/10/2021 | Patent Owner's Updated Power of Attorney |
| 2/10/2021 | Patent Owner's Updated Mandatory Notices |
| 2/12/2021 | Notice of Deposition - Durand, Ph.D. |
| 3/2/2021 | Petitioner's Updated Mandatory Notices |
| 3/2/2021 | Patent Owner's Response (Private) |
| 3/2/2021 | Patent Owner's Response (Redacted Version) |
| 3/2/2021 | Patent Owner's Motion to File Under Seal and for Entry of Protective Order |
| 5/7/2021 | Notice of Deposition - Hart, Ph.D. |
| 5/11/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/2/2021 | Unopposed Motion for Pro Hac Vice Admission - Fenster and Tsuei |
| 6/4/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/10/2021 | Order - Pro Hac Vice Admission - Fenster and Tsuei |
| 6/11/2021 | Petitioner's Reply (Private) |
| 6/11/2021 | Petitioner's Reply |
| 6/11/2021 | Petitioner's Motion to Seal |
| 6/17/2021 | Notice of Deposition - Durand, Ph.D. |
| 7/23/2021 | Patent Owner's Sur-Reply |
| 7/27/2021 | Patent Owner's Request for Oral Argument |
| 7/27/2021 | Petitioner's Request for Oral Argument |
| 7/30/2021 | Patent Owner's Updated Mandatory Notices |
| 7/30/2021 | Petitioner's Objections to Patent Owner's Exhibits |
| 8/17/2021 | Petitioner's Motion to Exclude Evidence |
| 8/20/2021 | Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence |
| 8/26/2021 | Order - Parties Requests for a Trial Hearing |
| 8/30/2021 | Joint Stipulation to Alternative Schedule for Exchanging Demonstratives and Request to Modify Schedule |
| 12/6/2021 | Oral Hearing Transcript |
| 12/7/2021 | Final Written Decision |
| 1/31/2022 | Petitioner's Corrected Motion to Seal |
| 1/31/2022 | Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Durand, Ph.D. Declaration in Support of Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Transcript of Hart Deposition (Public Copy) |
| 2/1/2022 | Patent Owner's Corrected Motion to File Under Seal |
| 2/1/2022 | Patent Owner's Response (Confidential) |

**Prosecution History ~ IPR2020-00862**

| Date | Document |
|------|----------|
| 2/1/2022 | Patent Owner's Response (Redacted) |

Paper No. 43

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.
_____

Case No. IPR2020-00861
U.S. Patent No. 10,230,898
_____

PATENT OWNER'S NOTICE OF APPEAL

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*Submitted Electronically via the PTAB E2E System*

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and in accordance with 37 C.F.R. §§ 90.2-90.3, Patent Owner Corephotonics, Ltd. ("Corephotonics") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered on December 7, 2021, in IPR2020-00861 (Paper No. 35) ("Final Written Decision"), and from all underlying findings, determinations, rulings, opinions, orders, and decisions regarding the inter partes review of U.S. Patent No. 10,230,898 (the "'898 patent").

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Corephotonics states that the issues on appeal may include, but are not limited to: the Board's determination that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent have been shown to be unpatentable; the Board's consideration of the expert testimony, prior art, and other evidence in the record; and the Board's factual findings, conclusions of law, or other determinations supporting or related to those issues, as well as all other issues decided adversely to Corephotonics in any orders, decisions, rulings, and opinions.

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Dated: February 8, 2022           /Neil A. Rubin/
                                  Neil A. Rubin (Reg. No. 67,030)
                                  RUSS AUGUST & KABAT
                                  12424 Wilshire Boulevard, 12th Floor
                                  Los Angeles, CA  90025
                                  Telephone: 310-826-7474

                                  Attorney for Patent Owner,
                                  COREPHOTONICS, LTD.

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically filed through the Patent Trial and Appeal Board End to End System, the above document is being sent on February 8, 2022 by United States Postal Service Priority Mail Express to the United States Patent and Trademark Office at the following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned also hereby certifies that the above document is being e-filed with the Clerk's Office for the United States Court of Appeals for the Federal Circuit, along with payment of the required docketing fees.

Dated: February 8, 2022          /Neil A. Rubin/

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## CERTIFICATE OF SERVICE

I hereby certify that "Patent Owner's Notice of Appeal" was served on February 8, 2022 by email sent to:

> David W. O'Brien
> Hong Shi
> HAYNES AND BOONE, LLP
> 600 Congress Ave. Suite 1300
> Austin, TX  78701
> Telephone: 512-867-8400
> Email: david.obrien.ipr@haynesboone.com
> Email: hong.shi.ipr@haynesboone.com
>
> Andrew S. Ehmke
> Michael S. Parsons
> Jordan Maucotel
> Stephanie N. Sivinski
> HAYNES AND BOONE, LLP
> 2323 Victory Ave. Suite 700
> Dallas, TX  75219
> Telephone: 214-651-5000
> Email: andy.ehmke.ipr@haynesboone.com
> Email: michael.parsons.ipr@haynesboone.com
> Email: jordan.maucotel.ipr@haynesboone.com
> Email: stephanie.sivinski.ipr@haynesboone.com

      /Neil A. Rubin/

Paper No. 43

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.
_____

Case No. IPR2020-00862
U.S. Patent No. 10,356,332
_____

PATENT OWNER'S NOTICE OF APPEAL

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*Submitted Electronically via the PTAB E2E System*

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and in accordance with 37 C.F.R. §§ 90.2-90.3, Patent Owner Corephotonics, Ltd. ("Corephotonics") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered on December 7, 2021, in IPR2020-00862 (Paper No. 35) ("Final Written Decision"), and from all underlying findings, determinations, rulings, opinions, orders, and decisions regarding the inter partes review of U.S. Patent No. 10,356,332 (the "'332 patent").

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Corephotonics states that the issues on appeal may include, but are not limited to: the Board's determination that claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent have been shown to be unpatentable; the Board's consideration of the expert testimony, prior art, and other evidence in the record; and the Board's factual findings, conclusions of law, or other determinations supporting or related to those issues, as well as all other issues decided adversely to Corephotonics in any orders, decisions, rulings, and opinions.

2

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

Dated: February 8, 2022                  /Neil A. Rubin/
                                         Neil A. Rubin (Reg. No. 67,030)
                                         RUSS AUGUST & KABAT
                                         12424 Wilshire Boulevard, 12th Floor
                                         Los Angeles, CA  90025
                                         Telephone: 310-826-7474

                                         Attorney for Patent Owner,
                                         COREPHOTONICS, LTD.

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically

filed through the Patent Trial and Appeal Board End to End System, the above

document is being sent on February 8, 2022 by United States Postal Service

Priority Mail Express to the United States Patent and Trademark Office at the

following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned also hereby certifies that the above document is being

e-filed with the Clerk's Office for the United States Court of Appeals for the

Federal Circuit, along with payment of the required docketing fees.

Dated: February 8, 2022                    */Neil A. Rubin/*                    

4

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

## CERTIFICATE OF SERVICE

I hereby certify that "Patent Owner's Notice of Appeal" was served on February 8, 2022 by email sent to:

David W. O'Brien
Hong Shi
HAYNES AND BOONE, LLP
600 Congress Ave. Suite 1300
Austin, TX  78701
Telephone: 512-867-8400
Email: david.obrien.ipr@haynesboone.com
Email: hong.shi.ipr@haynesboone.com

Andrew S. Ehmke
Michael S. Parsons
Jordan Maucotel
Stephanie N. Sivinski
HAYNES AND BOONE, LLP
2323 Victory Ave. Suite 700
Dallas, TX  75219
Telephone: 214-651-5000
Email: andy.ehmke.ipr@haynesboone.com
Email: michael.parsons.ipr@haynesboone.com
Email: jordan.maucotel.ipr@haynesboone.com
Email: stephanie.sivinski.ipr@haynesboone.com

/Neil A. Rubin/

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**COREPHOTONICS, LTD.,**
**Patent Owner/Appellant**

**Appeal Nos. 2022-1455[1]**
**v.**                                                    **2022-1456**

**APPLE INC.,**
**Petitioner/Appellee**

**Proceeding Nos.: IPR2020-00861 and IPR2020-00862**

_____

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed February 8, 2022, in the United States Patent and Trademark Office in connection with the above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Date:  March 21, 2022

By: *Macia L. Fletcher*
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

_____

[1] Appeal No. 2022-1455 (Lead) is consolidated with Appeal No. 2022-1456 (Member Case) pursuant to Court Order (Dkt. No. 2) and Note to File (Dkt. No. 3) dated February 17, 2022.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant

and Appellee this 21st day of March, 2022, as follows:

| PATENT OWNER: | PETITIONER: |
|---|---|
| Marc A. Fenster<br>Neil Rubin<br>James S. Tsuei<br>RUSS AUGUST & KABAT<br>mafenster@raklaw.com<br>nrubin@raklaw.com<br>jtsuei@raklaw.com | Erin Marie Boyd Leach<br>Mark S. Davies<br>ORRICK, HERRINGTON & SUTCLIFFE LLP<br>eleach@orrick.com<br>mark.davies@orrick.com |

By: _Macia L. Fletcher_

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

<u>**March 21, 2022**</u>
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
**Petitioner,**

**v.**

**COREPHOTONICS, LTD.,**
**Patent Owner.**

**Case:  IPR2020-00861**
**Patent No. 10,230,898 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



Appx200

**Prosecution History ~ IPR2020-00861**

| Date | Document |
|------|----------|
| 5/6/2020 | Petition for Inter Partes Review |
| 5/6/2020 | Petitioner's Power of Attorney |
| 5/8/2020 | Patent Owner's Power of Attorney |
| 5/8/2020 | Patent Owner's Mandatory Notices |
| 6/11/2020 | Notice of Filing Date Accorded to Petition |
| 9/11/2020 | Patent Owner's Preliminary Response |
| 12/9/2020 | Decision - Institution of Inter Partes Review |
| 12/9/2020 | Scheduling Order |
| 2/10/2021 | Patent Owner's Updated Power of Attorney |
| 2/10/2021 | Patent Owner's Updated Mandatory Notices |
| 2/12/2021 | Notice of Deposition - Durand, Ph.D. |
| 3/2/2021 | Petitioner's Updated Mandatory Notices |
| 3/2/2021 | Patent Owner's Response (Private) |
| 3/2/2021 | Patent Owner's Response (Redacted Version) |
| 3/3/2021 | Patent Owner's Corrected Motion to File Under Seal and for Entry of Protective Order |
| 5/7/2021 | Notice of Deposition - Hart, Ph.D. |
| 5/11/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/2/2021 | Unopposed Motion for Pro Hac Vice Admission - Fenster and Tsuei |
| 6/4/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/10/2021 | Order - Pro Hac Vice Admission - Fenster and Tsuei |
| 6/11/2021 | Petitioner's Reply (Private) |
| 6/11/2021 | Petitioner's Reply |
| 6/11/2021 | Petitioner's Motion to Seal |
| 6/17/2021 | Notice of Deposition - Durand, Ph.D. |
| 7/23/2021 | Patent owner's Sur-Reply |
| 7/23/2021 | Patent Owner's Sur-Reply |
| 7/27/2021 | Patent Owner's Request for Oral Argument |
| 7/27/2021 | Petitioner's Request for Oral Argument |
| 7/30/2021 | Patent Owner's Updated Mandatory Notices |
| 7/30/2021 | Petitioner's Objections to Patent Owner's Sur-Reply Exhibits |
| 8/17/2021 | Petitioner's Motion to Exclude Evidence |
| 8/26/2021 | Order - Parties Requests for a Trial Hearing |
| 8/30/2021 | Joint Stipulation to Alternative Schedule for Exchanging Demonstratives and Request to Modify Schedule |
| 12/6/2021 | Oral Hearing Transcript |
| 12/7/2021 | Final Written Decision |
| 1/31/2022 | Petitioner's Corrected Motion to Seal |
| 1/31/2022 | Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Durand, Ph.D. Declaration in Support of Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Transcript of Hart Deposition (Public Copy) |
| 2/1/2022 | Patent Owner's Corrected Motion to File Under Seal |
| 2/1/2022 | Patent Owner's Response (Confidential) |

**Prosecution History ~ IPR2020-00861**

| Date | Document |
|------|----------|
| 2/1/2022 | Patent Owner's Response (Redacted) |

**U.S. DEPARTMENT OF COMMERCE**
United States Patent and Trademark Office

<u>**March 21, 2022**</u>
<div align="right">(Date)</div>

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
Petitioner,

v.

**COREPHOTONICS, LTD.,**
Patent Owner.

**Case:  IPR2020-00862**
**Patent No. 10,356,332 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**



*Certifying Officer*



**Prosecution History ~ IPR2020-00862**

| Date | Document |
|------|----------|
| 5/6/2020 | Petition for Inter Partes Review |
| 5/6/2020 | Petitioner's Power of Attorney |
| 5/8/2020 | Patent Owner's Power of Attorney |
| 5/8/2020 | Patent Owner's Mandatory Notices |
| 6/11/2020 | Notice of Filing Date Accorded to Petition |
| 9/11/2020 | Patent Owner's Preliminary Response |
| 12/9/2020 | Decision - Institution of Inter Partes Review |
| 12/9/2020 | Scheduling Order |
| 2/10/2021 | Patent Owner's Updated Power of Attorney |
| 2/10/2021 | Patent Owner's Updated Mandatory Notices |
| 2/12/2021 | Notice of Deposition - Durand, Ph.D. |
| 3/2/2021 | Petitioner's Updated Mandatory Notices |
| 3/2/2021 | Patent Owner's Response (Private) |
| 3/2/2021 | Patent Owner's Response (Redacted Version) |
| 3/2/2021 | Patent Owner's Motion to File Under Seal and for Entry of Protective Order |
| 5/7/2021 | Notice of Deposition - Hart, Ph.D. |
| 5/11/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/2/2021 | Unopposed Motion for Pro Hac Vice Admission - Fenster and Tsuei |
| 6/4/2021 | Joint Stipulation to Modify Dates 2 and 3 |
| 6/10/2021 | Order - Pro Hac Vice Admission - Fenster and Tsuei |
| 6/11/2021 | Petitioner's Reply (Private) |
| 6/11/2021 | Petitioner's Reply |
| 6/11/2021 | Petitioner's Motion to Seal |
| 6/17/2021 | Notice of Deposition - Durand, Ph.D. |
| 7/23/2021 | Patent Owner's Sur-Reply |
| 7/27/2021 | Patent Owner's Request for Oral Argument |
| 7/27/2021 | Petitioner's Request for Oral Argument |
| 7/30/2021 | Patent Owner's Updated Mandatory Notices |
| 7/30/2021 | Petitioner's Objections to Patent Owner's Exhibits |
| 8/17/2021 | Petitioner's Motion to Exclude Evidence |
| 8/20/2021 | Patent Owner's Opposition to Petitioner's Motion to Exclude Evidence |
| 8/26/2021 | Order - Parties Requests for a Trial Hearing |
| 8/30/2021 | Joint Stipulation to Alternative Schedule for Exchanging Demonstratives and Request to Modify Schedule |
| 12/6/2021 | Oral Hearing Transcript |
| 12/7/2021 | Final Written Decision |
| 1/31/2022 | Petitioner's Corrected Motion to Seal |
| 1/31/2022 | Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Durand, Ph.D. Declaration in Support of Petitioner's Reply (Public Redacted Copy) |
| 1/31/2022 | Transcript of Hart Deposition (Public Copy) |
| 2/1/2022 | Patent Owner's Corrected Motion to File Under Seal |
| 2/1/2022 | Patent Owner's Response (Confidential) |

**Prosecution History ~ IPR2020-00862**

| Date | Document |
|------|----------|
| 2/1/2022 | Patent Owner's Response (Redacted) |

Paper No. 43

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

———————

PATENT OWNER'S NOTICE OF APPEAL

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*Submitted Electronically via the PTAB E2E System*

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and in accordance with 37 C.F.R. §§ 90.2-90.3, Patent Owner Corephotonics, Ltd. ("Corephotonics") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered on December 7, 2021, in IPR2020-00861 (Paper No. 35) ("Final Written Decision"), and from all underlying findings, determinations, rulings, opinions, orders, and decisions regarding the inter partes review of U.S. Patent No. 10,230,898 (the "'898 patent").

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Corephotonics states that the issues on appeal may include, but are not limited to: the Board's determination that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent have been shown to be unpatentable; the Board's consideration of the expert testimony, prior art, and other evidence in the record; and the Board's factual findings, conclusions of law, or other determinations supporting or related to those issues, as well as all other issues decided adversely to Corephotonics in any orders, decisions, rulings, and opinions.

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Dated: February 8, 2022

 /Neil A. Rubin/
Neil A. Rubin (Reg. No. 67,030)
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA  90025
Telephone: 310-826-7474

Attorney for Patent Owner,
COREPHOTONICS, LTD.

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically

filed through the Patent Trial and Appeal Board End to End System, the above

document is being sent on February 8, 2022 by United States Postal Service

Priority Mail Express to the United States Patent and Trademark Office at the

following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned also hereby certifies that the above document is being

e-filed with the Clerk's Office for the United States Court of Appeals for the

Federal Circuit, along with payment of the required docketing fees.

Dated: February 8, 2022                 */Neil A. Rubin/*

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## CERTIFICATE OF SERVICE

I hereby certify that "Patent Owner's Notice of Appeal" was served on February 8, 2022 by email sent to:

>   David W. O'Brien
>   Hong Shi
>   HAYNES AND BOONE, LLP
>   600 Congress Ave. Suite 1300
>   Austin, TX 78701
>   Telephone: 512-867-8400
>   Email: david.obrien.ipr@haynesboone.com
>   Email: hong.shi.ipr@haynesboone.com
>
>   Andrew S. Ehmke
>   Michael S. Parsons
>   Jordan Maucotel
>   Stephanie N. Sivinski
>   HAYNES AND BOONE, LLP
>   2323 Victory Ave. Suite 700
>   Dallas, TX 75219
>   Telephone: 214-651-5000
>   Email: andy.ehmke.ipr@haynesboone.com
>   Email: michael.parsons.ipr@haynesboone.com
>   Email: jordan.maucotel.ipr@haynesboone.com
>   Email: stephanie.sivinski.ipr@haynesboone.com


   /Neil A. Rubin/

Paper No. 43

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

## APPLE INC.,
Petitioner,

v.

## COREPHOTONICS, LTD.,
Patent Owner.

_____

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

_____

## PATENT OWNER'S NOTICE OF APPEAL

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*Submitted Electronically via the PTAB E2E System*

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and in accordance with 37 C.F.R. §§ 90.2-90.3, Patent Owner Corephotonics, Ltd. ("Corephotonics") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered on December 7, 2021, in IPR2020-00862 (Paper No. 35) ("Final Written Decision"), and from all underlying findings, determinations, rulings, opinions, orders, and decisions regarding the inter partes review of U.S. Patent No. 10,356,332 (the "'332 patent").

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Corephotonics states that the issues on appeal may include, but are not limited to: the Board's determination that claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent have been shown to be unpatentable; the Board's consideration of the expert testimony, prior art, and other evidence in the record; and the Board's factual findings, conclusions of law, or other determinations supporting or related to those issues, as well as all other issues decided adversely to Corephotonics in any orders, decisions, rulings, and opinions.

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

Dated: February 8, 2022          /Neil A. Rubin/
                                 Neil A. Rubin (Reg. No. 67,030)
                                 RUSS AUGUST & KABAT
                                 12424 Wilshire Boulevard, 12th Floor
                                 Los Angeles, CA 90025
                                 Telephone: 310-826-7474

                                 Attorney for Patent Owner,
                                 COREPHOTONICS, LTD.

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically

filed through the Patent Trial and Appeal Board End to End System, the above

document is being sent on February 8, 2022 by United States Postal Service

Priority Mail Express to the United States Patent and Trademark Office at the

following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned also hereby certifies that the above document is being

e-filed with the Clerk's Office for the United States Court of Appeals for the

Federal Circuit, along with payment of the required docketing fees.


Dated: February 8, 2022                    */Neil A. Rubin/*

Case No. IPR2020-00862
U.S. Patent No. 10,356,332

## CERTIFICATE OF SERVICE

I hereby certify that "Patent Owner's Notice of Appeal" was served on February 8, 2022 by email sent to:

> David W. O'Brien
> Hong Shi
> HAYNES AND BOONE, LLP
> 600 Congress Ave. Suite 1300
> Austin, TX  78701
> Telephone: 512-867-8400
> Email: david.obrien.ipr@haynesboone.com
> Email: hong.shi.ipr@haynesboone.com

> Andrew S. Ehmke
> Michael S. Parsons
> Jordan Maucotel
> Stephanie N. Sivinski
> HAYNES AND BOONE, LLP
> 2323 Victory Ave. Suite 700
> Dallas, TX  75219
> Telephone: 214-651-5000
> Email: andy.ehmke.ipr@haynesboone.com
> Email: michael.parsons.ipr@haynesboone.com
> Email: jordan.maucotel.ipr@haynesboone.com
> Email: stephanie.sivinski.ipr@haynesboone.com

  /Neil A. Rubin/

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

_____

APPLE INC.,

Petitioner

v.

COREPHOTONICS LTD.,

Patent Owner

_____

IPR2020-00861
U.S. Patent No. 10,230,898

_____

**PETITION FOR _INTER PARTES_ REVIEW
UNDER 35 U.S.C. § 312 AND 37 C.F.R. § 42.104**

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. MANDATORY NOTICES .....................................................................1

    A. Real Party-in-Interest ..........................................................................1

    B. Related Matters.....................................................................................2

    C. Lead and Back-up Counsel and Service Information .........................2

III. GROUNDS FOR STANDING ...............................................................2

IV. THE '898 PATENT .................................................................................3

    A. Summary of the '898 Patent ................................................................3

    B. Prosecution History of the '898 Patent ..............................................5

V. LEVEL OF ORDINARY SKILL IN THE ART....................................7

VI. CLAIM CONSTRUCTION ....................................................................8

VII. REQUESTED RELIEF ...........................................................................8

VIII. OVERVIEW OF CHALLENGES .........................................................8

    A. Challenged Claims ..............................................................................8

    B. Statutory Grounds for Challenges.......................................................9

    C. Discretionary Denial is Not Warranted...............................................9

        1. Becton-Dickinson factors weigh in favor of institution. ...........9

        2. Advanced Bionics weighs in favor of institution ....................13

        3. None of the General Plastic factors apply. ..............................13

IX. IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE..13

    A. Ground 1: Claims 1, 4, 8, 12, and 15 are unpatentable under
        35 U.S.C. § 103 over Golan in view of Martin and Togo..................13

        1. Summary of Golan...................................................................13

        2. Summary of Martin..................................................................15

        3. Reasons to Combine Golan and Martin ...................................18

        4. Summary of Togo .....................................................................22

        5. Reasons to Combine Togo with Golan and Martin .................29

  6. Claim 1 ................................................................33

  7. Claim 4 ................................................................55

  8. Claim 8 ................................................................57

  9. Claim 12 ..............................................................58

  10. Claim 15 ..............................................................59

 B. Ground 2: Claim 9 is unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Levey .........................................59

  1. Summary of Levey .................................................59

  2. Reasons to Combine Levey, Golan, and Martin, and Togo ......60

  3. Claim 9 ................................................................61

 C. Ground 3: Claims 11 and 19 is unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Border. ...........................63

  1. Summary of Border ...............................................63

  2. Reasons to Combine Border with Golan, Martin, and Togo ....64

  3. Claim 11 ..............................................................66

  4. Claim 19 ..............................................................70

 D. Ground 4: Claims 10 and 20 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Parulski. ..................71

  1. Summary of Parulski ..............................................71

  2. Reasons to Combine Parulski, Golan, Martin, and Togo .........73

  3. Claim 10 ..............................................................76

  4. Claim 20 ..............................................................77

X. CONCLUSION ................................................................81

XI. CERTIFICATE OF WORD COUNT .......................................82

**CERTIFICATE OF SERVICE** ................................................83

**PETITIONER'S EXHIBIT LIST**

May 6, 2020

| APPL-1001 | U.S. Patent No. 10,230,898 to Cohen et al. (the "'898 Patent") |
|---|---|
| APPL-1002 | Prosecution File History of the '898 Patent (the "'720 App") |
| APPL-1003 | Declaration of Dr. Fredo Durand |
| APPL-1004 | CV of Dr. Fredo Durand |
| APPL-1005 | U.S. Patent Application Publication No. 2012/0026366 to Golan et al. ("Golan") |
| APPL-1006 | U.S. Patent 8,081,206 to Martin et al. ("Martin") |
| APPL-1007 | U.S. Patent 7,990,422 to Ahiska et al. ("Ahiska") |
| APPL-1008 | U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski") |
| APPL-1009 | U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border") |
| APPL-1010 | J.P. Patent Application Publication No. JP 2011-55246 to Togo, Certified English Translation and Original ("Togo") |
| APPL-1011 | RESERVED |
| APPL-1012 | U.S. Patent No. 8,553,106 to Scarff ("Scarff") |
| APPL-1013 | Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 ("Szeliski") |
| APPL-1014 | U.S. Patent No. 8,854,432 to Orimoto ("Orimoto") |
| APPL-1015 | U.S. Patent Application Publication No. 2012/0019704 to Levey et al. ("Levey") |
| APPL-1016 | Xiong, et al., "A critical review of image registration methods," International Journal of Image and Data Fusion, June 2010 ("Xiong") |

| APPL-1017 | Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson") |
|---|---|
| APPL-1018 | RESERVED |
| APPL-1019 | Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 ("Hansen") |
| APPL-1020 | U.S. Patent No. 9,571,731 to Shabtay, et al. ("'731 Patent") |
| APPL-1021 | U.S. Patent Application Publication No. 2014/0362274 to Christie, et al. ("Christie") |
| APPL-1022 | RESERVED |
| APPL-1023 | Warren J. Smith, MODERN LENS DESIGN (1992) ("Smith") |
| APPL-1024 | U.S. Patent No. 7,777,972 to Chen et al. ("Chen") |
| APPL-1025 | RESERVED |
| APPL-1026 | Jacobs et al., "Focal Stack Compositing for Depth of Field Control," Stanford Computer Graphics Laboratory Technical Report 2012-1 ("Jacobs") |
| APPL-1027 | Email authorizing electronic service |

## I.  INTRODUCTION

U.S. Patent No. 10,230,898 (the "'898 Patent," APPL-1001) is generally directed to a "dual aperture zoom digital camera with video support and switching/non-switching dynamic control."  (APPL-1001), Title.  Challenged claims 1, 4, 8-12, 15, 19, and 20 of the '898 Patent are directed to a multiple aperture zoom digital camera including 1) two imaging sections having respective image sensors and fixed focal length lenses with different fields of view (FOVs) to provide two images and 2) a camera controller configured to output a zoom video output image that includes only Wide image data or only Tele image data, depending on whether a no-switching criterion is fulfilled or not.  As shown in this Petition, these concepts in a digital camera that uses multiple lenses and image sensors were known in the art before the priority date of the '898 patent.

This Petition, along with the cited evidence, demonstrates that claims 1, 4, 8-12, 15, 19, and 20 of the '898 Patent were obvious under (post-AIA) 35 U.S.C. §103.  Apple Inc. ("Petitioner") therefore respectfully requests that these claims be held unpatentable and cancelled.

## II.  MANDATORY NOTICES

### A.  Real Party-in-Interest

The real party-in-interest is Apple Inc.

**B.    Related Matters**

As of the filing date of this Petition and to the best knowledge of Petitioner,

the '898 Patent has been asserted in the following matters:

- *Corephotonics Ltd. v. Apple Inc.*, Case No. 5-19-cv-04809 (N.D. Cal.

  filed August 14, 2019).

**C.    Lead and Back-up Counsel and Service Information**

Lead Counsel
David W. O'Brien                    Phone:      512-867-8457
HAYNES AND BOONE, LLP               Fax:        512-867-8644
600 Congress Ave. Suite 1300        david.obrien.ipr@haynesboone.com
Austin, TX 78701                    USPTO Reg. No. 40,107

Back-up Counsel
Andrew S. Ehmke                     Phone:      214-651-5116
HAYNES AND BOONE, LLP               Fax:        214-200-0853
2323 Victory Ave. Suite 700         andy.ehmke.ipr@haynesboone.com
Dallas, TX 75219                    USPTO Reg. No. 50,271

Hong Shi                            Phone:      512-867-8440
HAYNES AND BOONE, LLP               Fax:        512-867-8644
600 Congress Ave. Suite 1300        hong.shi.ipr@haynesboone.com
Austin, TX 78701                    USPTO Reg. No. 69,009

Please address all correspondence to lead and back-up counsel.  Petitioner

consents to electronic service.

**III.    GROUNDS FOR STANDING**

Pursuant to 37 C.F.R. §42.104(a), Petitioner certifies that the '332 Patent is

available for *inter partes* review and that Petitioner is not barred or estopped from

- 2 -

requesting an *inter partes* review challenging the patent claims on the grounds

identified in this Petition.

## IV.    THE '898 PATENT

### A. Summary of the '898 Patent

The '898 Patent is titled "Dual Aperture Zoom Camera with Video Support

and Switching / Non-Switching Dynamic Control," and is directed to a "dual-

aperture zoom digital camera operable in both still and video modes."  (APPL-

1001), Abstract; (APPL-1003), ¶¶24-31.

The '898 Patent describes video mode zoom operation from low zoom factor

(ZF) to higher ZF above a switch point (described variously as $Z_{Switch}$ or $ZF_T$ or up-

transfer ZF), with "[processing] applied to eliminate the changes in the image

during crossover from one camera to the other."  (APPL-1001), 7:57-8:31, 8:18-34.

The '898 Patent describes that "[s]witching from the Wide camera output to

the transformed Tele camera output will be performed unless some special

condition (criterion), determined based on inputs obtained from the two camera

images, occurs.  In other words, switching will not be performed only if [a] no-

switching criteria is fulfilled."  (APPL-1001), 10:1-7.

FIG. 1A of the '898 Patent illustrates a dual-aperture Zoom imaging system

100 including a Wide imaging section and a Tele imaging section, each having a

respective lens with respect field of view (FOV) and respective image sensor to

- 3 -

provide image data of an object or scene, and FIG. 2 of the '898 Patent illustrates

Wide and Tele sensors and their respective FOVs.



FIG. 1A



FIG. 2

**(APPL-1001), FIGS. 1A and 2**

FIG. 2 illustrates by way of exemplary images, a larger FOV for the Wide image provided by the Wide sensor 202 and a smaller FOV for the corresponding Tele image provided by the Tele sensor.

### B.    Prosecution History of the '898 Patent

U.S. Patent Application No. 15/324,720 ("'720 App"), which ultimately issued as the '898 Patent, was filed on January 8, 2017.  (APPL-1002), 37-40; (APPL-1003), ¶¶32-38.

On June 19, 2018, a non-final Office Action was issued.  Claims 1, 2, 8-14, 20, and 21 were rejected under 102(a)(1) as being anticipated by WO 2014/199338 to Shabtay et al. (eventually issued as US Patent 9,185,291).  *Id.*, 198-205. Remaining claims were objected to as dependent on a rejected base claim, but

- 5 -

allowable if rewritten. According to the Examiner, Shabtay and the art then of record did not provide disclosure of the no-switching criterion setting defined in dependent claims 3-7 and 15-19.

On September 23, 2018, Applicant filed an Information Disclosure Statement disclosing 103 US Patent references (including Golan), 16 foreign patent references, and 16 non-patent literature documents. *Id.*, 151-175.

On October 10, 2018, Applicant filed an Response **amending** the specification to recite "in other embodiments, for higher ZF than the up-transfer ZF, there will be no switching from the Wide to the Tele camera output" and **amending** independent claims 1 and 13 to recite "if the no-switching criterion is fulfilled, configuring the camera controller to output at a zoom factor (ZF) higher than an up-transfer ZF a zoom video output image that includes only Wide image data" and "if the no-switching criterion is not fulfilled, configuring the camera controller to output a zoom video output image that includes only transformed, digitally zoomed Tele image data." *Id.*, 141-145. Claim 11 was canceled. *Id.*, 293. Applicant's argument against the Shabtay anticipation rejection was based on the amendment and, more specifically, that Shabtay did not itself teach "a camera controller configured to output, at a ZF higher than an up-transfer ZF, a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value," but instead taught

- 6 -

"that <u>any</u> ZF higher than the up-transfer ZF a camera outputs a <u>Tele</u> image." *Id.*,

147-148.

On November 16, 2018, a Notice of Allowance issued. *Id.*, 301. Shortly

after allowance, on November 25, 2018, Applicant filed an additional Information

Disclosure Statement disclosing 16 US Patent references and 3 additional foreign

patent references. *Id.*, 38-42. Thereafter, on December 10, 2018, the Office issued

a notice of Non-Compliant IDS, indicating that the November 25, 2018 IDS would

be placed in the file, but had not been considered. *Id.*, 37.

The '898 Patent issued on March 12, 2019. *Id.*, 435. The allowed claims 1-

10 and 12-21 of the '720 Application were issued as claims 1-20 of the '898

Patent, respectively.

## V.     LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art may be reflected by the prior art of

record. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Here, a

Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed

invention would have a bachelor's or the equivalent degree in electrical and/or

computer engineering or a related field and 2-3 years of experience in imaging

systems including optics and image processing. (APPL-1003), ¶17. Furthermore,

a person with less formal education but more experience, or more formal education

but less experience, could have also met the relevant standard for a POSITA. *Id.*

However, Petitioner does not imply that a person having an extraordinary level of skill should be regarded as a POSITA.

## VI.   CLAIM CONSTRUCTION

During IPR, claims are construed according to the standard as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. §42.100(b) (Nov. 13, 2018). Petitioner believes that, for the purposes of this proceeding and the analysis presented herein, no claim term requires express construction. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).  Accordingly, this Petition analyzes the claims consistent with ordinary and customary meaning as would be understood by a POSITA in light of the specification. *Phillips*, 415 F.3d at 1314-17; (APPL-1003), ¶35.

## VII.   REQUESTED RELIEF

Petitioner requests that the Board institute *inter partes* review of claims 1, 4, 8-12, 15, 19, and 20 of the '898 Patent and cancel each of those claims as unpatentable.

## VIII.   OVERVIEW OF CHALLENGES

### A.   Challenged Claims

Claims 1, 4, 8-12, 15, 19, and 20 of the '898 Patent are challenged.

**B.    Statutory Grounds for Challenges**

| Ground No. | Claims | Basis |
|---|---|---|
| 1 | 1, 4, 8, 12, and 15 | §103 over Golan, Martin, and Togo |
| 2 | 9 | §103 over Golan, Martin, Togo, and Levey |
| 3 | 11 and 19 | §103 over Golan, Martin, Togo, and Border |
| 4 | 10 and 20 | §103 over Golan, Martin, Togo and Parulski |

Golan was published February 2, 2012.  Martin was published September 14, 2006.  Togo was published March 17, 2011.  Levey was published Jan. 26, 2012.  Border was published February 7, 2008.  Parulski was published September 11, 2008.  Golan, Martin, Togo, Levey, Border, and Parulski are prior art to the '332 Patent under at least §102(a)(1) and are not subject to an exception under §102(b)(1).

**C.    Discretionary Denial is Not Warranted**

Petitioner respectfully submits that the Board should not exercise its discretion under 35 U.S.C. §§314(a) or 325(d) to deny this Petition.

### 1. *Becton-Dickinson factors weigh in favor of institution.*

In determining whether to institute an IPR, the Board may consider whether "the same or substantially the same prior art or arguments previously were presented to the Office." §325(d). In *Becton, Dickinson and Company v. B. Braun Melsungen AG*, the Board collected "common non-exclusive factors" ("Becton-

- 9 -

Dickinson factors" (a)-(f)) to guide the §325(d) analysis. IPR2017-01586 (PTAB

Dec. 15, 2017) (Paper 8) (precedential).  In *Advanced Bionics, LLC v. Med-El*

*Elektromedizinische Geräte GmbH*, the Board advanced a two-part framework for

Becton-Dickinson factors analysis wherein if, after review of factors (a), (b), and

(d), it is determined that the same or substantially the same art or arguments

previously were presented to the Office, then factors (c), (e), and (f), which relate

to whether petitioner has demonstrated a material error by the Office, are

evaluated.  IPR2019-01469, Paper 6 (PTAB Feb. 13, 2020) (precedential).

Petitioner submits that because the Becton-Dickinson factors weigh in favor of

institution, the Board should decline to exercise its discretion under §325(d).

> **i.    Factor (a) – "similarities and material differences between the asserted art and the prior art involved during examination"**

This petition presents *new grounds* and *new art* that have not previously

been presented to the Office.  Although Golan, Border and Parulski were each

cited in an IDS, the only prior art involved during examination was Shabtay (WO

2014/199338), which was overcome by amendment during examination.  APPL-

1002, 296-98.

Petitioner's grounds 1-4 rely on Togo in the combination with Golan and

Martin for teachings related to the "no-switching criterion" as claimed and on

Martin in the combination with Golan and Togo for the "transformed" character of

- 10 -

digitally zoomed Tele image data as claimed.  Ground 2 relies further on Levy for

teachings related to "user inputs include[ing] … camera mode" as claimed.

None of Togo, Martin and Levey were before the Examiner, and none of

Golan, Togo, Martin, Levey, Border and Parulski were involved during

examination.  Thus, this factor weighs in favor of institution.  *See MCP IP, LLC, v.

Yehle*, IPR2019-01013, 43 (PTAB Nov. 13, 2019) (Paper 7) (declining to exercise

discretion under §325(d) when references not before the Examiner during

prosecution are an important basis for Petitioner's challenges).

### ii.    Factor (b) – "cumulative nature of the asserted art and the prior art evaluated during examination"

None of the asserted art is cumulative to Shabtay, the only prior art

evaluated during examination.  Accordingly, this factor weighs in favor of

institution.

### iii.   Factor (d) – "extent of the overlap between arguments made during examination and the manner in which Petitioner relies on the prior art"

No arguments were made during examination other than to distinguish

Shabtay. The '898 Patent acknowledged Border as Background art for teachings

unrelated to the asserted grounds.  There is no overlap in the manner in which

Petitioner relies on the prior art.  Thus, this factor weighs in favor of institution.

- 11 -

### iv.    Factor (c) – "extent to which asserted art was evaluated during examination, including whether prior art was basis for rejection"

There is no record evidence that the Examiner evaluated Golan, Martin, Togo, Levey, Border and/or Parulski in any manner, let alone as applied in Petitioner's grounds 1-4.  None formed the basis of a rejection.  Thus, this factor weighs in favor of institution.

### v.    Factor (e) – "whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art"

As there is no record evidence that the Examiner evaluated any of Golan, Martin, Togo, Levey, Border and/or Parulski, the Examiner arguably erred in failing to evaluate and apply at least the subset of references that were cited in an IDS, i.e., Golan, Border and Parulski.  Accordingly, this factor weighs in favor of institution.

### vi.    Factor (f) – "extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments"

Petitioner presents expert testimony, which provides evidence regarding how a POSITA would understand the teachings of Golan, Border and Parulski, themselves and in combination with prior art teachings of Togo, Martin and/or Levey that has not been considered by the Office.  Accordingly, this factor weighs in favor of institution.

- 12 -

### 2. *Advanced Bionics weighs in favor of institution*

*Advanced Bionics*' two-part framework for a Becton-Dickinson factors

analysis also weighs in favor of institution. In view of factors (a), (b), and (d), the

same or substantially the same art or arguments previously was *not* presented to the

Office. As such, the *Advanced Bionics* commitment to, at bottom, defer to

previous Office evaluations of the evidence of record unless material error is

shown is not implicated.

### 3. *None of the General Plastic factors apply.*

The '898 Patent has not been challenged in any prior IPR petition. As such,

none of discretionary factors 1-5 set forth in *General Plastic* apply to this Petition.

*See General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357,

Paper 19 at 16 (PTAB Sept. 6, 2016) (Section II.B.4.i. precedential). Accordingly,

discretionary denial under §314(a) is not warranted.

## IX.    IDENTIFICATION OF HOW THE CLAIMS ARE UNPATENTABLE

### A. Ground 1: Claims 1, 4, 8, 12, and 15 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin and Togo.

### 1.    *Summary of Golan*

Golan discloses providing video output with "a continuous electronic zoom for

an image acquisition system, the system including multiple imaging devices having

different fixed FOV." (APPL-1005), FIG. 1, Title, [0002]; (APPL-1003), ¶¶40-43.

Golan teaches use of wide and tele lenses and employs wide and tele images

- 13 -

during digital zooming, which "facilitates a light weight electronic zoom with a large

lossless zooming range." (APPL-1005), [0009]; (APPL-1003), ¶41. Specifically, as

illustrated in FIG. 1 below, Golan discloses zoom control sub-system 100 for an

image acquisition system including "multiple image sensors" (e.g., tele image sensor

110 and wide image sensor 112), "each with a fixed and preferably different FOV"

(e.g. with tele FOV 140 and wide FOV 142 respectively). (APPL-1005), [0036]-

[0037].



*Fig 1*

**(APPL-1005), FIG. 1**

Golan teaches that, in embodiments of FIGS. 1 and 2, each image frame of video output is generated based on an acquired image frame from "the relevant image sensor" of an image acquisition device selected based on the user input zoom factor. (APPL-1005), FIGS. 1-2, [0039]; (APPL-1003), ¶42. Specifically, Golan teaches that zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position. (APPL-1005), [0039].

Golan teaches that "an electronically calibrating is performed to determine the alignment offsets between wide image sensor array 110 and tele image sensor array 112," ((APPL-1005), [0038]) and that the "calibration of the alignment, between the first image sensor array and the second image sensor array, **facilitates continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image sensor array and the second image sensor array." (APPL-1005), [0015]. The electronic calibration is performed preferably with sub-pixel accuracy. *Id.*

### 2.    *Summary of Martin*

Martin is directed to "critical alignment of parallax images for autostereoscopic display." (APPL-1006), Title; (APPL-1003), ¶¶44-48.

Specifically, Martin describes a method to "**manipulate[ing] parallax images to create a resultant moving image**" that "can be perceived to be three-

dimensional without the use of special viewing aids." (APPL-1006), 1:18-20,

3:32-41; (APPL-1003), ¶45. As shown in FIG. 1 below, Martin describes that

cameras 10 and 12 are "displaced from each other" and capture respective parallax

images "of a common scene 14." (APPL-1006), 3:39-46.



**FIG. 1**

**(APPL-1006), FIG. 1**

Martin describes using the parallax images to generate an autostereoscopic

display "for producing two-dimensional images that, upon display, can be

perceived to be three-dimensional without the use of special viewing aids."

(APPL-1006), 1:16-20. Martin describes generating the autostereoscopic display is

by "alternately displaying" two parallax images on a display "to create a resultant

moving image."  (APPL-1006), 3:6-13, 3:32-35, 7:38-45.  Critical alignment is

used to "achieve a stable autostereoscopic display" during the alternating display

of parallax images.  (APPL-1006), 5:53-55; (APPL-1003), ¶46.

As shown in annotated FIGS. 3a-3d[1] of Martin below, Martin describes that

critical alignment is used to "achieve a stable autostereoscopic display" during the

alternating display of parallax images, and explains that "[s]tability of the whole

image may not be required, as long as at least a particular region of interest in the

autostereoscopic display is stable."  (APPL-1006), 5:53-58; (APPL-1003), ¶47.

---

[1] A POSITA would have understood that in FIG. 3b of Martin, element 34'

referring to a circle is a clerical error and that the annotation 34' instead

corresponds to the rectangle, which corresponds to region of interest 34 in

reference image 30 of FIG. 3a.  (APPL-1003), ¶47, n.1.



(APPL-1006), FIGS. 3a-3d, annotated

As shown in FIG. 3c of Martin above, unaligned image 32 is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment with region of interest 34 in reference image 30, as shown in FIG. 3d of Martin. (APPL-1006), 4:51-56. Martin's manipulation process "may be represented by **an affine transformation** including translation, rotation, scaling, and/or **any other desired transformation**," which provides a transformed image for position matching. (APPL-1006), 4:56-59, 7:36-51; (APPL-1003), ¶48.

### 3. Reasons to Combine Golan and Martin

A POSITA would have been motivated to apply Martin's teachings of executing registration using critical alignment between successive images from

- 18 -

IPR2020-00861 Petition
*Inter Partes* Review of 10,230,898

different points of view to generate a transformed succeeding image in video output images when switching between the two images in the digital camera of Golan to produce the obvious, beneficial, and predictable results of a stable transition in continuous zoom video output images when switching between the two images as taught by Martin. (APPL-1003), ¶¶49-54.

**First**, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using images from two imaging sections having different points of view. (APPL-1003), ¶50. Golan discloses providing continuous video output images using an image acquisition system "having multiple imaging devices" having different points of view. (APPL-1005), FIG. 1, [0009], [0036]; *see also id.*, Abstract, [0015]. Similarly, Martin discusses "display [of] alternating views of two or more parallax images" from cameras having different points of view to "create a resultant moving image." (APPL-1006), FIG. 1, 3:6-13, 3:32-35.

**Second**, a POSITA would have been motivated to incorporate the teachings of Golan and Martin because they share a need to provide continuous video output images when switching between images from two imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy. (APPL-1003), ¶51. Golan provides that "electronic calibration is performed with **sub-pixel accuracy**," between the first image sensor array and the

second image sensor array, which "**facilitates continuous electronic zoom with
uninterrupted imaging, when switching back and forth between the first
image sensor array and the second image sensor array**."  (APPL-1005), [0015].
Like Golan, an objective of Martin is to perform critical alignment of two images
such that "the **degree of alignment is sufficient to achieve a stable
autostereoscopic display**," *i.e.*, to achieve stable display in video/moving image
when switching between alternating views of two parallax images.  (APPL-1006),
5:51-55; (APPL-1003), ¶51.  Similarly, Martin describes an objective "to **achieve
sub-pixel alignment**."  (APPL-1006), 5:59-6:5.

  **Third**, Golan's expressed desire to achieve "continuous electronic zoom
with uninterrupted imaging, when switching back and forth between the first image
sensor array and the second image sensor array" would have motivated a POSITA
to incorporate Martin's teaching of critical alignment of an ROI in two images
having different points of view to calculate "transformation parameters of sub-
pixel resolution" for position matching of the ROI to achieve a stable transition in
the continuous zoom video output images of the digital camera of Golan.  (APPL-
1005), [0036]; (APPL-1006), 5:51-58; (APPL-1003), ¶52.  It was well known to a
POSITA that, for seamless transition between two images (e.g., from imaging
sections having different points of views and/or wider and narrower FOVs) in
zoom video, when a fixed calibration between two imaging sections (*e.g.*,

- 20 -

electronic calibration of Golan) is not sufficient alone (*e.g.*, because calibrated alignments change), registration of the two images (e.g., critical alignment of Martin) is beneficial for accurate position matching to video output images. *See e.g.*, (APPL-1007), 4:58-62, 10:2-5 ("[i]f **calibration** between the [wide-angle] master and slave cameras is **insufficient alone**, __image registration or matching__ can be carried out" for seamless transition in zoom video"); (APPL-1014), 1:63-2:1; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; (APPL-1003), ¶48.

**Fourth**, combining the teachings of Martin with the system of Golan would have produced operable results that are predictable. (APPL-1003), ¶53. Specifically, combining Martin's teachings of executing registration using critical alignment of two parallax images to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in continuous zoom video output images of the digital camera of Golan would have been no more than the combination of known elements according to known methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control sub-system of Golan) to achieve the benefits of a stable transition in video output images described by Martin. (APPL-1003), ¶49.

Finally, a POSITA would have understood that Martin's teachings of critical alignment (for video with three-dimensional illusion) apply to electronic camera

systems providing video output images as taught in Golan, because regardless of whether the position-matched images are switched to provide a three-dimensional illusion as in Martin, the shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections remains the same. (APPL-1003), ¶50.  A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images. (APPL-1003), ¶54.

### 4.    *Summary of Togo*

Togo is titled "Telephoto Imaging Device," and discloses improvements for "digital cameras and imaging devices (cameras) of mobile terminal devices such as mobile phones" that "realize a **zoom function by using a plurality of imaging modules made of a plurality of lenses with different focal lengths**."  (APPL-1010), [0002], [0007]; (APPL-1003), ¶¶55-64.

Togo describes switching between the respective imaging modules according to a magnification (zoom factor) set by a user.  (APPL-1010), [0007]; (APPL-1003), ¶56.  "For example, in a configuration … with a wide-angle lens

and … a telephoto lens, when a subject is at a short distance, an image … [from] the wide-angle lens, which has a short focal length, is **switched** to, and when the subject is at a long distance, an image … [from] the telephoto lens is **switched** to." (APPL-1010), [0008]. "Small changes in magnification are realized by electronic zooming, which changes [to] a cutout region" of the switched-to image. (APPL-1010), [0008].

Togo teaches a zoom digital camera with "[a] first imaging module 1 … for a wide-angle image" including a "wide angle lens system 7" (a Wide imaging section). (APPL-1010), [0023]; (APPL-1003), ¶57. Togo's zoom digital camera also includes "[a] second imaging module 2 … for a telephoto image" including a "telephoto lens system 10" (a Tele imaging section). (APPL-1010), [0026].



**(APPL-1010), FIG. 1, annotated**

Togo describes that its wide angle lens system 7 and telephoto lens system 10 are each "fixed magnification lens system[s]."  (APPL-1010), [0024], [0027]. A POSITA would understand Togo's reference to CCD camera as possible examples of imaging elements 8 and 11 as describing the possibility of CCD-type image sensors.  (APPL-1003), ¶58.

Togo recognizes that "by **switching between or compositing images** of a plurality of optical systems and a plurality of imaging elements joined to these

- 24 -

optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized." (APPL-1010), [0002]; (APPL-1003), ¶59.  For example, in a configuration having "an imaging module with a wide-angle lens and an imaging module with a telephoto lens, when a subject is at a short distance, an image of the imaging module of the wide-angle lens, which has a short focal length, is **switched** to, and when the subject is at a long distance, an image of the imaging module with the telephoto lens is **switched** to." (APPL-1010), [0008].

Togo discloses improvements to systems described in the patent literature that operate "by **switching between** or compositing images of a plurality of optical systems and … imaging elements …, [so that] a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized." (APPL-1010), [0002]; (APPL-1003), ¶60.  Specifically, Togo notes that "[t]elephoto imaging modules with a long focal length are often designed so **an image quality improves when the subject is far as opposed to near**. That is, a telephoto imaging module with a long focal length is **less sharp** **at close distances** compared to a wide-angle imaging module whose focal length is short." (APPL-1010), [0012].  As such a system zooms in, "a **switch** is made from the wide-angle imaging module to the telephoto imaging module.  However, at this time, **if the subject is close**, **the image quality degrades** due to the image being from the telephoto imaging module." (APPL-1010), [0013].

- 25 -

Togo's solution is for image control means 4 (a camera controller) to employ a no-switching **criterion** based on image quality to override the use of the telephoto image.  (APPL-1010), [0049]; (APPL-1003), ¶61.

As shown in FIG. 7 below, Togo describes that an example image quality no-switching criterion is based on when "**the image quality** of the cutout image 22 of the wide-angle image becomes **poorer** than **the image quality** of the telephoto image 23."  (APPL-1010), [0066]; (APPL-1003), ¶62.  The image quality no-switching criterion (i.e., the camera does not use the telephoto image when the image quality no-switching criterion is fulfilled), may include that "setting magnification X < A" or "setting magnification X $\geqslant$ A and the imaging distance Y $\leqslant$ B," where "A" is a "specific predetermined magnification A," and "the predetermined distance B is made to be an approximate imaging distance at which **the image quality** of the cutout image 22 of the wide-angle image **becomes poorer than** the image quality** of the telephoto image 23."   (APPL-1010), FIG. 7, [0049], [0061]-[0062], [0066]-[0067].



*specific predetermined magnification A*

*"B is made to be an approximate imaging distance at which the image quality of the cutout image 22 of the wide-angle image becomes poorer than the image quality of the telephoto image 23"*
*APPL-1010, Togo, [0066]*

*"image qualities of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21 at the long distance (B) in FIG. 7 are compared"*
*APPL-1010, Togo, [0067]*

**(APPL-1010), FIG. 7, annotated**

For example, if an "imaging distance (Y) between the mobile terminal [imaging] device and the subject [is] … B or less [Y ≤ B]," no switching to the telephoto image is performed.  (APPL-1010), [0053]-[0054],[0060]-[0063]; (APPL-1003), ¶63.  Togo evaluates whether the no-switching criterion is fulfilled (e.g., Y ≤ B) or not fulfilled (e.g., Y > B) during a zoom-in operation from a lower magnification X or zoom factor (ZF) value and to a higher magnification X or ZF

value higher than a switch point magnification (or up-transfer ZF) value of A

[X ≥ A]. *See* (APPL-1010), Togo, [0060]-[0064].



**(APPL-1010), FIGS. 5 and 6, juxtaposed and annotated**

As shown in annotated FIG. 6 above, when the no-switching criterion is

**fulfilled** in zoom-in operation, the output image includes only wide image data

- 28 -

from the wide-angle lens, for increasing levels of zoom (1)-(4). (APPL-1010),

[0054]. In contrast, and as shown in annotated FIG. 5(4) (juxtaposed above

annotated FIG. 6(4)) having the same magnification (zoom factor) as FIG. 5(4),

when the no-switching criterion is **not fulfilled** in zoom-in operation, the output

image is digitally-zoomed tele image data from the telephoto lens. (APPL-1010),

[0054] ("The setting magnifications in (1) to (4) in FIG. 6 substantially correspond

to (1) to (4) in FIG. 5."). Further, a POSITA would have understood that Togo's

FIG. 5(4) shows that at higher zoom level (4), when the telephoto image fully

encompasses the area of the output image, the output includes only digitally-

zoomed tele image data, as indicated by the diagonal lines, which is also used for

telephoto image 21. (APPL-1010), [0054], [0043], [0047-0049]; (APPL-1003),

¶64.

### 5.    *Reasons to Combine Togo with Golan and Martin*

A POSITA would have been motivated to apply Togo's teaching to evaluate

an imaging distance-based, no-switching criterion during zoom-in for possible

override of switching from only wide image data to telephoto image data at a

magnification (zoom factor) over a predetermined magnification threshold. The

application of Togo's no-switching criterion teaching in the analogous continuous

zoom video switching design of Golan and Golan would produce the obvious,

beneficial, and predictable results of avoiding output image degradation when the

- 29 -

quality of the telephoto image data would be degraded based on closeness of the subject as taught by Togo. (APPL-1003), ¶¶65-69.

**First**, the references are analogous prior art and are in the same field of endeavor pertaining to digital zoom camera systems including a camera controller operatively connected to wide and tele lens systems. (APPL-1005), [0036]-[0037] ("Zoom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150"); (APPL-1010) [0022], [0031] (describing a "mobile terminal device" wherein "[i]mage data from the first imaging module 1 (wide lens system) and the second imaging module 2 (tele lens system) are input to an image control means 4). In both camera systems, the camera controller selects wide or tele imaging data based on a specified magnification or distance of the object to be imaged. (APPL-1005), [0039] ("Zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112)"); (APPL-1010), [0036]-[0037] ("a user sets a setting magnification (defined as X) of the image of the subject to be photographed via a keying means 6, and this setting magnification X is input to the image control means. The image control means 4 performs image processing based on the image from the first imaging module 1, the image from the second imaging module 2.");

- 30 -

(APPL-1003), ¶66.

**Second**, a POSITA would have been motivated to incorporate the teachings of Togo with Golan's camera system because the references share a need to provide output images of objects at various ranges with a compact imaging system. (APPL-1003), ¶67. Golan discloses "a continuous electronic zoom for an image acquisition system, having multiple imaging devices each with a different fixed field of view ... [that] facilitates a light weight electronic zoom with a large lossless zooming range." (APPL-1005), [0009]. Togo discloses "an imaging device for a mobile terminal device that is thin and has a large telephoto magnification can be realized without the need for an optical zoom lens." (APPL-1010), [0020]. Furthermore, both Golan and Togo share a need for high-quality output images from the compact dual lens system. *See* (APPL-1005), [0015] ("the electronic calibration is performed with sub-pixel accuracy"); (APPL-1010), [0064] ("the imaging device of the present invention described above can suppress degradation of a high-magnification image a close distance"). "[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). Here, providing effective, high-quality imaging of objects at a range of distances through the use of two different imaging sections is a need shared by Golan and Togo, and provides at least one reason to

- 31 -

combine the respective teachings for further improvement in image quality in the combination. (APPL-1003), ¶67.

**Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Togo's teachings of a no-switching criterion based on a specific "setting magnification X" and "photography distance Y" of an object to be imaged. *See* (APPL-1005), [0015]; (APPL-1010), [0049]. In particular, the specific switching (and no-switching) criterion of Togo would provide useful guidance to a POSITA in choosing between the wide and tele lenses within the Golan system "when switching back and forth between" the lenses, based on parameters of an object to be imaged, thereby maintaining the "uninterrupted imaging" sought by Golan. *See* (APPL-1005) [0040]; (APPL-1010), [0002], [0037]. (APPL-1003), ¶68.

**Fourth**, combining the teachings of Togo with the system of Golan would have produced operable results that are predictable.  (APPL-1003), ¶69. Specifically, combining Togo's no-switching criterion based on image quality with Golan's zoom control sub-system 100 to determine when to "switch[] back and forth" between the wide and tele lenses would have been no more than the combination of known elements according to known methods (such as producing high-quality images with the wide and tele images in both references), and would

have been obvious to a POSITA to achieve the benefits of "continuous electronic

zoom" described by Golan.  *See* (APPL-1005), [0040]; (APPL-1010) [0020],

[0031].  The combination of Togo's teaching with the digital camera of Golan does

not require physical incorporation of Togo's camera into the digital camera of

Golan. To the extent that any modification would have been needed to the system

of Golan in order to accommodate the teachings of Togo, such modifications

would have been within the level of ordinary skill in the art.

### 6.    Claim 1

**[1.0] *A zoom digital camera comprising:***

To the extent that this preamble is deemed limiting, Golan teaches a zoom

digital camera.  (APPL-1003), ¶¶70-74.

Specifically, Golan is titled "**Continuous Electronic Zoom for an Imaging**

**System with Multiple Imaging Devices** Having Different Fixed FOV," and

teaches a zoom digital imaging system with multiple imaging devices each

defining an aperture for capturing a digital image.  (APPL-1005), Title.  Golan

explains that "**digital zoom** is a method of narrowing the apparent angle of view of

**a digital still or video image**," and that "[u]sing two (or more) image sensors,

having different fixed FOV, facilitates a light weight electronic zoom with a large

lossless zooming range." (APPL-1005), [0003], [0009]; (APPL-1003), ¶71.

As shown in Fig. 1 of Golan below, Golan's image acquisition system

includes a zoom control sub-system 100, which includes "**a tele image sensor 110**

- 33 -

**coupled with a narrow lens 120** having a predesigned FOV 140, a **wide image sensor 112 coupled with a wide lens 122** having a predesigned FOV 142, **a zoom control module 130** and an image sensor selector 150." (APPL-1005), [0037].

Golan's zoom control circuit 130 "receives a required zoom from an operator of the image acquisition system and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position. The relevant camera zoom factor is calculated by zoom control unit 130." (APPL-1005), [0039]; (APPL-1003), ¶72.



*Fig 1*

**(APPL-1005), FIG. 1**

In Golan's zoom control sub-system 100, each of the Wide imaging device (including wide image sensor 112 and wide lens 122) and the Tele imaging device (including tele image sensor 110 and narrow lens 120) defines an aperture for generating a corresponding digital image. *See* (APPL-1005), FIG.1. As such,

- 34 -

Golan's image acquisition system including a zoom control sub-system 100 is a multiple aperture digital camera providing digital zoom. (APPL-1003), ¶73. It is noted that the '898 Patent states "dual aperture" is "also referred to as dual-lens or two-sensor," and describes that a "multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "cameras")." (APPL-1001), 3:26-28;

Therefore, Golan's image acquisition system including zoom control sub-system 100 teaches [1.0]. (APPL-1003), ¶74.

> **[1.1]** *a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view (FOV) and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;*

Golan teaches this limitation. (APPL-1003), ¶¶75-85.

**First**, as shown in annotated Fig. 1 of Golan below, Golan's zoom control sub-system 100 includes a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with a FOV 142 (Wide field of view $FOV_W$) and a wide image sensor 112 (Wide sensor). (APPL-1005), FIG. 1, [0036]-[0037]; (APPL-1003), ¶76.

IPR2020-00861 Petition
*Inter Partes* Review of 10,230,898



**(APPL-1005), FIG. 1, annotated**

**Second**, Golan's wide lens 122 has a "fixed" and "predesigned FOV 142," therefore, teaches a fixed focal length Wide lens. (APPL-1005), [0036]-[0037]; *see also* (APPL-1005), [0009], [0043]; (APPL-1017), FIG. 4.13, 48; (APPL-1001), 7:3-5. (APPL-1003), ¶¶77-82.

**Third**, the Wide imaging section of Golan is operative to provide Wide

image data of object 20 (an object or scene), which is "viewed from both tele image sensor 110 and wide image sensor 112." (APPL-1005), [0037]. Specifically, Golan teaches an "**image frame is acquired by the selected image acquisition device**," and as such, teaches that Wide imaging section outputs a Wide image acquired by a wide image sensor 112. (APPL-1005), [0039], [0041], [0048]. A POSITA would have understood that when the wide image sensor 112 is selected, the Wide imaging section of Golan (including wide lens 122 and wide image sensor 112) provides Wide image data of object 20 as the acquired image frame. (APPL-1003), ¶83.

Therefore, Golan's zoom control sub-system 100 includes a Wide imaging section that includes a wide lens 122 with a fixed FOV 142 and a wide image sensor 112, which is operative to provide Wide image data of object 20, which teaches [1.1]. (APPL-1003), ¶84.

> **[1.2]** *b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and*

Golan teaches this limitation. (APPL-1003), ¶¶85-91.

**First**, as shown in annotated FIG. 1 below, Golan's zoom control sub-system 100 includes a Tele imaging section that includes tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV). (APPL-1005), Abstract, FIG. 1, [0036]-[0037];

- 37 -

(APPL-1003), ¶86.



**(APPL-1005), FIG. 1, annotated**

**Second**, for the same reason discussed in [1.1], because Golan's tele lens 120 has a "fixed" and "predesigned FOV 140," it teaches a fixed focal length Tele lens.  (APPL-1005), [0009], [0036]-[0037], [0043]; (APPL-1003), ¶87.

**Third**, Golan teaches that tele FOV 140 is narrower than wide FOV 142, where "wide FOV 142 is **substantially wider than** narrow FOV 140."  (APPL-1005), [0043], FIG. 1, [0009], [0037]; (APPL-1003), ¶88.

- 38 -

**Fourth**, the Tele imaging section of Golan is operative to provide Tele image data of object 20 (the object or scene), which is "viewed from both tele image sensor 110 and wide image sensor 112." (APPL-1005), [0037]. Specifically, Golan teaches that the Tele imaging section of zoom control sub-system 100 includes a "**tele image acquisition device**." (APPL-1005), [0037]; *see also* (APPL-1005), Abstract; [0039], [0041], [0048]. A POSITA would have understood that when the tele image sensor 110 is selected, the Tele imaging section of Golan (including tele lens 120 and tele image sensor 110) provides Tele image data of the object or scene as the acquired image frame. (APPL-1003), ¶89.

Therefore, Golan's zoom control sub-system 100 includes a Tele imaging section that includes a tele image sensor 110 and a tele lens 120 with fixed Tele FOV 140 narrower than fixed wide FOV 142, where the Tele imaging section is operative to provide Tele image data of object 20, which teaches [1.2]. (APPL-1003), ¶90.

**[1.3]** *c) a camera controller operatively coupled to the Wide and Tele imaging sections and*

Golan teaches this limitation. (APPL-1003), ¶¶91-94.

Specifically, Golan teaches a zoom control sub-system 100 of a digital camera that includes a camera controller including a zoom control circuit 130 coupled to the Wide and Tele imaging sections. (APPL-1003), ¶88. As shown in annotated Fig. 1 below, Golan describes that "zoom control circuit 130 receives a

- 39 -

required zoom from an operator of the image acquisition system, and selects the

relevant image sensor (110 and 112) by activating image sensor selector 150

position."  (APPL-1005), [0036].  Zoom control circuit 130 "performs electronic

zoom on the acquired image frame to meet the requested zoom" based on the

computed factor.  (APPL-1005), FIG. 2, [0048]-[0049]; (APPL-1003), ¶¶92-93.



**(APPL-1005), FIG. 1, annotated**

Therefore, Golan's zoom control circuit 130 is coupled to the Wide and Tele

imaging sections to select one of the Wide and Tele imaging sections based on a

- 40 -

requested zoom, receives an image frame acquired by the selected imaging section, and performs digital zoom to the acquired image frame to obtain an acquired image frame with said requested zoom, which teaches [1.3]. (APPL-1005), claim 1; (APPL-1003), ¶¶94-95.

> **[1.4]** *[the camera controller … ] configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and*

Golan combined with Martin and Togo renders obvious this limitation. (APPL-1003), ¶¶96-119.

**First**, Golan teaches a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF. Golan teaches a zoom switching setting that depends on the Wide and Tele fields of view, including a predetermined switch zoom factor $ZF_T$ = tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$). (APPL-1003), ¶97. Specifically, Golan explains that "[u]sing two (or more) image sensors, having different fixed FOV, facilitate a light weight electronic zoom with **a large lossless zooming range**." (APPL-1005), [0009]. Golan describes that in an example, such a large lossless zooming range has a value of (Wide_FOV/Narrow_FOV)$^2$, which is provided by

Case: 22-1455     Document: 30-1     Page: 280     Filed: 12/23/2022

IPR2020-00861 Petition
*Inter Partes* Review of 10,230,898

"switching between the image sensors" and performing digital zoom to both Wide and Tele images. (APPL-1005), [0009].

As explained in detail by Dr. Durand, a POSITA would have understood that the underlying geometric relationships and as such, would have understood that Golan's informal terminology, "Wide_FOV/Narrow_FOV," corresponds to the relative magnification ratio of an object "**magnified** in tele image sensor 110 with respect to wide image sensor 112," thereby representing tangent(θ_wide)/tangent(θ_tele), where θ_wide and θ_tele are the corresponding semi-angle of view θ such as illustrated in Fig. 4.13 of Jacobson below, and accordingly corresponds to "*tangent(FOV$_{Wide}$)/tangent(FOV$_{Tele}$)*" as claimed. *See* (APPL-1005), [0037]; (APPL-1017), FIGS. 4.13, 4.12a, 48; (APPL-1003), ¶¶98-106.

Dr. Durand further explains in detail that A POSITA would have understood that because Golan's lossless zoom range is determined based on the relative magnification ratio of Tele image expressed in the form of tangent(Wide FOV)/tangent(Tele FOV), Golan's Tele and Wide sensor sizes $K_{Wide}$ are substantially the same. *Id.*

In Golan's example where "Wide_FOV=Narrow_FOV*6," a lossless zooming range of 36 is provided. (APPL-1005), [0009]. As such, a POSITA would have understood that lossless zooming range of 36 is provided by switching between Wide and Tele sensors at a switch zoom factor ZF$_T$ (having a value of

- 42 -

Appx1047

tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$) = 6) that is the relative magnification ratio of Tele image to Wide image, e.g., by switching at a switch zoom factor equal to 6, performing digital zoom to Wide image for a requested zoom factor between 1 and 6, and performing digital zoom to Tele image for a requested zoom factor between 6 and 36.  (APPL-1003), ¶107.

Golan teaches selecting Wide image sensor and providing a zoom video output image including only Wide image data when a requested zoom factor value is less than the predetermined switch zoom factor $ZF_T$, and selecting Tele image sensor and providing a zoom video output image including only Tele image data when the requested zoom factor value is greater than the up-transfer ZF (e.g., the predetermined switch zoom factor $ZF_T$).  (APPL-1003), ¶108.  Specifically, Golan's zoom control 130 (sensor control module) "receives a required zoom from an operator of the image acquisition system, and **selects the relevant image sensor** (110 and 112) by activating image sensor selector 150 position" based on the requested zoom factor value.  (APPL-1005), [0039].

**Second**, Togo teaches that at a requested zoom factor (ZF) value, a camera controller is configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, and if the no-switching criterion is fulfilled the camera controller is further configured to output a zoom video output image that includes only digitally-zoomed Wide image data. (APPL-1003), ¶109.

- 43 -

Like Golan, Togo teaches a camera controller (Image Control Means 4) operatively coupled to Wide and Tele imaging sections including wide and tele "fixed magnification lens system[s]." (APPL-1010), FIG. 1, [0023]-[0024], [0026]-[0027]; (APPL-1003), ¶110.



**(APPL-1010), FIG. 1, annotated**

Togo recognizes that "by **switching between or compositing images** of a plurality of optical systems and a plurality of imaging elements joined to these optical systems, a wide dynamic range of enlargement magnification from wide-

angle to telephoto can be realized." (APPL-1010), [0002], [0008]; (APPL-1003),

(APPL-1003), ¶111.

Furthermore, Togo recognized that "a telephoto imaging module with a long

focal length is **less sharp at close distances** compared to a wide-angle imaging

module whose focal length is short." (APPL-1010), [0012]. During a zoom in

operation, "a switch is made from the wide-angle imaging module to the telephoto

imaging module. However, at this time, if the subject is close, the **image quality**

**degrades** due to the image being from the telephoto imaging module." (APPL-

1010), [0013]; (APPL-1003), ¶112.

Togo's solution is for image control means 4 (a camera controller) to

employ a no-telephoto **criterion** based on image quality. (APPL-1003), ¶113. For

example, as shown in annotated FIG. 7 below, one switching criterion is based on

when "**the image quality** of the cutout image 22 of the wide-angle image becomes

**poorer** than **the image quality** of the telephoto image 23." (APPL-1010), [0066].

Togo describes an example image quality no-switching criterion to include that

"setting magnification X < A" or "setting magnification X $\geqslant$ A and the imaging

distance Y $\leqslant$ B". (APPL-1010), [0061]-[0062].

- 45 -



*specific predetermined magnification A*

*"B is made to be an approximate imaging distance at which the image quality of the cutout image 22 of the wide-angle image becomes poorer than the image quality of the telephoto image 23"*
*APPL-1010, Togo, [0066]*

*"image qualities of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21 at the long distance (B) in FIG. 7 are compared"*
*APPL-1010, Togo, [0067]*

**(APPL-1010), FIG. 7, annotated**

As shown in annotated FIGS. 5 and 6 below, when the switching criterion is not fulfilled (i.e., no-switching criterion is fulfilled) as shown in FIG. 6, no use is made of the telephoto image, because the image quality of zoomed wide image is higher than the telephoto image, and an output image including only zoomed wide image is provided, as shown in FIG. 6(4) below ("**the enlarged images are generated entirely from cutout images (digital zooms) of the wide-angle image**

- 46 -

20"). *See also* (APPL-1010), [0053]-[0054],[0060]-[0063], [0066]; (APPL-1003),

¶114.



**(APPL-1010), FIGS. 5 and 6, juxtaposed and annotated**

On the other hand, as shown in FIG. 5 above, when the image quality

switching criterion ("image quality of the cutout image 22 of the wide-angle image

becomes poorer than the image quality of the telephoto image 23") is fulfilled (i.e.,

no-switching criterion is not fulfilled), ((APPL-1010), [0066]), telephoto image

- 47 -

data is used, and "**compositing or switching** to the telephoto image becomes

effective." (APPL-1010), [0047]-[0049], [0069]. In addition to switching, Togo

discloses support for compositing, in which "the telephoto image is pasted in a

center portion of the wide-angle image," (APPL-1010), [0047]-[0049], [0063],

however, when the zoom factor is sufficiently large, such that the zoomed area is

entirely covered by the telephoto image, Togo uses only the telephoto data and

switches to using just the telephoto image. See, (APPL-1010), FIG. 5(4); (APPL-

1003), ¶115.

Therefore, a POSITA would understand Togo to teach camera controller

operation that depends on image quality evaluation (e.g., using imaging distance

and/or comparative pixel density evaluations), and that these compositing or

**switching criteria** (or non-compositing or **no-switching criteria**, if specified

conversely), determine whether digital zooming output includes or switches to the

telephoto image depending on whether a non-compositing or no-switching

criterion is fulfilled or not fulfilled. (APPL-1003), ¶116. Togo also teaches that

"because image quality depends on a performance of a lens system that is used and

the like, theoretically strict derivation is difficult." (APPL-1010), [0066].

A POSITA would have been motivated to apply Togo's teaching of

evaluating a no-switching criterion in the system of Golan and Martin when

zooming in with a requested zoom factor greater than the switch zoom position

ZF$_T$ for the benefit of improved image quality as described in Togo. (APPL-1003),

¶117.

A POSITA would have understood that Golan teaches separate embodiments

that use switching (e.g., zoom control sub-system 100 of FIG. 1) and that use

fusion (e.g., camera system 600 of FIG. 6) between Wide and Tele sections for

video output images. As such, a POSITA would have been motivated to apply

Togo's no-switching criterion (instead of its no-compositing criterion) teaching to

the embodiments using switching (e.g., zoom control sub-system 100 of FIG. 1),

because in zoom control sub-system 100 of FIG. 1 of Golan, there is no need for

applying a no-compositing criterion. A POSITA would have understood that

Togo's image quality no-switching criterion applies to a digital camera including

image sensors of a substantially similar size or of different sizes. *See also* Ground

1: Reasons to Combine Togo, Golan, and Martin; (APPL-1003), ¶118.

Therefore, the digital camera of Golan, Martin, and Togo includes a camera

controller, which is configured to evaluate if a no-switching criterion is fulfilled or

not fulfilled based on image quality comparison between Wide and Tele images in

a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF

value at a zoom factor (ZF) higher than an up-transfer ZF at a requested zoom

factor greater than an up-transfer ZF. If the no-switching criterion is fulfilled, a

zoom video output image that includes only Wide image data. As such, the

- 49 -

combination renders obvious [1.4].  (APPL-1003), ¶119.

> **[1.5]** *wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.*

Golan combined with Martin and Togo renders obvious this limitation.

(APPL-1003), ¶¶120-132.

**First**, Golan teaches switching from Wide image to Tele image in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF ($ZF_T$), the zoom video output image includes only digitally-zoomed Tele image data.  (APPL-1005), Golan, FIG. 1, [0009], [0036]; *see also* [1.4]; (APPL-1003), ¶121.

**Second**, as discussed at [1.4], a POSITA would have been motivated to apply Togo's teachings of image quality non-switching criterion to Golan and Martin, such that in the combination of Golan, Martin, and Togo, a camera controller is configured to evaluate if a no-switching criterion (e.g., based on image quality comparison between Wide and Tele images) is fulfilled or not fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF ($ZF_T$).  If the no-switching criterion is fulfilled, switching is not performed, and the zoom video output image includes only digitally-zoomed Wide image data.  (APPL-1003), ¶122.

A POSITA would have understood that in the combination, if the no-switching criterion is __not__ fulfilled, switching from Wide image to Tele image as taught in Golan is performed, and the zoom video output image includes only digitally-zoomed Tele image data.  (APPL-1005), FIG. 1, [0009], [0036]; *see also*, (APPL-1010), FIG. 5(4); (APPL-1003), ¶123.

**Third**, Martin teaches when switching between two successive images having different points of view, executing registration using critical alignment to register a succeeding image to a preceding image to generate **a transformed succeeding image** in video output images for a stable video display.  (APPL-1003), ¶124.

As shown in Fig. 1 below, Martin describes that cameras 10 and 12 "being displaced from each other" capture sets of images "of a common scene 14," "resulting sets of images from cameras of images from cameras 10 and 12 will be parallax images."  (APPL-1006), 3:39-46; (APPL-1003), ¶125.



**FIG. 1**

**(APPL-1006), FIG. 1**

Martin describes using critical alignment to "achieve a **stable** autostereoscopic display" during the alternating display of parallax images "to create a resulting moving image," and "[s]tability of the whole image may not be required, as long as at least **a particular region of interest** in the autostereoscopic display is stable." (APPL-1006), 3:32-35, 5:53-58; 7:38-45; (APPL-1003), ¶126.

As shown in annotated FIGS. 3a-3d below, critical alignment teaches that unaligned image 32 (succeeding image in video) is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment with region of interest 34 in reference image 30 (preceding image in

- 52 -

video), as shown in FIG. 3d. (APPL-1006), 4:51-56. Martin explains that the

alignment "may be represented by an affine transformation including translation,

rotation, scaling, and/or any other desired trans formation." (APPL-1006), 4:56-

59, 5:10-50; (APPL-1003), ¶127.



**(APPL-1006), FIGS. 3a-3d, annotated**

A POSITA would have understood that Martin's critical alignment teaches

determining correspondences between the coordinate systems of the two images

from different points of view, which represent the registration between the two

images (e.g., "represented by affine transformation…and/or any other desired

transformation"), and therefore teaches executing registration of successive images

for position matching in the ROI and generating a transformed succeeding image

(e.g., transformed and shifted succeeding image 32 as in FIG. 3d above). (APPL-

1006), 4:56-59, 5:10-50; *see also* (APPL-1009), [0041], [0042]; (APPL-1013),

FIGS. 2.4 and 6.2, Tables 2.1 and 6.1, 33-35, 273-277; (APPL-1016), 137; (APPL-

1003), ¶128.

Further, Martin teaches in critical alignment, the transformed succeeding

image is used to achieve position matching of ROI between the preceding image

and transformed succeeding image to the video output images when switching

between the two images for providing stable video output images.  (APPL-1003),

¶129; (APPL-1006), 7:36-51, 5:6-21.  Further, a POSITA would have understood

that the critical alignment of Martin changes with object distance of the ROI in a

specific image, and is performed when switching between each pair of parallax

images.  (APPL-1003), ¶129.

As such, Martin teaches providing stable video output images by performing

critical alignment between two parallax images to provide a transformed

succeeding image for performing position matching with the preceding image in

the video output images when switching.  (APPL-1003), ¶130.

A POSITA would have been motivated to incorporate Martin's teaching of

critical alignment of ROI in successive parallax images to achieve a stable

transition in the continuous zoom video output images in the digital camera of

Golan.  (APPL-1006), Martin, 5:51-58; (APPL-1003), ¶131.  This is consistent

with what was well known in the art that, for seamless transition between two

- 54 -

images in continuous zoom video applications, when calibration between two

cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (e.g.,

because of shocking, vibration, thermal variation, etc.), image registration of two

images from two imaging sections (e.g., critical alignment of Martin) may be used

for position matching. *See e.g.*, (APPL-1007), 4:58-62; 10:2-5; (APPL-1014),

1:58-62; (APPL-1019), 1059; (APPL-1009), [0041]-[0042]; Ground 1: Reasons to

Combine Golan and Martin.

Therefore, in the digital camera of Golan, Togo, and Martin, after the no-

switching criterion is not fulfilled, when switching from the Wide image

(preceding image) to Tele image (succeeding image), a transformed digitally

zoomed Tele image (transformed succeeding image as taught by Martin) is

provided for smooth transition in the video output image, which renders obvious

[1.5]; (APPL-1003), ¶132.

### 7.    Claim 4

**[4.1] *The camera of claim 1, wherein the no-switching criterion includes
an effective resolution of the Tele image being lower than an
effective resolution of the Wide image.***

Golan combined with Martin and Togo renders obvious this limitation.

(APPL-1003), ¶¶133-136.

As discussed at [1.4] and [1.5], in the combination of Golan, Martin, and Togo,

the camera controller uses a no-switching criterion including an image quality

including sharpness of the Tele image being lower than an image quality including

sharpness of the Wide image.  (APPL-1003), ¶134.

A POSITA would have understood that the image quality no-switching criterion as taught in Togo includes "*an effective resolution of the Tele image being lower than an effective resolution of the Wide image*" because Togo's image quality no-switching criterion compares image quality including the degree of detail, where Togo describes image quality including blurriness and sharpness.  (APPL-1003), ¶135; (APPL-1010), [0012] ("telephoto imaging module with a long focal length is **less sharp** at close distances compared to a wide-angle imaging module whose focal length is short"), [0057] ("a telephoto image 23 is **blurry**"), Abstract, [0011]; *see also* (APPL-1010), [0050] ("Note that because **image quality depends on a performance of a lens system** that is used and the like, theoretically strict derivation is difficult.").  As such, Togo's image quality no-switching criterion includes an effective resolution (also termed as "resolving power" in the art which is the reciprocal of resolution) of the Tele image being lower than the effective resolution of the Wide image.  *See, e.g.*, (APPL-1017), 80 (regarding effective resolution/resolving power, explaining that the "ability of a lens to image fine *detail* as a distance *(d)* between two adjacent points in the subject is termed its *resolution (R)*"); 81 (explaining that effective resolution is the ability to resolve spatial frequencies); *see also* (APPL-1020), '731 Patent, 7:15-17.

As such, in the digital camera of Golan, Martin, and Togo, the camera

controller uses a no-switching criterion including an image quality including

sharpness (effective resolution) of the Tele image being lower than an effective

resolution of the Wide image, which renders obvious [5.1].  (APPL-1003), ¶136.

### 8.    *Claim 8*

**[8.1]** ***The camera of claim 1, wherein the camera controller includes a
user control module for receiving user inputs and a sensor control
module for configuring each sensor to acquire the Wide and Tele
image data based on the user inputs.***

Golan combined with Martin and Togo renders obvious this limitation.

(APPL-1003), ¶¶137-140.

**First**, Golan teaches a "zoom selecting control" (a user control module) for

receiving user inputs including "a requested zoom" (a zoom factor).  (APPL-1005),

Abstract, FIG. 2, [0045]-[0046], claim 1; (APPL-1003), ¶138.

**Second** Golan's zoom control circuit 130 (sensor control module) configures

each sensor to acquire Wide and Tele images, by "**select[ing] the relevant image

sensor (110 and 112) by activating image sensor selector 150 position**," based

on a user input zoom factor in video mode.  (APPL-1003), ¶139.

Accordingly, the digital camera of Golan, Martin, and Togo includes zoom

control sub-system 100, which includes a zoom selecting control (a user control

module) for receiving user inputs including a zoom factor, and a zoom control

circuit 130 (sensor control module) for configuring each sensor to acquire the

Wide and Tele images based on the user inputs (e.g., the user provided zoom

factors), which renders obvious [9.1].  (APPL-1003), ¶140.

### 9.    Claim 12

**[12.0]** *A method for obtaining zoom images of an object or scene using a digital camera, comprising the steps of:*

To the extent the preamble is limiting, Golan teaches this limitation for the

reasons discussed above at [1.0].  (APPL-1003), ¶141.

**[12.1]** *a) providing in the digital camera a Wide imaging section having a Wide lens with a Wide field of view (FOV) and a Wide sensor*

Golan teaches this limitation for the reasons discussed above at [1.1].

(APPL-1003), ¶142.

**[12.2]** *[providing in the digital camera] a Tele imaging section having a Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, and*

Golan teaches this limitation for the reasons discussed above at [1.2].

(APPL-1003), ¶143.

**[12.3]** *[providing in the digital camera] a camera controller operatively coupled to the Wide and Tele imaging sections; and*

Golan teaches this limitation for the reasons discussed above at [1.3].

(APPL-1003), ¶144.

**[12.4]** *b) configuring the camera controller to evaluate if a no-switching criterion is fulfilled or not fulfilled, and if the no-switching criterion is fulfilled, configuring the camera controller to output at a zoom factor (ZF) higher than an up-transfer ZF a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value, or*

Golan combined with Martin and Togo renders this limitation obvious for

the reasons discussed above at [1.4].  (APPL-1003), ¶145.

**[12.5]** *if the no-switching criterion is not fulfilled, configuring the camera controller to output a zoom video output image that includes only transformed, digitally zoomed Tele image data*

Golan combined with Martin and Togo renders this limitation obvious for

the reasons discussed above at [1.5].  (APPL-1003), ¶146.

### 10.    Claim 15

**[15.1]** *The method of claim 12, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image.*

Golan combined with Martin and Togo renders obvious this limitation for

the reasons discussed above at [4.1].  (APPL-1003), ¶147.

### B. Ground 2: Claim 9 is unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Levey.

### 1.    Summary of Levey

Levey pertains to digital imaging systems generating still/video output

images.  (APPL-1015), Abstract; (APPL-1003), ¶¶148-150. Specifically, Levey

describes "a photography mode user interface for selecting between a plurality of

photography modes, the **photography modes having associated image capture**

- 59 -

**and image processing settings**." (APPL-1015), Abstract, [0039], [0041], [0045], [0057], [0070]-[0071]

### 2. *Reasons to Combine Levey, Golan, and Martin, and Togo*

A POSITA would have been motivated to apply Levey's teaching of receiving a user input including a camera mode and configuring its image sensor using image capture settings associated with the camera mode selected by the user in the combination of Golan, Martin, and Togo to produce the obvious, beneficial, and predictable results of providing a user a plurality of camera modes in a digital camera as taught by Levey.  (APPL-1003), ¶¶151-155.

**First**, like the combination of Golan, Levey pertains to digital imaging systems generating still/video output images.  (APPL-1003), ¶152; (APPL-1015), [0032]; (APPL-1005), [0003].

**Second**, a POSITA would have been motivated to incorporate Levey's teachings in the dual-aperture zoom digital camera of Golan combined with Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes "that can be selected by the user to control various elements of the image capture process and the image processing chain."  (APPL-1015), [0004]; (APPL-1003), ¶153.

**Third**, combining Levey's teaching of configuring an image sensor based on a user input camera mode (while described using a single image sensor camera) in

- 60 -

the dual-aperture digital camera of Golan and Martin would have been no more than the combination of known elements according to known methods (such as providing a user interface for camera mode selection and configuring Wide and Tele sensors based on associated image capture settings) to provide user camera mode selection. (APPL-1003), ¶¶154-155.

### 3. Claim 9

**[9.1]** *The camera of claim 8, wherein the user inputs include a zoom factor, a camera mode and a region of interest.*

Golan in combination with Martin, Togo, and Levey renders obvious this limitation. (APPL-1003), ¶¶156-161.

**First**, as discussed at [8.1], Golan teaches that the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs, where in the user inputs include a zoom factor. (APPL-1003), ¶157.

**Second**, Levey describes "a **photography mode user interface** for selecting between a plurality of photography modes," and configuring its image sensor using associated image capture settings. (APPL-1015), Abstract, [0045], [0057], [0070]. [0039], [0041], [0070]-[0071]; (APPL-1003), ¶158.

**Third**, Martin describes that receiving a user input including a region of interest. Specifically, Martin describes that "while displaying the images, aligning **<u>a user-selected region of interest</u>** associated with the first image with a

- 61 -

corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image." (APPL-1006), 7:36-51; (APPL-1003), ¶159.

A POSITA would have been motivated to incorporate Levey's teachings for user selected camera mode in the dual-aperture zoom digital camera of Golan and Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes. (APPL-1015), [0004]; (APPL-1003), ¶160.  A POSITA would have understood that in the digital camera of Golan, Martin, Togo, and Levey, the region of interest may be defined by a user through a user input of the digital camera, including a user-selected autofocus reference point indicating a region of interest on which the Wide and Tele imaging sections are focused on. *See e.g.*, (APPL-1006), 5:37-38, 7:36-51; (APPL-1021), FIGS. 5A-5B, [0166], [0208]; *see also* Ground 2: Reasons to Combine Levey, Golan, Martin, and Togo.

Therefore, a camera controller of the digital camera of Golan, Martin, Togo, and Levey includes a user control module for receiving, from a user interface, a user input including a required zoom factor, a camera mode, and a region of interest.  Further, the camera controller includes a sensor control module for configuring each sensor to acquire the Wide and Tele images based on the user input (e.g., according to the required zoom factor, region of interest for focusing, and image capture settings associated with the selected camera mode) as recited in

the claim.  As such, the digital camera of Golan, Martin, Togo, and Levey renders obvious [10.1].  (APPL-1003), ¶161.

### C. Ground 3: Claims 11 and 19 is unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Border.

#### 1.    *Summary of Border*

Border discloses "a digital camera that uses multiple lenses and image sensors to provide an extended zoom range and the method used to produce a digital image that combines the multiple images produced by the digital camera." (APPL-1009), Title, Abstract, [0002]; (APPL-1003), ¶¶162-165.

Border describes providing a digital camera include lenses having different focal lengths for an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range."  (APPL-1009), [0010], [0070]; (APPL-1003), ¶163.

As shown in Figure 5 of Border below, the processor of the digital camera includes an image compositor 202 to form a composite image 208 using the two images, wide image 204 and telephoto image 206.  (APPL-1009), [0029], [0036], [0043]-[0044]; (APPL-1003), ¶¶164-165.

IPR2020-00861 Petition
*Inter Partes* Review of 10,230,898



*FIG. 5*

**(APPL-1009), FIG. 5**

### 2.    *Reasons to Combine Border with Golan, Martin, and Togo*

A POSITA would have been motivated to apply Border's teachings of

combining in still mode, at a predefined range of ZF values, at least some of the

Wide and Tele image data to provide a fused output image of the object or scene

from a particular point of view in the digital camera of Golan combined with

Martin and Togo to achieve the benefit of "a zoomed image with high resolution

throughout the zoom range and improved image quality" in still mode as taught by

Border.  (APPL-1009), Abstract; (APPL-1003), ¶¶166-169.

**First**, like Golan combined with Martin and Togo, Border pertains to

imaging systems generating improved output images (still or video) using images

- 64 -

of different FOVs of the same scene. (APPL-1003), ¶167; (APPL-1009), [0015]; (APPL-1005), [0003].

**Second**, a POSITA would have understood that Golan teaches separate embodiments using video switching (e.g., zoom control sub-system 100 of FIG. 1) and video fusion (e.g., camera system 600 of FIG. 6) between Wide and Tele sections for video output images respectively. (APPL-1003), ¶168. As such, a POSITA would have been motivated to apply Border's teachings of providing a fused output image in still mode only to a still mode of zoom control sub-system 100 of Golan while maintaining switching for the video mode of zoom control sub-system 100, because a POSITA would have maintained Golan's design choice of video switching in zoom control sub-system 100 over video fusion described in Golan's another embodiment (e.g., camera system 600 of FIG. 6) in Golan.

**Third**, combining Border's teachings of a fused output image in still mode in the digital camera of Golan combined with Martin would have been no more than the combination of known elements according to known methods (such as in still mode, when requested zoom factor is at the zoom range, configuring Wide and Tele imaging sections to capture Wide and Tele simultaneously and generating a composite image by combining Wide and Tele images in the camera controller of Golan, Martin, and Togo) for improved still mode output image quality described in Border. (APPL-1003), ¶169.

- 65 -

### 3.     Claim 11

**[11.1]** ***The camera of claim 1, wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.***

Golan combined with Martin, Togo, and Border renders obvious this limitation. (APPL-1003), ¶¶170-178.

Border teaches a camera controller configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view. (APPL-1003), ¶171.

**First**, with reference to FIG. 5 of Border below, Border teaches an image processor 50 (a camera controller) that includes an image compositor 202, which "generates a **composite image 208 using image data from both the wide image 204 and the telephoto image 206**." (APPL-1009), [0036]; (APPL-1003), ¶172.

- 66 -



*FIG. 5*

**(APPL-1009), FIG. 5**

Because the wide image, the tele image, and the composite image each include still images, a POSITA would understand Border to teach a camera controller configured to combine images in a still mode. (APPL-1003), ¶173.

Further, a POSITA would understand Border's composite image to constitute a fused output image as claimed. (APPL-1003), ¶174; *see, e.g.*, (APPL-1001), 2:20-21 ("The images are then stitched (fused) together to form a composite ("fused") image."). Specifically, Border teaches compositing of wide and tele image data by registering and resampling to provide a composite (fused output) image 208. (APPL-1009), FIG. 5, [0038]-[0042] (describing registrations such as in the form of a homography $H_{TW}$ that transforms coordinates of the telephoto image to the wide image), [0043]-[0045] (describing resampling using the

- 67 -

registration information and zoom amount to produce the composite image).

Accordingly, a POSITA would understand Border's image processor (camera

controller) to teach combining in still mode at least some of the Wide and Tele

image data to provide a fused output image.

**Third**, Border's composite image (fused output image) is an "*image of the*

*object or scene from a particular point of view*" as claimed. (APPL-1003), ¶174.

More specifically, a POSITA would have understood that the composite image 208

is generated in Border by modifying the wide image 204 using the telephoto image

206 with registration information (e.g., represented by homography $H_{TW}$) that

"transforms the coordinates of the telephoto image 206 to the wide image 204" and

therefore has the point of view of the wide image 204. (APPL-1009), [0038]-

[0040], [0042],[0048]; (APPL-1017), 5, 57-58. It was well known in the art to use

registration (e.g., in the form of homography) to map an image having a point of

view from one camera to another image having a point of view from another

camera. (APPL-1013), Fig. 2.12, 50-51.

Indeed, in prior litigation between the parties, the Board concluded that

Petitioner had sufficiently shown that Border taught an analogous limitation.

*Apple Inc. v. CorePhotonics, Ltd.*, IPR2018-01133, Final Written Decision (Paper

34), 15 (concluding that Boarder taught "a processor configured to provide an

output image from a point of view of the first camera based on a zoom factor (ZF)

input that defines a respective field of view (FOV$_{ZF}$).").

**Finally**, POSITA would have understood that the image compositor 202 of Border is configured to combine the wide and tele image data "at a predefined range of ZF values" as recited. (APPL-1003), ¶¶175-176. Border states that "zoom amount 210 … specifies the desired relative zoom amount of the produced composite image 208." (APPL-1009), [0044]. Border further defines zoom amount 210 as a range of zoom values: "**When the zoom amount is between 1 and M**, data from both the wide image 204 and the telephoto image 206 are used by the image resampler 214 to produce the composite image 208," where M is a relative magnification ratio of Tele image to Wide image. (APPL-1009), [0044].

A POSITA would have been motivated to apply Border's teachings of providing a fused output image in still mode in the combination of Golan, Martin, and Togo to achieve the benefit of "a zoomed image with high resolution throughout the zoom range and improved image quality" in still mode as taught by Border. (APPL-1003), ¶177. A POSITA would have understood that Golan teaches separate embodiments using video switching (e.g., zoom control sub-system 100 of FIG. 1) and video fusion (e.g., camera system 600 of FIG. 6) between Wide and Tele sections for video output images respectively. As such, a POSITA would have been motivated to apply Border's teachings of providing a fused output image in still mode only to a still mode of zoom control sub-system 100 of Golan while

- 69 -

maintaining switching for the video mode of zoom control sub-system 100,

because a POSITA would have maintained Golan's design choice of video

switching in zoom control sub-system 100 over video fusion described in Golan's

another embodiment (e.g., camera system 600 of FIG. 6) in Golan.  (APPL-1003),

¶177; *see also* Ground 3: Reasons to Combine Border, Golan, Martin, and Togo.

Thus, Golan's zoom control sub-system 100 (as applied in combination with

Martin and Togo in [1.0]) is adapted to apply Border's teaching of still mode

operation in which wide image and telephoto image are combined, which for zoom

amounts between 1 and M (a relative magnification ratio of Tele image to Wide

image), uses registration information to transform coordinates of the telephoto

image to the wide image and produces a composite image having the point of view

of the wide image, which renders obvious [12.1].  (APPL-1003), ¶178.

### 4.    *Claim 19*

**[19.1]** ***The method of claim 12, further comprising the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view.***

Golan combined with Martin, Togo, and Border renders obvious this

limitation for the reasons discussed above at [11.1].  (APPL-1003), ¶179.

**D. Ground 4: Claims 10 and 20 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Parulski.**

*1.    Summary of Parulski*

Parulski is titled "Method and Apparatus for Operating a Dual Lens Camera to Augment an Image," and discloses "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability."  (APPL-1008), Parulski, Title, 1:8-10; (APPL-1003), ¶¶180-182.

As shown in FIG. 16B below, Parulski teaches a digital camera including a Wide imaging section (including wide lens 612 and wide sensor 614), and a Tele imaging section including (tele lens 616 and tele sensor 618).  (APPL-1008), Parulski, 23:28-43; (APPL-1003), ¶181.



**(APPL-1008), Parulski, FIG. 16B, annotated**

Parulski teaches in still mode, combining Wide and Tele image data only in focused areas (e.g., sharp portions of Wide and Tele images positioned near their corresponding focus distances) to generate a fused output image with a broadened depth of field. (APPL-1003), ¶182. Specifically, as shown in FIG. 14 below, Parulski discloses that two images with different focus positions "are combined into a modified image with a **broadened depth of field**" where "the secondary **still image** is used to **sharpen portions of the primary still image that are positioned near the secondary focus distance**." (APPL-1008), Parulski, FIGS. 14, 26, 22:14-23:3, 28:45-56; 7:32-35; *see, also, e.g.*, (APPL-1026), Jacobs, FIG. 12, 7 (providing "all-focus" images having "an extended depth of field" by combining focused areas in images with different focus distances).

- 72 -

IPR2020-00861 Petition
*Inter Partes* Review of 10,230,898



**FIG. 14**

**(APPL-1008), Parulski, FIG. 14**

### 2.   *Reasons to Combine Parulski, Golan, Martin, and Togo*

A POSITA would have been motivated to apply Parulski's teachings of in

still mode, combining Wide and Tele image data only in focused areas to generate

a fused output image in the system of Golan combined with Martin and Togo for

- 73 -

the benefit of a fused output image having a broadened depth of field as described in Parulski at a predefined range of ZF values.  (APPL-1003), ¶¶183-187.

**First**, similar to Golan combined with Martin and Togo, Parulski pertains to a digital camera that uses multiple lenses and image sensors to provide an enhanced output image in video/still mode.  (APPL-1003), ¶184.  Parulski discusses in still mode, using "one of the images from a dual-lens camera as a secondary image ... to modify the other, primary image and thereby generating an enhanced primary image" with "a broaden depth of field." (APPL-1008), Parulski, 28:45-29:7; 7:32-35; *see also* (APPL-1005), [0003] (considering dual-aperture digital cameras providing "**digital still** or video images").

**Second**, a POSITA would have understood that Golan teaches separate embodiments using video switching (e.g., zoom control sub-system 100 of FIG. 1) and video fusion (e.g., camera system 600 of FIG. 6) between Wide and Tele sections for video output images respectively.  (APPL-1003), ¶185.  As such, a POSITA would have been motivated to apply Parulski's teachings of providing a fused output image in still mode only to a still mode of zoom control sub-system 100 of Golan while maintaining switching for the video mode of zoom control sub-system 100, because a POSITA would have maintained Golan's design choice of video switching in zoom control sub-system 100 over video fusion described in Golan's another embodiment (e.g., camera system 600 of FIG. 6) in Golan.

- 74 -

**Third**, combining Parulski's teachings of a fused output image with a broadened depth of field in still mode in the digital camera of Golan combined with Martin and Togo would have been no more than the combination of known elements according to known methods (such as in still mode, when requested zoom factor is at the zoom range, configuring Wide and Tele imaging sections to capture Wide and Tele simultaneously and generating a composite image by combining focused areas of Wide and Tele images in the camera controller of Golan, Martin, and Togo) for improved still mode output image quality described in Parulski. (APPL-1003), ¶186.

Thus, a POSITA would have been motivated to apply Parulski's teachings of in still mode, combining Wide and Tele image data only in focused areas to generate a fused output image in the system of Golan combined with Martin and Togo for the benefit of a fused output image having a broadened depth of field, at a predefined range of ZF values (e.g., the large lossless zooming range described in Golan) in such a digital camera.  (APPL-1008), Parulski, FIG. 14 (applying the method in a zooming range both less than and greater than switch zoom position "X"), 28:52-53, 29:4-7, 30:17-20; (APPL-1003), ¶187.

- 75 -

3.    *Claim 10*

**[10.1]** *The camera of claim 1, wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1.*

Golan combined with Martin, Togo, and Parulski renders obvious this limitation.  (APPL-1003), ¶¶188-191.

As discussed at [1.2], the digital camera of Golan includes a Tele lens 120.  (APPL-1005), FIG. 1, [0036]-[0037]; Abstract ("a computerized image acquisition system [] having … **a tele image acquisition device** having a tele image sensor array coupled with **a tele lens** having a narrow FOV").  A POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ("less than unit").  *See, e.g.*, (APPL-1023), Smith, 169 ("The arrangement shown in Fig. 10.1, with a positive component followed by a negative component, can produce a compact system with an **effective focal length F** that is longer than **the overall length L** of the lens. **The ratio of L/F is called the telephoto ratio**, and a lens for which this ratio is less than unit is **classified as a telephoto lens**.").  A POSITA would understand the "telephoto ratio" of Smith and of tele lens of Golan 120 is the same as the claimed TTL/EFL ratio, since TTL and L both refer to the overall length of the lens (*see* (APPL-1024), Chen, 3:24-26), and F is described as the effective focal length of the lens system.  (APPL-1023), Smith, 169; (APPL-1003), ¶189.

- 76 -

Appx1081

**Second**, to the extent that Patent Owner argues that Golan does not explicitly describe tele lens 120 as a telephoto lens as claimed, it would have been obvious to a POSITA to implement Golan's tele lens 120 with "a fixed focal length **telephoto lens**" having TTL/EFL smaller than 1 as taught in Parulski for the benefit of a "very small figure." (APPL-1008), Parulski, FIGS. 16A-B, 23:38, 24:20-21; *see also*, (APPL-1023), Smith, 169 (describing using a telephoto lens for "produc[ing] a compact system"); (APPL-1003), ¶190.

Therefore, in the combination of Golan, Martin, Togo, and Parulski, an imaging acquisition system includes a Tele lens, which has a telephoto ratio of total track length (TTL)/effective focal length (EFL) smaller than 1, which renders obvious [11.1]. (APPL-1003), ¶191.

### 4.    Claim 20

**[20.1]** ***The method of claim 12, wherein the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image includes configuring the camera controller to combine Wide and Tele image data only in focused areas.***

Golan combined with Togo, Martin, and Parulski renders obvious this limitation. (APPL-1003), ¶¶192-196.

**First**, Parulski teaches configuring the camera controller, in still mode, to combine Wide and Tele image data only in focused areas to provide a fused output image, at zoom values both greater than and less than or equal to switch zoom position "X". (APPL-1008), Parulski, FIG. 14 (e.g., step 502); (APPL-1003), ¶191.

- 77 -

Specifically, as shown in FIG. 14 below, Parulski discloses that "an image is captured from the primary capture unit at **one focus position** and another image is captured from the scene analysis capture unit (the secondary image capture unit) at **another focus position**," and that "the two images are combined into a modified image with a **broadened depth of field**" where "the secondary still image is used to **sharpen portions of the primary still image that are positioned near the secondary focus distance**." (APPL-1008), Parulski, FIGS. 14, 26, 22:14-23:3, 28:45-56. As such, Parulski teaches in still mode, combining Wide and Tele image data only in focused areas (e.g., sharp portions of Wide and Tele images positioned near their corresponding focus distances) to generate a fused output image with a broadened depth of field. *See, also, e.g.*, (APPL-1026), Jacobs, FIG. 12, 7 (providing "all-focus" images having "an extended depth of field" by combining focused areas in images with different focus distances); (APPL-1003), ¶193.



**FIG. 14**

**(APPL-1008), Parulski, FIG. 14**

**Second**, Golan teaches a predefined range of ZF values. (APPL-1005),

[0009] ("Using two (or more) image sensors, having different fixed FOY,

facilitates a light weight electronic zoom with a large lossless zooming range,"

with an example of a zoom range 36). A POSITA would have been understood

Golan's predefined large lossless zooming range applies to both still and video

output images. (APPL-1003), ¶194.

- 79 -

**Third**, a POSITA would have been motivated to apply Parulski's teachings

of in still mode, combining Wide and Tele image data only in focused areas to

generate a fused output image in the system of Golan combined with Martin and Togo

for the benefit of a fused output image having a broadened depth of field, at a

predefined range of ZF values (e.g., the predefined lossless zooming range) in such a

digital camera. (APPL-1008), Parulski, FIG. 14 (applying the method in a zooming

range both less than and greater than switch zoom position "X"), 28:52-53, 29:4-7,

30:17-20; *see also* Ground 4: Reasons to Combine Parulski, Golan, Martin, and Togo;

(APPL-1003), ¶195.

Thus, Golan's zoom control sub-system 100 (as applied in combination with

Martin and Togo in claim 12) is adapted to apply Parulski's teaching of still mode

operation in which wide image and telephoto image are combined only in focused

areas, which for a predetermined lossless zooming range, produces a fused output

image having a broadened depth of field, which renders obvious [22.1]. (APPL-

1003), ¶196.

- 80 -

## X.     CONCLUSION

For the reasons set forth above, Petitioner has established a reasonable

likelihood that claims 1, 4, 8-12, 15, 19, and 20 of the '898 patent are unpatentable.

Petitioner requests institution of *inter partes* review and cancelation of claims 1, 4,

8-12, 15, 19, and 20.


                                      Respectfully submitted,


Dated: May 6, 2020                    /David W. O'Brien/
                                      David W. O'Brien
                                      Lead Counsel for Petitioner
                                      Registration No. 40,107

## XI.    CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. §42.24, the undersigned attorney for Petitioner

declares that the argument section of this Petition (Sections I and III–X) has 13,969

words, according to the word count tool in Microsoft Word™.

/David W. O'Brien/
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

## CERTIFICATE OF SERVICE

The undersigned certifies that, in accordance with 37 C.F.R. § 42.6(e) and 37 C.F.R. § 42.105, service was made on Patent Owner as detailed below. ***Patent Owner has authorized electronic service due to the United States Post Office suspending deliver to the address listed in accordance with 37 CFR § 42.105(a).*** *See* APPL-1027.

| | |
|---|---|
| *Date of service* | May 6, 2020 |
| *Manner of service* | Electronically: mafenster@raklaw.com, bwang@raklaw.com, jtsuei@raklaw.com, nrubin@raklaw.com |
| *Documents served* | Petition for *Inter Partes* Review, including Exhibit List; Exhibits APPL-1001–APPL-1027 |
| *Persons served* | Marc A. Fenster, Benjamin T. Wang James S. Tsuei, Neil A. Rubin Russ August & Kabat 12424 Wilshire Blvd., 12th Floor Los Angeles, CA 90025 |

/David W. O'Brien/
David W. O'Brien
Lead Counsel for Petitioner
Registration No. 40,107

- 83 -

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Accordingly, the Board should construe "no-switching criterion" as "one more criteria determined based on inputs obtained from the two camera images."

## V.     THE PETITION FAILS TO ESTABLISH THE REASONABLE LIKELIHOOD OF A *PRIMA FACIE* CASE OF OBVIOUSNESS

### A.     The Petition Fails to Demonstrate a Motivation to Combine Techniques from Martin's Autostereoscopic System into a Fundamentally Different Digital Zoom System

Petitioner presents the same improper combination of references (Golan in view of Martin) in related petition IPR2020-00860. Indeed, despite the '898 patent claiming a different invention than the patent at issue in the -860 Petition (U.S. Patent No. 10,326,942), Petitioner has used the exact same argument to support its motivation to combine. Accordingly, Petitioner's motivation to combine Golan and Martin fail for the same reasons expressed in the -860 petition.

Martin is directed to an autostereoscopic system that emphasizes parallax effects to create the desired three-dimensional illusions, while the '898 patent is directed to an invention that seeks to reduce or remove parallax effects. The claims of the '898 patent are directed to a "zoom digital camera" with multiple apertures (a "Wide imaging section" and a "Tele imaging section"). Ex. 1001

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

at claims 1, 11. Such a camera seeks to "approximate the effect" of a large and expensive lens that uses mechanically moving elements to provide optical zoom. *Id.* at 1:42–51. As explained in the '898 patent, parallax effects are undesirable in this system and detract from its ability to "approximate" the performance of a mechanical zoom system. *Id.* at 2:48–50, 7:50–53, 11:64–12:2.

Indeed, both the '898 patent and Petitioner recognize that it is desirable to "remove parallax artifacts" in a digital zoom camera, not to emphasize them. *Id.* at 11:67; *see also* Paper 2 at 29 (The goal of "avoiding output image degradation" is also the reason that Petitioner argues Golan and Martin would be combined with Togo). As the '898 specification explains, parallax makes it more difficult to switch between different cameras. *Id.* at 7:50–53.

The goals of the autostereoscopic display system disclosed in Martin are very different. The purpose of Martin is to "produc[e] two-dimensional images that, upon display, can be perceived to be three-dimensional." Ex. 1006 at 1:18–19. Martin teaches achieving this by displaying two images that ***intentionally*** differ due to parallax:

> Particularly, retinal disparity results in parallax information (i.e., an apparent change in the position, direction of motion, or other visual characteristics of an object caused by different observational positions) being supplied to the brain. Because each eye

10

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

> has a different observational position, each eye can provide a
> slightly different view of the same scene. ***The differences be-
> tween the views represents parallax information that the brain
> can use to perceive three dimensional aspects of a scene.***

Ex. 1006 at 1:51–59 (emphasis added); *see also* Paper 2 at 16-17 (describing

Martin as using "parallax images" to create the perception of a moving three-

dimensional image).

    In other words, while parallax artifacts are ***undesirable*** effects that stand

in the way of the goal of approximating a mechanical zoom lens, in Martin

the parallax artifacts are ***vital***. Rather than seeking to minimize parallax effects

as the '898 patent describes in the specification, Martin intentionally empha-

sizes the parallax effects to create an autostereoscopic display.[2] If the parallax

effects were diminished, as discussed by the '898 patent, the autostereoscopic

display that is the goal of Martin could not be achieved.

    The '898 patent teaches that, in the context of the invention, parallax

causes a "'jump' (discontinuous) image change" when "a dual-aperture cam-

era switches the camera output between cameras or points of view." Ex. 1001

---

[2] "Autostereoscopic techniques . . . product images with a three dimensional
illusion without the use of special glasses." Ex. 1006 at 2:14–17. In other
words, as Martin describes the art, the goal is to produce "three-dimensional
illusions." *Id.* at 1:26.

Trials@uspto.gov                                                                    Paper 7
571-272-7822                                                    Entered: December 9, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————

IPR2020-00861
Patent 10,230,898 B2

———————

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

MOORE, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

## I.    INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1, 4, 8–12, 15, 19, and 20 ("the challenged claims") of U.S. Patent No. 10,230,898 B2 (Ex. 1001, "the '898 patent").  Paper 2 ("Pet."). Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").

We have authority under 35 U.S.C. § 314, which provides that an *inter partes* review may not be instituted unless the information presented in the Petition shows "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a) (2018); *see* 37 C.F.R. § 42.4(a).  Based on the information presented in the Petition and the supporting evidence, we determine that there is a reasonable likelihood Petitioner would prevail with respect to at least one of the challenged claims.  Accordingly, we institute an *inter partes* review of claims 1, 4, 8–12, 15, 19, and 20 on all grounds set forth in the Petition.

Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far.  This is not a final decision as to patentability of the challenged claims.

## II.    BACKGROUND

### A.    *Related Proceedings*

Petitioner and Patent Owner identify the following corresponding district court proceeding: *Corephotonics, Ltd. v. Apple Inc.*, Case No. 5:19-cv-04809 (N.D. Cal.).  Pet. 2; Paper 4, 1.[1]

---

[1] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, Case No. 3:19-cv-04809-LHK (N.D. Cal.) (Paper 5, 1), but this case number appears to reflect

IPR2020-00861
Patent 10,230,898 B2

We identify the following related administrative matters, including
applications and patents claiming the benefit of the priority of the filing date
of patents in the priority chain of the '332 patent. *See* Office Consolidated
Trial Practice Guide[2] at 18; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019).
The '332 patent is a continuation of Application No. 15/324,720 (now U.S.
Patent No. 10,230,898, "the '898 patent"). Ex. 1001, code (63). The
following co-pending proceeding challenges a patent in the priority chain of
the '898 patent: IPR2020-00862 (claims 1, 2, 5, 9–14, 17, 21, and 22 of the
'898 patent).

## B.     The '898 Patent

The '898 Patent is titled "Dual Aperture Zoom Camera with Video
Support and Switching / Non-Switching Dynamic Control," and is directed
to a "dual aperture zoom digital camera operable in both still and video
modes." Ex. 1001, code (57).

The '898 Patent describes video mode zoom operation from low zoom
factor (ZF) to higher ZF above a switch point (described variously as
Z*switch* or $ZF_T$ or uptransfer ZF), with "[processing] applied to eliminate the
changes in the image during crossover from one camera to the other." *Id.* at
7:57–8:29.

The '898 Patent describes that "[s]witching from the Wide camera
output to the transformed Tele camera output will be performed unless some
special condition (criterion), determined based on inputs obtained from the

---

a typographical error. A PACER search of Case No. 5:19-cv-04809 reveals
that Patent Owner's complaint in that case was erroneously identified as
"Civil Action No. 3:19-cv-4809" on its cover page.
[2] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-00861
Patent 10,230,898 B2

two camera images, occurs. In other words, switching will not be performed only if [a] no switching criteria is fulfilled." *Id.* at 10:2–9.

FIG. 1A of the '898 Patent illustrates a dual-aperture Zoom imaging system 100 including a Wide imaging section and a Tele imaging section, each having a respective lens with respect field of view (FOV) and respective image sensor to provide image data of an object or scene.



Figure 1A shows a dual-aperture zoom imaging system. *Id.*

### C.    Challenged Claims

Petitioner challenges claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent. Claims 1 and 13 are independent. Claim 1 is reproduced below.

1. A zoom digital camera comprising:

   a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view FOV$_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;

IPR2020-00861
Patent 10,230,898 B2

b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and

c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

Ex. 1001, 12:32–54.

> D.    *Asserted Grounds of Unpatentability*

Petitioner challenges claims 1, 4, 8–12, 15, 19, and 20 as follows. *See* Pet. 7.

IPR2020-00861
Patent 10,230,898 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 4, 8, 12, 15 | 103 | Golan[3], Martin[4], Togo[5] |
| 9 | 103 | Golan, Martin, Togo, Levey[6] |
| 11, 19 | 103 | Golan, Martin, Togo, Border[7] |
| 10, 20 | 103 | Golan, Martin, Togo, Parulski[8] |

In support, Petitioner relies on the declaration of Dr. Frédo Durand (Ex. 1003).

## III.    ANALYSIS

### A.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness,

---

[3] U.S. Patent Application Publication No. 2012/0026366 A1, published Feb. 2, 2012 (Ex. 1005, "Golan").
[4] U.S. Patent No. 8,081,206 B2, issued Dec. 20, 2011 (Ex. 1006, "Martin").
[5] Japanese Patent Application Publication No. JP 2011/055246 (P2011-55246A), published Mar. 17, 2011 (Ex. 1010, "Togo"); we refer to the English translation.
[6] U.S. Patent Application Publication No. 2012/0019704 A1, published Jan. 26, 2012 (Ex. 1015, "Levey").
[7] US Patent Application Pub. No. 2008/0030592 A1, filed Aug. 1, 2006, published Feb. 7, 2008 ("Border," Ex. 1009).
[8] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1008, Parulski").

i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

> B.    *Level of Ordinary Skill in the Art*

Petitioner contends

> [A] Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's degree or the equivalent degree in electrical and/or computer engineering, or a related field and 2–3 years of experience in imaging systems including optics and image processing. Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.

Pet. 6 (citing Ex. 1003 ¶ 17). Patent Owner does not take a position as to the level of ordinary skill in the art. *See generally* Prelim. Resp.

We determine, on the current record, that the level of ordinary skill in the art proposed by Petitioner is consistent with the '898 patent and the asserted prior art. We adopt that level in deciding whether to institute trial.

## C.    Claim Construction

For *inter partes* reviews filed on or after November 13, 2018, we apply the same claim construction standard used by Article III federal courts and the ITC, both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny. 37 C.F.R. § 42.100(b). Accordingly, we construe each challenged claim of the '898 patent to generally have "the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b).

Petitioner asserts "for the purposes of this proceeding and the analysis presented herein, no claim term requires express construction [and] analyzes the claims consistent with ordinary and customary meaning as would be understood by a POSITA in light of the specification." Pet. 8 (citation omitted). Patent Owner proposes a construction for one limitation, "no-switching criterion," as recited in each of the challenged claims. Prelim. Resp. 7–9.

Patent Owner asserts "no-switching criterion" should be construed as "one more criteria determined based on inputs obtained from the two camera images." *Id.* at 7. Patent Owner asserts that the dependent claims consistently recite criteria determined based on inputs obtained from the two camera images such as global registration, comparing effective resolutions, or analyzing images from the Wide and Tele lenses. *Id.* at 7–8. Nevertheless, the independent claims do not recite basing the criteria on

inputs obtained from the two camera images. Additionally, "[u]nder the principles of claim differentiation, the independent claims are presumed to be broader" then the claims that depend therefrom. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1376 (Fed. Cir. 2014). Thus, while not conclusive, if anything, the inclusion of these limitations in the dependent claims tends to suggest an intent for the independent claim to be broader.

Patent Owner also asserts "the specification consistently refers to the "no-switching criterion" as requiring inputs from both the Wide and Tele lenses. Prelim Resp. 8 (citing Ex. 1001, 4:37–39, 6:58–61, 10:6–10, 10:13–40). Nevertheless, even if "all of the embodiments discussed in the patent have a [particular feature], . . . it is not proper to import from the patent's written description limitations that are not found in the claims themselves." *FloHealthcare Sols., LLC v. Kappos*, 697 F.3d 1367, 1375 (Fed. Cir. 2012), *abrogated on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)). Although the embodiments in the specification indeed have inputs from the Wide and Tele lenses, the Specification does not manifest an intent to redefine criterion to require such inputs, or even disclose that such inputs are "important" to the invention. *Cf. Poly-Am., L.P. v. API Indus., Inc.,* 839 F.3d 1131, 1137 (Fed. Cir. 2016) (Finding no importation when"[e]very embodiment described in the specification has inwardly extended short seals **and** every section of the

IPR2020-00861
Patent 10,230,898 B2

specification indicates the importance of inwardly extended short seals. These two facts provide together a proper reason to limit the claims in this way.").

Patent Owner argues that limitation of "determined by inputs from both Wide and Tele image data" was removed from the independent claims via amendment in prosecution. Prelim. Resp. 8 n. 1. In the file history of the '898 patent, original claims 1 and 12 (issued claims 1 and 11) expressly required that the no-switching criterion be "determined by inputs from both Wide and Tele image data." *Id.* (citing Ex. 1002, 292, 294). This language was removed from the claims. Ex. 1002, 296–97. Patent Owner asserts it was removed for "clarity." *Id.* Nevertheless, the case law precludes a reading that restricts a claim to the limitations removed by broadening amendment. *See United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed. Cir. 1988) ("[C]ourts are not permitted to read back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office."); *Kistler Instrumente AG. v. United States*, 224 Ct. Cl. 370, 628 F.2d 1303, 1308 (Ct. Cl. 1980) ("It is significant that none of the claims in the patent which ultimately issued contain the narrow limitation of original claim . . . . It must be concluded that the Patent Office did not feel that this was a critical limitation. Thus, defendant's insistence upon this court's reading back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office cannot be permitted."). Thus, the prosecution also suggests the limitation to "determined by inputs from both Wide and Tele image data" should not be imported into claims 1 and 12 of the '898 patent.

IPR2020-00861
Patent 10,230,898 B2

For the reasons above, we do not limit "no-switching criterion" to "one more criteria determined based on inputs obtained from the two camera images." Thus, we do not explicitly construe the term "the term "no-switching criterion" for the purpose of this Decision.

At this stage of the proceeding, we do not discern a dispute between the parties regarding any other limitation and we need not expressly construe any other limitation to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D.     Obviousness over Golan and Martin

Petitioner contends that claims 1, 4, 8, 12, and 15 are unpatentable as obvious under 35 U.S.C. § 103 over Golan, Martin, and Togo. Pet. 13–59. For the reasons that follow, we determine that the evidence sufficiently supports Petitioner's arguments and thus establishes a reasonable likelihood of prevailing with respect to the challenge to claims 1, 4, 8, 12, and 15, at this stage of the proceeding.

### 1.     Overview of Golan (Ex. 1005)

Golan concerns a "method for continuous electronic zoom in a computerized image acquisition system," in which the system has "a wide image acquisition device and a tele image acquisition device." Ex. 1005, code (57). By providing "multiple imaging devices each with a different fixed field of view (FOV)," Golan's system "facilitates a light weight electronic zoom with a large lossless zooming range." *Id.* ¶ 9. Golan's

11
Appx1121

IPR2020-00861
Patent 10,230,898 B2

Figure 1, reproduced below, illustrates a zoom control sub-system for an image acquisition system. *Id.* ¶ 26.



*Fig 1*

Figure 1 of Golan illustrates a zoom control sub-system for an image acquisition system. *Id.*

According to Golan, "[z]oom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* ¶ 37. Zoom control circuit 130 selects an appropriate image sensor through image sensor selector 150 and calculates a camera

IPR2020-00861
Patent 10,230,898 B2

zoom factor when it receives a required zoom from an operator. *Id.* ¶ 39.

Golan's system facilitates "continuous electronic zoom capabilities with uninterrupted imaging," which "is also maintained when switching back and forth between adjacently disposed image sensors." *Id.* ¶ 40.

### 2. Overview of Martin (Ex. 1006)

Martin concerns a method for generating an autostereoscopic display by aligning a first parallax image and at least one other parallax image. Ex. 1006, code (57). By manipulating parallax images—two or more images with overlapping visual fields but different points of view—Martin's method creates a moving three-dimensional image without the use of special viewing aids, i.e., an autostereoscopic display. *Id.* at 1:16–20; 3:32–41. Martin's Figure 1, reproduced below, illustrates a method of capturing parallax images. *Id.* at 3:41–51.



**FIG. 1**

Figure 1 of Martin illustrates exemplary camera positions for
generating parallax images. *Id.* at 3:17–18.

According to Martin, "a camera 10 may capture a first set of images and a camera 12 may capture a second set of images of a common scene 14

while being displaced from one another. The resulting sets of images from cameras 10 and 12 will be parallax images." *Id.* at 3:42–46. Martin discloses generating a set of aligned parallax images by displaying alternating views of two or more parallax images at a desired view rate and manipulating the images such that at least a portion of the images are aligned with each other. *Id.* at 3:6–13. Figures 3a–3d, reproduced below, illustrate an alignment process.



Figures 3a–3d of Martin illustrate a transformation process for aligning parallax images. *Id.* at 3:20–22.[9]

In Martin, "[t]he alignment matching process begins by selecting a reference image 30, as shown in FIG. 3a, from a set of parallax images. Once reference image 30 has been selected, other images 32, as shown in FIG. 3b, from the parallax image set can be aligned to reference image 30." *Id.* at 4:39–43. "Reference image 30 may include region of interest 34." *Id.*

---

[9] According to Petitioner, "[a] POSITA would have understood that element 34' in FIG. 3b referring to a circle is a clerical error, and instead corresponds to the rectangle corresponding to region 34." Pet. 16, n.1.

IPR2020-00861
Patent 10,230,898 B2

at 4:51.  "Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example, until region 34' matches alignment with region 34, as illustrated in FIG. 3d." *Id.* at 4:54–56.  "The manipulation process may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation." *Id.* at 4:56–59.

Martin discloses that a computer may align the images using convergence points in the images.  *Id.* at 5:6–11. "The computer may further perform pattern matching or feature extraction algorithms . . . to match alignment of regions of interest in the selected images at or near the selected convergence points." *Id.* at 5:11–28.  The computer may continuously adjust the transformation parameters to achieve "critical alignment," corresponding "to a condition where the degree of alignment is sufficient to achieve a stable auto-stereoscopic display.  Stability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." *Id.* at 5:53–58.  Martin further discloses that the process may include "parallax image manipulations of sub-pixel resolution to achieve critical alignment . . . where one image is moved with respect to another image by an amount less than an integral number of pixels." *Id.* at 5:59–65.

### 3.    *Overview of Togo (Ex. 1010)*

Japanese Patent Application Publication No. JP 2011-055246 (P2011-55246A) is titled "Telephoto Imaging Device," and discloses improvements for "digital cameras and imaging devices (cameras) of mobile terminal devices such as mobile phones" that "realize a zoom function by using a plurality of imaging modules made of a plurality of lenses with different

focal lengths— that is, lenses of different fixed magnifications."
Ex. 1010 ¶¶ 2, 7, code (54).

Togo describes switching between the respective imaging modules according to a magnification (zoom factor) set by a user. *Id.* ¶ 7. "For example, in a configuration . . . with a wide-angle lens and . . . a telephoto lens, when a subject is at a short distance, an image . . . [from] the wide-angle lens, which has a short focal length, is switched to, and when the subject is at a long distance, an image . . . [from] the telephoto lens is switched to." *Id.* ¶ 8. "Small changes in magnification are realized by electronic zooming, which changes [to] a cutout region" of the switched-to image. *Id.*

Togo teaches a zoom digital camera with "[a] first imaging module 1 . . . for a wide-angle image" including a "wide angle lens system 7" and "a first imaging element 8 such as a CCD camera . . ." (a Wide imaging section). *Id.* ¶ 23. Togo's zoom digital camera also includes "[a] second imaging module 2 . . . for a telephoto image" including a "telephoto lens system 10" and "a second imaging element 11 such as a CCD camera" (a Tele imaging section). *Id.* ¶ 26.

### 4.  Independent Claim 1

*"A zoom digital camera comprising:*

*a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view FOV$_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;*

*b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view FOV$_T$ that is narrower than FOV$_W$ and a Tele sensor, the Tele*

> imaging section operative to provide Tele image
> data of the object or scene"

Petitioner contends that the embodiment depicted in Figure 1 of Golan teaches "a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image." Pet. 33 (citing Ex. 1005 ¶¶ 3, 9, code (54); Ex. 1003 ¶¶ 70–74). Petitioner explains that Golan's image acquisition system includes,

> tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150.

*Id.* at 32–33 (citing Ex. 1005, 37, 39, Fig. 1; Ex. 1003 ¶ 72; Ex. 1001, 3:26–28).

Petitioner further contends that Golan teaches the claimed Wide imaging section and Tele imaging section. *Id.* 35–39. Specifically, Petitioner argues Golan discloses "a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with FOV [Field of View] 142 (Wide field of view $FOV_w$) and a wide image sensor 112 (Wide sensor)." *Id.* at 35 (citing Ex. 1005 ¶¶ 36–37, Fig. 1; Ex. 1003 ¶ 76); *see id.* at 36 (citing Ex. 1001, 7:3–5; Ex. 1003 ¶¶ 77–82; Ex. 1005 ¶¶ 9, 36, 37, 43; Ex. 1017, Fig. 4.13, 48 (Jacobson photography textbook)). Petitioner also contends that Golan's zoom control sub-system 100 includes "a Tele imaging section that includes a tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV)." *Id.* at 37–38 (citing Ex. 1003 ¶ 86; Ex. 1005 ¶¶ 36, 37, code (57), Fig. 1); *see id.* at 38 (citing Ex. 1003 ¶ 87; Ex. 1005 ¶¶ 9, 36, 37, 39,

43).  Petitioner further asserts that Golan discloses that "wide FOV 142 is substantially wider than narrow FOV 140."  *Id.* at 38 (quoting Ex. 1005 ¶ 43) (citing Ex. 1003 ¶ 82; Ex. 1005 ¶¶ 9, 37, Fig. 1) (emphasis omitted).

Patent Owner does not specifically address the preamble and the Wide and Tele imaging sections of claim 1.  Having reviewed the cited evidence and Petitioner's contentions, we determine that Petitioner's contentions are sufficiently supported, at this stage of the proceeding.[10]

> "c a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

Petitioner contends that Golan's zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections for receiving a requested zoom and provides an acquired image frame with the requested zoom."  Pet. 40–41 (citing Ex. 1003 ¶ 91–95); *see id.* at 39–40 (citing Ex. 1005, Figs. 1 and 2, claim 1, ¶¶ 48, 49; Ex. 1003 ¶¶ 92, 93).

---

[10] We need not determine whether the preamble is limiting, at this stage of the proceeding, because Petitioner shows sufficiently that it is satisfied by the prior art.

Petitioner relies on the combination of Golan, Martin, and Togo to teach the claimed configuration of the camera controller. *Id.* at 39–55. Specifically, Petitioner contends that "Golan teaches a zoom switching setting that depends on the Wide and Tele fields of view, including a predetermined switch zoom factor $ZF_T$=tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)." *Id.* at 41 (citing Ex. 1003 ¶ 97).

Petitioner contends that "Golan describes that in an example, such a large lossless zooming range has a value of (Wide_FOV/Narrow_FOV)$^2$, which is provided by 'switching between the image sensors' and performing digital zoom to both Wide and Tele images." *Id.* at 41–42 (citing Ex. 1005 ¶ 9). Petitioner asserts "that POSITA would have understood that the underlying geometric relationships and as such, would have understood that Golan's informal terminology, "Wide_FOV/Narrow_FOV," corresponds to . . . "*tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)*" as claimed." *Id.* 42. Petitioner further contends that "

Golan teaches selecting Wide image sensor and providing a zoom video output image including only Wide image data when a requested zoom factor value is less than the predetermined switch zoom factor $ZF_T$, and selecting Tele image sensor and providing a zoom video output image including only Tele image data when the requested zoom factor value is greater than the up-transfer ZF (e.g., the predetermined switch zoom factor $ZF_T$)." *Id.* (citing Ex. 1003 ¶ 108 (citing Ex. 1005 ¶ 39)).

Petitioner contends that "Togo recognizes that 'by **switching between or compositing images** of a plurality of optical systems and a plurality of imaging elements joined to these optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized.'"

IPR2020-00861
Patent 10,230,898 B2

*Id.* 44–45 (quoting Ex. 1010 ¶¶ 2, 8; citing Ex. 1003 ¶ 111).  Petitioner
further contends that "Togo recognized that 'a telephoto imaging module
with a long focal length is **less sharp at close distances** compared to a wide-
angle imaging module whose focal length is short.'"  *Id.* at 45 (quoting Ex.
1010 ¶ 12).  Further, Petitioner contends that Togo recognizes "[d]uring a
zoom in operation, 'a switch is made from the wide-angle imaging module
to the telephoto imaging module.  However, at this time, if the subject is
close, the **image quality degrades** due to the image being from the
telephoto imaging module.'"  *Id.* (quoting Ex. 1010 ¶ 13; citing Ex. 1003 ¶
112).

Petitioner contends that "Togo's solution is for image control means 4
(a camera controller) to employ a no-telephoto **criterion** based on image
quality."  *Id.* (citing Ex. 1003 ¶ 113).  For example, according to Petitioner
"as shown in annotated FIG. 7 . . . one switching criterion is based on when
'**the image quality** of the cutout image 22 of the wide-angle image becomes
**poorer** than **the image quality** of the telephoto image 23.'"  *Id.* at 45 (citing
Ex. 1010 ¶ 66).

Petitioner also contends that "Togo describes an example image
quality no-switching criterion to include that 'setting magnification X < A"
or "setting magnification X ≥ A and the imaging distance Y ≤ B".  *Id.*
(quoting Ex. 1010 ¶¶ 61, 62).

Petitioner contends that Golan combined with Martin and Togo teach
the limitation of "if the no-switching criterion is not fulfilled, the camera
controller is further configured to output a zoom video output image that
includes only transformed, digitally zoomed Tele image data."  *Id.* at 50.
Specifically, Petitioner contends that in addition to the disclosure discussed

IPR2020-00861
Patent 10,230,898 B2

above, "[a] POSITA would have understood that in the combination, if the no-switching criterion is **not** fulfilled, switching from Wide image to Tele image as taught in Golan is performed, and the zoom video output image includes only digitally-zoomed Tele image data." *Id.* at 51 (citing Ex. 1005 ¶¶ 9, 36, Fig. 1; Ex. 1010 Fig. 5(4); Ex. 1003 ¶ 123).

As to "transformed, digitally zoomed Tele image data," Petitioner contends further that "Martin teaches when switching between two successive images having different points of view, executing registration using critical alignment to register a succeeding image to a preceding image to generate **a transformed succeeding image** in video output images for a stable video display." *Id.* at 51 (citing Ex. 1003 ¶ 124).

Martin's Figure 3, reproduced as annotated below, illustrates registration between two images as part of Martin's critical alignment. *Id.* at 52–53 (citing-in-part Ex. 1006, 4:51–56).



Petitioner's annotated version of Martin's

IPR2020-00861
Patent 10,230,898 B2

Figures 3A–3D.[11]

According to Petitioner, with respect to the annotated version of Martin's

Figures 3A through 3D

> A POSITA would have understood that Martin's critical alignment teaches determining correspondences between the coordinate systems of the two images from different points of view, which represent the registration between the two images (e.g., "represented by affine transformation . . . and/or any other desired transformation"), and therefore teaches executing registration of successive images for position matching in the ROI and generating a transformed succeeding image (e.g., transformed and shifted succeeding image 32 as in FIG. 3d above).

*Id.* at 53–54 (citing Ex. 1003 ¶ 128; Ex. 1009 ¶¶ 41, 42; Ex. 1013, Figs. 2.4, 6.2, Tables 2.1, 6.1, 33–35, 273–77; Ex. 1016, 137 (Xiong article on image registration methods)).  Petitioner further argues that "Martin teaches in critical alignment, the transformed succeeding image is used to achieve position matching of ROI between the preceding image and transformed succeeding image to the video output images when switching between the two images for providing stable video output images" and the critical alignment "changes with object distance of the ROI in a specific image, and is performed when switching between each pair of parallax images." *Id.* at 54 (citing Ex. 1003 ¶ 129; Ex. 1006, 7:36–51, 5:6–21).

Petitioner takes the position that "in the digital camera of Golan, Togo, and Martin, after the no-switching criterion is not fulfilled, when switching from the Wide image (preceding image) to Tele image (succeeding image), a transformed digitally zoomed Tele image

---

[11] Petitioner apparently takes the position that element number 34' should reference the rectangle, not the circle, in Martin's Figure 3b.

IPR2020-00861
Patent 10,230,898 B2

(transformed succeeding image as taught by Martin) is provided for smooth transition in the video output image, which renders obvious" the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data." *Id.* at 55 (citing Ex. 1003 ¶ 128).

### *Rationale for Combining Golan and Martin*

Petitioner contends a person of ordinary skill in the art would have been motivated to apply Martin's teachings to Golan "to produce the obvious, beneficial, and predictable results of a stable transition between images from different points of view for providing continuous zoom video output images." Pet. 18–19 (citing Ex. 1003 ¶¶ 49–54). Petitioner supports its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using two imaging sections having different points of view." *Id.* at 19 (quoting Ex. 1003 ¶ 50).

*Second*, "they share a need to provide continuous video output images when switching between images from imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy." *Id.* at 19–20 (citing Ex. 1003 ¶ 58); *see id.* (citing Ex. 1005 ¶ 15; Ex. 1006, 5:51–55, 5:59–6:5).

*Third*, Martin addresses these needs identified in Golan by providing "critical alignment of an ROI in two images having different points of view to calculate 'transformation parameters of subpixel resolution' for position matching of the ROI to achieve a stable transition in the continuous zoom

IPR2020-00861
Patent 10,230,898 B2

video output images of the digital camera of Golan." *Id.* at 20–21 (quoting Ex. 1006, 5:51–58) (citing Ex. 1003 ¶ 59; Ex. 1005 ¶ 36).

*Fourth*, applying Martin to the teachings of Golan would have required no more than combining "known elements according to known methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control subsystem of Golan) to achieve the benefits of a stable transition in video output images described by Martin." *Id.* at 21. According to Petitioner, the combined teachings of Golan and Martin would have "produced operable results that are predictable." *Id*. (citing Ex. 1003 ¶ 49).

*Fifth*, that Golan and Martin have a "shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections." *Id.* at 22 (citing Ex. 1003 ¶ 62).  According to Petitioner,

> A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images.

*Id.* at 22.

### Patent Owner's Contentions

*First*, Patent Owner asserts that Martin intentionally displays parallax artifacts from two different images to create a three-dimensional image.  *See* Prelim. Resp. 10–11.  On this basis, Patent Owner contrasts Martin with the

IPR2020-00861
Patent 10,230,898 B2

disclosure of the '898 patent, which Patent Owner characterizes as disclosing minimizing discontinuities such as those that result from parallax and "minimiz[ing] parallax artifacts." *Id.* at 11–12 (citing Ex. 1001, 7:42–53).

*Second*, Patent Owner also contends that "parallax artifacts are ***undesirable*** effects that stand in the way of the goal of approximating a mechanical zoom lens, in Martin the parallax artifacts are ***vital***." *Id*. at 11. According to Patent Owner, "[t]he Petition['s] argu[ment] that Golan and Martin are 'analogous prior art and are in the same field of endeavor' and that both have a need for 'alignments having sub-pixel accuracy' . . . do not establish the necessary motivation to combine the two references." *See* Prelim. Resp. 12–13. Additionally, Patent Owner argues

> Petitioner's combination of Martin with Golan ignores the differences in how and why they combine images that would have prevented a POSITA from being motivated to combine them. Instead, the petition relies on impermissible hindsight, using the claims of the '898 patent as a roadmap to combine the references. Martin's "critical alignment" is treated as a jigsaw puzzle piece to fill in the missing claim element.

*Id.* at 13–14 (citing *InTouch Technologies, Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014)).

### *Discussion*

Based on the contentions above, at this stage of the proceeding, we determine that Golan sufficiently supports Petitioner's contentions regarding limitation (a), (b), and (c) of independent claim 1.

With respect to Petitioner's rationale for combining, we determine that Petitioner's *third* and *fourth* reasons are sufficiently supported by the cited evidence, at this stage of the proceeding. In particular, Petitioner

presents evidence, Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *See* Pet. 20–21 (citing-in-part Ex. 1007, 4:58–62, 10:2–5 ("If calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out . . ." and "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function.")).  Dr. Durand also cites Ahiska, in addition to other references, to support his testimony.  Ex. 1003 ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:58–62  (Orimoto patent) (describing "image registration on the side of the manufacturer . . . to obtain the three dimensional image without noticing misalignment of the plural images"); Ex. 1019, 1059 (Hansen article) (describing how extrinsic calibration errors occur due to shock, vibration, thermal variation and cycling); Ex. 1009 ¶¶ 52 (explaining that registration between wide image 204 and telephoto image 206 is an alternative to correspondences preferably determined at the time of manufacturing)).[12]

> Dr. Durand testifies that
>
> It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*, because of shocking, vibration, thermal variation, etc.), image

---

[12] We note that Dr. Durand cites to column 1, lines 58–62 of Orimoto in connection with his testimony regarding the rationale for combining Golan and Martin, although he appears to quote from column 1, line 63 through column 2, line 1.  Ex. 1003 ¶ 52.  In IPR2020-00487, Dr. Durand cites to column 1, line 63 through column 2, lines 1.  IPR2020-00487, Ex. 1003 ¶ 61 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:63–2:1; Ex. 1019, 1059; Ex. 1009 ¶¶ 41, 42).

> registration of two images from two imaging sections for
> position matching (e.g., critical alignment of Martin) may be
> used.

*Id.* Dr. Durand's testimony quoted above is supported by some of the cited references. The cited portion of Hansen (Ex. 1019) addresses how extrinsic calibration errors occur and "a method to recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019, 1059 (emphasis omitted). The cited portion Orimoto (Ex. 1014) concerns image registration, at the manufacturer's end, to address misalignment of images. The quoted portion of Orimoto discloses how misalignment occurs, irrespective of "how exactly the dual lens camera has been conditioned and adjusted by the manufacturer." Ex. 1014, 1:63–2:1; *see supra* n.12. The cited portions of Border (Ex. 1009) addresses image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. And the cited portions of Ahiska disclose image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5. Accordingly, at this stage of the proceeding, Ahiska and Border sufficiently support Petitioner's rationale for combining Golan and Martin.

With regard to Patent Owner's *first* contention contrasting Martin's teachings with the disclosure of the '898 patent, which Patent Owner characterizes as disclosing "remov[ing] parallax artifacts," (*see* Prelim. Resp. 10 (citing Ex. 1001, 12:67), we consider this a teaching away argument. "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction

IPR2020-00861
Patent 10,230,898 B2

divergent from the path that was taken by the applicant." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1332 (Fed. Cir. 2008) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).

At this stage, we are not persuaded that Martin teaches away from the invention claimed in the '898 patent because it does not discourage or lead one in a direction divergent from "evaluat[ing] if a no-switching criterion is fulfilled or not fulfilled . . ." as recited in claim 1. In addition to providing an autostereoscopic display of 3D images using parallax images, Martin also discloses aligning these same parallax images using transformation parameters. *See* Ex. 1006, 5:38–42. Thus, Martin's teaching of critical alignment does not appear to be divergent from or incompatible with the scope of independent claim 1 *or* the objectives of the '898 patent. Nor is Martin incompatible with Golan for having a different objective. Petitioner need not show that Martin shares a common objective with Golan or the patent at issue. Rather, it is necessary only to show a reasonable expectation of success "in combining the references to meet the limitations of the claimed invention." *Intelligent Bio-Systems v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).

With regard to Patent Owner's *second* contention, we disagree that "[t]he Petition['s] argu[ment] that Golan and Martin are 'analogous prior art and are in the same field of endeavor' and that both have a need for 'alignments having sub-pixel accuracy' . . . do not establish the necessary motivation to combine the two references." *See* Prelim. Resp. 12–13. Nor do we agree that the combination constitutes hindsight. *See id.* at 13. This is because we determine that the combination is supported by sufficient evidence (e.g., Ahiska, Ex. 1007 and Border, Ex. 1009) at this stage of the

IPR2020-00861
Patent 10,230,898 B2

proceeding. As discussed above, the evidentiary support, Border and Ahiska, teaches image registration and matching as an alternative or improvement, respectively, to calibration/correspondence. Further, at this stage of the proceeding, the cited evidence supports the finding that the ordinarily skilled artisan would have looked to Martin's critical alignment, which involves image registration and position matching, to address insufficiencies of Golan's electronic calibration.

For the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan and Martin is supported by sufficient rational underpinning at this stage of the proceeding. *See KSR*, 550 at 418. We are further persuaded that the cited evidence sufficiently supports Dr. Durand's testimony at this stage of the proceeding.

*Rationale for Combining Golan, Martin, and Togo*

Petitioner contends that a person of ordinary skill in the art would have been motivated to apply Togo's teachings to Golan to "produce the obvious, beneficial, and predictable results of avoiding output image degradation when the quality of the telephoto image data would be degraded based on closeness of the subject as taught by Togo." Pet. 29–30 (citing Ex. 1003 ¶¶ 49–54). Petitioner supports its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field of endeavor pertaining to digital zoom camera systems including a camera controller operatively connected to wide and tele lens systems." *Id.* at 30 (citing Ex. 1003 ¶¶ 66).

IPR2020-00861
Patent 10,230,898 B2

*Second*, "the references share a need to provide output images of objects at various ranges with a compact imaging system." *Id.* at 31–32 (citing Ex. 1003 ¶ 67).

*Third*, "Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged." *Id.* at 32 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 68).

*Fourth*, combining the teachings of Togo with the system of Golan "would have produced operable results that are predictable." *Id.* at 32–33.

We are persuaded by Petitioner's contentions that Golan's expressed desire to achieve continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array would have motivated a person of ordinary skill in the art to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged.

For the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan, Martin, and Togo is supported by sufficient rational underpinning at this stage of the proceeding. *See KSR*, 550 at 418. We are further persuaded that the cited evidence sufficiently supports Dr. Durand's testimony at this stage of the proceeding.

IPR2020-00861
Patent 10,230,898 B2

Accordingly, we are persuaded that Petitioner sufficiently demonstrates a reasonable likelihood of prevailing with respect to unpatentability of claim 1 over the combination of Golan, Martin, and Togo.

## 5.    *Independent Claim 12*

Independent claim 13 recites a method for providing a digital video output in a multiple aperture zoom digital camera similar to that recited in independent claim 1.  Ex. 1001, 13:27–40.

Petitioner's arguments for independent claim 13 refer, in large part, to its arguments for independent claim 1.  *See* Pet. 58–59.

Patent Owner does not present separate arguments for independent claim 12.  *See generally* Prelim. Resp.  For substantially the same reasons discussed in section III.D.3, we are persuaded that Petitioner sufficiently demonstrates a reasonable likelihood of prevailing with respect to unpatentability of claim 12 over the combination of Golan, Martin, and Togo.

## 6.    *Dependent Claims 4, 8, 15*

Patent Owner does not present separate arguments for claims 4, 8, and 15.  *See generally* Prelim. Resp. We have reviewed Petitioner's arguments and evidence concerning claims 4, 8, 15 and are persuaded, at this stage of the proceeding, that Petitioner sufficiently demonstrates a reasonable likelihood of prevailing with respect to unpatentability of these claims over the combination of Golan, Martin, and Togo.  *See* Pet. 55–58, 59.

IPR2020-00861
Patent 10,230,898 B2

### E.    Obviousness over Golan, Martin, Togo, and Levey

#### 1.    Overview of Levey (Ex. 1015)

Levey concerns digital cameras and automatically selecting a photography mode.  Ex. 1015 ¶ 2.  In Levey, a user can select between different photography modes by "single button activation," instead of interacting with a multi-step menu selection process—this reduces the amount of user input required to select the photography mode.  *Id.* ¶ 18.

#### 2.    Dependent Claim 9

Claim 9 recites "wherein the user inputs include a zoom factor, a camera mode and a region of interest."  Ex. 1001, 13:18–19.

According to Petitioner,

> First, as discussed at [8.1], Golan teaches that the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs, where in the user inputs include a zoom factor. (APPL-1003), ¶157.
> Second, Levey describes "a photography mode user interface for selecting between a plurality of photography modes," and configuring its image sensor using associated image capture settings. (APPL-1015), Abstract, [0045], [0057], [0070][, ][0039], [0041], [0070]-[0071]; (APPL-1003), ¶158.

Pet. 61–62 (emphases omitted).  As one reason for combining Golan, Martin, and Levey, Petitioner contends that

> a POSITA would have been motivated to incorporate Levey's teachings in the dual-aperture zoom digital camera of Golan combined with Martin to produce the obvious, beneficial, and predictable results of providing a plurality of camera modes "that can be selected by the user to control various elements of the image capture process and the image processing chain."

32

IPR2020-00861
Patent 10,230,898 B2

*Id.* at 60 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶¶153).  Patent Owner does not present separate arguments for dependent claim 10.

A cited portion of Martin describes that "while displaying the images, aligning **a user-selected region of interest** associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image."  Ex. 1006, 7:36–51 (emphasis added); Ex. 1003 ¶ 157.  A cited portion of Levey discloses that "[m]ost digital cameras have a variety of photography modes that can be selected by the user to control various elements of the image capture process and the image processing chain."  Ex. 1015 ¶ 4.  Levey further discloses determining "image capture settings such as the exposure index, the lens F/# [F number], the exposure time and the electronic flash setting, as well as other user settings 175, such as those discussed with reference to FIG. 2," with respect to an automatic mode.  *Id.* ¶ 70.  As an example, Levey discloses that "[i]f a user is capturing images at a soccer game, they would typically set the camera to operate in a sport photography mode" which "would generally choose appropriate image capture settings to minimize the motion blur associated with moving subjects."  *Id.* ¶ 71.

At this stage of the proceeding, we are persuaded that Golan discloses the user control module and the sensor control module in the claimed camera controller, Martin discloses "a user-selected region of interest," and Levey discloses "wherein the user inputs include a zoom factor, a camera mode and a region of interest" based on the cited portions of Golan and Levey. Accordingly, we are persuaded the combination of Golan, Martin, and Levey teaches the limitations recited in claims 9, at this stage of the proceeding.

IPR2020-00861
Patent 10,230,898 B2

Further, Petitioner's rationale for combining Levey with Golan and Martin, and Levey is undisputed at this stage of the proceeding.  For the foregoing reasons, Petitioner shows a reasonable likelihood of prevailing with respect to unpatentability of claim 9 over Golan, Martin, and Levey.

### F.    Obviousness over Golan, Martin, Togo, and Border

#### 1.    Overview of Border (Ex. 1009)

Border describes providing a digital camera with an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range."  Ex. 1009 ¶ 10.  As shown in Figure 5 of Border, reproduced below, the processor of a digital camera includes an image compositor 202 to form a composite image 208 using the two images, wide image 204 and telephoto image 206 of the same scene, that are captured using lenses having different focal lengths.  *Id.* ¶ 70.



*FIG. 5*

As seen in Figure 5, above, the image registration determiner 212 determines the registration between the wide image 204 and the telephoto image 206, so that the two images are matched to "locate the high-resolution

image accurately into the low-resolution image and then stitched into place so the edge between the two images in the composite image is not discernible." *Id.* ¶ 29, Fig. 5. Border goes on to explain that in the context of Figure 5, telephoto image 206 captures a smaller portion of the scene, but with greater resolution than wide image 204. *Id.* ¶ 36.

Border also describes that an image resampler 214 of the processor produces the composite image 208 based on a zoom amount Z specifying the desired relative zoom amount of the produced composite image 208. *Id.* ¶ 43. Specifically, Border explains that the composite image 208 is generated from the two images and that the resulting composite image is produced differently for different zoom amount values, such as Z=1, 1<Z<M, and Z=M, where M is the relative magnification ratio M of the telephoto image 206 to the wide image 204. *Id.* ¶¶ 29, 44.

### 2.    *Dependent Claim 11 and 19*

Claim 11 recites "wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view." Ex. 1001, 13:23–27. Claim 21 recites essentially the same features. *Id.* at 14:28–32.

According to Petitioner,

> Border describes providing a digital camera include lenses having different focal lengths for an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range."

> As shown in Figure 5 of Border below, the processor of the digital camera includes an image compositor 202 to form a

IPR2020-00861
Patent 10,230,898 B2

> composite image 208 using the two images, wide image 204 and
> telephoto image 206.

Pet. 63 (citing Ex. 1003 ¶¶ 162–165) (emphases omitted) (citations omitted). Petitioner contends that "[a] POSITA would have been motivated to apply Border's teachings of combining in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view in the digital camera of Golan combined with Martin and Togo to achieve the benefit of 'a zoomed image with high resolution throughout the zoom range and improved image quality' in still mode as taught by Border." *Id.* at 64 (citing Ex. 1009, code (57); Ex. 1003 ¶¶ 166–169). Petitioner contends that in its combination "Golan's zoom control sub-system 100 (as applied in combination with Martin and Togo is adapted to apply Border's teaching of still mode operation in which wide image and telephoto image are combined, which for zoom amounts between 1 and M (a relative magnification ratio of Tele image to Wide image), uses registration information to transform coordinates of the telephoto image to the wide image and produces a composite image having the point of view of the wide image." *Id.* at 70. Patent Owner does not present separate arguments for dependent claims 11 and 19.

We have reviewed the cited portions of Border and are persuaded the combination of Golan, Martin, Togo, and Border teaches the limitations recited in claims 11 and 19, at this stage of the proceeding. We are further persuaded that Petitioner's rationale for combining Golan, Martin, Togo, and Border is supported by sufficient rational underpinning at this stage of the proceeding. Accordingly, we are persuaded Petitioner shows a reasonable

likelihood of prevailing with respect to unpatentability of these claims over the combination of Golan, Martin, Togo and Border.

### G.    Obviousness over Golan, Martin, and Parulski

#### 1.    Overview of Parulski (Ex. 1008)

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex. 1008, 1:8–10.  In one embodiment, an image capture assembly can be a digital camera that includes two image capture stages.  *See id.* at 12:36–45. The two image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes, and the other is used for capturing an image.  *Id.* at 8:9–13.  This allows for improved imaging capability without unduly increasing the size or cost of the digital camera.  *Id.* at 8:13–16.  In one example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens.  *Id.* at 23:28–40.  An image processor that "may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface . . . ." *Id.* at 23:54–56.

#### 2.    Dependent Claims 10 and 20

Claim 10 recites "wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1."  Ex. 1001, 13:10-13.

Petitioner contends "[a] POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ('less than unit')."  Pet. 76 (citing Ex. 1003 ¶ 189).  Petitioner

further contends that to the extent that Patent Owner argues that Golan does not explicitly describe tele lens 120 as a telephoto lens as claimed, it would have been obvious to a POSITA to implement Golan's tele lens 120 with "a fixed focal length **telephoto lens**" having TTL/EFL smaller than 1 as taught in Parulski for the benefit of a "very small figure." *Id.* at 77 (citing Ex. 1008 ¶¶ 23:38, 24:20–21; Ex. 1003 ¶¶ 190).

As rationale for combining, Petitioner contends that a POSITA would have been motivated to apply Parulski's teachings of in still mode, combining Wide and Tele image data only in focused areas to generate a fused output image in the system of Golan combined with Martin and Togo for the benefit of a fused output image having a broadened depth of field, at a predefined range of ZF values (e.g., the large lossless zooming range described in Golan) in such a digital camera" *Id.* at 74 (citing Ex. 1008, 28:52–53, 29:4–7, 30:17–20; Ex. 1003 ¶¶ 181–185). Patent Owner does not present separate arguments for dependent claim 10.

We are persuaded that the cited portions of Golan, Martin, Togo, and Parulski teach the limitations recited in claim 10, at this stage of the proceeding. We are also persuaded, at this stage of the proceeding, that the ordinarily skilled artisan would have combined Golan, Martin, and Parulski.

Claim 20 recites "the step of configuring the camera controller to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image includes configuring the camera controller to combine Wide and Tele image data only in focused areas."

Petitioner contends that Golan's zoom control sub-system 100 (as applied in combination with Martin and Togo in claim 12) is adapted to

apply Parulski's teaching of still mode operation in which wide image and telephoto image are combined only in focused areas, which for a predetermined lossless zooming range, produces a fused output image having a broadened depth of field." Pet. 80 (citing Ex. 1003 ¶¶ 192–196). At this stage of the proceeding, we are persuaded that the cited portions of Golan, Martin, Togo, and Parulski teach the limitations recited in claim 20.

For the foregoing reasons, we are persuaded the combination of Golan, Martin, and Parulski teaches the limitations recited in claims 10 and 20 at this stage of the proceeding. We are further persuaded that, at this stage of the proceeding, Petitioner's rationale for combining Golan, Martin, Togo, and Parulski is supported by sufficient rational underpinning. Accordingly, Petitioner shows a reasonable likelihood of prevailing with respect to unpatentability of these claims over Golan, Martin, Togo, and Parulski.

IV.    DISCRETIONARY DENIAL

According to Petitioner, "[a]lthough Golan, Border and Parulski were each cited in an IDS, the only prior art involved during examination was Shabtay (WO 2014/199338), which was overcome by amendment during examination. APPL-1002, 296-98." and because "[n]one of Togo, Martin and Levey were before the Examiner, and none of Golan, Togo, Martin, Levey, Border and Parulski were involved during examination.," the *Becton, Dickinson* factors weigh in favor of institution, the Board should not exercise its discretion under 35 U.S.C. § 325(d) to deny this Petition. Pet. 10–11. Patent Owner does not address discretionary denial. *See generally,* Prelim. Resp.

IPR2020-00861
Patent 10,230,898 B2

Institution of *inter partes* review is discretionary. *See Harmonic Inc. v. Avid Tech, Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding."); 35 U.S.C. § 314(a) (2018). Pursuant to 35 U.S.C. § 325(d), in determining whether to institute an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office." In evaluating arguments under § 325(d), we use

> [a] two-part framework: (1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims.

*Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential); *see also Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017–01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential as to Section III.C.5, first paragraph) (listing factors to consider in evaluating the applicability of § 325(d)). Because we determine that the same or substantially same art or arguments were not previously presented to the Office, we need not reach the second part of the *Advanced Bionics* framework.

We begin our analysis with the first part of the *Advanced Bionics* framework. In the first part of the framework, we look to *Becton, Dickinson* factors (a), (b), and (d) to evaluate "the similarities and material differences between the asserted art and the prior art" previously presented to the Office during a proceeding pertaining to the challenged patent (factor (a)), "the

IPR2020-00861
Patent 10,230,898 B2

cumulative nature of the asserted art and the prior art evaluated" previously (factor (b)), and "the extent of the overlap between the arguments" previously presented "and the manner in which petitioner relies on the prior art" (factor (d)). *Advanced Bionics*, Paper 6 at 9 n.10 (citing *Becton, Dickinson*, Paper 8 at 17–18); *see id.* at 9–10.

The Petition presents four grounds of unpatentability against the challenged claims—each based on Golan and Martin in combinations with Levey, Border, Parulski. *See* Pet. 9. The pre-grant publications of Golan, Border, and Parulski, were printed on the face of the '898 patent. Ex. 1001, code (56). Because the pre-grant publications of Golan, Border, and Parulski were cited in an information disclosure statement (IDS) at some point during the prosecution of the '898 patent, each was previously presented to the Office. *See Advanced Bionics*, Paper 6 at 7–8. However, Martin, Togo, and Levey were never cited by the Examiner during the prosecution of the '898 patent. The teachings of Martin, Togo, and Levey set forth in the Petition are not cumulative to the teachings of the art evaluated by the Examiner during prosecution of the '898 patent. Because each of the challenges set forth in the Petition are in combination with Martin, which was not considered by the Examiner, we find that consideration of the references and arguments based thereon to be materially different than the Examiner's previous consideration of the pre-grant publications of Golan, Border, and Parulski.

With respect to the Petition, the prosecution of the '898 patent, and the arguments applied in each, we find salient differences. Petitioner relies on different prior art (i.e., Martin, Togo, and Levey), combined in ways not contemplated during prosecution.

IPR2020-00861
Patent 10,230,898 B2

There was only one rejection, anticipation by Shabtay, in prosecution. Ex. 1002, 199–205.  In an amendment in order to overcome the rejection over Shabtay, the Applicant stated "Claims 1 and 13 are amended to recite the added limitation that if the no-switching criterion is fulfilled, the <u>camera controller</u> is configured to output at *a zoom factor (ZF) higher than an up-transfer ZF* a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value, and <u>if the no–switching criterion is not fulfilled, the camera controller</u> is configured <u>to output a zoom video output image that includes only transformed digitally zoomed Tele image data</u>." *Id.* at 296.  These amendments and arguments overcame Shabtay.  *Id.* at 297–298; 305–307. Thus, the prior art presented in the Petition was not argued in prosecution and is different than Shabtay at the very least in that it is applied to the limitations added by amendment.  For example, Martin, which was not presented in prosecution, is used in the Petition to teach "a transformed digitally zoomed Tele image (transformed succeeding image as taught by Martin)." *See* Pet. 55

Accordingly, we do not find that *Becton Dickinson* factors (a), (b), and (d) are met for Petitioner's four challenges based, in part, on Golan and Martin, and we find that those grounds of unpatentability do not rely upon the same or substantially the same prior art or arguments considered during examination of the '898 patent.  *See Oticon Medical AB v. Cochlear Ltd.*, IPR2019-00975, Paper 15 at 20 (PTAB Oct. 16, 2019) (precedential) (declining to exercise discretion when new, noncumulative prior art was asserted in the Petition).  Having failed the first part of the framework under *Advanced Bionics*, we need not determine whether Petitioner has

42

IPR2020-00861
Patent 10,230,898 B2

demonstrated that the Office erred in a manner material to the patentability
of the challenged claims.  After careful consideration of the record before us,
we determine that, on balance, the totality of the evidence favors declining
to exercise our discretion under 35 U.S.C. § 325(d) to deny institution.

## V.     CONCLUSION

For the foregoing reasons, we conclude that the information presented
in the Petition demonstrates a reasonable likelihood of prevailing with
respect to establishing that at least one claim of the '898 patent is
unpatentable.  Accordingly, we institute *inter partes* review of all challenged
claims and all grounds presented in the Petition.  *See PGS Geophysical AS v.
Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018) (indicating that a decision
whether to institute an *inter partes* review "require[s] a simple yes-or-no
institution choice respecting a petition, embracing all challenges included in
the petition"); Guidance on the Impact of *SAS* on AIA Trial Proceedings
(April 26, 2018).

## VI.     ORDER

In consideration of the foregoing, it is hereby:

ORDERED, pursuant to 35 U.S.C. § 314(a), that an *inter partes*
review of claims 1, 4, 8–12, 15, 19, and 20 is instituted with respect to all
grounds set forth in the Petition; and

FURTHER ORDERED, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R.
§ 42.4(b), that the *inter partes* review of the '898 patent shall commence on
the entry date of this Order, and notice is hereby given of the institution of a
trial.

IPR2020-00861
Patent 10,230,898 B2

PETITIONER:

David W. O'Brien
Andrew S. Ehmke
Hong Shi
HAYNES AND BOONE, LLP
david.obrien.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
hong.shi.ipr@haynesboone.com

PATENT OWNER:

Neil A. Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

To make this technology a reality, Corephotonics developed solutions to practical issues, some of which are the subject matter of the '898 patent. For example, Corephotonics developed technology that transitions between wide-angle ("Wide") images and telephoto ("Tele") images while taking video. These transitions occur when adjusting the zoom factor in video mode, which includes the preview mode used for framing in still mode. *See id.* at 3:47-51.

The '898 discloses a zooming behavior organized into three zoom factor intervals. "Zoom from 1 to $Z_{switch}$ is performed using the Wide sensor only." "From $Z_{switch}$ + ΔZoom to $Z_{max}$ only the Tele sensor is operational … ." "From $Z_{switch}$ to $Z_{switch}$ + ΔZoom both sensors are operational." Furthermore, the ΔZoom term can be set to different values depending on whether the "continuous and smooth zoom experience" is a "zoom-in" (increasing ZF) or a "zoom-out" (decreasing ZF). *Id.* at 7:57-8:17.

The '898 later refers to an "up-transfer ZF" and a "down-transfer ZF." *Id.* at 8:30, 9:60-67, 10:37-46. The up-transfer ZF refers to a zoom factor between $Z_{switch}$ and $\Delta Zoom_{in}$ during a zoom-in. The down-transfer ZF refers to a zoom factor between $Z_{switch}$ and $\Delta Zoom_{out}$ during a zoom-out.

The '898 defines a threshold zoom factor "$ZF_T$" as

$$\text{"}ZF_T = \text{Tan}(\text{FOV}_{\text{Wide}})/\text{Tan}(\text{FOV}_{\text{Tele}})\text{"}$$

CONTAINS PROTECTIVE ORDER MATERIAL
Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Y-coordinate offset and optionally, a Z-coordinate rotational offset of the correlation between wide image sensor array 110 and tele image sensor array 112." *Id.* The "calibration" is claimed to "facilitate[] continuous electronic zoom with uninterrupted imaging." *Id.* at cl. 1.

Golan summarizes the invention with a paragraph that a POSITA would understand was erroneous, misleading and outside of the normal conventions and terminology of imaging and photography. "For example, a first image sensor has a 60° angle of view and a second image sensor has a 60° angle of view. Therefore, Wide_FOY=Narrow_FOY*6." Ex. 1005, ¶9. A POSITA, which under Dr. Durand's definition has "a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field" would understand the asterisk "*" in this context to indicate multiplication. Golan's statement that "Wide_FOY=Narrow_FOY*6" is mathematically inconsistent with Golan's statement immediately preceding it that "a first image sensor has a 60° angle of view and a second image sensor has a 60° angle of view." A POSITA would understand in the context of Golan ¶9 that "angle of view" is identical to "field of view" and the latter is abbreviated "FOV." Dr. Durand relies on Golan ¶9 multiple times in his declaration. Dr. Durand does not resolve this mathematical inconsistency on the field (angle) of view of the two cameras

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

The Board preliminarily credited Petitioner's third and fourth reasons to be "sufficiently supported by the cited evidence, at this stage of the proceeding." Paper No. 7, Institution Decision, at 25.

The Board's Institution Decision also stated "[n]or is Martin incompatible with Golan for having different objectives. Petitioner need not show that Martin shares a common objective with Golan or the patent at issue. Rather, it is necessary only to show a reasonable expectation of success 'in combining the references to meet the limitations of the claimed invention.'" *Id.*, at 28.

Despite the Board's preliminary crediting Petitioner's alleged rationale for combining Golan and Martin, Petitioner's motivation to combine argument does not withstand closer scrutiny. As explained below, a POSITA would not have been motivated to combine Golan with Martin's fundamentally different system to create the claimed invention.

**1.    A POSITA Would Not Have Selected Martin to Combine with Golan, Which Are Fundamentally Dissimilar and Directed to Different Goals**

The Petition ignores the fundamental differences between Martin and Golan in its analysis of whether a POSITA would have had a motivation to combine the two references to meet the challenged claims of the '898 patent.

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Those differences would have affected what a POSITA, starting with one reference as a primary reference, would have understood another reference to teach (and whether the references could be combined). Those differences would also have affected the predicate step of whether a POSITA, starting with Golan would have even selected Martin to meet the challenged claims. Petition's motivation to combine arguments fail to address Martin's context or objective—an autostereoscopic display.

The core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: "whether [a] skilled artisan would have plucked one reference out of the sea of prior art ... and combined with conventional [] elements to address some need present in the field." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016). Here, Golan and Martin are so fundamentally different that a POSITA, starting with Golan's digital camera, would not have selected Martin's autostereoscopic system in the first place to explore possible modifications to Golan's digital zoom.

Martin discloses an image flipping display designed for autostereoscopic visual perception. Ex. 2001, ¶56. However, there is no evidence of record of any camera that utilizes this mode for image display. Rather, a POSITA would

CONTAINS PROTECTIVE ORDER MATERIAL
Case No. IPR2020-00861
U.S. Patent No. 10,230,898

recognize Martin as a display system patent intended for post-processing im-

ages for display, whereas Golan is an image acquisition patent intended for

pre-processing images in preparation for photographic image capture. *Id.*

Martin doesn't disclose any specific algorithm or method for aligning images.

The method claims in Martin consist of display system steps, where e.g. one

of the steps is that alignment occurs. *Id.*

The Petition errs in stating that both Golan and Martin "are analogous

prior art and are in the same field of endeavor pertaining to imaging systems

generating video output images using images from two imaging sections hav-

ing different points of view." Pet. at 19. While Petitioner's expert, Dr. Durand,

states that "Golan and Martin disclose imaging systems for generating video

output images using two imaging sections having different points of view,"

that would be true of any imaging system that incorporated two camera inputs,

such as a video mixer designed to fade between an interviewer and an inter-

viewee in the video production of a live interview. Ex. 2001, ¶58 (citing Ex.

1003, ¶50). That criterion is simply way to broad and includes far too many

references to motivate a POSITA to specifically select Golan and Martin. Ex.

2001, ¶58.

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Dr. Durand emphasizes that both patents operate at the "sub-pixel" level. Ex. 1003, ¶51. However, sub-pixel image operations were well known to a POSITA long before any of these patents, and facilitate the ability to access image information with non-integer sample locations, e.g. between pixel centers. Ex. 2001, ¶59. A POSITA understood that pixels are discrete samples of a continuous image, and the well-known process of "reconstruction," particularly through the well-known process of "interpolation" provided a POSITA with sufficient knowledge for implementing image operations at the "sub-pixel" level. *Id.* Thus, this fact does not encourage combining the references.

Further, Petitioner incorrectly cites Golan's "desire to achieve 'continuous electronic zoom with ***uninterrupted*** imaging, when switching back and forth between the first image sensor array and the second image sensor array'" (emphasis added) as motivating "a POSITA to incorporate Martin's teaching of executing registration using ***critical alignment*** of region of interest in two images having different points of view" (emphasis added). Petition at 20. Martin's "critical alignment" is defined as "a condition where the degree of alignment is sufficient to achieve a stable autostereoscopic display." Ex. 2001, ¶60; Ex. 1006, 5:53-54. Martin further qualifies this stability as only a partial stability, stating that "[s]tability of the whole image may not be required, as long

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

as at least a particular region of interest in the autostereoscopic display is stable." *Id.* at 5:55-58. If only a particular region need be stable, then the rest of the image need not be, and a POSITA would not consider this a good choice to satisfy Golan's desire for "uninterrupted imaging." Ex. 2001, ¶60.

Petitioner also wrongly argues that "combining the teachings of Martin with the system of Golan would have produced operable results that are predictable." Petition at 21. One reason that combining Golan and Martin would fail is that they have different dependencies on the configuration of the camera pair. Ex. 2001, ¶61. A POSITA would understand from Golan that its approach works better if the cameras can be as close as possible to minimize the differences in their points of view. Golan even suggests the use of a beam splitter so that both sensors could share the exact same point of view. Ex. 1005, [0022]. Martin on the other hand ***requires*** "parallax images" that a POSITA would understand as images captured from necessarily different points-of-view. Martin further emphasizing these differences of point of view, stating that "[p]arallax images may even be generated by a single camera 10 that captures a first image of scene 14 before moving to a new position (e.g., the position of camera 12 in FIG. 1) and capturing a second image of scene 14." Ex. 1006, 3:56-60. A POSITA would understand that sufficient parallax for stereo

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

perception would require points of view far enough apart from each other to resolve disparities depending on the depth of the subject matter in the scene. Given these differences in camera configurations that teach away from each other, it would not have been obvious to a POSITA in possession of Golan to combine it with Martin. Ex. 2001, ¶61.

Golan and Martin also have significant differences in their approaches to alignment and the need for camera calibration. Ex. 2001, ¶62. Golan teaches a preference that camera calibration occur before zooming resulting in "alignment offsets." Ex. 1005, [0044]. Golan further teaches that "[t]ypically, since the spatial offsets between wide image sensor array 110 and tele image sensor array 112 are fixed, the electronic calibration step is performed one time, after the manufacturing of the image acquisition system and before the first use." *Id.* Martin, on the other hand, teaches away from Golan with an "exemplary embodiment" that uses "convergence points" in the two camera images to determine alignment that would continue to work even if the position and orientation of the two cameras varied. Ex. 1006, 5:6-21. Since both Golan and Martin rely on careful "sub-pixel" alignment, these differences in alignment processing would be critical, and it would not be obvious to a POSITA which choice to use for a hypothetical combined embodiment. Ex. 2001, ¶62.

CONTAINS PROTECTIVE ORDER MATERIAL
Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Therefore, a POSITA, looking at the full teachings of Golan and Martin, would not have been motivated to combine the two references. Ex. 2001, ¶63. In this circumstance, the "real question is whether [a] skilled artisan would have plucked one reference out of the sea of prior art [] and combined it with conventional [] elements to address some need present in the field." *WBIP*, 829 F.3d at 1337. That is, whether "a skilled artisan would be motivated to make a combination includes ***whether he would select particular references in order to combine their elements***." *Id.* (emphasis added). On this question, the similarity or dissimilarity of the goals, objectives, and techniques of alleged prior art references which comprise an obviousness combination are informative on what a POSITA would have been motivated to do.

Just as Apple previously argued that a "skilled artisan designing mobile phone would not have been motivated to turn to a wall-mounted air conditioning controller to solve a pocket dialing problem," *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 (Fed. Cir. 2016) , a POSITA designing a multi-aperture digital camera system, starting with Golan, would not have turned to a system for producing auto-stereoscopic images to improve the smoothness of the digital camera' zoom functionality. *See* Ex. 2001, ¶63.

CONTAINS PROTECTIVE ORDER MATERIAL
Case No. IPR2020-00861
U.S. Patent No. 10,230,898

This is because Golan and Martin references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems. This would have been immediately apparent to a POSITA viewing these references at the time of the '898 patent's invention and indicates a POSITA would not have, starting with Golan, actually gone to and selected Martin to create the combination proposed in the Petition. *See* Ex. 2001, ¶52-63.

In *Nichia Corp. v. Everlight Elecs. Co.*, No. 02:13-CV-702-JRG, 2016 WL 310142, at *64 (E.D. Tex. Jan. 25, 2016), *aff'd sub nom. Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328 (Fed. Cir. 2017), the court found no motivation to combine where the alleged references, though directed to LED packages, "describe[d] different structures" and "address[ed] different problems." Like in that case, here, the Petition fails to provide sufficient rationale or explanation for why a POSITA would have specifically chosen Martin's image registration techniques to modify Golan's digital zoom despite the fundamental differences between the references. The Petition articulates no reason with rational underpinnings why a POSITA, during the relevant time period, would have focused on the improving the continuous digital zoom in

CONTAINS PROTECTIVE ORDER MATERIAL
Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Golan by turning to Martin specifically where, as explained above, the references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems. *See, e.g.*, *Adidas AG v. Nike, Inc.*, 963 F.3d 1355, 1360 (Fed. Cir. 2020) (affirming FWD finding claims not obvious, where the "Board properly considered these fundamental differences [between prior art references] as part of its motivation to combine inquiry" and because Petitioner "failed to reconcile these differences"). *See* Ex. 2001, ¶¶52-63.

Thus, a POSITA, starting with Golan, would have considered Martin's autostereoscopic image system to be too dissimilar to provide the inspiration and teaching necessary to modify Golan to meet the challenged claims. *Id.*

### 2. The Petition Fails to Establish a Motivation to Combine Togo with Golan and Martin

Petitioner also argues that a POSITA would have been motivated to combine Togo with Golan and Martin "to evaluate an imaging distance-based, no-switching criterion during zoom-in for possible override of switching from only wide image data to telephoto image data at a magnification (zoom factor) over a predetermined magnification threshold." Petition at 29. Petitioner is wrong.

CONTAINS PROTECTIVE ORDER MATERIAL

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

claim 1. Thus, Petitioner has not demonstrated invalidity of claims 4 and 8-11 of the '898 patent. *See* Ex. 2001, ¶86.

### C.    Claim 4

The Petition asserts that Golan combined with Martin and Togo renders claim 4 unpatentable. However, a POSITA would understand the plain and ordinary meaning of "effective resolution," as illuminated by the '898 and its description of an "effective resolution score" utilizing image analysis of image sensor data. Ex. 2001, ¶88; Ex. 1001 at 6:4-24.

Petitioner argues that Togo alone discloses Claim 4 by citing only the following Togo excerpts: "telephoto imaging module with a long focal length is less sharp at close distances compared to a wide-angle imaging module whose focal length is short," "a telephoto image 23 is blurry" and "[n]ote that because image quality depends on a performance of a lens system that is used and the like, theoretically strict derivation is difficult." Ex. 1010, ¶¶12, 11 and 50 (respectively). These first two Togo excepts were drawn from Togo's problem statement, not Togo's solution. Ex. 2001, ¶89. The third except is drawn from Togo's discussion of the use of the "imaging distance," which Togo obtains electronically from the autofocus mechanism, and not from any image analysis performed on the image sensor data. The assertion that a POSITA

Petitioner's Reply
IPR2020-00861 (Patent No. 10,230,898)

Petitioner applied the correct standards.  Petition, 18-19.  Golan and Martin

are analogous art to the '898 Patent, because they meet both standards—"the same

field of endeavor" and "reasonably pertinent to the particular problem with which

the inventor was concerned."  *See In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir.

1992).  Golan, Martin, and the '898 Patent are in the same field of endeavor

pertaining to imaging systems including digital cameras generating video output

images of the same scene from two imaging sections having different points of

view.  Petition, 19; (APPL-1003), ¶50; (APPL-1005), FIG. 1, Abstract, [0015];

[0009], [0036]; (APPL-1006), FIG. 1, 3:6-13, 3:32-35; (APPL-1001), 1:17-19,

FIGS. 1A and 1B (illustrating an exemplary dual-aperture zoom imaging system).

Furthermore, Golan and Martin are each pertinent to the problem addressed in the

'898 Patent, namely, achieving "a continuous, smooth zoom in video mode."

APPL-1040, ¶32; (APPL-1001), 3:16-17; *see also* Petition, 18-19; (APPL-1005),

[0015]; (APPL-1006), 5:51-55.

**Second**, PO's argument that Martin's critical alignment is not "a good

choice to satisfy Golan's desire for 'uninterrupted imaging'" (POR, 26-27) should

be rejected because it mischaracterizes critical alignment as "[i]f only a particular

region need be stable, then the rest of the image need not be."  APPL-1040, ¶¶33-

35.  Martin's critical alignment teaches stability in **at least** a particular region of

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## II.    APPLE FAILS TO ESTABLISH A MOTIVATION TO COMBINE GOLAN, MARTIN, AND TOGO

### A.    Apple's untimely arguments as whether Golan and Martin are "analogous art" to the '898 patent should be rejected.

As Corephotonics previously explained, Apple failed to apply the correct test for whether Golan and Martin are "analogous art" to the '898 patent such that they could be considered as obviousness references. IPR2020-00861, Paper No. 14, Patent Owner's Response ("POR") at 23–31. Instead of applying the correct legal test, Apple only asserted that Golan and Martin were "analogous" because they are both in "the same field of endeavor." IPR2020-00861, Paper No. 1, Apple's Petition for *Inter Partes* Review of U.S. Patent No. 10,230,898 ("Pet.") at 19.

Apple's reply seeks to belatedly correct its test for analogous all while continuing ignore the proverbial elephant in the room. As an initial matter, Apple's belated attempt to correct its misapplication of the test for analogous art should be ignored as untimely. Further, Apple asserts without more that "Golan, Martin, and the '898 Patent are in the same field of endeavor pertaining to imaging systems including digital cameras generating video output images of the same scene from two imaging sections having different points of view." IPR2020-00861, Paper No. 22, Petitioner's Reply Brief ("Reply") at 3. The video output images of Martin could not be more different than those of

2

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Golan and the '898 patent. Martin teaches displaying autostereoscopic images using alternating parallax images. Martin Ex. 1006, 1:16-20, 3:32-35, 4:10-15. Even Dr. Fredo Durand, Apple's expert, agreed that Martin is involved in creating parallax images and generating autostereoscopic displays. Ex. 2015, July 1, 2021, Deposition of Fredo Durand, Ph.D., 30:23-31:9. There is no teaching in either Golan or the '898 patent of parallax images. In fact, parallax images would be undesirable in either Golan or the '322 patent, as both are directed toward achieving a smooth, continuous zoom. Golan Ex. 1005, ¶2; '898 patent Ex. 1001, 3:16-17.

Apple compounds this mischaracterization by asserting that Golan, Martin and the '897 patent all pertain to the problem of achieving "a continuous, smooth zoom in video mode." Reply at 3. While the '897 patent is certainly concerned with this issue, there is nothing in Martin that describes this concern. The cited portions of Martin (Ex. 1006, 5:51-55) are concerned with creating an autostereoscopic image, and do not mention effectuating a smooth, continuous zoom. Martin makes explicit that "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable *autostereoscopic* display." Ex. 1006, 5:53-55 (emphasis added). Thus, Apple is wrong in its characterization that Martin is pertinent to obtaining a

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

continuous, smooth zoom in video mode and wrong in in its characterization that Martin is analogous art to the either Golan or the '898 patent. That Martin, Golan, and the '898 patent are all involved in imaging in some broad way is not sufficient to demonstrate that they are analogous. Therefore, Martin, Golan, and the '898 patent are not analogous art.

**B.    Apple's Reply Does Not Demonstrate That a POSITA Would Have Been Motivated to Combine Golan and Martin.**

Even assuming *arguendo* that Golan and Martin are analogous, determining that prior art is analogous based on the field of endeavor is not sufficient, on its own, to show a motivation to combine that prior art. *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 (Fed. Cir. 2016) (finding that "concluding that the references are within the scope and content of the prior art to be considered for obviousness (i.e. analogous art) does not end the inquiry"––motivation to combine must still be shown). Apple fails to meet that burden.

As Patent Owner' noted in its initial Response, the core problem with Apple's argument for combining Golan and Martin involves a more basic question: "whether [a] skilled artisan would have plucked one reference out of the sea of prior art ... and combined with conventional [] elements to address some need present in the field." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016). This is because Golan and Martin are so

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

fundamentally different that a POSITA, starting with Golan's digital camera, would not have selected Martin's autostereoscopic system in the first place to explore possible modifications to Golan's digital imaging system to create a smooth, continuous zoom. However, Petitioner's Reply continues in its attempt to gloss over the differences between Martin and Golan.

Martin says its invention is concerned with "overcoming one or more problems associated with the prior art three-dimensional image display systems and methods." *See* Ex. 1006, at 2:7–62. As noted above, nowhere does Martin contain any teaching about continuous zoom. As seen by the very portions of Martin cited by Apple, Martin is about "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable ***autostereoscopic*** display." Ex. 1006, 5:53-55 (emphasis added). Because Martin is "directed to a different purpose" than either Golan or the '898 patent, "the inventor would accordingly have had less motivation to consider it" to be "analogous art." *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992).

### 1. Apple's cursory "not discouraged" argument violates 37 C.F.R. § 42.6(a)(3) and should be disregarded.

Apple asserts that:

> As explained in detail by Dr. Durand, each of the differences alleged, including 'different dependencies on the configuration of the camera pair' and 'approaches to alignment and the need for

Trials@uspto.gov
571-272-7822
Paper No. 34

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

APPLE, INC.,
Petitioner,

v.

COREPHOTONICS LTD.,
Patent Owner.

———————

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

———————

Record of Oral Hearing
Held Virtually:   Thursday, September 9, 2021

———————

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
BRENT M. DOUGAL, *Administrative Patent Judges*.

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1


APPEARANCES:

ON BEHALF OF THE PETITIONER:

    DAVID O'BRIEN, ESQUIRE
    HAYNES & BOONE, LLP
    600 Congress Avenue
    Suite 1300
    Austin, TX 78701
    (512) 867-8400


ON BEHALF OF THE PATENT OWNER:

    MARC FENSTER, ESQUIRE
    JONATHAN LINK, ESQUIRE
    RUSS AUGUST & KABAT
    12424 Wilshire Boulevard
    12th Floor
    Los Angeles, California 90025
    (310) 826-7474


    The above-entitled matter came on for hearing on Thursday, September 9, 2021, commencing at 9:01 a.m. EST, by video/by telephone.

2

1     claims, but that's how it works.

2         And in the other situation where the no-switching

3     criterion is fulfilled, so don't switch, that's the portion

4     that's in the 1.4 portion and it says stick with the wide. So

5     continue doing your zoom in on the wide. Don't do what you

6     would normally do which is to switch to the tele. And the

7     reason that you would not do that is because it wouldn't be a

8     good idea. It might result in a degraded image, blurry image,

9     something of that sort. So that's what this claim is about.

10    That is also what the 332 claim is about. You know, again,

11    it's just a slightly different formulation of the up-transfer

12    ZF or the ZFT switch point.

13        So moving forward then to slide 5. In this case

14    and in both cases quite frankly there is no claim construction

15    issue. I will note that patent owner advanced a claim

16    construction issue for this no-switching criterion in its

17    proffer. Your Honors reviewed that and frankly rejected it as

18    an attempt to import limitations into the claim. Since

19    institution and in the entirety of this trial there has been

20    no discussion of claim construction. That issue has been

21    abandoned by the patent owner.

22        Turning to 6, there's a little bit of a road map.

23    We'll go quickly to 7. I want to speak to the combination of

24    Golan with Martin. These are ones that you are of course

25    familiar with. We have -- yes, Your Honor? Do you have --

26        JUDGE MOORE: Something small flew in front of my

27    face.

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1　　　　　MR. O'BRIEN: It happens. So speaking to the
2　　combination of Golan and Martin, we have established that they
3　　are analogous art. We have established that both in terms of
4　　their field of endeavor. The first four rows of this table
5　　tend to correspond to field of endeavor inquiries. I'll get
6　　back to that in a second. And we've also established in terms
7　　of the other portion of that board inquiry which is reasonably
8　　pertinent to the problem faced by the inventors. That being
9　　the problem of reducing that jump effect, that me jumping to
10　　the side when we switch effect that is inherent in parallax
11　　image systems.
12　　　　　So on the analogous art issue, the proper inquiry
13　　of the field of invention is really imaging systems. We have
14　　in this proceeding and other proceedings made that very clear
15　　that under KSR guidance as the broad field the patent owner
16　　has said that's way too broad. And without conceding that
17　　point, because that is the right analysis, we have made the
18　　further point that even if one took a much narrower view of
19　　imaging systems, video output images, two imaging sections,
20　　parallax images, so narrowing it really to all those
21　　characteristic aspects, these are in the same field of
22　　endeavor. And as I said, the proper inquiry is imaging
23　　systems and however you cut it they are in the same field of
24　　endeavor. It is also undisputed that the 898 patent itself
25　　and the 332 patent itself are in that field of endeavor.
26　　　　　So turning -- I do want to comment on two other
27　　things that relate to the patent owner's treatment of Martin

12

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    and this seems as good a time as any.  The patent owner has
2    raised for the first time in its slides, Your Honor, two -- at
3    least two concepts which were never of record or never argued
4    in this proceeding.  One is the assertion and you'll see it in
5    their slides when they get to them on 12, 13, and several
6    others down from there that Martin is only about post-
7    processing captured still images.  Well, that's wrong.  Martin
8    is very clearly about both acquisition of video sequences of
9    images, sequences of frames, and it's about outputting video
10   sequences of images.
11       So that's clearly wrong when they try to place that
12   in your minds.  And I'll just reiterate, that point has never
13   been made in this record.  They tried to argue it in previous
14   proceedings.  They argue it for the first time in these
15   slides.  You'll note that all those slides have no citations
16   to the record.  There's a reason they don't have citations to
17   the record.  It isn't in this record.  And it's provably
18   false.
19       Second, patent owner argues that Martin's critical
20   alignment only preserves parallax.  Judge Moore in a prior
21   proceeding and Judge Ullagaddi also in a prior proceeding, you
22   asked questions of patent owner's counsel on this point.
23   Absolutely Martin eliminates parallax in the region of
24   interest.  So their rejoinder and their constant rejoinder
25   that Martin's critical alignment only preserves parallax,
26   again, provably false, and two, not made in this record.
27   They're arguing it here in their slides and I presume that

13

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    there's no dispute between the parties I don't believe that

2    switch zoom factor was well known. Here in Parulski it deals

3    with that. Border deals with the switch zoom factor. Golan

4    of course does. Togo does. It's very common in the art. So

5    I don't think that's really reasonably disputed.

6        Turning to slide 38. I have said or I have played

7    back for you that Togo -- that patent owner has

8    mischaracterized Togo as not disclosing that its function of

9    applying a no-switching criterion is the field in the zoom

10   operation. Well, it absolutely it and I don't know what about

11   our description of Togo or our understanding of Togo could not

12   be understood to be in the course of a zoom-in operation.

13   We've identified the narrowing field in the not fulfilled

14   situation of narrowing, narrowing, narrowing, switching to the

15   transform and continuing to narrow. And in the fulfilled

16   situation of narrowing, narrowing, narrowing, narrowing based

17   on the non-switching criterion and foregoing what would be the

18   switch to the tele and continuing to narrow. So it most

19   certainly is in the zoom-in operation in both the fulfilled

20   and unfulfilled sense.

21       Turning to slide 39. Patent owner has tried to

22   mischaracterize our combination position as requiring image

23   analysis. What we have simply described as what Togo

24   describes is that Togo's no-switching criterion is image

25   quality based. That's Togo's language. Togo specifically

26   talks about image quality as being the reason. That doesn't

27   mean that Togo requires or that I guess from the patent

30

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1   owner's articulative perspective that our combination requires
2   image analysis.  Certainly a person of skill could envision
3   implementing Togo doing image analysis but it's not required
4   the combination.  It's not required by the claims.  So when
5   they argue that that's really extraneous.  As I said, it's not
6   required.
7          JUDGE ULLAGADDI:  Counsel, I've got a question on
8   that.
9          MR. O'BRIEN:  Yes, Your Honor.
10         JUDGE ULLAGADDI:  How would the no-switching
11  criterion be based on image quality if there isn't any image
12  analysis?  How else would you figure out the image quality?
13         MR. O'BRIEN:  Well, in an embodiment -- okay.  So
14  image quality can -- so Togo teaches at least two examples.
15  It teaches a pixel density analysis which could either be how
16  many pixels are in play or how many pixels are measured, and
17  it also describes a distance to the object measure.  That's
18  the comparison with the capital B distance.  So if it's less
19  than a B distance in Togo that's that inquiry, that's that
20  predicate.  That is what Togo describes as a marker for image
21  quality.  Togo describes that.
22         And as I've said before -- and I can jump back to
23  it if you would like, Your Honor -- it is well known in the
24  art that objects at a close distance are a problem for
25  telephoto lenses and often the wide-angle lens will be the
26  better lens because they can focus on it whereas the telephoto
27  cannot.  That's an image quality problem.  It's a resolution

31

1    problem.  It's a fuzziness problem if you want to talk about

2    it that way.  It's a blur problem.  But we know that it's a

3    problem simply because the object is close.  We could measure

4    the blur.  We could measure the degradation of resolution as

5    well.  Those are all options that could be done.  But we don't

6    have to.  We can simply know that when an object is this close

7    it's going to be blurry in the telephoto lens.  I'm not going

8    to switch.  That's my no-switching criterion.  So Togo

9    provides that insight and it also provides the comparative

10   pixel density insight and it explains the overarching concern

11   that it has as being one of image quality.  Did I answer your

12   question?

13        JUDGE ULLAGADDI:  Yes.  Thank you.

14        MR. O'BRIEN:  Thank you.  So sort of my next slide

15   is this image quality question.  This is the playback of the

16   analysis of Togo.  The presentation by Togo of the totality of

17   issues as being ones of image quality and the explanation with

18   Dr. Durand about the various ways that that image quality

19   could be actualized.  One of them being image distance and

20   zoom factor.  That's the comparison with the cap B and the cap

21   A in Togo.  Another one being the pixel density evaluations

22   which is recited in claim 3 as well as paragraph 69.  We read

23   it in our petition at 47 as well.  And these other ones: the

24   sharpness, noise, dynamic range, those are all possibilities

25   as well as Dr. Durand explains based on Togo 12 to 13, 66, and

26   in his cited declaration, both at the reply declaration stage

27   and at the petition stage.  And if you'd like, the petition

32

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1      would be in this record 24 to 28. The opening declaration for

2      Dr. Durand, Exhibit 10-103 would be paragraphs 108 through

3      112. I believe there are four up in the 898 record and one up

4      in the page numbers in the petition in the 898 record.

5           Turning to slide 41. We've gone through this

6      before but this is Martin teaches the transformation. They

7      capture a second image in 3B, is transformed according to the

8      showing in 3C, in this case to the left and down, to result in

9      the image with the position matching in the ROI shown in 3D

10     and you'll notice that 3D eliminates any parallax in the ROI

11     with respect to 3A. All of the parallax shift has been

12     eliminated for the square. In this illustration it looks like

13     it's probably been eliminated for the other features as well

14     but in the general case it may not.

15          So turning to -- so patent owner also tries to

16     argue that Martin's critical alignment teachings are limited

17     to characteristics that they attribute to audio stereoscopic

18     displays. The principle one I dealt with at the front end,

19     which is their argument, again, never made in this record,

20     only advanced in the slides, and I assume that we will hear it

21     today that Martin -- their argument, Martin only preserves

22     parallax. That of course is categorically wrong. We have

23     established and discussed that Martin eliminates parallax in

24     the ROI. We discussed that on the last slide.

25          You'll also recall that Martin's description of

26     critical alignment is that it performs this alignment at such

27     a precision in terms of eliminating the parallax shift for the

33

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1     about this claim that are important. So first of all, it's a

2     zoom camera. It has a wide imaging section and a tele imaging

3     section. And then when you get to 1C we're talking about a

4     camera controller that is operatively coupled to both the wide

5     and tele imaging sections. It's configured to evaluate a no-

6     switching criteria during a zoom-in operation and to output

7     zoom video output image.

8          Okay. So one, we're focused on the camera

9     controller that is evaluating this no-switch criteria and

10    effecting a zoom video output during a zoom-in operation. So

11    that will become important when we discuss Martin because

12    Martin is not aimed at video. It has nothing to do with zoom.

13    And it doesn't have anything to do with real-time registration

14    during image acquisition.

15         So with that, if you can turn to slide 8. So slide

16    8 is how I understand that petitioner is relying on Golan for

17    the stuff in yellow. Slide 9, they're relying on Togo for the

18    green material which is the no-switch criteria. And if you

19    turn to slide 10, they're relying on Golan and Martin together

20    for the transformed digitally zoomed tele-image data

21    particularly for the transformation.

22         So that's how the claims fit together. I want to

23    make sure that the board is comfortable and focused on the

24    fact that the claims require this no-switch criteria during a

25    zoom-in operation for the purpose of outputting video image

26    data.

27         So if we can start with slide 11 or turn next to

41

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    slide 11.  So the stated motivation to combine Martin and

2    Golan is to improve alignment and reduce parallax.  Golan, you

3    may recall, has a factory -- a one-time factory calibration

4    before acquisition.  That's done at the factory.  It's not

5    part of something done by the camera controller during

6    acquisition or during zoom in.  And petitioner admits that the

7    calibration is not sufficient to meet the transformed

8    limitation.  Instead, they rely on Martin, but Martin, as I'll

9    show you, has to do with a post-processing alignment that is

10   specifically designed and defined as preserving parallax, not

11   eliminating it.  Neither Martin nor Golan talk about

12   registration or calibration by a camera controller that's

13   operatively coupled to the wide and tele images during image

14   acquisition and during a zoom-in process.

15        So if you can turn to slide 12.  Golan and Martin,

16   as the board has recognized in a previous decision denying

17   institution that I know is not binding on the board here, has

18   recognized that Golan and Martin do have different approaches

19   to parallax.  Golan, as you've heard, is directed to

20   simulating an optical zoom with two fixed field of view

21   cameras that have different fields of view, a wide and a tele.

22   It uses a one-time factory calibration.

23        And Martin, on the other hand, is directed to

24   capturing images for autostereoscopy.  So autostereoscopy is

25   where you take two images that are still images that are

26   offset to trick the brain into thinking that it's a 3D image.

27   There's no consideration in Martin of zoom or video or a zoom-

42

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    in operation.  The two cameras have the same field of view in
2    Martin and the critical alignment, as I'll show you, is
3    designed to preserve parallax.  The post -- the critical
4    alignment is something that happens post-processing.  It's
5    after acquisition, not during acquisition, and that's a
6    critical difference.  And of course there's no switch criteria
7    with respect to Martin.
8        At slide 13, this is kind of a summary of why
9    petitioner has failed to show that a person of skill in the
10   art would be motivated to combine Golan and Martin with
11   Martin's critical alignment teachings.  One, they're
12   dissimilar technologies, dissimilar goals, and they achieve
13   them in dissimilar ways.  One is real-time video zoom
14   calibration versus post-processing critical alignment of still
15   images.  Golan seeks to minimize parallax and Martin needs to
16   preserve parallax to achieve that 3D effect.
17       And two, the stated motivation to combine the two
18   is to reduce the so-called jump effect and reduce parallax,
19   but Golan and Martin is aimed at post-processing still images
20   preserving parallax, not zoom video output images to reduce
21   parallax.  They really are fundamentally different.  And if
22   there was a deficiency in the factory calibration of Golan,
23   you would not look to the post-processing autostereoscopy
24   solution of Martin.  There are other registration solutions
25   out there.  We've discussed those in other IPRs.  There's no
26   motivation to look to the autostereoscopy.
27       So if we can go to a summary of Golan.  Let's skip

43

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1  ahead to slide 16. So Golan is continuous electronic zoom for

2  an imaging system with multiple imaging devices having

3  different fixed field of view cameras. That's Golan. And you

4  can see that on page 17. It has two, a wide and a tele

5  camera. It simulates optical zoom and it was simulating

6  optical zoom to avoid the wait and complication of an optical

7  zoom that requires mechanically moving the lenses.

8      At slide 18 petitioner acknowledges that the

9  calibration that's done in Golan does not meet the transformed

10  requirement of claim 1 of the 898 patent. Instead, they use a

11  calibration that's performed once at the factory. There's no

12  analysis of image outputs or real-time image processing during

13  zoom. There's no image registration or position matching in

14  Golan and I think that that's undisputed. That's why they're

15  looking to Martin to fill that gap.

16      So now let's turn to Martin. Martin at slide 20.

17  So the title is Critical Alignment of Parallax Images for

18  Autostereoscopic Display. That's what Martin is about. And

19  if you turn to slide 21 you see that there are two cameras

20  that are offset. They have the same field of view, not

21  different. It's not to simulate zoom. It's to capture the

22  same image from two points of view in order to display

23  parallax images with parallax with an offset to trick the

24  brain into thinking that one is from your left eye and one is

25  from your right. To make it trick your brain into seeing or

26  thinking it's seeing a 3D image.

27      Okay. So let's go to slide 23 and talk about

44

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    Martin's critical alignment.  This is done in post-processing
2    software.  Now Mr. O'Brien was pretty emphatic that it is
3    provably false what I just said, that it has to do with post-
4    processing software.  He said that it's provably false.  Now
5    he gave you no evidence and I will show you in Martin where it
6    talks about post-processing.  So referring to Martin which is
7    Exhibit 1006.  If you have access to that that will be helpful
8    and I can show you exactly where -- I'll point out a few
9    things in Exhibit 1006 for Martin.  Let me know when you're
10   there.  All good?  Okay.  So looking at --
11        JUDGE MOORE:  I'm having technical issues.  It
12   takes me a second to get off mute.
13        MR. FENSTER:  Okay.  Thank you, Your Honor.  I
14   apologize.  So looking at Exhibit 1006, the Martin 206 patent.
15   So Martin -- if you turn first to figure 2.  So figure 2 is a
16   flow diagram that describes what's happening in box 20,
17   acquire source images.  Box 22, load source images into
18   alignment software.  Then you do adjust alignment parameters.
19   That's the critical alignment.  Save and store the aligned
20   images and then view the aligned images in 28.
21        Then when we get to the text of the 206, if I can
22   ask you to turn to the summary of invention which starts at
23   the bottom of column 2 and continues on the top of column 3,
24   the summary describes -- this is at column 2, line 65 -- a
25   first aspect of the invention includes a method for generating
26   an autostereoscopic display.  The method includes acquiring a
27   first parallax image and at least one other parallax image.

45

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1       reference of zoom in the entire Martin reference in the

2       context of post-processing and doing this critical alignment

3       after images have been acquired so that you can align them for

4       autostereoscopy.

5               How do I know that? Well, if you go to column 5,

6       line 53, it defines critical alignment. It states, quote,

7       Critical alignment corresponds to a condition where the degree

8       of alignment is sufficient to achieve a stable

9       autostereoscopic display, end quote. Okay. So that's what

10      Martin is talking about. It's talking about critical aligning

11      two -- or sets of two images, two images or sets of two images

12      that can be alternately displayed to preserve parallax to

13      present a stable autostereoscopic display. It is done post-

14      processing after acquisition.

15              Okay. So now let's go back to my slides. And we

16      were on slide 23. So that is our evidence. That's the

17      evidence in the record that Martin is post-processing of

18      captured still images. There is no discussion in Martin of

19      video images. It talks about extracting images

20      from -- extracting still images from a video stream so that

21      you can -- as a source of acquisition. And it talks about

22      once you critically align pairs of images that you could

23      output them in a video format meaning that they run in a loop

24      alternating one then the other so that it looks like a 3D

25      image. But there's no discussion in Martin of the video that

26      a person of ordinary skill in the art would understand is

27      being discussed in the 898 where you're talking about moving

47

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    pictures at a frame rate of 30 frames per second or so.

2    There's just nothing like that in Martin.

3         Okay.  So if we can go to slide 24.  Critical

4    alignment as we've seen in Martin preserves parallax.  And

5    this is the quote that I just showed you from column 5.  It is

6    post-processing and it preserves parallax.

7         Let's skip ahead to 27.  And this is just a summary

8    of the differences between how Martin and Golan are

9    approaching parallax.  Golan is using two fixed field of view

10   cameras to simulate optical zoom and wants to reduce but does

11   so only with a factory calibration done before acquisition,

12   and Martin does something after acquisition to preserve

13   parallax.  And the claims at issue here, the proposed

14   combination, uses neither.  It is reducing parallax in real

15   time during a zoom-in operation.  So neither reference hits

16   the real-time aspect of the claims.

17        Slide 28 is just a further summary of that.  So at

18   slide 29, this is from our surreply noting that there's

19   nothing in Martin that describes the concern of achieving a

20   continuous smooth zoom in video mode.  Martin doesn't describe

21   that and neither does -- well, Martin doesn't describe that.

22   Dr. Durand on slide 30 admits that Martin has no mention of

23   smooth zoom in video.  Slide 31 and 32 have some new

24   arguments.  They weren't raised by Mr. O'Brien today.  They

25   were raised in their surreply or in their reply that one of

26   skill in the art would not be discouraged.  This was a new

27   argument.  It's in violation of CFR 42.683.  That argument is

48

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    preserved in our briefs and I'll move on unless the board has

2    any questions about those.

3        So fundamentally Martin and Golan are addressed to

4    different things and so the question is would one of skill in

5    the art look to an autostereoscopic reference? The board

6    previously made factual findings, preliminary I acknowledge,

7    but valid factual findings that one of skill in the art would

8    not look to Martin's autostereoscopic registration.

9        So if we can turn to slide 34. This is from the

10    board's preliminary decision denying institution in IPR2020-

11    487. And Dr. Durand -- and it's the same evidence that was

12    there as here -- does not further explain or shed more light

13    on why one of ordinary skill in the art would have even looked

14    to Martin specifically for a teaching of position matching for

15    reducing or eliminating parallax when Martin concerns an

16    autostereoscopic display that relies on parallax images to

17    operate. That, Your Honors, is a valid finding and we haven't

18    seen anything to undermine that since.

19        If I can ask you to turn to slide 35, also from the

20    same board decision. The petitioner's explanations constitute

21    hindsight because they are not sufficiently supported by the

22    evidence. Martin, however, does not disclose a stable

23    transition in all displays but specifically in an

24    autostereoscopic one.

25        And then at slide 36, the second bullet point is

26    from the board's institution decision there in the 487 IPR.

27    There is insufficient evidence to support the rationale that

49

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1   Martin's critical alignment disclosed in the context of

2   autostereoscopic displays would achieve the stable, seamless,

3   or continuous transition in continuous zoom video output

4   images.  That is a valid finding and I would add to it, Your

5   Honors, that one, Martin -- it's all the more valid because

6   Martin is post-processing.  It's aimed at still images, not

7   video.  And it preserves parallax as the board found.

8       And then I'd ask you to skip to slide 38, Dr.

9   Durand's testimony that a POSITA would have understood that

10  Martin's teaching of critical alignment for stable transition

11  between images of different points of view apply to electric

12  camera systems providing continuous zoom video output images

13  as taught in Golan regardless of whether a three-dimensional

14  illusion is provided is not supported by sufficient evidence.

15  The cited references do not support that position.  The record

16  in that case is the same here.  There is no additional

17  evidence provided by petitioners in this IPR than supported

18  the board's finding in that one.  And so I submit to Your

19  Honors that that is a valid finding.

20      So in sum, we ask the board to find that the

21  petitioner has not met its burden to show a motivation to

22  combine Golan and Martin to get that critical alignment.  So

23  remember the claim requires that it be a transformed image

24  during a video output, real time, during acquisition, during a

25  zoom-in operation.  Neither reference teaches that and Martin

26  is -- one of skill would not look to Martin's post-processing

27  of still images even if it found a deficiency in Golan's

50

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    factory alignment, factory calibration for the video

2    processing. That finding -- if you were to make that finding

3    that would be dispositive across all the grounds that

4    petitioner has failed to meet its burden to show

5    unpatentability.

6           Okay. The next point that I wanted to raise is on

7    slide 43. And this is that the petition failed to make a

8    prima facie showing that Martin and Golan are analogous art.

9    And Mr. O'Brien addressed this and tried to argue that they

10   are all related to the problem of reducing a jump effect,

11   providing continuous video output images. That's how he

12   described the problem. So first of all, Martin is not aimed

13   at video output, or continuous video output, or a zoom. We've

14   seen that and they can't point to anything in Martin that

15   shows otherwise. But the point here is that the petition

16   failed to make the prima facie case. They applied the wrong

17   standard and that's not really disputed.

18          So slide 44. Petitioner failed to apply the

19   correct legal test in their petition and accompanying

20   declaration for analogous art. So the legal -- the proper

21   legal standard is whether it's analogous to the claimed

22   invention and they just didn't try to make that showing in the

23   petition. What they tried to show instead was that Martin was

24   analogous to Golan but not that either was analogous to the

25   claimed invention. They try to fix that later but then that

26   becomes a late argument. You can't supplement the petition

27   with later evidence to try to make out your prima facie case.

51

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1    So turning to slide 45.  Instead of applying the
2    correct legal test, Apple only asserted that Golan and Martin
3    were analogous.  Then at slide 46 they argue for the first
4    time that Martin and Golan satisfy the proper legal test but
5    that's too little too late and you can't meet your prima facie
6    case.  This is not responding to an argument.  This is just
7    responding to us pointing out that they failed to make the
8    prima facie case that Martin and Golan are analogous art.  The
9    new arguments are not permitted on reply.  That's at slide 47
10   and slide 48.
11       So and then at slide 49, this is kind of where I
12   started on this point, petitioner still fails to show that
13   Martin is analogous art.  The problem is providing a
14   continuous smooth zoom in the video mode and there's no
15   showing still that Martin recognized that problem or addressed
16   that problem.  It's just not analogous art.  It is aimed at a
17   different problem of providing parallax images for an
18   autostereoscopic effect.  It's not video and it's not reducing
19   parallax.  It's not zooming in.  And so unless you take the
20   kind of absurdly broad view of analogous art to be imaging
21   systems, which would really encompass anything, if you accept
22   the statement of the problem as shown on slide 49 then we urge
23   the board to find that they have not met their burden to show
24   that Martin is addressing the same problem in analogous art.
25       Okay.  So those are the first two points I wanted
26   to make with respect to Martin and Golan.  I'll turn now,
27   unless the board has any questions about those, to Martin,

52

IPR2020-00861 (Patent 10,230,898 B2)
IPR2020-00862 (Patent 10,356,332 B2)1

1  Golan, and Togo.

2      Okay.  So turning to slide 52.  Togo is a telephoto

3  imaging device.  This is a Japanese reference.  We have the

4  translated version.  So Togo does disclose the switching

5  criteria that uses the auto-signal -- auto-focus signal for

6  distance.  Now what Mr. O'Brien said was that this was just

7  one example but it's really the only example that is taught.

8  If you pull up the Togo reference it describes in the abstract

9  a measurement means for measuring a distance to a subject.

10  And at paragraph 20 it talks about estimated -- that the

11  distance, the photography distance Y is estimated from an

12  output signal of the auto-focusing means or a control signal

13  controlling the auto-focusing means.

14      So what Togo teaches is it does teach a no-switch

15  criteria based on a measured distance which it says is

16  measured by the auto-focus.  Okay.  So the real failure

17  here -- so let me back up.  It is undisputed that Golan does

18  not have an auto-focus display.  Martin does not discuss auto-

19  focus.  Neither Martin or Golan provide any means of measuring

20  distance between the object lens and the object being

21  photographed.  Okay.  So what's happening is -- the problem is

22  that the petition says incorporate this no-switch criteria but

23  it doesn't address in the petition or in the declaration how

24  one of skill would do that or realize a reasonable expectation

25  of success in doing so because there is no auto-focus, there's

26  no way to measure distance, and there's no discussion in the

27  petition or the accompanying declaration as to how one of

53

Paper No. 43

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

_____

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

_____

PATENT OWNER'S NOTICE OF APPEAL

Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*Submitted Electronically via the PTAB E2E System*

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Pursuant to 35 U.S.C. §§ 141, 142, and 319, and in accordance with 37 C.F.R. §§ 90.2-90.3, Patent Owner Corephotonics, Ltd. ("Corephotonics") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board ("Board") entered on December 7, 2021, in IPR2020-00861 (Paper No. 35) ("Final Written Decision"), and from all underlying findings, determinations, rulings, opinions, orders, and decisions regarding the inter partes review of U.S. Patent No. 10,230,898 (the "'898 patent").

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Corephotonics states that the issues on appeal may include, but are not limited to: the Board's determination that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent have been shown to be unpatentable; the Board's consideration of the expert testimony, prior art, and other evidence in the record; and the Board's factual findings, conclusions of law, or other determinations supporting or related to those issues, as well as all other issues decided adversely to Corephotonics in any orders, decisions, rulings, and opinions.

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

Dated: February 8, 2022                  /Neil A. Rubin/
                                         Neil A. Rubin (Reg. No. 67,030)
                                         RUSS AUGUST & KABAT
                                         12424 Wilshire Boulevard, 12th Floor
                                         Los Angeles, CA  90025
                                         Telephone: 310-826-7474

                                         Attorney for Patent Owner,
                                         COREPHOTONICS, LTD.

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## CERTIFICATE OF FILING

The undersigned hereby certifies that, in addition to being electronically

filed through the Patent Trial and Appeal Board End to End System, the above

document is being sent on February 8, 2022 by United States Postal Service

Priority Mail Express to the United States Patent and Trademark Office at the

following address:

> Office of the General Counsel
> United States Patent and Trademark Office
> P.O. Box 1450
> Alexandria, VA 22313-1450

The undersigned also hereby certifies that the above document is being

e-filed with the Clerk's Office for the United States Court of Appeals for the

Federal Circuit, along with payment of the required docketing fees.

Dated: February 8, 2022          */Neil A. Rubin/*

Case No. IPR2020-00861
U.S. Patent No. 10,230,898

## CERTIFICATE OF SERVICE

I hereby certify that "Patent Owner's Notice of Appeal" was served on February 8, 2022 by email sent to:

> David W. O'Brien
> Hong Shi
> HAYNES AND BOONE, LLP
> 600 Congress Ave. Suite 1300
> Austin, TX  78701
> Telephone: 512-867-8400
> Email: david.obrien.ipr@haynesboone.com
> Email: hong.shi.ipr@haynesboone.com
>
> Andrew S. Ehmke
> Michael S. Parsons
> Jordan Maucotel
> Stephanie N. Sivinski
> HAYNES AND BOONE, LLP
> 2323 Victory Ave. Suite 700
> Dallas, TX  75219
> Telephone: 214-651-5000
> Email: andy.ehmke.ipr@haynesboone.com
> Email: michael.parsons.ipr@haynesboone.com
> Email: jordan.maucotel.ipr@haynesboone.com
> Email: stephanie.sivinski.ipr@haynesboone.com

*/Neil A. Rubin/*

Trials@uspto.gov                                    Paper 35
571-272-7822                            Entered: December 7, 2021

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

COREPHOTONICS, LTD.,
Patent Owner.

———————————

IPR2020-00861
Patent 10,230,898 B2

———————————

Before BRYAN F. MOORE, MONICA S. ULLAGADDI, and
BRENT M. DOUGAL, *Administrative Patent Judges.*

MOORE, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00861
Patent 10,230,898 B2

## I.     INTRODUCTION

Apple Inc. ("Petitioner") filed a Petition to institute an *inter partes* review of claims 1, 4, 8–12, 15, 19, and 20 ("the challenged claims") of U.S. Patent No. 10,230,898 B2 (Ex. 1001, "the '898 patent").  Paper 2 ("Pet.").  Corephotonics, Ltd. ("Patent Owner") filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").

We instituted an *inter partes* review.  Paper 7 ("Institution Decision" or "Inst. Dec."); *see* 35 U.S.C. § 314(a) (2018); 37 C.F.R. § 42.4(a).  Patent Owner filed a Response (Paper 13, "Patent Owner Response" or "PO Resp.").[1]  Petitioner filed a Reply (Paper 21, "Petitioner's Reply" or "Pet. Reply").[2]  Thereafter, Patent Owner filed a Sur-Reply (Paper 25, "Patent Owner Sur-Reply" or "PO Sur-Reply").[3]

An oral hearing was held on September 9, 2021 and a transcript (Paper 33, "Tr.") was entered in the record.

We have jurisdiction pursuant to 35 U.S.C. § 6.  This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on which we instituted trial.  Having reviewed the arguments and the supporting evidence, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent are unpatentable.

---

[1] We cite to the sealed version of Patent Owner's Response (Paper 13).  The public version is Paper 14.
[2] We cite to the sealed version of Petitioner's Reply (Paper 21).  The public version is Paper 22.
[3] We cite to the sealed version of Patent Owner's Sur-Reply (Paper 25).  The public version is Paper 26.

IPR2020-00861
Patent 10,230,898 B2

## II.     BACKGROUND

### A.     Related Proceedings

Petitioner and Patent Owner identify the following corresponding district court proceeding: *Corephotonics, Ltd. v. Apple Inc.*, Case No. 5:19-cv-04809 (N.D. Cal.).  Pet. 2; Paper 4, 1.[4]

We identify the following related administrative matters, including applications and patents claiming the benefit of the priority of the filing date of patents in the priority chain of the '898 patent.  *See* Office Consolidated Trial Practice Guide[5] at 18; *see also* 84 Fed. Reg. 64,280 (Nov. 21, 2019) (explaining what is considered an "administrative matter").  U.S. Patent No. 10,356,332 ('332 patent) is a continuation of Application No. 15/324,720 (now U.S. Patent No. 10,230,898, "the '898 patent").  The following co-pending proceeding challenges a patent in the priority chain of the '898 patent:  IPR2020-00862 (claims 1, 2, 5, 9–14, 17, 21, and 22 of the '332 patent).

### B.     The '898 Patent

The '898 patent is titled "Dual Aperture Zoom Camera with Video Support and Switching / Non-Switching Dynamic Control," and is directed to a "dual aperture zoom digital camera operable in both still and video modes."  Ex. 1001, code (57).

---

[4] Patent Owner cites *Corephotonics, Ltd. v. Apple Inc.*, Case No. 3:19-cv-04809-LHK (N.D. Cal.) (Paper 5, 1), but this case number appears to reflect a typographical error.  A PACER search of Case No. 5:19-cv-04809 reveals that Patent Owner's complaint in that case was erroneously identified as "Civil Action No. 3:19-cv-4809" on its cover page.

[5] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-00861
Patent 10,230,898 B2

The '898 patent describes video mode zoom operation from low zoom factor (ZF) to higher ZF above a switch point (described variously as Z*switch* or $ZF_T$ or uptransfer ZF), with "[processing] applied to eliminate the changes in the image during crossover from one camera to the other." *Id.* at 7:57–8:29.

The '898 patent describes that "[s]witching from the Wide camera output to the transformed Tele camera output will be performed unless some special condition (criterion), determined based on inputs obtained from the two camera images, occurs. In other words, switching will not be performed only if [a] no switching criteria is fulfilled." *Id.* at 10:2–9.

Figure 1A of the '898 patent, reproduced below, illustrates a dual-aperture Zoom imaging system 100 including a Wide imaging section and a Tele imaging section, each having a respective lens with respect field of view (FOV) and respective image sensor to provide image data of an object or scene.



FIG. 1A

4

Figure 1A shows a dual-aperture zoom imaging system. *Id.*

### C.    Challenged Claims

Petitioner challenges claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent. Claims 1 and 13 are independent. Claim 1 is reproduced below.

1. A zoom digital camera comprising:

   a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;

   b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and

   c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

Ex. 1001, 12:32–54.

### D.    Asserted Grounds of Unpatentability

Petitioner challenges claims 1, 4, 8–12, 15, 19, and 20 as follows. *See* Pet. 7.

IPR2020-00861
Patent 10,230,898 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 4, 8, 12, 15 | 103 | Golan[6], Martin[7], Togo[8] |
| 9 | 103 | Golan, Martin, Togo, Levey[9] |
| 11, 19 | 103 | Golan, Martin, Togo, Border[10] |
| 10, 20 | 103 | Golan, Martin, Togo, Parulski[11] |

In support, Petitioner relies on the declaration of Dr. Frédo Durand
(Ex. 1003).

### III.    ANALYSIS

#### A.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if the differences
between the claimed invention and the prior art are such that the claimed
invention as a whole would have been obvious before the effective filing
date of the claimed invention to a person having ordinary skill in the art to
which the claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550
U.S. 398, 406 (2007). The question of obviousness is resolved on the basis
of underlying factual determinations, including: (1) the scope and content of
the prior art; (2) any differences between the claimed subject matter and the

---

[6] U.S. Patent Application Publication No. 2012/0026366 A1, published Feb.
2, 2012 (Ex. 1005, "Golan").
[7] U.S. Patent No. 8,081,206 B2, issued Dec. 20, 2011 (Ex. 1006, "Martin").
[8] Japanese Patent Application Publication No. JP 2011/055246 (P2011-
55246A), published Mar. 17, 2011 (Ex. 1010, "Togo"); we refer to the
English translation.
[9] U.S. Patent Application Publication No. 2012/0019704 A1, published Jan.
26, 2012 (Ex. 1015, "Levey").
[10] US Patent Application Pub. No. 2008/0030592 A1, filed Aug. 1, 2006,
published Feb. 7, 2008 (Ex. 1009, "Border").
[11] U.S. Patent No. 7,859,588 B2, issued Dec. 28, 2010 (Ex. 1008,
"Parulski").

IPR2020-00861
Patent 10,230,898 B2

prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness, i.e., secondary considerations. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (2012) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

## B.    Level of Ordinary Skill in the Art

Petitioner contends

[A] Person of Ordinary Skill in the Art ("POSITA") at the time of the claimed invention would have a bachelor's degree or the equivalent degree in electrical and/or computer engineering, or a related field and 2–3 years of experience in imaging systems including optics and image processing. Furthermore, a person with less formal education but more experience, or more formal education but less experience, could have also met the relevant standard for a POSITA.

Pet. 7 (citing Ex. 1003 ¶ 17). Patent Owner argues Petitioner's definition of a person of ordinary skill in the art improperly fails to require knowledge,

IPR2020-00861
Patent 10,230,898 B2

skills or experience in the specific field of photography.  PO Resp. 8.
According to Patent Owner, the field of photography would represent
knowledge, skills and experience that include, e.g., the choice of lens,
exposure, aperture and other settings appropriate for the aesthetics of a given
shot.  *Id.*  Additionally, Patent Owner argues that neither an engineering
education nor experience in imaging systems, even if they were focused on
optics and image processing, require any knowledge, skills or experience in
the field of photography.  *Id.* at 8–9 (citing Ex. 2001 ¶¶ 32–33 (Hart
declaration)).

   "The importance of resolving the level of ordinary skill in the art lies
in the necessity of maintaining objectivity in the obviousness inquiry."  *Ryko
Mfg. Co. v. Nu–Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991).  "A less
sophisticated level of skill generally favors a determination of [non-
obviousness] . . . while a higher level of skill favors the reverse."
*Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir.
2011).

   Here, as explained below in Section III.E.2., under either articulation
of the level of skill in the art Petitioner has shown the claims would have
been obvious.  Therefore, we do not need to determine whether knowledge
of photography is required for the level of skill in this case.  *Okajima v.
Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (Where a determination of
level of skill would not change the result, "we find no harm under the
circumstances of this case in the Board's failure to set forth express findings
as to the level of skill.").

   For the reasons above, we determine, on the full record before us, that
the level of ordinary skill in the art proposed by Petitioner is consistent with

IPR2020-00861
Patent 10,230,898 B2

the '898 patent and the asserted prior art.  We adopt that level for the purpose of this Decision.

### C.    Claim Construction

For *inter partes* reviews filed on or after November 13, 2018, we apply the same claim construction standard used by Article III federal courts and the ITC, both of which follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny.  37 C.F.R. § 42.100(b). Accordingly, we construe each challenged claim of the '898 patent to generally have "the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  *Id.*

Petitioner asserts "for the purposes of this proceeding and the analysis presented herein, no claim term requires express construction [and that it] analyzes the claims consistent with ordinary and customary meaning as would be understood by a POSITA in light of the specification."  Pet. 8. Patent Owner does not request construction of any claim term.  *See generally* PO Resp.[12]

---

[12] Patent Owner proposed a construction for the limitation "no-switching criterion," as recited in each of the challenged claims, in its Preliminary Response.  Prelim. Resp. 7–9.  Patent Owner asserted "no-switching criterion" should be construed as "one more criteria determined based on inputs obtained from the two camera images."  *Id.* at 7.  In the Institution Decision, we did not limit "no-switching criterion" to "one more criteria determined based on inputs obtained from the two camera images."  Patent Owner did not address claim construction in its Patent Owner Response. *See generally* PO Resp.  Our Scheduling Order states that "Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."  Paper 8, 8.  Thus, Patent Owner's proposed construction for the limitation "no-switching criterion" is waived, and we do not

IPR2020-00861
Patent 10,230,898 B2

We do not discern a dispute between the parties regarding any limitation and we need not expressly construe any limitation to resolve the controversy before us. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### D.   *Obviousness over Golan, Martin, and Togo*

Petitioner contends that claims 1, 4, 8, 12, and 15 are unpatentable as obvious under 35 U.S.C. § 103 over Golan, Martin, and Togo. Pet. 13–59. For the reasons that follow, we determine that the evidence sufficiently supports Petitioner's contentions, Patent Owner's contentions regarding secondary considerations of non-obviousness do not weigh in favor of non-obviousness, and thus Petitioner's contentions establish by a preponderance of evidence that claims 1, 4, 8, 12, and 15 would have been obvious over Golan, Martin, and Togo.

### 1.   *Overview of Golan (Ex. 1005)*

Golan concerns a "method for continuous electronic zoom in a computerized image acquisition system," in which the system has "a wide image acquisition device and a tele image acquisition device." Ex. 1005, code (57). By providing "multiple imaging devices each with a different fixed field of view (FOV)," Golan's system "facilitates a light weight electronic zoom with a large lossless zooming range." *Id.* ¶ 9. Golan's

---

explicitly construe the term for the purpose of this Decision. *In re NuVasive, Inc.*, 842 F.3d 1376, 1380–81 (Fed. Cir. 2016).

IPR2020-00861
Patent 10,230,898 B2

Figure 1, reproduced below, illustrates a zoom control sub-system for an image acquisition system. *Id.* ¶ 26.



## Fig 1

Figure 1 of Golan illustrates a zoom control sub-system for an image acquisition system. *Id.*

According to Golan, "[z]oom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* ¶ 37. Zoom control circuit 130 selects an appropriate image sensor through image sensor selector 150 and calculates a camera

zoom factor when it receives a required zoom from an operator. *Id.* ¶ 39. Golan's system facilitates "continuous electronic zoom capabilities with uninterrupted imaging," which "is also maintained when switching back and forth between adjacently disposed image sensors." *Id.* ¶ 40.

### 2.  *Overview of Martin (Ex. 1006)*

Martin concerns a method for generating an autostereoscopic display by aligning a first parallax image and at least one other parallax image. Ex. 1006, code (57). By manipulating parallax images—two or more images with overlapping visual fields but different points of view—Martin's method creates a moving three-dimensional image without the use of special viewing aids, i.e., an autostereoscopic display. *Id.* at 1:16–20; 3:32–41. Martin's Figure 1, reproduced below, illustrates a method of capturing parallax images. *Id.* at 3:41–51.



**FIG. 1**

IPR2020-00861
Patent 10,230,898 B2

Figure 1 of Martin illustrates exemplary camera positions for generating parallax images. *Id.* at 3:17–18.

According to Martin, "a camera 10 may capture a first set of images and a camera 12 may capture a second set of images of a common scene 14 while being displaced from one another. The resulting sets of images from cameras 10 and 12 will be parallax images." *Id.* at 3:42–46. Martin discloses generating a set of aligned parallax images by displaying alternating views of two or more parallax images at a desired view rate and manipulating the images such that at least a portion of the images are aligned with each other. *Id.* at 3:6–13. Figures 3a–3d, reproduced below, illustrate an alignment process.



Figures 3a–3d of Martin illustrate a transformation process for aligning parallax images. *Id.* at 3:20–22.[13]

In Martin, "[t]he alignment matching process begins by selecting a reference image 30, as shown in FIG. 3a, from a set of parallax images.

---

[13] According to Petitioner, "[a] POSITA would have understood that element 34′ in FIG. 3b referring to a circle is a clerical error, and instead corresponds to the rectangle corresponding to region 34." Pet. 17 n.1.

IPR2020-00861
Patent 10,230,898 B2

Once reference image 30 has been selected, other images 32, as shown in
FIG. 3b, from the parallax image set can be aligned to reference image 30."
*Id.* at 4:39–43. "Reference image 30 may include region of interest 34." *Id.*
at 4:51. "Unaligned image 32 may be manipulated, as shown in FIG. 3c, for
example, until region 34′ matches alignment with region 34, as illustrated in
FIG. 3d." *Id.* at 4:54–56. "The manipulation process may be represented by
an affine transformation including translation, rotation, scaling, and/or any
other desired transformation." *Id.* at 4:56–59.

     Martin discloses that a computer may align the images using
convergence points in the images. *Id.* at 5:6–11. "The computer may
further perform pattern matching or feature extraction algorithms . . . to
match alignment of regions of interest in the selected images at or near the
selected convergence points." *Id.* at 5:11–28. The computer may
continuously adjust the transformation parameters to achieve "critical
alignment," corresponding "to a condition where the degree of alignment is
sufficient to achieve a stable auto-stereoscopic display. Stability of the
whole image may not be required, as long as at least a particular region of
interest in the auto stereoscopic display is stable." *Id.* at 5:53–58. Martin
further discloses that the process may include "parallax image manipulations
of sub-pixel resolution to achieve critical alignment . . . where one image is
moved with respect to another image by an amount less than an integral
number of pixels." *Id.* at 5:59–65.

### 3.    *Overview of Togo (Ex. 1010)*

     Togo is titled "Telephoto Imaging Device," and discloses
improvements for "[d]igital cameras and imaging devices (cameras) of
mobile terminal devices such as mobile phones" that "realize a zoom

function by using a plurality of imaging modules made of a plurality of lenses with different focal lengths— that is, lenses of different fixed magnifications." Ex. 1010 ¶¶ 2, 7, code (54).

Togo describes switching between the respective imaging modules according to a magnification (zoom factor) set by a user. *Id.* ¶ 7. "For example, in a configuration . . . with a wide-angle lens and . . . a telephoto lens, when a subject is at a short distance, an image . . . [from] the wide-angle lens, which has a short focal length, is switched to, and when the subject is at a long distance, an image . . . [from] the telephoto lens is switched to." *Id.* ¶ 8. "Small changes in magnification are realized by electronic zooming, which changes [to] a cutout region" of the switched-to image. *Id.*

Togo teaches a zoom digital camera with "[a] first imaging module . . . for a wide-angle image" including a "wide angle lens system 7" and "a first imaging element 8 such as a CCD camera . . ." (a Wide imaging section). *Id.* ¶ 23. Togo's zoom digital camera also includes "[a] second imaging module 2 . . . for a telephoto image" including a "telephoto lens system 10" and "a second imaging element 11 such as a CCD camera" (a Tele imaging section). *Id.* ¶ 26.

### 4.    *Independent Claim 1*

Patent Owner explicitly contests Petitioner's showing as to motivation to combine, and the last limitation of claim 1, which recites "a camera controller . . . ," and presents secondary considerations of non-obviousness. We discuss Petitioner's contentions as to each limitation and Patent Owner's arguments below.

IPR2020-00861
Patent 10,230,898 B2

> *"A zoom digital camera comprising:*
>
> *a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view $FOV_W$ and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;*
>
> *b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele field of view $FOV_T$ that is narrower than $FOV_W$ and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene"*

Petitioner contends that the embodiment depicted in Figure 1 of Golan teaches "a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image." Pet. 33 (citing Ex. 1005 ¶¶ 3, 9, code (54); Ex. 1003 ¶¶ 70–74). Petitioner explains that Golan's image acquisition system includes, "tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150." *Id.* at 30–33 (citing Ex. 1005 ¶¶ 37, 39, Fig. 1; Ex. 1003 ¶ 72; Ex. 1001, 3:26–28).

Petitioner further contends that Golan teaches the claimed Wide imaging section and Tele imaging section. *Id.* at 35–39. Specifically, Petitioner argues Golan discloses "a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with FOV [Field of View] 142 (Wide field of view $FOV_w$) and a wide image sensor 112 (Wide sensor)." *Id.* at 35 (citing Ex. 1005 ¶¶ 36–37, Fig. 1; Ex. 1003 ¶ 76); *see id.* at 36 (citing Ex. 1001, 7:3–5; Ex. 1003 ¶¶ 77–82; Ex. 1005 ¶¶ 9, 36, 37, 43; Ex. 1017, Fig. 4.13, 48 (Jacobson photography textbook)). Petitioner also contends that Golan's zoom control sub-system 100 includes "a Tele

IPR2020-00861
Patent 10,230,898 B2

imaging section that includes a tele image sensor 110 (Tele sensor) coupled with narrow lens 120 (a fixed focal length Tele lens) having fixed FOV 140 (Tele FOV)." *Id.* at 37–38 (citing Ex. 1003 ¶ 86; Ex. 1005 ¶¶ 36, 37, code (57), Fig. 1); *see id.* at 38 (citing Ex. 1003 ¶¶ 87; Ex. 1005 ¶¶ 9, 36, 37, 39, 43). Petitioner further asserts that Golan discloses that "wide FOV 142 is substantially wider than narrow FOV 140." *Id.* at 38 (quoting Ex. 1005 ¶ 43) (citing Ex. 1003 ¶ 82; Ex. 1005 ¶¶ 9, 37, Fig. 1) (emphasis omitted).

Patent Owner does not specifically address the preamble and the Wide and Tele imaging sections of claim 1. Having reviewed the cited evidence and Petitioner's contentions, we determine that Petitioner's contentions are sufficiently supported.[14]

> *"c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data."*

Petitioner contends that "Golan's zoom control sub-system 100 includes a camera controller including zoom control circuit 130 coupled to the Wide and Tele imaging sections for receiving a requested zoom and

---

[14] We need not determine whether the preamble is limiting because Petitioner shows sufficiently that it is satisfied by the prior art.

provides an acquired image frame with the requested zoom." Pet. 40–41 (citing Ex. 1003 ¶¶ 91–95); *see id.* at 39–40 (citing Ex. 1005, Figs. 1 and 2, claim 1, ¶¶ 48, 49; Ex. 1003 ¶¶ 92, 93).

Petitioner relies on the combination of Golan, Martin, and Togo to teach the claimed configuration of the camera controller. *Id.* at 39–55. Specifically, Petitioner contends that "Golan teaches a zoom switching setting that depends on the Wide and Tele fields of view, including a predetermined switch zoom factor $ZF_T$=tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)." *Id.* at 41 (citing Ex. 1003 ¶ 97).

Petitioner contends that "Golan describes that in an example, such a large lossless zooming range has a value of (Wide_FOV/Narrow_FOV)$^2$, which is provided by 'switching between the image sensors' and performing digital zoom to both Wide and Tele images." *Id.* at 41–42 (citing Ex. 1005 ¶ 9). Petitioner asserts "that [a] POSITA would have understood . . . the underlying geometric relationships and as such, would have understood that Golan's informal terminology, 'Wide_FOV/Narrow_FOV,' corresponds to . . . '*tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$)*' as claimed." *Id.* at 42. Petitioner further contends that

> Golan teaches selecting Wide image sensor and providing a zoom video output image including only Wide image data when a requested zoom factor value is less than the predetermined switch zoom factor $ZF_T$, and selecting Tele image sensor and providing a zoom video output image including only Tele image data when the requested zoom factor value is greater than the up-transfer ZF (e.g., the predetermined switch zoom factor $ZF_T$).

*Id.* (citing Ex. 1003 ¶ 108 (citing Ex. 1005 ¶ 39)).

Petitioner contends that "Togo recognizes that 'by **switching between or compositing images** of a plurality of optical systems and a plurality of

imaging elements joined to these optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized.'" *Id.* at 44–45 (quoting Ex. 1010 ¶¶ 2, 8; citing Ex. 1003 ¶ 111). Petitioner further contends that "Togo recognized that 'a telephoto imaging module with a long focal length is **less sharp at close distances** compared to a wide-angle imaging module whose focal length is short.'" *Id.* at 45 (quoting Ex. 1010 ¶ 12). Further, Petitioner contends that Togo recognizes "[d]uring a zoom in operation, 'a switch is made from the wide-angle imaging module to the telephoto imaging module. However, at this time, if the subject is close, the **image quality degrades** due to the image being from the telephoto imaging module.'" *Id.* (quoting Ex. 1010 ¶ 13; citing Ex. 1003 ¶ 112).

Petitioner contends that "Togo's solution is for image control means 4 (a camera controller) to employ a no-telephoto **criterion** based on image quality." *Id.* (citing Ex. 1003 ¶ 113). For example, according to Petitioner "as shown in annotated FIG. 7 . . . one switching criterion is based on when '**the image quality** of the cutout image 22 of the wide-angle image becomes **poorer** than **the image quality** of the telephoto image 23.'" *Id.* at 45 (citing Ex. 1010 ¶ 66).

Petitioner also contends that "Togo describes an example image quality no-switching criterion to include that 'setting magnification X < A" or "setting magnification X ≥ A and the imaging distance Y ≤ B." *Id.* (quoting Ex. 1010 ¶¶ 61, 62).

Petitioner contends that Golan combined with Martin and Togo teach the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that

IPR2020-00861
Patent 10,230,898 B2

includes only transformed, digitally zoomed Tele image data." *Id.* at 50.
Specifically, Petitioner contends that in addition to the disclosure discussed
above, "[a] POSITA would have understood that in the combination, if the
no-switching criterion is **not** fulfilled, switching from Wide image to Tele
image as taught in Golan is performed, and the zoom video output image
includes only digitally-zoomed Tele image data." *Id.* at 51 (citing Ex. 1005
¶¶ 9, 36, Fig. 1; Ex. 1010, Fig. 5(4); Ex. 1003 ¶ 123).

As to "transformed, digitally zoomed Tele image data," Petitioner
contends further that "Martin teaches when switching between two
successive images having different points of view, executing registration
using critical alignment to register a succeeding image to a preceding image
to generate **a transformed succeeding image** in video output images for a
stable video display." *Id.* (citing Ex. 1003 ¶ 124).

Martin's Figure 3, reproduced as annotated by Petitioner below,
illustrates registration between two images as part of Martin's critical
alignment. *Id.* at 52–53 (citing e.g. Ex. 1006, 4:51–56).

IPR2020-00861
Patent 10,230,898 B2



Petitioner's annotated version of Martin's
Figures 3A–3D.[15]

According to Petitioner, with respect to the annotated version of Martin's

Figures 3A through 3D:

> A POSITA would have understood that Martin's critical alignment teaches determining correspondences between the coordinate systems of the two images from different points of view, which represent the registration between the two images (e.g., "represented by affine transformation . . . and/or any other desired transformation"), and therefore teaches executing registration of successive images for position matching in the ROI [Region of Interest] and generating a transformed succeeding image (e.g., transformed and shifted succeeding image 32 as in FIG. 3d above).

*Id.* at 53–54 (citing Ex. 1003 ¶ 128; Ex. 1009 ¶¶ 41, 42; Ex. 1013, Figs. 2.4,

6.2, Tables 2.1, 6.1, 33–35, 273–77; Ex. 1016, 137 (Xiong article on image

---

[15] Petitioner apparently takes the position that element number 34′ should reference the rectangle, not the circle, in Martin's Figure 3b.

IPR2020-00861
Patent 10,230,898 B2

registration methods)).  Petitioner further argues that "Martin teaches in critical alignment, the transformed succeeding image is used to achieve position matching of ROI between the preceding image and transformed succeeding image to the video output images when switching between the two images for providing stable video output images" and the critical alignment "changes with object distance of the ROI in a specific image, and is performed when switching between each pair of parallax images." *Id.* at 54 (citing Ex. 1003 ¶ 129; Ex. 1006, 7:36–51, 5:6–21).

Petitioner takes the position that in the digital camera of Golan, Togo, and Martin, "after the no-switching criterion is not fulfilled, when switching from the Wide image (preceding image) to Tele image (succeeding image), a transformed digitally zoomed Tele image (transformed succeeding image as taught by Martin) is provided for smooth transition in the video output image, which renders obvious" the limitation of "if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data." *Id.* at 55 (citing Ex. 1003 ¶ 128).

Below we address Patent Owner's arguments regarding this claim limitation, the motivation to combine Golan and Martin, the motivation to combine Golan, Martin, and Togo, and secondary considerations of non-obviousness, respectively.

*Patent Owner's Arguments Regarding Claim Limitation of:*

*"[the camera controller ...] configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, wherein if the no-switching criterion is not*

IPR2020-00861
Patent 10,230,898 B2

*fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data"*

Patent Owner criticizes Petitioner's presentation as to claim 1, suggesting Dr. Durand spends too many pages explaining errors in Golan's paragraph 9 and does not explain how those errors would have affected a person of ordinary skill's motivation to utilize Golan.  PO Resp. 36.  Patent Owner appears to suggest, without explicitly arguing, that Golan's errors would have discouraged one of ordinary skill from looking to Golan to address the subject matter of the claims.  *Id.*  Because Patent Owner's argument is unclear and poorly supported, we are unable to determine the extent to which Patent Owner's argument undermines Petitioner's showing.

Patent Owner argues that Golan's teaching that "[t]he zoom control 130 selects an image acquisition device with the having a zoom more proximal to the requested zoom (Ex. 1005, ¶47)" is insufficient to support Petitioner's contentions as to claim 1.  *Id.* (alteration in original).  According to Patent Owner, "[a] POSITA would find the term 'proximal' far too nebulous and indeterminate to prescribe the specific threshold selection provided by the '898."  *Id.*

Petitioner responds that a "POSITA would have understood both Golan's teachings of up-transfer ZF with a switch zoom factor (e.g., at 6x in the 36x zoom range example) when zooming in, and that, in the context of Golan, the term 'proximal' in Golan [0047] is far from nebulous."  Pet. Reply 12 (citing Ex. 1040 ¶¶ 63–65 (Durand reply declaration)).  We agree. Golan explicitly discloses such thresholds.  Ex. 1005 ¶¶ 7–9.  Thus, Patent Owner's argument does not undermine Petitioner's showing.

23

Patent Owner also argues that "Petitioner provides not [sic] evidence of Golan disclosing any non-switching criteria that would cause Golan to ***not*** 'select an image acquisition device … having a zoom more proximal to the requested zoom.'" PO Resp. 37 (citing Ex. 2001 ¶ 75) (second alteration in original). Nevertheless, Petitioner relies on Togo to teach this limitation of the claim.[16] Non-obviousness cannot be established by attacking the references individually when a challenge is predicated upon a combination of prior art disclosures. *See In re Merck & Co., Inc.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986). Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo's switching criteria is not "fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value," as required by claim 1. PO Resp. 37–38 (quoting Ex. 2001 ¶ 77). Rather, according to Patent Owner, "Togo's switching criteria are evaluated for a zoom setting regardless of whether the zoom factor was set in a continuously increasing, continuously decreasing or discretely specified manner." *Id.* Nevertheless, Petitioner relies on Golan to teach the continuous zoom aspect of this limitation of the claim.[17] Non-obviousness cannot be established by attacking the references individually when a challenge is predicated upon a combination of prior art

---

[16] Petitioner asserts "Petitioner details why and how to combine Togo' no-switching criterion based on image quality in the combination of Golan and Martin, and POSITA reading Golan would not have been discouraged from the combination." Pet. Reply 12.

[17] Petitioner asserts "Petitioner details why and how to combine Togo'[s] no-switching criterion based on image quality in the combination of Golan and Martin, and [a] POSITA reading Golan would not have been discouraged from the combination." Pet. Reply 12.

disclosures. *See Merck & Co.*, 800 F.2d at 1097.  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo's alleged no switching criteria is not based on image quality.  PO Resp. 38.  Patent Owner relies on the following statement in Togo, that "***in the mobile terminal device of the present invention***, the photography distance Y between the photography subject and the mobile terminal device is estimated from an output signal of the autofocusing means or a control signal controlling the autofocusing means." *Id.* (quoting Ex. 1010 ¶ 19).  Although Togo may use autofocus to estimate the distance, Petitioner contends Togo also "describes switching/no-switching based on comparing '**image qualities** of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21.'" Pet. Reply 15 (citing Pet 45–46; Ex. 1010 ¶¶ 66–67, Fig. 7 ("image qualities of the enlarged image 22 of the wide-angle image 20 and the telephoto image 21 at the long distance (B) in FIG. 7 are compared")).  Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues that Togo does not "perform image analysis using the disparity of corresponding wide-angle and telephoto pixels to estimate distance." PO Resp. 38–39.  We find the claims do not recite "image analysis;" rather, the claims recite "image quality" which, as explained above, is used by Togo.  Therefore, this argument does not undermine Petitioner's showing.

Finally, as to the limitation of "wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data," Patent Owner argues that the '898 patent "teaches away" from

IPR2020-00861
Patent 10,230,898 B2

Martin's use of parallax to create its autostereoscopic effect. *Id.* at 39–40
(citing Ex. 2001 ¶ 84; Ex. 1001, 7:46–48, 7:50–53; Pet. 51). We discuss this
issue below in association with the arguments regarding the motivation to
combine Golan and Martin.

Having reviewed the whole record including the cited evidence,
Petitioner's contentions, and Patent Owner's arguments, we determine that
Petitioner's contentions are sufficiently supported.

*Petitioner's Contentions Regarding the Rationale for Combining
Golan and Martin*

Petitioner contends a person of ordinary skill in the art would have
been motivated to apply Martin's teachings to Golan "to produce the
obvious, beneficial, and predictable results of a stable transition between
images from different points of view for providing continuous zoom video
output images." Pet. 18–19 (citing Ex. 1003 ¶¶ 49–54). Petitioner supports
its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field
of endeavor pertaining to imaging systems generating video output images
using two imaging sections having different points of view." *Id.* at 19
(quoting Ex. 1003 ¶ 50).

*Second*, "they share a need to provide continuous video output images
when switching between images from imaging sections having different
points of view, for example, by using alignments having sub-pixel
accuracy." *Id.* at 19–20 (citing Ex. 1003 ¶ 58); *see id.* (citing Ex. 1005 ¶ 15;
Ex. 1006, 5:51–55, 5:59–6:5).

*Third*, Martin addresses these needs identified in Golan by providing
"critical alignment of an ROI [Region of Interest] in two images having

IPR2020-00861
Patent 10,230,898 B2

different points of view to calculate 'transformation parameters of subpixel resolution' for position matching of the ROI to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan." *Id.* at 20–21 (quoting Ex. 1006, 5:51–58) (citing Ex. 1003 ¶ 59; Ex. 1005 ¶ 36).

*Fourth*, applying Martin to the teachings of Golan would have required no more than combining "known elements according to known methods (such as performing critical alignment of an ROI in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control subsystem of Golan) to achieve the benefits of a stable transition in video output images described by Martin." *Id.* at 21. According to Petitioner, the combined teachings of Golan and Martin would have "produced operable results that are predictable." *Id*. (citing Ex. 1003 ¶ 49).

*Fifth*, that Golan and Martin have a "shared goal to provide continuous video output images with seamless transition when switching between images from two imaging sections." *Id.* at 22 (citing Ex. 1003 ¶ 62). According to Petitioner,

> A POSITA would have sought to improve the efficacy of Golan's image sensor alignments (e.g., determined at the time of manufacture without consideration of different parallax shifts for objects of different distances) with image registration-based critical alignment as taught by Martin (e.g., determined after the images are captured and dependent on object distances) to improve robustness of the seamless transition when switching for continuous zoom output images.

*Id.* at 22.

IPR2020-00861
Patent 10,230,898 B2

*Discussion of Petitioner's Reasons to Combine Martin and Golan*

With respect to Petitioner's *third* and *fourth* reasons, we find that these reasons are sufficiently supported by the cited evidence. Golan teaches "a first image acquisition device having a first image sensor array coupled with a first lens having a first FOV, typically a wide FOV, and a first electronic zoom and "a second image acquisition device having a second image sensor array coupled with a second lens having a second FOV, typically a narrow FOV, and a second electronic zoom," and that the "*calibration the alignment, between the first image sensor array and the second image sensor array*, facilitates continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array." Ex. 1005 ¶¶ 14, 15 (emphasis added). Petitioner argues that the ordinarily skilled artisan would have been motivated "to incorporate Martin's teaching of *executing registration using critical alignment of ROI in two images having different points of view* to calculate 'transformation parameters of sub-pixel resolution' for position matching to achieve a stable transition in the continuous zoom video output images of the digital camera of Golan." Pet. 20 (citing Ex. 1005 ¶ 36; Ex. 1006, 5:51–58; Ex. 1003 ¶ 57) (emphasis added). Petitioner presents evidence, Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *Id.* (citing-in-part Ex. 1007, 4:58–62, 10:2–5).

Martin teaches *aligning images*:

Reference image 30 may include a region of interest 34. The same region of interest 34′, albeit as viewed from a different point of view, may appear in unaligned image 32. Unaligned image 32 may be manipulated, as shown in FIG. 3c, for example,

28

IPR2020-00861
Patent 10,230,898 B2

> until region 34′ matches alignment with region 34, as illustrated
> in FIG. 3d. The manipulation process may be represented by an
> affine transformation including translation, rotation, scaling,
> and/or any other desired transformation.

Ex. 1006, 4:51–59. Martin discloses that *critical alignment* "corresponds to
a condition where the degree of alignment is sufficient to achieve a stable
auto stereoscopic display," and that "[s]tability of the whole image may not
be required, as long as at least a particular region of interest in the auto
stereoscopic display is stable." *Id.* at 5:53–58. According to Martin, the
"alignment process is the use of parallax image manipulations of sub-pixel
resolution to achieve critical alignment" and "the transformations for
achieving critical alignment may proceed to a sub-pixel level where one
image is moved with respect to another image by an amount less than an
integral number of pixels." *Id.* at 5:59–65.

We determine that Martin's teaching of critical alignment that reduces
positional differences in a region of interest does not conflict with Martin's
teaching of producing or maintaining parallax artifacts in other portions of
the image, based on the entirety of the record developed at trial. *See* Ex.
1006, 7:46–51 ("while displaying the images, aligning a user-selected region
of interest associated with the first image with a corresponding region of
interest of the second image such that said region of interest of the first
image occupies in the display the same location as the region of interest in
the second image").

Dr. Durand testifies that "a POSITA would have understood that
Martin's teachings of critical alignment for stable transition between images
of different points of view apply to electronic camera systems providing
continuous zoom video output [i]mages as taught in Golan, regardless of

IPR2020-00861
Patent 10,230,898 B2

whether a three dimensional illusion is provided." Ex. 1003 ¶ 54. Citing

Ahiska (Ex. 1007), Border (Ex. 1009), Orimoto (Ex. 1014), and Hansen (Ex.

1019) to support his testimony, Durand further testifies that

> It was well known in the art that for seamless transition between
> two images of different points of views in continuous zoom video
> applications, when calibration between two cameras (*e.g.*, the
> electronic calibration of Golan) is not sufficient alone (*e.g.*,
> because of shocking, vibration, thermal variation, etc.), image
> registration of two images from two imaging sections for
> position matching (e.g., critical alignment of Martin) may be
> used.

*Id.* ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:63–2:1; Ex. 1019,

1059; Ex. 1009 ¶¶ 41, 42). The portion of Hansen (Ex. 1019) cited by Dr.

Durand addresses how extrinsic calibration errors occur and "a method to

recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019,

1059 (emphasis omitted). Orimoto discloses how misalignment occurs,

irrespective of "how exactly the dual lens camera has been conditioned and

adjusted by the manufacturer." Ex. 1014, 1:63–2:1. Border addresses image

registration as an alternative to correspondence (i.e., calibration). Ex. 1009

¶¶ 41, 42. And Ahiska disclose image registration or matching, when

calibration is insufficient, to provide a seamless transition between master

and slave cameras and "create the quality of a continuous zoom function."

Ex. 1007, 4:58–62, 10:2–5 ("[i]f calibration between the [wide-angle] master

and slave cameras is insufficient alone, image registration or matching can

be carried out," "transition[ing] between the master view and the slave view

as seamlessly as possible to create the quality of a continuous zoom

function").

IPR2020-00861
Patent 10,230,898 B2

Petitioner's *third* and *fourth* reasons for combining Golan and Martin are supported by Dr. Durand's testimony quoted above, which is in turn supported by Ahiska and Border. The portions of Border cited by Dr. Durand address image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. The portions of Ahiska cited by Dr. Durand address the additional step of image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5. Thus, each of Border and Ahiska show a relation between electronic calibration and registration.

*Patent Owner's Arguments Regarding Petitioner's Rationale for Combining Golan and Martin*

As to Petitioner's proffered rationale for combining Golan and Martin, Patent Owner contends that the "Golan and Martin references are fundamentally dissimilar, address different problems, and prescribe different techniques to address those different problems." PO Resp. 30 (citing *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1340 (Fed. Cir. 2017) (affirming district court conclusion of no motivation to combine where the combination of references relating to LED packages "describe[d] different structures" and "address[ed] different problems")); *see id.* at 31–32 (citing *Adidas AG v. Nike, Inc.,* 963 F.3d 1355, 1360 (Fed. Cir. 2020); Ex. 2015 ¶ 66). Patent Owner argues that "Golan teaches a preference that camera calibration occur before zooming resulting in 'alignment offsets'" [and teaches that] "[t]ypically, since the spatial offsets between wide image sensor array 110 and tele image sensor array 112 are fixed, the electronic calibration step is performed one time, after the manufacturing of the image

acquisition system and before the first use." *Id.* at 28 (Ex. 1005 ¶ 44).
Patent Owner argues that "Martin, on the other hand, teaches away from
Golan with an 'exemplary embodiment' that uses 'convergence points' in
the two camera images to determine alignment that would continue to work
even if the position and orientation of the two cameras varied." *Id.* (quoting
Ex. 1006, 5:6–21).

Patent Owner further argues that "[s]ince both Golan and Martin rely
on careful 'sub-pixel' alignment, these differences in alignment processing
would be critical, and it would not be obvious to a POSITA which choice to
use for a hypothetical combined embodiment." *Id.* at 28.  Patent Owner also
argues "[a] POSITA would understand from Golan that its approach works
better if the cameras can be as close as possible to minimize the differences
in their points of view." *Id.* at 27 (citing Ex. 1005 ¶ 22).  Patent Owner
further argues "Martin on the other hand ***requires*** 'parallax images' that a
POSITA would understand as images captured from necessarily different
points-of-view." *Id.* (citing Ex. 1006, 3:56–60; Ex. 2001 ¶ 61).

Petitioner responds by distinguishing *Nichia*, arguing that "the
relevant teachings of Golan and Martin address the same problem, and a
relation between solutions of Golan and Martin was well-known and no
alleged difference between the relevant teachings would require the
alteration of Golan's principles of operation or render Golan inoperable."
Pet. Reply 7 (citing *Nichia Corp.*, 855 F.3d at 1339; *Adidas AG*, 963 F.3d at
1358–159; Pet. 18–20; Ex. 1006, 2:49–50, 5:51–58).  According to
Petitioner, "for seamless transition between two images in continuous zoom
video applications, when calibration between two cameras . . . is not
sufficient alone . . . , image registration of two images from two imaging

sections (e.g., critical alignment of Martin) may be used for position matching."  Pet. 54–55 (citing Ex. 1007, 4:58–62; 10:2–5; Ex. 1014, 1:58–62; Ex. 1019, 1059; Ex. 1009 ¶¶ 41–42).  Petitioner further contends that a "POSITA starting with Golan would have found it obvious to use Martin's critical alignment including registration to provide improved seamless transition."  Pet. Reply 6 (citing Pet. 20–21).

We are not persuaded that Golan and Martin are "fundamentally dissimilar," because Golan and Martin both involve parallax effects caused by two cameras with different fields of view and they both address a common problem—a discontinuity in images that are misaligned due to parallax from two different cameras—albeit in different contexts and with different techniques.  *See* PO Resp. 23–31.

Martin also does not need to share a goal, objective, problem, or purpose in order to be combined with Golan.  Golan and Martin are not incompatible with each other for having different objectives.  *Intelligent Bio-Systems v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016).  Even assuming, *arguendo*, that Golan discloses reducing a parallax and Martin discloses the *opposite* (i.e., creating or maintaining a parallax)—this is not necessarily fatal to the combination of these references.  Nonetheless, one of the problems noted by each of the references *is* shared in common between Golan and Martin, as discussed in the preceding paragraph.  Thus, Patent Owner's "fundamentally dissimilar" argument does not undermine Petitioner's contentions.

Patent Owner also argues that "these differences in camera configurations [between Martin and Golan] teach away from each other.  PO Resp. 28.  Patent Owner also argues that the '898 patent "teaches away"

IPR2020-00861
Patent 10,230,898 B2

from parallax, which Martin depends on. *Id.* at 40 (citing Ex. 2001 ¶ 84; Ex. 1001, 7:50–53). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1332 (Fed. Cir. 2008) (quoting *In re Kahn*, 441 F.3d 977, 990 (Fed. Cir. 2006)).

We are not persuaded that the invention claimed in the '898 patent or Golan teaches away from Martin because they do not discourage or lead one in a direction divergent from Martin's teachings relevant to "evaluat[ing] if a no-switching criterion is fulfilled or not fulfilled . . ." as recited in claim 1. In addition to providing an autostereoscopic display of 3D images using parallax images, Martin also discloses aligning these same parallax images using transformation parameters. *See* Ex. 1006, 5:38–42. Thus, Martin's teaching of critical alignment does not appear to be divergent from or incompatible with the scope of independent claim 1 *or* the objectives of the '898 patent. Nor is Martin incompatible with Golan for having a different objective. Petitioner need not show that Martin shares a common objective with Golan or the patent at issue. *Intelligent Bio-Systems*, 821 F.3d at 1367. Thus, Patent Owner's teaching away argument does not undermine Petitioner's contentions.

Patent Owner also argues that although Martin is for autostereoscopic display, there is no evidence in the record of a camera utilizing autostereoscopic visual perception. PO Resp. 24–25. Patent Owner contends "a POSITA would recognize Martin as a display system patent intended for post-processing images for display, whereas Golan is an image

acquisition patent intended for pre-processing images in preparation for photographic image capture." *Id.* Nevertheless, we determine that Patent Owner does not explain sufficiently in its Patent Owner Response why Martin's critical alignment could not be used in Golan during image acquisition.

As discussed above, Petitioner, by contrast, presents evidence, i.e. Ahiska (Ex. 1007), that tends to show a relation between electronic calibration and registration for position matching. *See* Pet. 20–21 (citing-in-part Ex. 1007, 4:58–62, 10:2–5 ("If calibration between the master and slave cameras is insufficient alone, image registration or matching can be carried out . . ." and "transition[ing] between the master view and the slave view as seamlessly as possible to create the quality of a continuous zoom function.")). Dr. Durand also cites Ahiska, in addition to other references, to support his testimony. Ex. 1003 ¶ 52 (citing Ex. 1007, 4:58–62, 10:2–5; Ex. 1014, 1:58–62 (Orimoto patent) (describing "image registration on the side of the manufacturer . . . to obtain the three dimensional image without noticing misalignment of the plural images"); Ex. 1019, 1059 (Hansen article) (describing how extrinsic calibration errors occur due to shock, vibration, thermal variation and cycling); Ex. 1009 ¶ 52 (explaining that registration between wide image 204 and telephoto image 206 is an alternative to correspondences preferably determined at the time of manufacturing)).

Dr. Durand testifies that

It was well known in the art that for seamless transition between two images of different points of views in continuous zoom video applications, when calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not sufficient alone (*e.g.*,

IPR2020-00861
Patent 10,230,898 B2

> because of shocking, vibration, thermal variation, etc.), image
> registration of two images from two imaging sections for
> position matching (e.g., critical alignment of Martin) may be
> used.

*Id.* Dr. Durand's testimony quoted above is supported by some of the cited references. The cited portion of Hansen (Ex. 1019) addresses how extrinsic calibration errors occur and "a method to recalibrate extrinsic parameters online to correct drift or bias." Ex. 1019, 1059 (emphasis omitted). The cited portion Orimoto (Ex. 1014) concerns image registration, at the manufacturer's end, to address misalignment of images. The quoted portion of Orimoto discloses how misalignment occurs, irrespective of "how exactly the dual lens camera has been conditioned and adjusted by the manufacturer." Ex. 1014, 1:63–2:1. The cited portions of Border (Ex. 1009) address image registration as an alternative to correspondence (i.e., calibration). Ex. 1009 ¶¶ 41, 42. And the cited portions of Ahiska disclose image registration or matching, when calibration is insufficient, to provide a seamless transition between master and slave cameras and "create the quality of a continuous zoom function." Ex. 1007, 4:58–62, 10:2–5.

Thus, Petitioner has shown sufficiently that one of ordinary skill would have chosen to use registration such as occurs in Martin, in the system of Golan during acquisition.[18] Thus, Patent Owner's pre- processing

----

[18] Patent Owner asserts in its Sur-Reply that Petitioner's statement that Patent Owner's argument at pages 27–28 of the Patent Owner Response "would not have discouraged POSITA from applying Martin's critical alignment teachings in Golan" incorporates a nine-paragraph, 1163-word discussion from Dr. Durand into the Petitioner's Reply in violation of 37 C.F.R. § 42.6(a)(3)'s prohibition on incorporation by reference of arguments from expert declarations. PO Sur-Reply 6. We have reviewed

IPR2020-00861
Patent 10,230,898 B2

versus post-processing argument does not undermine Petitioner's contentions.

Patent Owner further argues that "the core problem with Petitioner's argument for combining Golan and Martin involves a more basic question: 'whether [a] skilled artisan would have plucked one reference out of the sea of prior art … and combined it with conventional [] elements to address some need present in the field.'" PO Resp. 24, 29 (quoting *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016)) (alterations in original).

Petitioner responds that the evidence of record does not indicate that there was a "sea" of other image registration or position matching patents or literature to choose from; rather it was a finite pool including Martin and Ahiska. *See* Pet. Reply 6. Petitioner further argues that it is not required to show why it chose one reference, in this case, Martin, over another. *Id.* (citing *Infineum USA L.P. v. Chevron Oronite Co. LLC*, 2021 WL 210722, at *4 (Fed. Cir. 2021)). We are persuaded that the evidence of record does not indicate that there were several alternatives that a POSITA could have chosen instead of Martin so as to establish a "sea" or "ocean" as Patent Owner contends, nor has Patent Owner shown Petitioner is relying on the concept of "combining known element to yield predictable results" under which a finite number of alternatives may be required.[19] *See Fanduel, Inc.*

---

the referenced section of the Reply and declaration and do not find that Petitioner violated the page limits or any other rules.

[19] We do not suggest that this is required. *WBIP* was not concerned with showing that a particular reference could be found in the "sea." Rather, *WBIP* pointed out that one must show a rationale to combine instead of assuming that "a person of skill, [has] two (and only two) references sitting on the table in front of him." *WBIP*, 829 F.3d at 1337. In other words, one does *not* need to show that there is something about the references relied on

*v. Interactive Games LLC*, 966 F.3d 1334, 1346 (Fed. Cir. 2020) ("when the record shows a finite number of identified, predictable solutions to a design need that existed at the relevant time, which a person of ordinary skill in the art ha[d] a good reason to pursue, common sense can supply a motivation to combine") (citations and internal quotation marks omitted, alteration in original).

We are further persuaded that Petitioner need not explain why it chose Martin over another reference with similar teachings, or why its combination is superior. *See Novartis Pharms. Corp. v. W.-Ward Pharms. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019) ("It is thus improper to require West-Ward to prove that a person of ordinary skill would have selected everolimus over other prior art treatment methods."); *see also In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004) ("[O]ur case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention."). Thus, Patent Owner's "sea" of references argument does not undermine Petitioner's contentions.

Patent Owner also argues that Durand's "analogous art" analysis is deficient because it fails to address whether Golan and Martin, separately, are "analogous" to the invention of the '898 patent, because it instead "only

---

that is different than *all* other references in the sea *nor* does one need to show the sea is so small that the two references would be easily found (unless one is relying on combining known elements to yield predictable results). *See Yeda Rsch. v. Mylan Pharms. Inc.*, 906 F.3d 1031, 1044–45 (Fed. Cir. 2018) (associating "sea" of prior art argument with concept of "a finite number of identified, predictable solutions").

IPR2020-00861
Patent 10,230,898 B2

asserted that Golan and Martin were 'analogous' because they are both in 'the same field of endeavor.'" PO Sur-Reply 2.

Art is analogous when it is: (1) from the same field of endeavor as the claimed invention; and (2) if the art is not from the same field of endeavor, reasonably pertinent to the particular problem faced by the inventor. *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). In its Petition, Petitioner compares Golan and Martin to each other instead of the claimed invention. *See* Pet. 17–18. In its Reply, Petitioner rectifies the improper comparison and asserts that Golan and Martin are in the same field of endeavor as the claimed invention: "pertaining to imaging systems including digital cameras generating video output images of the same scene from two imaging sections having different points of view." Pet. Reply 3 (citing Pet. 19; Ex. 1005, Fig. 1, code (57), ¶¶ 9, 15, 36; Ex. 1006, Fig. 1, 3:6–13, 3:32–35; 5:51–55).[20] Also as discussed above, Petitioner asserts that Golan and Martin "are each pertinent to the problem addressed in the '898 Patent, namely, achieving 'a continuous, smooth zoom in video mode.'" *Id.* (citing Ex. 1040 ¶ 32; Ex. 1001, 3:16–17; Petition 18–19; Ex. 1005 ¶ 15; Ex. 1006, 5:51–55).

---

[20] Petitioner properly replied to Patent Owner's criticism of its showing regarding analogous art. *Dynamic Drinkware, LLC*, 800 F.3d at 1379 (finding an *inter partes* review petitioner has both the "burden of persuasion to prove unpatentability" and also "the initial burden of production," which "is a shifting burden, 'the allocation of which depends on where in the process of trial the issue arises.' The burden of production may entail 'producing additional evidence and presenting persuasive argument based on new evidence or evidence already of record.'"); *see also Apple Inc. v. Qualcomm Inc.*, IPR2018-01245, Paper 39, 16 (PTAB Jan. 15, 2020) (citing *Drinkware* and finding a petitioner properly established a reference was analogous art for the first time in its Petitioner Reply).

IPR2020-00861
Patent 10,230,898 B2

We are persuaded that Golan is in the same field of endeavor as the claimed invention because Golan describes performing digital zoom using a wide image sensor array and lens and a tele image sensor array and lens with the goal of providing "continuous electronic zoom with uninterrupted imaging." *See* Ex. 1005 ¶ 15. We are persuaded that Martin is reasonably pertinent to the problem faced by the inventor: reducing an image jump effect seen in video output images when switching between cameras that have different fields of view. Both Golan and Martin have multiple cameras with differing fields of view. Martin describes the problem in terms of its solution: "[c]ritical alignment corresponds to a condition where the degree of alignment is sufficient to achieve a stable auto stereoscopic display" and "[s]tability of the whole image may not be required, as long as at least a particular region of interest in the auto stereoscopic display is stable." Ex. 1006, 5:53–58. Thus, Patent Owner's analogous argument does not undermine Petitioner's contentions.

As such, and for the foregoing reasons, we are persuaded that Petitioner's rationale for combining Golan and Martin is supported by sufficient rational underpinning, based on the entirety of the record developed at trial. *See KSR*, 550 at 418.

*Petitioner's Rationale for Combining Golan, Martin, and Togo*

Petitioner contends that a person of ordinary skill in the art would have been motivated to apply Togo's teachings to Golan to "produce the obvious, beneficial, and predictable results of avoiding output image degradation when the quality of the telephoto image data would be degraded based on closeness of the subject as taught by Togo." Pet. 29–30 (citing Ex.

40

IPR2020-00861
Patent 10,230,898 B2

1003 ¶¶ 49–54).  Petitioner supports its contention with the following reasons.

*First*, "the references are analogous prior art and are in the same field of endeavor pertaining to digital zoom camera systems including a camera controller operatively connected to wide and tele lens systems." *Id.* at 30 (citing Ex. 1003 ¶ 66).

*Second*, "the references share a need to provide output images of objects at various ranges with a compact imaging system." *Id.* at 31–32 (citing Ex. 1003 ¶ 67).

*Third*, "Golan's expressed desire to achieve 'continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array' would have motivated a POSITA to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged." *Id.* at 32 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 68).

*Fourth*, combining the teachings of Togo with the system of Golan "would have produced operable results that are predictable." *Id.* at 32–33.

We are persuaded by Petitioner's contentions that Golan's expressed desire to achieve continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array would have motivated a person of ordinary skill in the art to incorporate Togo's teachings of a no-switching criterion based on a specific 'setting magnification X' and 'photography distance Y' of an object to be imaged.

41

IPR2020-00861
Patent 10,230,898 B2

*Patent Owner's Arguments Regarding Petitioner's Rationale for
Combining Golan, Martin, and Togo*

Patent Owner argues "a POSITA reading Golan would not be motivated to combine it with Togo because the POSITA would not be aware from Golan of any issues regarding focus and subject depth. Ex. 2001, ¶67." PO Resp. 32. Patent Owner asserts that Golan "assumes both images are always in perfect focus." *Id*. Petitioner contends "POSITA would have understood the tele image degradation would be an issue for Golan, e.g., when capturing images of a subject at close distance in zoom-in operation using both Tele and Wide imaging system." Pet. Reply 8 (citing Ex. 1040 ¶ 48). Further, Petitioner contends that a "POSITA would have understood that Golan includes embodiments that focus subjects at various distances, including at close distance and the infinite, and would be motivated to resolve any associated issues using teachings in the art." *Id.* at 8–9 (Ex. 1040 ¶ 49; Ex. 1005 ¶ 17, claims 3, 17). We agree and thus, Patent Owner's argument does not undermine Petitioners showing.

Patent Owner also argues because Togo requires parallel optical axes "when the imaging distance (Y) to the subject is long (several tens of m), center positions of the wide-angle image 17 and the telephoto image are substantially equal" and "a function of correcting the center positions of the wide-angle image and the telephoto image as in patent literature 3 is unnecessary. Ex. 1010, [0052]." PO Resp. 34 (citing Ex. 2001 ¶ 70; Ex. 1010 ¶¶ 18, 38) (internal quotations omitted). Patent Owner also argues "Martin teaches away from this requirement by specifying that '[a]dditionally, cameras ***10 and 12 need not be in any special alignment configuration*** to produce suitable parallax images for use with the present

42

IPR2020-00861
Patent 10,230,898 B2

invention.' *Id.* (Ex. 1006, 3:64–67; Ex. 2001 ¶ 70)." Patent Owner also points to Martin's teaching that "[previous] methods require the use of at least two ***carefully aligned*** cameras to capture images" and that alignment can be "cumbersome" and "difficult." *Id.* at 34–35 (citing Ex. 1006, 2:19–59).

We do not agree with Patent Owner's arguments, which are premised on a "physical" or "bodily" incorporation of limitations of one reference into the other. However, this is not the standard. *See In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable to render obvious the invention under review."). The relevant inquiry is whether the claimed subject matter would have been obvious to those of ordinary skill in the art in light of the *combined teachings* of those references. *See In re Keller,* 642 F.2d 413, 425 (CCPA 1981). "Combining the *teachings* of references does not involve an ability to combine their specific structures." *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973). Rather than express obviousness as the physical incorporation of a structure from one reference into the structure of another reference, the prior art should be viewed as a combination of teachings from different sources, and the use of those teachings by one of ordinary skill in the art. *See KSR Int'l Co.*, 550 U.S. at 418 (the conclusion of obviousness can be based on the interrelated teachings of multiple patents, the effects of demands known to the design community or present in the marketplace, and the background knowledge possessed by a person having ordinary skill in the art.)

Petitioner contends "Togo's image-quality-based no-switching criterion teachings apply to the combination regardless of whether a distance

43

between cameras is close or whether optical axes are parallel." Pet. Reply
10 (citing Ex. 1040 ¶ 52). Petitioner seeks only "to incorporate Togo's
teachings of a no-switching criterion based on a specific 'setting
magnification X' and 'photography distance Y' of an object to be imaged."
Pet. 32 (citing Ex. 1005 ¶ 15; Ex. 1010 ¶¶ 2, 37, 49; Ex. 1003 ¶ 68). Thus,
Patent Owner's argument does not undermine Petitioners showing

For the foregoing reasons, we are persuaded that Petitioner's rationale
for combining Golan, Martin, and Togo is supported by sufficient rational
underpinning. *See KSR*, 550 U.S. at 418. We are further persuaded that the
cited evidence sufficiently supports Dr. Durand's testimony.

*Evidence of Secondary Considerations*

Patent Owner presents evidence of secondary considerations of non-
obviousness. PO Resp. 56–69. As to licensing, Patent Owner presents
evidence in the form of emails and its litigation complaint to show that "the
licensing discussions between Petitioner and Patent Owner lasted over many
years." *Id.* at 62. "Petitioner specifically asked Patent Owner for an 'option
to license all of Corephotonics IP' in August 2016." *Id.* Patent Owner
further notes that Petitioner "specifically asked for information about smooth
transition technology." *Id.* (citing Ex. 2007; Ex. 2011; Ex. 2012). "The
licensing discussions specifically would have encompassed the smooth
transition technology," and a license to '898 patent. *Id.* These discussions,
Patent Owner contends, establish "that there is a 'nexus' between the
licensing negotiations between Patent Owner and Petitioner as [to] the
claims of the '898 patent challenged by Petitioner in this proceeding." *Id.* at
62–63. Patent Owner also lists several companies that licensed Patent

IPR2020-00861
Patent 10,230,898 B2

Owner's technology, and contends that this is "evidence of industry-wide respect for the patented technology." *Id.* at 63–64 (citing Ex. 2001 ¶ 91).

As to industry praise, Patent Owner cites several articles that show it is an "industry leader in developing dual-camera designs and software technologies to power them." *Id.* at 64–65.

Patent Owner asserts that the failure of others and "Petitioner's copying of Patent Owner's technologies, including the smooth transition techniques that Patent Owner demonstrated to Petitioner, is evidence of non-obviousness." *Id.* at 68 (citing Ex. 2001 ¶ 150). Patent Owner presents arguments with respect to the failure of Golan and Border inventors to achieve what is disclosed by the '898 patent. *Id.* at 66–69. Patent Owner also asserts: "[t]hat Petitioner copied the invention of the '898 patent (among other Corephotonics technologies, which Petitioner also appears to have copied) is strongly implied by the course of conduct between the parties and the timing of Petitioner's announcement of their own version of 'smooth transition' in their iPhone 7 series in Fall of 2016." *Id.* at 68–69 (citing Ex. 2001 ¶ 150).

*Analysis of Patent Owner's Evidence of Secondary Considerations*

Objective indicia of non-obviousness (also referred to as secondary considerations) may include long-felt but unsolved need, failure of others, unexpected results, commercial success, copying, licensing, industry praise, and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012). Objective indicia are "only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of non-obviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463

45

IPR2020-00861
Patent 10,230,898 B2

F.3d 1299, 1312 (Fed. Cir. 2006)); *see also ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016). As the Federal Circuit explained, "a patentee is entitled to a rebuttable presumption of nexus between the asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, the patentee is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process. *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and the evidence of secondary considerations. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential). We first consider whether a patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* If not, that "does not end the inquiry into secondary considerations"; "the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the

IPR2020-00861
Patent 10,230,898 B2

claimed invention.'" *Id.* (quoting *Fox Factory*, 944 F.3d at 1373–75). Once
a patent owner has presented a prima facie case of nexus, the burden of
coming forward with evidence in rebuttal shifts to the challenger to adduce
evidence showing that the objective indicia were due to extraneous factors
other than the patented invention. *Demaco*, 851 F.2d at 1392–93.

With regard to the first step of an analysis under *Fox Factory*, Patent
Owner's evidence of secondary considerations is not tied to a specific
product or technology that is disclosed and claimed in the '898 patent, for
the reasons discussed below. *See* Pet. Reply 24–25 (citing *Fox Factory*, 944
F.3d at 1374).

Patent Owner presents evidence of secondary considerations
purporting to address at least: industry praise and licensing; commercial
success; and failure of others and copying. *See* PO Resp. 56–69.

According to one of the emails submitted by Patent Owner, licensing
negotiations with Petitioner involved not only the '898 patent, but all patents
in Patent Owner's intellectual property portfolio. *Id.* at 62; Ex. 2010 (email
chain between Corephotonics and Apple discussing an "option to license all
of Corephotonics IP"). In the licensing context, the relevant inquiry is
whether there is a nexus between the patent and the licensing activity itself,
such that the factfinder can infer that the licensing "arose out of recognition
and acceptance of the subject matter claimed" in the patent. *In re GPAC
Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). To the extent that negotiations
with Petitioner or any other licensee (*see* PO Resp. 63–64 (listing entities
that have taken a license from Patent Owner)) were specific to the smooth
transition technology Patent Owner mentions, Petitioner argues that "smooth
transition' [relied on by Patent Owner] refers to techniques used ***when***

IPR2020-00861
Patent 10,230,898 B2

*switching*, in order to provide for a more seamless transition between the camera images" but, the "'898 claims recite evaluating a 'non-switching criterion,' to determine *whether to switch* between cameras, and depending on the evaluation, outputting the Wide image data or the Tele image data." Pet. Reply 26 (citing PO Resp. 57–58; Ex. 1001, 5:27–34, 7:41–56, claims 1, 12). Petitioner further argues that "Patent Owner fails to even discuss, let alone prove, whether any usage of 'smooth transition' is actually a reference to the *claimed* technique or merely *unclaimed* techniques described as 'smooth transition' in the '898 patent." *Id.* (citing Ex. 1040 ¶ 107). For the reasons that follow, we find that Petitioner has the better position.

> In the '898 patent,
>
> [a] "smooth transition" (ST) is a transition between cameras or POVs that minimizes the jump effect. This may include matching the position, scale, brightness and color of the output image before and after the transition. However, an entire image position matching between the sub-camera outputs is in many cases impossible, because parallax causes the position shift to be dependent on the object distance. Therefore, in a smooth transition as disclosed herein, the position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area.

Ex. 1001, 7:46–56. At its broadest, "[a] 'smooth transition' . . . minimizes the jump effect," and as disclosed in the '898 patent, this encompasses position matching "only in the ROI region" and matching "scale brightness and color . . . for the entire output image area." *See id.* In other patents in the continuity chain of the '898 patent, "smooth transition" is similarly defined. *See* U.S. Patent No. 10,326,942 ("the '942 patent," 10:41–51). But this disclosure does not appear to address "evaluat[ing] if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is

48

fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data," as required by independent claim 1 and similarly required by independent claim 12 of the '898 patent. That is, independent claim 1 recites a more specific invention than "smooth transition" as it is broadly defined in the '898 patent.

As Patent Owner discloses "smooth transition" in multiple patents, it is not clear what inventions the term encompasses. *See*, *e.g.*, Ex. 1001, 7:46–56; '942 patent, 10:41–51. Patent Owner's arguments, too, appear to imply that the inventions disclosed in more than one patent are encompassed by smooth transition technology. *See generally* PO Resp. 58–65. The '898 patent defines a smooth transition as a transition between cameras or POVs that minimizes the jump effect and teaches methods for achieving a smooth transition in video zoom mode, including position matching, to address the different spatial perspectives and viewing angles of each camera, as well as matching scale, brightness, and color. Ex. 1001, 7:46–56. With respect to the '898 patent specifically, Dr. Hart testifies that its "central innovation" is the "reduction of the image discontinuity in video output seen when a multi-aperture camera switches from one sensor to another during the zooming process *using registration and* position matching." Ex. 2001 ¶ 147 (emphasis added). Both Dr. Hart's characterization of the '898 patent's "central innovation" and the recitations of claim 1 are more particular than

IPR2020-00861
Patent 10,230,898 B2

the broad definition of "smooth transition" in the '898 patent. Patent Owner's evidence of industry-wide praise and licensing, commercial success, as well as failure of others and copying is tied to, at its most specific, Patent Owner's smooth transition technology, which is defined more broadly than the invention recited in claim 1 of the '898 patent.

For example, as evidence of licensing negotiations, Patent Owner submits Exhibits 2011 and 2012, which discuss "Corephotonic's technologies and intellectual property, including 'software that fuses wide angle and telephoto video together,' 'sensor synchronization,' 'MIPI signaling and image processing requirements,' and 'image registration in GPU . . . .'" Not only are these areas of technology not limited to the invention recited in claim 1, it is not entirely clear how, aside from image registration, they even relate to it. Exhibit 2007 is an email chain discussing "a number of eleven 'top level deliverables'." Those top level deliverables are not limited to the invention recited in claim 1. Exhibit 2008 concerns smooth transitions and technical discussions between Petitioner and Patent Owner. For the reasons discussed above, evidence tied to Patent Owner's smooth transition technology is not coextensive with the invention recited in claim 1 of the '898 patent.

As industry praise, Patent Owner cites several articles describing it as a "leader in multi-camera technology," "world-renowned leader in the mobile imaging space," a "leading supplie[r]" and a "'key player' in the computational photography market." PO Resp. 64. The praise is for Patent Owner, Corephotonics, as a company, not the specific invention recited in claim 1 of the '898 patent. Similarly, Patent Owner's evidence of commercial success, which includes articles in Forbes.com, Globes.co.il,

IPR2020-00861
Patent 10,230,898 B2

and Engadget.com concerning Samsung's purchase of Corephotonics, does not specifically address the invention recited in claim 1.  *Id.* at 65–66.

As evidence of failure of others, Patent Owner points to Golan's failure to "recognize the problem of discontinuities due to parallax which are present in such switching or the use of the position matching techniques and image registration techniques discussed in the '898 patent." *Id.* at 67 (citing Ex. 2001 ¶ 148).  Patent Owner also points to Border's purported failure to "recognize the need for a 'continuous' zoom or 'smooth transition' between sensors or," "the need to provide a 'continuous zoom video output.'" *Id.* at 67–68 (citing Ex. 2001 ¶ 149).  We do not consider Golan's and Border's lack of disclosure on this specific problem, even if it is a failure to recognize the problem, sufficient evidence of failure of others to solve the problem. Failure of other requires "that, notwithstanding knowledge of the references, the art *tried and failed* to solve the problem."  *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1338 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (emphasis added). Nevertheless, even if Patent Owner's argument about Golan and Border is relevant, neither reference has been shown to support failure of others.

For the reasons discussed above, the evidence presented is not sufficiently tied to, or coextensive with, the invention of claim 1 in the '898 patent in particular.  We further determine that, presenting evidence that is tied to "smooth transition" instead of the invention recited in claim 1 as Patent Owner does, does not establish that any of the evidence is coextensive with the invention recited in claim 1 of the '898 patent.

In view of step 1 of the analysis under *Fox Factory*, we move to step 2 and determine whether Patent Owner's evidence of secondary considerations

is "the direct result of the unique characteristics of the claimed invention."
*Fox Factory*, 944 F.3d at 1373–75. Patent Owner is not entitled to a
presumption of nexus where the relevant product embodies at least two
patented inventions, and the burden remains on Patent Owner to show that
the claimed secondary considerations were due to the invention claimed in
the patent at issue here. *See Therasense, Inc. v. Becton, Dickinson and Co.*,
593 F.3d. 1289, 1299 (Fed. Cir. 2010).

Applying *Therasense*, the Federal Circuit explained that allowing a
presumption in such a situation would not be "consistent with *Demaco*'s
explanation that nexus cannot be presumed where, for example, 'the
patented invention is only a component of a commercially successful
machine or process.'" *See Fox Factory*, 944 F.3d at 1377 (citing *Demaco*,
851 F.2d at 1392) (rejecting a patent owner's "attempt to reduce the
coextensiveness requirement to an inquiry into whether the patent claims
broadly cover the product that is the subject of the evidence of secondary
considerations").

For reasons substantially similar to those discussed above, we
determine that none of the evidence presented is "the direct result of the
unique characteristics of the claimed invention," because Patent Owner's
evidence is only as particular as discussing smooth transition technology,
which we determine above is broader than and thus, not coextensive with the
invention recited in claim 1 of the '898 patent. *See Fox Factory*, 944 F.3d at
1373–75. It is further unclear that any of the industry-wide praise and
articles resulted from the preeminence of the invention recited in claim 1 of
the '898 patent.

IPR2020-00861
Patent 10,230,898 B2

Because the same evidence of secondary considerations cannot be presumed to be attributable to two or more different features, Patent Owner retains the burden of proving the degree to which the evidence tied to "smooth transition" technology is attributable to the invention recited in the challenged claims. *Fox Factory*, 944 F.3d at 1378 (citing *Therasense*, 593 F.3d at 1299; *WMS Gaming, Inc. v. Int'l. Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999)); *see also Lectrosonics*, Paper 33 at 34–35.

Some of the exact same evidence and arguments submitted in the present proceeding has also been submitted in IPR2020-00905—Petitioner contends that "Patent Owner's reliance on the same underlying allegations in other PTAB proceedings involving different patents of different scope casts considerable doubt on [Patent Owner's] argument." Pet. Reply 25 (citing IPR2020-00905, Paper 15 at 41 (contending that licensing discussions "specifically would have encompassed lens design and image fusion technology" in addition to smooth transition technology)). This is despite the fact that independent claim 1 of U.S. Patent No. 10,225,479 ("the '479 patent) in IPR2020-00905 recites a different invention from that of the inventions recited in independent claims 1 and 12 of the '898 patent. Independent claim 1 of the '479 patent recites, *inter alia*, "a camera controller operatively coupled to the first and second AF mechanisms and to the Wide and Tele image sensors and configured to control the AF mechanisms and to process the Wide and Tele images to create a fused image." Independent claim 23 of the '479 patent recites substantially similar features. Neither claim includes "evaluat[ing] if a no switching criterion is fulfilled or not fulfilled" as in the inventions of claims 1 and 12 of the '898 patent. The '479 and the '898 patents do not claim the same inventions. *See*

IPR2020-00861
Patent 10,230,898 B2

*generally Fox Factory*, 944 F.3d at 1377 (rejecting the argument that a presumption should exist where the two patents at issue are related). In this case, the '479 and '898 patents have claims that address different aspects of smooth transition technology.

We are not persuaded that Patent Owner has met its burden to establish a nexus between the merits of the claimed invention and the submitted evidence relating to industry-wide praise and licensing, commercial success, as well as failure of others and copying. Absent a nexus, we determine that Patent Owner's evidence of objective indicia does not weigh in favor of non-obviousness.

*Summary — Claim 1*

We have reviewed Petitioner's arguments, the supporting testimony provided by Dr. Durand, the cited portions of Golan, Martin, and Togo, and the other cited evidence and we are persuaded that the proposed combination teaches the limitations recited in independent claim 1 as set forth above. Petitioner's rationales for combining Golan and Martin and Golan, Martin, and Togo are set forth earlier in this Section, and are determined to be supported by sufficient rational underpinning for at least the reasons set forth above. Patent Owner's contentions regarding secondary considerations of non-obviousness are set forth above and, as discussed, do not weigh in favor of non-obviousness because Patent Owner has not established a nexus between the claimed invention and the cited evidence. For the foregoing reasons, we conclude Petitioner establishes unpatentability of independent claim 1 over Golan, Martin, and Togo by a preponderance of the evidence.

Accordingly, we are persuaded that Petitioner demonstrates the unpatentability of claim 1 over the combination of Golan, Martin, and Togo by a preponderance of the evidence.

### 5.    Independent Claim 12

Independent claim 12 recites a method for providing a digital video output in a multiple aperture zoom digital camera similar to that recited in independent claim 1. Ex. 1001, 13:18–37.

Petitioner's arguments for independent claim 13 refer, in large part, to its arguments for independent claim 1. *See* Pet. 58–59.

Patent Owner does not present separate arguments for independent claim 12. *See generally* Prelim. Resp. For substantially the same reasons discussed in section III.D.4, we are persuaded that Petitioner sufficiently demonstrates the unpatentability of claim 12 over the combination of Golan, Martin, and Togo by a preponderance of the evidence.

### 6.    Dependent Claim 4

Claim 4, which depends from claim 1, further recites "[t]he camera of claim 1, wherein the no-switching criterion includes an effective resolution of the Tele image being lower than an effective resolution of the Wide image." Ex. 1001, 12:54–56.

Patent Owner asserts that "a POSITA would understand the plain and ordinary meaning of 'effective resolution,' as illuminated by the '898 [patent] and its description of an 'effective resolution score' utilizing image analysis of image sensor data." PO Resp. 41 (citing Ex. 2001 ¶ 88; Ex. 1001 at 6:4–24). Patent Owner essentially asks us to construe "effective resolution" as requiring calculation of an "effective resolution score" as defined in the Specification of the '898 patent. Limitations in the

IPR2020-00861
Patent 10,230,898 B2

specification must not be read into the claims absent lexicography or disclaimer/disavowal. *Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). We find neither lexicography nor disavowal here.

Petitioner responds to this implicit construction by contending that "the plain and ordinary meaning of 'effective resolution' means the degree of detail, which may be measured by image quality including blurriness and sharpness—a meaning supported by undisputed evidence." Pet. Reply 17 (citing Pet. 56; Ex. 1017, 80–81; Ex. 1020, 7:15–17; Ex. 1003 ¶ 135). Petitioner relies on Jacobson (Ex. 1017), which determines resolution by calculating "resolving power," and Shabatay (Ex. 1020), which defines resolution using "spatial frequencies."

Neither party proposed a construction in its initial briefing for "effective resolution." Petitioner has not explained how its construction of "effective resolution" as image quality including blurriness and sharpness is supported by resolving power and determining spatial frequencies as recited in Jacobson and Shabatay.

We decline to agree with Patent Owner's implicit request to limit effective resolution to calculating an effective resolution score or with Petitioner's implicit definition as resolving power involving special frequencies. There is no indication that the patentee intended to limit the claim in that way or redefine effective resolution to be something that can only be determined by an effective resolution score.

The effective resolution score in the '898 patent does include a measure of sharpness, which tends to support Petitioner's construction that sharpness and blurriness are a part of "effective resolution." Ex. 1001, 6:20–

56
Appx1517

23 ("The effective resolution score can be derived from a combination of the sharpness scores and edge scores.").  We construe "effective resolution" as image quality including but not limited to blurriness and sharpness.

Petitioner relies on Togo's disclosure doing a comparison based on blurriness and sharpness, but does not explain how the comparison would be done or on what calculations (or strict derivation) it would be based.  Pet. 56 (citing Ex. 1010, code (57), ¶¶ 11, 12 ("telephoto imaging module with a long focal length is less sharp at close distances compared to a wide-angle imaging module whose focal length is short"), 57 ("a telephoto image 23 is blurry"), 50 ("Note that because image quality depends on a performance of a lens system that is used and the like, theoretically strict derivation is difficult.")).  Nevertheless, the patentee drafted the claim broadly to require only an "effective resolution" of one image to be lower than the effective resolution of another, rather than an effective resolution score lower than another image's effective resolution score.  Thus, we determine that Togo teaches the limitation of "an effective resolution of the Tele image being lower than an effective resolution of the Wide image." *See id.* at 55–57.

We have reviewed Petitioner's arguments and evidence concerning claim 4 and are persuaded that Petitioner sufficiently demonstrates by a preponderance of the evidence the unpatentability of this claim over the combination of Golan, Martin, and Togo.  *See id.* at 55–57.

### 7.    *Dependent Claims 8, 15*

Patent Owner does not present separate arguments for claims 8 and 15, which depend directly from claims 1 and 12 respectively.  *See generally* PO Resp.  We have reviewed Petitioner's arguments and evidence concerning claims 8 and 15 and are persuaded that Petitioner sufficiently

IPR2020-00861
Patent 10,230,898 B2

demonstrates by a preponderance of the evidence the unpatentability of these claims over the combination of Golan, Martin, and Togo.  *See* Pet. 57–58, 59.

### E.    Obviousness over Golan, Martin, Togo, and Levey

#### 1.    Overview of Levey (Ex. 1015)

Levey concerns digital cameras and automatically selecting a photography mode.  Ex. 1015 ¶ 2.  In Levey, a user can select between different photography modes by "single button activation," instead of interacting with a multi-step menu selection process—this reduces the amount of user input required to select the photography mode.  *Id.* ¶ 18.

#### 2.    Dependent Claim 9

Claim 9 depends from claim 8, which depends from claim 1.  Claim 9 further recites "wherein the user inputs include a zoom factor, a camera mode and a region of interest."  Ex. 1001, 13:8–9.

According to Petitioner,

> First, as discussed at [8.1], Golan teaches that the camera controller includes a user control module for receiving user inputs and a sensor control module for configuring each sensor to acquire the Wide and Tele image data based on the user inputs, where in the user inputs include a zoom factor. (APPL-1003), ¶157.
>
> Second, Levey describes "a photography mode user interface for selecting between a plurality of photography modes," and configuring its image sensor using associated image capture settings. (APPL-1015), Abstract, [0045], [0057], [0070][, ][0039], [0041], [0070]-[0071]; (APPL-1003), ¶158.

Pet. 61–62 (emphases omitted).  As one reason for combining Golan, Martin, and Levey, Petitioner contends that

> a POSITA would have been motivated to incorporate Levey's
> teachings in the dual-aperture zoom digital camera of Golan
> combined with Martin to produce the obvious, beneficial, and
> predictable results of providing a plurality of camera modes "that
> can be selected by the user to control various elements of the
> image capture process and the image processing chain."

*Id.* at 60 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶ 153).

A portion of Martin cited by the Petition describes that "while displaying the images, aligning **a user-selected region of interest** associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image." Ex. 1006, 7:36–51 (emphasis added); Ex. 1003 ¶ 157.  A portion of Levey cited by the Petition discloses that "[m]ost digital cameras have a variety of photography modes that can be selected by the user to control various elements of the image capture process and the image processing chain." Ex. 1015 ¶ 4.  Levey further discloses determining "image capture settings such as the exposure index, the lens F/# [F number], the exposure time and the electronic flash setting, as well as other user settings 175, such as those discussed with reference to FIG. 2," with respect to an automatic mode.  *Id.* ¶ 70.  As an example, Levey discloses, in a portion cited by the Petition, that "if a user is capturing images at a soccer game, they would typically set the camera to operate in a sport photography mode" which "would generally choose appropriate image capture settings to minimize the motion blur associated with moving subjects."  *Id.* ¶ 71.

Patent Owner argues because Levey uses a preview setting that is of lower quality "a POSITA would thus not be motivated to apply Levey's teaching to the task of selecting an appropriate lens based on a zoom setting

IPR2020-00861
Patent 10,230,898 B2

for use in the preview window." Ex. 2001 ¶ 99.  However, a portion of
Levey cited in the Petition recites that the image sensor is actuated by a
timing generator when capturing video images **and also** when previewing a
still image.  Ex. 1015 ¶ 39 (emphasis added).  Patent Owner has not
explained sufficiently why Levey is limited to a preview mode.

Patent Owner also argues Levey's preview mode is not appropriate for
"the task of selecting an appropriate lens based on a zoom setting.  Claim 9
is not limited to the task of selecting an appropriate lens based on a zoom
setting and Patent Owner has not explained sufficiently why claim 9 would
be limited to such a task.

Patent Owner argues that a person of ordinary skill in that art would
be familiar with photography.  We analyze this claim under that level of skill
and, below, without Patent Owner's proposed familiarity with photography.
Under that level of skill Patent Owner argues

> a POSITA that had additional knowledge, skill and experience in
> photography would understand that for each and every individual
> example of a photography mode enumerated by Levey, the
> photographer may want to access multiple settings of the preview
> display for framing a shot. For example, each photography mode
> enumerated by Levey may be executed using a wide-angle or
> telephoto zoom setting, as the choice of photography mode is
> independent of the choice of framing.

PO Resp. 45 (citing Ex. 2001 ¶¶ 101–103; Ex. 2003).  Patent Owner has not
explained sufficiently why the distinction between framing and photography
mode would mean that one of ordinary skill would not have wanted both
options available on a dual lens camera.  We are persuaded by Petitioner's
contention that one of ordinary skill would have been motivated to have both
features.  Pet. 60 (citing Ex. 1015 ¶ 4; Ex. 1003 ¶¶ 153–159).

IPR2020-00861
Patent 10,230,898 B2

Patent Owner also argues "Petitioner seeks to intermix Levey's 'photography mode' with Levey's 'camera mode' since Levey's user input innovation is used to control ***photography mode,*** not ***camera mode*** as required by Claim 9." PO Resp. 47. To the extent Patent Owner is correct that photography mode is different than camera mode, Patent Owner has not explained sufficiently how that difference would have prevented the use of Levey's user input with camera modes. Thus, Patent Owner's argument does not undermine Petitioner's showing.

Patent Owner also argues "A POSITA would not necessarily be familiar with photography and would therefore not necessarily understand how settings involving the preview display used for framing shots would be related to the settings used for a 'photography mode.'" *Id.* at 44–45. Again, regardless of one of ordinary skill's knowledge of a preview display used for framing shots, he or she would either have recognized the photography modes as camera modes as claimed or recognized that Levey's user input for adjusting photography modes could be combined with Golan's and Martin's user controls.

Patent Owner also repeats its argument that Martin involves post-acquisition activity and the '898 patent involves pre-processing activity. Specifically, Patent Owner argues "the '898 [patent] discloses the selection of a region of interest ***before*** the still image is acquired whereas Martin discloses the selection of a region of interest ***after*** the images used for autostereoscopic display have been acquired." *Id.* at 48. We rejected this argument above at Section III.D.4. Nevertheless, the claims do not distinguish pre-acquisition and post-acquisition and Patent Owner has not explained sufficiently why pre-acquisition and post-acquisition are

incompatible such that they cannot be combined or undermine the reasons for combining presented by Petitioner. Thus, Patent Owner's argument does not undermine Petitioner's showing. We are persuaded by Petitioner's contention that Martin describes that "aligning **<u>a user-selected region of interest</u>** associated with the first image with a corresponding region of interest of the second image." Pet. 61–62 (quoting Ex. 1006, 7:36–51; citing Ex. 1003 ¶ 157).

We are persuaded that Golan discloses the user control module and the sensor control module in the claimed camera controller, Martin discloses "a user-selected region of interest," and Levey discloses "wherein the user inputs include a zoom factor, a camera mode and a region of interest" based on the cited portions of Golan and Levey. We are persuaded also that Petitioner's rationale for combining Golan, Martin, Togo, and Levey is supported by sufficient rational underpinning, based on the entirety of the record developed at trial. *See KSR*, 550 at 418. Accordingly, we are persuaded the combination of Golan, Martin, and Levey teaches the limitations recited in claims 9. Thus, we are persuaded that Petitioner has shown, by a preponderance of the evidence, the unpatentability of these claims over the combination of Golan, Martin, Togo and Levey.

### F.    *Obviousness over Golan, Martin, Togo, and Border*

#### 1.    *Overview of Border (Ex. 1009)*

Border describes providing a digital camera with an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range." Ex. 1009 ¶ 10. As shown in Figure 5 of Border, reproduced below, the processor of a digital camera includes an image compositor 202 to form a

composite image 208 using the two images, wide image 204 and telephoto image 206 of the same scene, that are captured using lenses having different focal lengths. *Id.* ¶ 70.



*FIG. 5*

As seen in Figure 5, above, the image registration determiner 212 determines the registration between the wide image 204 and the telephoto image 206, so that the two images are matched to "locate the high-resolution image accurately into the low-resolution image and then stitched into place so the edge between the two images in the composite image is not discernible." *Id.* ¶ 29, Fig. 5. Border goes on to explain that in the context of Figure 5, telephoto image 206 captures a smaller portion of the scene, but with greater resolution than wide image 204. *Id.* ¶ 36.

Border also describes that an image resampler 214 of the processor produces the composite image 208 based on a zoom amount Z specifying the desired relative zoom amount of the produced composite image 208. *Id.* ¶ 43. Specifically, Border explains that the composite image 208 is generated from the two images and that the resulting composite image is produced differently for different zoom amount values, such as Z=1,

IPR2020-00861
Patent 10,230,898 B2

1<Z<M, and Z=M, where M is the relative magnification ratio M of the telephoto image 206 to the wide image 204. *Id.* ¶¶ 29, 44.

<div align="center">

2.    *Dependent Claims 11 and 19*

</div>

Claim 11, which depends from claim 1, further recites "wherein the camera controller is further configured to combine in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view." Ex. 1001, 13:13–17. Claim 19, which depends from claim 12, further recites essentially the same features. *Id.* at 14:26–30.

According to Petitioner,

> Border describes providing a digital camera include lenses having different focal lengths for an extended zoom range without unduly increasing the size or cost of the digital camera "while providing good perceived image quality throughout the zoom range."

> As shown in Figure 5 of Border. . . , the processor of the digital camera includes an image compositor 202 to form a composite image 208 using the two images, wide image 204 and telephoto image 206.

Pet. 63 (citing Ex. 1003 ¶¶ 162–165) (citations omitted). Petitioner contends that

> [a] POSITA would have been motivated to apply Border's teachings of combining in still mode, at a predefined range of ZF values, at least some of the Wide and Tele image data to provide a fused output image of the object or scene from a particular point of view in the digital camera of Golan combined with Martin and Togo to achieve the benefit of 'a zoomed image with high resolution throughout the zoom range and improved image quality' in still mode as taught by Border.

*Id.* at 64 (citing Ex. 1009, code (57); Ex. 1003 ¶¶ 166–169). Petitioner contends that in its combination

<div align="center">

64

</div>

IPR2020-00861
Patent 10,230,898 B2

> Golan's zoom control sub-system 100 (as applied in combination
> with Martin and Togo) is adapted to apply Border's teaching of
> still mode operation in which wide image and telephoto image
> are combined, which for zoom amounts between 1 and M (a
> relative magnification ratio of Tele image to Wide image), uses
> registration information to transform coordinates of the telephoto
> image to the wide image and produces a composite image having
> the point of view of the wide image.

*Id.* at 70.

Patent Owner argues that none of Golan, Togo, and Border creates a
fused image from a particular point of view.  PO Resp. 49–50.  Patent
Owner does not offer a construction of the term "point of view."  Patent
Owner implies that "distortion" is required to change a point of view.  *Id.*
Patent Owner has not cited to evidence explaining sufficiently what
distortions are required or why translation and rotation are not enough to
change a point of view.  We are persuaded by Petitioner's contention that
Border teaches using registration information to transform coordinates of the
telephoto image to the wide image and produces a composite image having
the point of view of the wide image.[21]

Patent Owner also does not offer a construction for the term "fused."
Patent Owner argues that Border results in an image "consist[ing] of a
quadrilateral portion from the telephoto point of view surrounded by a

---

[21] In an appeal of a related IPR, a similar argument regarding whether a
related patent required resolving occlusions cause by different points of view
was rejected by the Federal Circuit *Apple Inc. v. Corephotonics Ltd.*,
IPR2018-01133, Paper 34 (PTAB Dec. 2, 2019), *aff'd* 857 F. App'x 641
(Fed. Cir. 2021) (nonprecedential).  That similar argument was based in part
on the essentially the same "rectification" and/or distortion process argued
by Patent Owner in this IPR.  *Id.*

IPR2020-00861
Patent 10,230,898 B2

remaining image portion from the wide-angle point of view." *Id.* at 50. Even if we agree with Patent Owner's characterization of Border, Patent Owner has not explained sufficiently how such a combination of the Wide and Tele images would not be considered as being from the Wide point of view based on the transformation of coordinates that was done. *See* Pet. 70.

Patent Owner also suggests that "fus[ing]" as claimed requires "rectification" as shown in Figure 3C of the '898 patent and excludes any parallax. PO Resp. 51–53. Patent Owner implicitly argues that a limitation to rectification should be read into the claims. Notwithstanding the importance of a specification, limitations in the specification must not be read into the claims absent lexicography or disclaimer/disavowal. *Hill-Rom Services, Inc.*, 755 F.3d at 1371. Thus, absent a clear disavowal or alternative lexicography by a patentee, he or she "is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning." *Thorner v. Sony Comput. Entm't Am. LLC,* 669 F.3d 1362, 1367 (Fed. Cir. 2012).

We decline to require the rectification process in order to fuse two images to a particular point of view as claimed. *See* Pet. Reply 21. Thus, Patent Owner's argument does not undermine Petitioner's showing. We are persuaded by Petitioner's reliance on Border's use of registration information to transform coordinates of the telephoto image to the wide image and produce a composite image having the point of view of the wide image. *See* Pet. 70.

We have reviewed the cited portions of Border and are persuaded the combination of Golan, Martin, Togo, and Border teaches the limitations recited in claims 11 and 19. We are further persuaded that Petitioner's

rationale for combining Golan, Martin, Togo, and Border is supported by sufficient rational underpinning.  Accordingly, we are persuaded Petitioner has shown, by a preponderance of the evidence, the unpatentability of these claims over the combination of Golan, Martin, Togo and Border.

### G.     Obviousness over Golan, Martin, Togo, and Parulski

#### 1.     Overview of Parulski (Ex. 1008)

Parulski concerns "a digital camera that uses multiple lenses and image sensors to provide an improved imaging capability." *See, e.g.*, Ex. 1008, 1:8–10.  In one embodiment, an image capture assembly can be a digital camera that includes two image capture stages.  *See id.* at 12:36–45. The two image capture stages can be used to separately capture images of the same scene so that one image capture stage can be used for autofocus and other purposes, and the other is used for capturing an image.  *Id.* at 8:9– 13.  This allows for improved imaging capability without unduly increasing the size or cost of the digital camera.  *Id.* at 8:13–16.  In one example, the image capture assembly can include a fixed focal length wide angle lens and a fixed focal length telephoto lens.  *Id.* at 23:28–40.  An image processor that "may provide digital zooming between the wide angle and the telephoto focal lengths; the user may initiate such zooming via a user interface . . . ." *Id.* at 23:54–56.

#### 2.     Dependent Claims 10 and 20

Claim 10, which depends from claim 1, further recites "wherein the Tele lens includes a ratio of total track length (TTL)/effective focal length (EFL) smaller than 1." Ex. 1001, 13:10–12.

Petitioner contends "[a] POSITA would have understood that Golan's tele lens 120 is a telephoto lens, which by definition, has a telephoto ratio smaller than 1 ('less than unit')." Pet. 76 (citing Ex. 1003 ¶ 189). Petitioner further contends that to the extent that Patent Owner argues that Golan does not explicitly describe tele lens 120 as a telephoto lens as claimed, it would have been obvious to a POSITA to implement Golan's tele lens 120 with "a fixed focal length **telephoto lens**" having TTL/EFL smaller than 1 as taught in Parulski for the benefit of a "very small figure." *Id.* at 77 (citing Ex. 1008, 23:38, 24:20–21; Ex. 1003 ¶ 190).

As rationale for combining, Petitioner contends that a POSITA would have been motivated to apply Parulski's teachings of, in still mode, combining Wide and Tele image data only in focused areas to generate a fused output image in the system of Golan combined with Martin and Togo for the benefit of a fused output image having a broadened depth of field, at a predefined range of ZF values (e.g., the large lossless zooming range described in Golan) in such a digital camera. *Id.* at 74 (citing Ex. 1008, 28:52–53, 29:4–7, 30:17–20; Ex. 1003 ¶¶ 181–185).

Patent Owner argues

Petitioner confuses the fusion disclosed by Golan, used to fuse the color of a low-resolution image with the detail of a high-resolution monochromatic image, with block 514 of Parulski that uses an "enhancement signal" to "sharpen portions of the primary still image that are positioned near the secondary focus distance." Ex. 2001, ¶122; Ex. 1003, ¶185; Ex. 1008, 22:40-42. Parulski lacks sufficient disclosure for a POSITA to understand what source of "enhancement signal" was available from the combination of Golan, Martin and Togo. Togo estimates the distance to the subject, but this distance is a single value for the entire pair of wide-angle and telephoto images and does not

IPR2020-00861
Patent 10,230,898 B2

> indicate which pixels from which image should be used. Ex.
> 2001, ¶122.

PO Resp. 53–54. As to Golan and Parulski, Petitioner contends a person of
ordinary skill "would have been motivated to apply Parulski's teachings of
still mode fusion to a still mode of Golan, while in video mode, maintaining
Golan's design choice of video switching (e.g., for the benefit of reduced
computation power of video switching over video fusion)." Pet. Reply 21–
22 (citing Pet. 74) (emphasis omitted). We agree and adopt and rely on
Petitioner's contentions explained above. As to Togo's estimate of distance
and Border's enhancement signal, we do not find this argument persuasive
because it is directed to bodily incorporation and not to what the combined
teachings would have suggested to one of skill in the art. *In re Keller*, 642
F.2d 413, 425 (CCPA 1981); Pet. Reply 22.

We are persuaded that the cited portions of Golan, Martin, Togo, and
Parulski teach the limitations recited in claim 10. We are also persuaded
that the ordinarily skilled artisan would have combined Golan, Martin, and
Parulski.

Claim 20, which depends from claim 12, further recites "the step of
configuring the camera controller to combine in still mode, at a predefined
range of ZF values, at least some of the Wide and Tele image data to provide
a fused output image includes configuring the camera controller to combine
Wide and Tele image data only in focused areas." Ex. 1001, 14:31–36.

Petitioner contends that "Golan's zoom control sub-system 100 (as
applied in combination with Martin and Togo in claim 12) is adapted to
apply Parulski's teaching of still mode operation in which wide image and
telephoto image are combined only in focused areas, which for a

69

IPR2020-00861
Patent 10,230,898 B2

predetermined lossless zooming range, produces a fused output image
having a broadened depth of field." Pet. 80 (citing Ex. 1003 ¶¶ 192–196).
We are persuaded that the cited portions of Golan, Martin, Togo, and
Parulski teach the limitations recited in claim 20.

Patent Owner also argues that it would require "undue
experimentation" to combine the references because "Parulski does not
disclose this 'enhancement signal,' nor does Parulski disclose how this
enhancement signal is used to sharpen pixels in the primary still image." PO
Resp. 55. To the extent that Patent Owner argues that Border is not enabled,
"[i]n general, a prior art reference asserted under § 103 does not necessarily
have to enable its own disclosure, i.e., be 'self-enabling,' to be relevant to
the obviousness inquiry." *Raytheon Techs. Corp. v. Gen. Elec. Co.*, 993
F.3d 1374, 1380 (Fed. Cir. 2021).

Additionally, we do not find Patent Owner's argument regarding
combining the enhancement signal of Parulski with Golan and Martin
persuasive because it is directed to bodily incorporation and not to what the
combined teachings would have suggested to one of skill in the art. *In re
Keller*, 642 F.2d at 425; Pet. Reply 23. As to the feasibility of the
combination, we credit Dr. Durand's testimony that the combination would
have been within the ordinary skill in the art. Ex. 1003 ¶¶ 192–196; Ex.
1040 ¶ 101.

Patent Owner also argues

Parulski['s] "broadened depth of field" that Petitioner points to
addresses an entirely different issue than the one addressed and
required by Claim 20. Ex. 2001, ¶129. In light of the
specification, a POSITA would understand Claim 20 "focus" in
the context of "[t]he ROI is the region of interest on which both
cameras are focused on." Ex. 1001, 6:50-51. This region of

IPR2020-00861
Patent 10,230,898 B2

interest is used specifically for the fusion of Wide and Tele images. "… [T]he position matching is achieved only in the ROI region while scale brightness and color are matched for the entire output image area." *Id*. at 7:54-56. A POSITA would understand Claim 20 "to combine … ***at least some*** of the Wide and Tele image data to provide a ***fused*** output image includes configuring the camera controller to ***combine Wide and Tele image data only in focused areas***" (emphasis added). In other words, a POSITA reading claim 20 in light of the '898 specification would understand the requirement to only fuse (transform to the same point of view) the same portion of the Wide and Tele images only where ***both*** were in focus. Dr. Durand uses Parulski to show how one might combine portions of images together where ***either*** was in focus. Ex. 2001, ¶129.

PO Resp. 55–56. Petitioner responds

PO's reliance upon "position matching [] achieved only in the ROI region" (POR, 56) is inapposite because that description is for "Video Mode Operation/Function," not for still mode as claimed. (APPL- 1001), 7:40-56. On the contrary, the '898 Patent describes under "**Still Mode** Operation/Function" that image processing "fuses the wide and the Tele images to…**provide wide dynamic range**," (APPL-1001), 7:14-30, which is consistent with the issue addressed by Parulski's fusion to provide 'broadened depth of field.' APPL-1040, ¶102.

Pet. Reply 23 (alterations in original). We agree with Petitioner that Petitioner's contentions in the Petition rely on the still mode function and thus, Patent Owner's argument does not undermine Petitioner's showing.

For the foregoing reasons, we are persuaded the combination of Golan, Martin, and Parulski teaches the limitations recited in claims 10 and 20. We are further persuaded that Petitioner's rationale for combining Golan, Martin, Togo, and Parulski is supported by sufficient rational underpinning. Accordingly, Petitioner has shown by a preponderance of the

IPR2020-00861
Patent 10,230,898 B2

evidence the unpatentability of these claims over Golan, Martin, Togo, and Parulski.

## IV.    CONCLUSION

For the foregoing reasons, we conclude that Petitioner has established unpatentability of: claims 1–4, 8, 12, and 15 over Golan, Martin, and Togo; claim 9 over Golan, Martin, Togo, and Levey; claims 11 and 19 over Golan, Martin, Togo, and Border; and claims 10 and 20 over Golan, Martin, Togo, and Parulski.[22]  Our conclusions regarding the challenged claims are summarized below:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–4, 8, 12, 15 | 103 | Golan, Martin, Togo | 1–4, 8, 12, 15 | |
| 9 | 103 | Golan, Martin, Togo, Levey | 9 | |
| 11, 19 | 103 | Golan, Martin, Togo, Border | 11, 19 | |
| 10, 20 | 103 | Golan, Martin, Togo, Parulski | 10, 20 | |

---

[22] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-00861
Patent 10,230,898 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| Overall Outcome | | | 1, 4, 8–12, 15, 19, 20 | |

## V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 4, 8–12, 15, 19, and 20 of the '898 patent are determined to be unpatentable; and

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00861
Patent 10,230,898 B2

PETITIONER:

David W. O'Brien
Andrew S. Ehmke
Hong Shi
HAYNES AND BOONE, LLP
david.obrien.ipr@haynesboone.com
andy.ehmke.ipr@haynesboone.com
hong.shi.ipr@haynesboone.com

PATENT OWNER:

Neil A. Rubin
C. Jay Chung
RUSS AUGUST & KABAT
nrubin@raklaw.com
jchung@raklaw.com

# UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,

Petitioner

v.

COREPHOTONICS, LTD.

Patent Owner

U.S. Patent No. 10,230,898

# DECLARATION OF FRÉDO DURAND, PH.D. UNDER 37 C.F.R. § 1.68 IN SUPPORT OF PETITION FOR INTER PARTES REVIEW

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   QUALIFICATIONS ..............................................................................3

III.  LEVEL OF ORDINARY SKILL IN THE ART ................................6

IV.   RELEVANT LEGAL STANDARDS ................................................8

    A.    Obviousness...................................................................................8

V.    THE '898 PATENT .............................................................................10

    A.    Summary of the '898 Patent ......................................................10

    B.    Prosecution History of the '898 Patent ..................................15

VI.   CLAIM CONSTRUCTION ...............................................................17

VII.  GROUNDS ...........................................................................................17

    A.    Ground 1: Claims 1, 4, 8, 12, and 15 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin and Togo..................17

        1.    Summary of Golan...........................................................17

        2.    Summary of Martin..........................................................20

        3.    Reasons to Combine Golan and Martin ....................................23

        4.    Summary of Togo .............................................................28

        5.    Reasons to Combine Togo with Golan and Martin .................35

        6.    Claim 1 ...............................................................................39

        7.    Claim 4 ...............................................................................72

        8.    Claim 8 ...............................................................................75

        9.    Claim 12 .............................................................................77

        10.   Claim 15 .............................................................................78

    B.    Ground 2: Claim 9 is unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Levey.........................................79

        1.    Summary of Levey............................................................79

        2.    Reasons to Combine Levey, Golan, and Martin, and Togo......80

        3.    Claim 9 ...............................................................................82

- i -

C.   Ground 3: Claims 11 and 19 is unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Border. ..............................85

    1.   Summary of Border.....................................................85

    2.   Reasons to Combine Border with Golan, Martin, and Togo ....87

    3.   Claim 11 ...................................................................89

    4.   Claim 19 ...................................................................94

D.   Ground 4: Claims 10 and 20 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin, Togo, and Parulski. .................94

    1.   Summary of Parulski....................................................94

    2.   Reasons to Combine Parulski, Golan, Martin, and Togo .........97

    3.   Claim 10 .................................................................100

    4.   Claim 20 .................................................................102

VIII.  DECLARATION ...........................................................106

APPL-1003 / Page 3 of 109

## I.     INTRODUCTION

**1.**     I, Frédo Durand, have been retained by counsel for Apple Inc.

("Apple" or "Petitioner") as a technical expert in connection with the proceeding

identified above.  I submit this declaration in support of Apple's Petition for *Inter*

*Partes* Review of U.S. Patent No. 10,230,898 ("the '898 Patent").

**2.**     Compensation for my work in this matter is based on an hourly rate.

In addition, reasonable and customary expenses associated with my work and

testimony in this matter are reimbursed.  This compensation is not contingent on

the outcome of this matter, nor is it contingent on the specifics of my testimony.  I

have no personal or financial stake, nor any interest in the outcome of the present

proceeding.

**3.**     In the preparation of this declaration, I have studied:

(1)     The '898 Patent, APPL-1001;

(2)     The prosecution file history of the '898 Patent ('720 App), APPL-
        1002;

(3)     U.S. Patent Application Publication No. 2012/0026366 to Golan, et al.

("Golan"), APPL-1005;

(4)     U.S. Patent No. 8,081,206 to Martin et al. ("Martin"), APPL-1006;

(5)     U.S. Patent No. 7,990,422 to Ahiska et al. ("Ahiska"), APPL-1007;

(6)     U.S. Patent No. 7,859,588 to Parulski et al. ("Parulski"), APPL-1008;

- 1 -

(7)    U.S. Patent Application Publication No. 2008/0030592 to Border et al. ("Border"), APPL-1009;

(8)    J.P. Patent Application Publication No. JP 2011-55246 to Togo ("Togo"), APPL-1010;

(9)    U.S. Patent No. 8,553,106 to Scarff ("Scarff"), APPL-1012;

(10)    Richard Szeliski, Computer Vision: Algorithms and Applications, 2011 ("Szeliski"), APPL-1013;

(11)    U.S. Patent No. 8,854,432 to Orimoto ("Orimoto"), APPL-1014;

(12)    U.S. Patent Application Publication No. 2012/0019704 to Levey ("Levey"), APPL-1015;

(13)    Xiong, et al., "A critical review of image registration methods," International Journal of Image and Data Fusion, June 2010 ("Xiong"), APPL-1016;

(14)    Ralph E. Jacobson et al., The Manual of Photography: photographic and digital imaging, 9th Edition, 2000 ("Jacobson"), APPL-1017;

(15)    Hansen, et al., "Online continuous stereo extrinsic parameter estimation," 2012 IEEE Conference on Computer Vision and Pattern Recognition, June 2012 ("Hansen"), APPL-1019;

(16)    U.S. Patent No. 9,571,731 to Shabtay, et al. ("'731 Patent"), APPL-1020;

- 2 -

(17)    U.S. Patent Application Publication No. 2014/0362274 to Christie, et al. ("Christie"), APPL-1021;

(18)    Warren J. Smith, MODERN LENS DESIGN (1992) ("Smith"), APPL-1023;

(19)    U.S. Patent No. 7,777,972 to Chen et al. ("Chen"), APPL-1024; and

(20)    Jacobs et al., "Focal Stack Compositing for Depth of Field Control," Stanford Computer Graphics Laboratory Technical Report 2012-1 ("Jacobs"), APPL-1026.

**4.**    In forming the opinions expressed below, I have considered:

(1)    The documents listed above;

(2)    Any additional documents discussed below; and

(3)    My own knowledge and experience based upon my work in the fields of imaging systems as described below.

## II.    QUALIFICATIONS

**5.**    My qualifications and professional experience are described in my *Curriculum Vitae*, a copy of which can be found in exhibit APPL-1004.  The following is a brief summary of my relevant qualifications and professional experience.

**6.**    I earned my Bachelor's degree in Math and Computer Science from École Normale Superieure of Paris, France in 1993, Master of Science degree in

- 3 -

Computer Science from Grenoble Institute of Technology, Grenoble, France in 1994, and Ph.D. degree in Computer Science from Joseph Fourier University, Grenoble, France in 1999. My doctoral thesis focused on 3D visibility and lighting simulation.

7.     For more than 25 years, I have been developing professional and academic experience in the field of imaging systems, including integration of optics, sensors, and digital processing in imaging systems. My research interests span most aspects of picture generation and creation, and one of the major themes of my research has been directed to computational photography, which combines expertise in optics design and image processing.

8.     I am a tenured full Professor in the Electrical Engineering and Computer Science Department of the Massachusetts Institute of Technology, and a member of the Computer Science and Artificial Intelligence Laboratory.

9.     As a professor, I teach in the area of computational photography. In the courses of Computational Photography, I teach principles of computational photography through a series of hands on projects, including applications of computational photography in high-dynamic range photography, photomontage, panoramas, image resampling, foreground extraction, Bayer sensor demosaicing, optical aberration correction, background defocusing, and morphing.

10.     I have authored and co-authored over two hundred journal

- 4 -

publications, conference proceedings, technical papers, and technical presentations

in the area of imaging system technologies, including optics design, image

processing, and computational photography.

**11.**     In 2004, I received an inaugural Eurographics Young Researcher

Award.  I received a National Science Foundation (NSF) Faculty Early Career

Development (CAREER) award in 2005.  The NSF CAREER award is to support

my research project "Transient Signal Processing for Realistic Imagery," which is

NSF's most prestigious award in support of early-career faculty who has the

potential to serve as academic role models in research and education and to lead

advances in the mission of their department or organization.  The goal of this

project is to characterize light transport from a signal-processing perspective with

applications to image synthesis and material-appearance acquisition.  I received an

inaugural Microsoft Research New Faculty Fellowship in 2005, a Sloan fellowship

in 2006, a Spira award for distinguished teaching in 2007.  I received Association

for Computing Machinery's (ACM's) Special Interest Group on Computer

Graphics and Interactive Techniques (SIGGRAPH) Computer Graphics

Achievement Award in 2016, which is given by the organization each year to

recognize an individual for an outstanding achievement in computer graphics and

interactive techniques.  I became an ACM fellow in 2016, which is ACM's most

prestigious member grade that recognizes the top 1% of ACM members for their

- 5 -

outstanding accomplishments in computing and information technology and/or

outstanding service to ACM and the larger computing community.

**12.**     My involvement in the research community extends to several

organizations, journals, and conferences.  Over the years, I have organized and

served in the Program Committee of a variety of conferences, including IEEE

International Conference on Computational Photography, Symposium on

Computational Photography and Video, ACM SIGGRAPH, Eurographics

Symposium on Rendering (EGSR), Graphics Interface, Eurographics, Non-

Photorealistic Animation and Rendering (NPAR), Symposium on Point-Based

Rendering, ACM Transactions on Graphics, Foundations and Trends in Computer

Graphics and Computer Vision.  I was a Member of the advisory board of Image

and Meaning 2, an interdisciplinary conference on scientific illustration and

education.

**13.**     A list of my publications and patents is contained in my CV at exhibit

APPL-1004.

### III.    LEVEL OF ORDINARY SKILL IN THE ART

**14.**     I understand that the level of ordinary skill may be reflected by the

prior art of record, and that a Person of Ordinary Skill in The Art ("POSITA") to

which the claimed subject matter pertains would have the capability of

understanding the scientific and engineering principles applicable to the pertinent

art.  I understand that a POSITA has ordinary creativity, and is not an automaton.

**15.**     I understand that there are multiple factors relevant to determining the level of ordinary skill in the pertinent art, including (1) the levels of education and experience of persons working in the field at the time of the invention; (2) the sophistication of the technology; (3) the types of problems encountered in the field; and (4) the prior art solutions to those problems.

**16.**     I am familiar with the imaging system art pertinent to the '898 Patent. I am also aware of the state of the art at the time the application resulting in the '898 Patent was filed.  I have been informed by counsel that the earliest claimed priority date for the '898 Patent is August 13, 2015, although any given claim of the '898 Patent may or may not be entitled to the earliest claimed date.

**17.**     Based on the technologies disclosed in the '898 Patent, I believe that a POSITA would include someone who had, as of the claimed priority date of the '898 Patent, a bachelor's or the equivalent degree in electrical and/or computer engineering or a related field and 2-3 years of experience in imaging systems including optics and image processing.  In addition, I recognize that someone with less formal education but more experience, or more formal education but less experience could have also met the relevant standard for a POSITA.  I believe that I am at least a POSITA and, furthermore, I have supervised students and engineers who were also POSITAs.  Accordingly, I believe that I am qualified to opine

- 7 -

from the perspective of a POSITA regarding the '898 Patent.

**18.** For purposes of this Declaration, unless otherwise noted, my opinions and statements, such as those regarding the understanding of a POSITA (and specifically related to the references I consulted herein), reflect the knowledge that existed in the art before the earliest claimed priority date of the '898 Patent.

## IV.    RELEVANT LEGAL STANDARDS

**19.** I have been asked to provide my opinions regarding whether claims 1, 4, 8-12, 15, 19, and 20 (the "Challenged Claims") of the '898 Patent would have been obvious to a POSITA at the time of the alleged invention in light of the prior art.

**20.** I am not an attorney. In preparing and expressing my opinions and considering the subject matter of the '898 Patent, I am relying on certain legal principles explained to me by counsel.

**21.** I understand that a claim is unpatentable if it is anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103.

### A.    Obviousness

**22.** I have been informed and I understand that a claimed invention is unpatentable under 35 U.S.C. § 103(a) if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a POSITA at the time the invention was made. I

- 8 -

understand that the appropriate analysis for determining obviousness of a claimed

invention takes into account factual inquiries, including the level of ordinary skill

in the art, the scope and content of the prior art, and the differences between the

prior art and the claimed subject matter as a whole.

23.     I have been informed and I understand that the United States Supreme

Court has recognized several rationales for combining references or modifying a

reference to show obviousness of claimed subject matter.  Some of these rationales

include the following: (a) combining prior art elements according to known

methods to yield predictable results; (b) simple substitution of one known element

for another to obtain predictable results; (c) use of a known technique to improve a

similar device (method, or product) in the same way; (d) applying a known

technique to a known device (method, or product) ready for improvement to yield

predictable results; (e) choosing from a finite number of identified, predictable

solutions, with a reasonable expectation of success; and (f) some teaching,

suggestion, or motivation in the prior art that would have led a POSITA to modify

the prior art reference or to combine prior art reference teachings to arrive at the

claimed invention.  I have also been informed and I understand that a

demonstration of obviousness does not require a physical combination or bodily

incorporation, but rather may be found based on consideration of what the

combined teachings would have suggested to a POSITA at the time of the alleged

- 9 -

invention.

## V.     THE '898 PATENT

## A.     Summary of the '898 Patent

**24.**     The '898 Patent is titled "Dual Aperture Zoom Camera with Video

Support and Switching / Non-Switching Dynamic Control" and was issued on

March 12, 2019.  (APPL-1001), '898 Patent, Title.  The '898 Patent is directed to a

"dual-aperture zoom digital camera operable in both still and video modes."

(APPL-1001), '898 Patent, Abstract.  In its background, the '898 Patent

acknowledges that using digital zooming is an "alternative approach [to optical

zooming] for approximating the zoom effect," and use of "**multi-aperture** imaging

systems to approximate the effect of a zoom lens **are known**."  (APPL-1001), '898

Patent, 1:46-53.  For example, the '898 Patent acknowledges that US Patent

Application Publication No. 2008/0030592 to Border et al. ("Border", APPL-1009)

describe a digital camera including "two lenses having different focal lengths" with

corresponding Wide and Tele sensors providing "Wide" and "Tele" images with

different fields of view (FOVs) respectively.  (APPL-1001), '898 Patent, 2:8-20.

However, the '898 Patent alleges that Border "requires, in video mode, very large

processing resources in addition to high frame rate requirements and high power

consumption (since both cameras are fully operational)."  *Id.*, 2:30-33.  For further

example, the '898 Patent acknowledges that US Patent Application Publication No.

- 10 -

2010/0277619 to Scarff ("Scarff", APPL-1012) describes a camera with two lens/sensor combinations, where "the zoomed image is provided from the lens/sensor combination having a FOV that is next larger than the requested FOV" based on a zoom amount requested by a user, but alleges that Scarff "leads to parallax artifacts when moving to the Tele camera in video mode." (APPL-1001), '898 Patent, 2:38-50.

25.    The '898 Patent alleges that neither Border nor Scarff deal with registration errors and that none of the known art references "provide a thin (e.g., fitting in a cell-phone) dual-aperture zoom digital camera with fixed focal length lenses, the camera configured to operate in both still mode and video mode to provide still and video images, wherein the camera configuration does not use any fusion to provide a continuous, smooth zoom in video mode." (APPL-1001), '898 Patent, 2:58-59, 3:11-17.

26.    As an alleged solution to this problem, the '898 Patent describes a dual-aperture digital camera including "a Wide camera and a Tele camera." (APPL-1001), '898 Patent, 3:28-31. "In video mode, optical zoom is achieved 'without fusion,' by, in some embodiments, switching between the W and T images to shorten computational time requirements, thus enabling high video rate." (APPL-1001), '898 Patent, 3:38-41. The '898 Patent describes video mode zoom operation from low zoom factor (ZF) to higher ZFs above a switch point (described

- 11 -

variously as $Z_{switch}$ or $ZF_T$ or up-transfer ZF), with "[processing] applied to eliminate the changes in the image during crossover from one camera to the other." (APPL-1001), '898 Patent, 7:57-8:31, 8:18-34.

27.    "[A]t low ZF up to slightly above $ZF_T$ (the zoom factor that enables switching between Wide and Tele outputs) the output image is the digitally zoomed, unchanged Wide camera output." (APPL-1001), '898 Patent, 8:18-21. "[F]or higher ZF than the up-transfer ZF, the output is the transformed Tele camera output, digitally zoomed. However, in other embodiments, for higher ZF than the up-transfer ZF, there will be no switching from the Wide to the Tele camera output, i.e. the output will be from the Wide camera, digitally zoomed." (APPL-1001), '898 Patent, 9:60-66. "Switching from the Wide camera output to the transformed Tele camera output will be performed unless some special condition (criterion), determined based on inputs obtained from the two camera images, occurs. In other words, switching will not be performed only if [a] no-switching criteria is fulfilled." (APPL-1001), '898 Patent, 10:1-7.

28.    FIG. 1A of the '898 Patent illustrates a dual-aperture Zoom imaging system 100 including a Wide imaging section and a Tele imaging section, each having a respective lens with respect field of view (FOV) and respective image sensor to provide image data of an object or scene, and FIG. 2 of the '898 Patent illustrates Wide and Tele sensors and their respective FOVs.

- 12 -

Declaration of Frédo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 10,230,898





**(APPL-1001), '898 Patent, FIGS. 1A and 2**

- 13 -

**29.** FIG. 2 illustrates by way of exemplary images, a larger FOV for the

Wide image provided by the Wide sensor 202 and a smaller FOV for the

corresponding Tele image provided by the Tele sensor.

**30.** Independent claim 1 of the '898 Patent is representative:

> 1. A zoom digital camera comprising:
> a) a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view (FOV) and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;
> b) a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and
> c) a camera controller operatively coupled to the Wide and Tele imaging sections and configured to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF, the camera controller is further configured to output a zoom video output image that includes only Wide image data, and wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.

(APPL-1001), '898 Patent, 12:23-45.

**31.** As I discuss below in more detail, the system and method presented in

the '898 Patent, namely, a multiple aperture zoom digital camera using 1) Wide

and Tele imaging sections to provide images of an object or scene, and 2) a camera

controller to evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein

if the no-switching criterion is fulfilled in a zoom-in operation at a zoom factor

(ZF) higher than an up-transfer ZF, the camera controller outputs a zoom video

- 14 -

output image that includes only Wide image data, and wherein if the no-switching

criterion is not fulfilled, the camera controller outputs a zoom video output image

that includes only transformed, digitally zoomed Tele image data was well known

to persons of ordinary skill in the art before the earliest priority date of the '898

Patent.

### B.    Prosecution History of the '898 Patent

**32.**    U.S. Patent Application No. 15/324,720 ("'720 App"), which

ultimately issued as the '898 Patent, was filed on January 8, 2017, and contained

21 claims.  (APPL-1002), '720 App, 37-40.  The '720 App was filed under 35

U.S.C. § 371 from International Patent Application PCT/IB2016/053803, filed

June 26, 2016, and claims priority from US Provisional Application No.

62/204,667, filed August 13, 2015.  *Id.*, 21.

**33.**    On June 19, 2018, a non-final Office Action was issued.  Claims 1, 2,

8-14, 20, and 21 were rejected under 35 U.S.C. 102(a)(1) as being anticipated by

WO 2014/199338 to Shabtay et al.[1]  *Id.*, 198-205.  Remaining claims were

objected to as dependent on a rejected base claim, but allowable if rewritten.

According to the Examiner, Shabtay and the art then of record did not provide

_____

[1]    The international application that published as WO 2014/199338 eventually

issued as US Patent 9,185,291 to Shabtay, Goldenberg, Gigushinski and Cohen.

- 15 -

disclosure of the no-switching criterion setting defined in dependent claims 3-7 and 15-19.

**34.**     On September 23, 2018, Applicant filed an Information Disclosure Statement disclosing 103 US Patent references (including Golan), 16 foreign patent references, and 16 non-patent literature documents. *Id.*, 151-175.

**35.**     On October 10, 2018, Applicant filed an Response **amending** the specification to recite "in other embodiments, for higher ZF than the up-transfer ZF, there will be no switching from the Wide to the Tele camera output" and **amending** independent claims 1 and 13 to recite "if the no-switching criterion is fulfilled, configuring the camera controller to output at a zoom factor (ZF) higher than an up-transfer ZF a zoom video output image that includes only Wide image data" and "if the no-switching criterion is not fulfilled, configuring the camera controller to output a zoom video output image that includes only transformed, digitally zoomed Tele image data." *Id.*, 141-145.  Claim 11 was canceled. *Id.*, 293.  Applicant's argument against the Shabtay anticipation rejection was based on the amendment and, more specifically, that Shabtay did not itself teach "a camera controller configured to output, at a ZF higher than an up-transfer ZF, a zoom video output image that includes only Wide image data in a zoom-in operation between a lower ZF value and a higher ZF value," but instead taught "that any ZF higher than the up-transfer ZF a camera outputs a Tele image." *Id.*,

- 16 -

147-148.

**37.**     On November 16, 2018, a Notice of Allowance issued. *Id.*, 301.

Shortly after allowance, on November 25, 2018, Applicant filed an additional

Information Disclosure Statement disclosing 16 US Patent references and 3

additional foreign patent references. *Id.*, 38-42.  Thereafter, on December 10,

2018, the Office issued a notice of Non-Compliant IDS, indicating that the

November 25, 2018 IDS would be placed in the file, but had not been considered.

*Id.*, 37.

**38.**     The '898 Patent issued on March 12, 2019. *Id.*, 435.  The allowed

claims 1-10 and 12-21 of the '720 Application were issued as claims 1-20 of the

'898 Patent, respectively.

## VI.     CLAIM CONSTRUCTION

**39.**     I have reviewed the claim language, the specification, and the

prosecution history. For the purposes of my analysis below, I do not believe any of

the claim terms require a specific construction beyond the plain and ordinary

meaning as would be understood by one of ordinary skill in the art.

## VII.    GROUNDS

### A.     Ground 1: Claims 1, 4, 8, 12, and 15 are unpatentable under 35 U.S.C. § 103 over Golan in view of Martin and Togo.

#### 1.     Summary of Golan

**40.**     U.S. Patent Application Publication No. 2012/0026366 to Golan et al.

- 17 -

("Golan") was published on February 2, 2012.  Golan is titled "Continuous Electronic Zoom for an Imaging System with Multiple Imaging Devices Having Different Fixed FOV," and discloses providing a video output with "a continuous electronic zoom for an image acquisition system, the system including multiple imaging devices having different fixed FOV."  (APPL-1005), Golan, FIG. 1, Title, [0002].

**41.**    Golan teaches use of wide and tele lenses and employs wide and tele images during digital zooming, which "facilitates a light weight electronic zoom with a large lossless zooming range."  (APPL-1005), Golan, [0009].  Specifically, as illustrated in FIG. 1 below, Golan discloses zoom control sub-system 100 for an image acquisition system including "multiple image sensors, each with a fixed and preferably different FOV."  (APPL-1005), Golan, [0036].   Golan's zoom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a tele FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a wide FOV 142, a zoom control module 130 and an image sensor selector 150.  (APPL-1005), Golan, FIG. 1, [0037].

- 18 -



*Fig 1*

**(APPL-1005), Golan, FIG. 1**

**42.** Golan teaches that, in embodiments of FIGS. 1 and 2, each image frame of video output is generated based on an acquired image frame from "the relevant image sensor" of an image acquisition device selected based on the user input zoom factor. (APPL-1005), Golan, FIGS. 1-2, [0039]. Specifically, Golan teaches that zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position. (APPL-1005), Golan, [0039].

- 19 -

**43.** Golan teaches that "an electronically calibrating is performed to determine the alignment offsets between wide image sensor array 110 and tele image sensor array 112," ((APPL-1005), Golan, [0038]) and that the "calibration of the alignment, between the first image sensor array and the second image sensor array, **facilitates continuous electronic zoom with uninterrupted imaging**, when **switching** back and forth between the first image sensor array and the second image sensor array." (APPL-1005), Golan, [0015].  The electronic calibration is performed preferably with sub-pixel accuracy. *Id.*

### 2.    Summary of Martin

**44.** U.S. Patent No. 8,081,206 to Martin et al. ("Martin") is directed to "critical alignment of parallax images for autostereoscopic display." (APPL-1006), Martin, Title.

**45.** Specifically, Martin describes "a method for creating an autostereoscopic display by **manipulating parallax images to create a resultant moving image**," where "parallax images include two or more images with overlapping visual fields but different points of view." (APPL-1006), Martin, 3:32-41.  As shown in Fig. 1 of Martin below, Martin describes that cameras 10 and 12 "being displaced from each other" capture sets of images "of a common scene 14," "resulting sets of images from cameras of images from cameras 10 and 12 will be parallax images." (APPL-1006), Martin, 3:39-46.

- 20 -



**FIG. 1**

**(APPL-1006), Martin, FIG. 1**

**46.**    Martin describes using the parallax images to generate an autostereoscopic display "for producing two-dimensional images that, upon display, can be perceived to be three-dimensional without the use of special viewing aids." (APPL-1006), Martin, 1:16-20. Martin describes generating the autostereoscopic display is by "alternately displaying" two parallax images on a display "to create a resultant moving image." (APPL-1006), Martin, 3:6-13, 3:32-35, 7:38-45. Critical alignment is used to "achieve a stable autostereoscopic display" during the alternating display of parallax images. (APPL-1006), Martin, 5:53-55.

- 21 -

**47.**     As shown in annotated FIGS. 3a-3d[2] of Martin below, Martin

describes that critical alignment is used to "achieve a stable autostereoscopic

display" during the alternating display of parallax images, and explains that

"[s]tability of the whole image may not be required, as long as at least a particular

region of interest in the autostereoscopic display is stable."  (APPL-1006), Martin,

5:53-58.



<hr>

[2] A POSITA would have understood that in FIG. 3b of Martin, element 34'

referring to a circle is a clerical error and that the annotation 34' instead

corresponds to the rectangle, which corresponds to region of interest 34 in

reference image 30 of FIG. 3a.

- 22 -

**(APPL-1006), Martin, FIGS. 3a-3d, annotated**

**48.** As shown in FIG. 3c of Martin above, unaligned image 32 is manipulated until its "same region of interest 34', albeit as viewed from a different point of view" matches alignment with region of interest 34 in reference image 30, as shown in FIG. 3d of Martin. (APPL-1006), Martin, 4:51-56. Martin's manipulation process "may be represented by an affine transformation including translation, rotation, scaling, and/or any other desired transformation." (APPL-1006), Martin, 4:56-59. Martin describes that "while displaying the images, aligning a user-selected region of interest associated with the first image with a corresponding region of interest of the second image such that said region of interest of the first image occupies in the display the same location as the region of interest in the second image." (APPL-1006), Martin, 7:36-51.

### 3. Reasons to Combine Golan and Martin

**49.** A POSITA would have been motivated to apply Martin's teachings of executing registration using critical alignment between successive images from different points of view to generate a transformed succeeding image in video output images when switching between the two images in the digital camera of Golan to produce the obvious, beneficial, and predictable results of a stable transition in continuous zoom video output images when switching between the two images as taught by Martin.

- 23 -

**50.     First**, the references are analogous prior art and are in the same field of endeavor pertaining to imaging systems generating video output images using images from two imaging sections having different points of view.  Golan discloses providing video output images with "a continuous electronic zoom for an image acquisition system, having multiple imaging devices each with a different fixed field of view (FOV)," which provides "continuous electronic zoom capabilities with uninterrupted [imaging], when switching back and forth between the image sensors."  (APPL-1005), Golan, FIG. 1, [0009], [0036]; *see also* (APPL-1005), Golan, Abstract, [0015].  Similarly, Martin discusses "display alternating views of two or more parallax images" from cameras having different points of view to "create a resultant moving image." (APPL-1006), Martin, FIG. 1, 3:6-13; 3:32-35.  Accordingly, both Golan and Martin disclose imaging systems for generating video output images using two imaging sections having different points of view.

**51.     Second**, a POSITA would have been motivated to incorporate the teachings of Golan and Martin because they share a need to provide continuous video output images when switching between images from two imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy.  Golan provides that "calibration of the alignment, between the first image sensor array and the second image sensor array, **facilitates continuous**

- 24 -

**electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array**," and that "[p]referably the electronic calibration is performed with **sub-pixel accuracy**." (APPL-1005), Golan, [0015]. Similar to Golan, an objective of Martin is to perform critical alignment of two images from different points of views such that "the **degree of alignment is sufficient to achieve a stable autostereoscopic display**," which is to achieve stable display in a moving image when displaying alternating views of the two parallax images. (APPL-1006), Martin, 5:51-55. Similarly, Martin describes an objective "to **achieve sub-pixel alignment**." (APPL-1006), Martin, 5:59-6:5. "[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). Here, to provide stable continuous video output images when switching between images from two imaging sections having different points of view, for example, by using alignments having sub-pixel accuracy, is a need shared by Golan and Martin, and provides at least one reason to combine the respective teachings.

52.     **Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a

- 25 -

POSITA to incorporate Martin's teaching of executing registration using critical

alignment of region of interest in two images having different points of view to

calculate "transformation parameters of sub-pixel resolution" for position matching

to achieve a stable transition in the continuous zoom video output images of the

digital camera of Golan.  (APPL-1005), Golan, [0036]; (APPL-1006), Martin,

5:51-58.   It was well known in the art that for seamless transition between two

images of different points of views in continuous zoom video applications, when

calibration between two cameras (*e.g.*, the electronic calibration of Golan) is not

sufficient alone (*e.g.*, because of shocking, vibration, thermal variation, etc.),

image registration of two images from two imaging sections for position matching

(e.g., critical alignment of Martin) may be used.  *See e.g.*, (APPL-1007), Ahiska,

4:58-62; 10:2-5 ("[i]f calibration between the master and slave cameras is

**insufficient alone**, image registration or matching can be carried out" "to

**transition** between the master view and the salve view **as seamless as possible** to

create the quality of **a continuous zoom function**.") (emphasis added); (APPL-

1014), Orimoto, 1:58-62 ("However, an accident may occur to give **extraordinary**

**shock** to the dual lens camera typically when the user drops or strikes the dual lens

camera. The **misalignment is likely to occur with images** as the optical axes of

the lens systems may skew no matter how exactly the dual lens camera has been

conditioned and adjusted by the manufacturer.") (emphasis added); (APPL-1019),

- 26 -

Hansen, 1059 ("For real systems, extrinsic calibration errors occur more frequently due to larger exposure to shock, vibration, thermal variation and cycling."); *see also e.g.*, (APPL-1009), Border, [0041]-[0042] (explaining that registration "determined using the image information contained" in two images having different points of view is an alternative to correspondences "preferably determined at the time of manufacture by shooting test targets, as is well known in the art").

53.    **Fourth**, combining the teachings of Martin with the system of Golan would have produced operable results that are predictable.  Specifically, combining Martin's teachings of executing registration using critical alignment of a region of interest in two images having different points of view to calculate "transformation parameters of sub-pixel resolution" for position matching to achieve a stable transition in continuous zoom video output images of the digital camera of Golan would have been no more than the combination of known elements according to known methods (such as performing critical alignment of region of interest in Wide and Tele images for position matching when switching between Wide and Tele images in zoom control sub-system of Golan), and would have been obvious to a POSITA to achieve the benefits of a stable transition in video output images described by Martin.  The combination of Martin's teaching with the digital camera of Golan does not require physical incorporation of Martin's computing

- 27 -

device for critical alignment into the digital camera of Golan.

54.     Furthermore, while Martin describes that its imaging system may be used to produce video signals where two-dimensional images can be displayed to provide a three-dimensional illusion, a POSITA would have understood that Martin's teachings of critical alignment for stable transition between images of different points of view apply to electronic camera systems providing continuous zoom video output mages as taught in Golan, regardless of whether a three-dimensional illusion is provided.  To the extent that any modification would have been needed to the system of Golan in order to accommodate the teachings of Martin, such modifications would have been within the level of ordinary skill in the art.

### 4.     Summary of Togo

55.     Japanese Patent Application Publication No. JP 2011-055246 (P2011-55246A) naming Hitomoro Togo as inventor ("Togo") was published on March 17, 2011.  Togo is titled "Telephoto Imaging Device," and discloses improvements for "digital cameras and imaging devices (cameras) of mobile terminal devices such as mobile phones" that "realize a **zoom function by using a plurality of imaging modules made of a plurality of lenses with different focal lengths**—that is, lenses of different fixed magnifications."  (APPL-1010), Togo, [0002], [0007].

56.     Images from the respective imaging modules are switched between

- 28 -

according to a magnification (zoom factor) set by a user.  (APPL-1010), Togo, [0007].

"For example, in a configuration … with a wide-angle lens and … a telephoto lens, when a subject is at a short distance, an image … [from] the wide-angle lens, which has a short focal length, is **switched** to, and when the subject is at a long distance, an image … [from] the telephoto lens is **switched** to."  (APPL-1010), Togo, [0008].

"Small changes in magnification are realized by electronic zooming, which changes [to] a cutout region" of the switched-to image.  (APPL-1010), Togo, [0008].

57.     Togo teaches a zoom digital camera with "[a] first imaging module 1 … for a wide-angle image" including a "wide angle lens system 7" and "a first imaging element 8 such as a CCD camera …" (a Wide imaging section).  (APPL-1010), Togo, [0023].  Togo's zoom digital camera also includes "[a] second imaging module 2 … for a telephoto image" including a "telephoto lens system 10" and "a second imaging element 11 such as a CCD camera" (a Tele imaging section).  (APPL-1010), Togo, [0026].

- 29 -



**(APPL-1010), Togo, FIG. 1, annotated**

**58.**    Wide angle lens system 7 and telephoto lens system 10 are each

"fixed magnification lens system[s]."  (APPL-1010), Togo, [0024], [0027].  A

POSITA would understand Togo's reference to CCD camera as possible examples

of imaging elements 8 and 11 as describing the possibility of CCD-type image

sensors.

**59.**    Togo recognizes that "by **switching between or compositing images**

of a plurality of optical systems and a plurality of imaging elements joined to these

- 30 -

optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized." (APPL-1010), Togo, [0002]. For example, in a configuration having "an imaging module with a wide-angle lens and an imaging module with a telephoto lens, when a subject is at a short distance, an image of the imaging module of the wide-angle lens, which has a short focal length, is **switched** to, and when the subject is at a long distance, an image of the imaging module with the telephoto lens is **switched** to." (APPL-1010), Togo, [0008].

     **60.**     Togo discloses improvements to systems described in the patent literature that operate "by **switching between** or compositing images of a plurality of optical systems and … imaging elements …, [so that] a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized." (APPL-1010), Togo, [0002]. Specifically, Togo notes that "[t]elephoto imaging modules with a long focal length are often designed so **an <u>image quality</u> improves when the subject is far as opposed to near**. That is, a telephoto imaging module with a long focal length is **<u>less sharp</u> at close distances** compared to a wide-angle imaging module whose focal length is short." (APPL-1010), Togo, [0012]. As such a system zooms in, "a **switch** is made from the wide-angle imaging module to the telephoto imaging module. However, at this time, **if the subject is close**, **the <u>image quality</u> degrades** due to the image being from the telephoto imaging module." (APPL-1010), Togo, [0013].

- 31 -

**61.** Togo's solution is for image control means 4 (a camera controller) to employ a no-switching **criterion** based on image quality to override the use of the telephoto image. (APPL-1010), Togo, [0049].

**62.** As shown in FIG. 7 below, an example image quality no-switching criterion is based on when "**the image quality** of the cutout image 22 of the wide-angle image becomes **poorer** than **the image quality** of the telephoto image 23." (APPL-1010), Togo, [0066]. The image quality no-switching criterion (i.e., the camera does not use the telephoto image when the image quality no-switching criterion is fulfilled), may include that "setting magnification $X < A$" or "setting magnification $X \geqslant A$ and the imaging distance $Y \leqslant B$," where "A" is a "specific predetermined magnification A," and "the predetermined distance B is made to be an approximate imaging distance at which **the image quality** of the cutout image 22 of the wide-angle image **becomes poorer than** the image quality of the telephoto image 23." (APPL-1010), Togo, FIG. 7, [0049], [0061]-[0062], [0066]-[0067]

- 32 -

APPL-1003 / Page 35 of 109



**Togo, FIG. 7, annotated**

**63.** For example, if an "imaging distance (Y) between the mobile terminal [imaging] device and the subject [is] … B or less [Y ≤ B]," no switching to the telephoto image is performed. *See* (APPL-1010), Togo, [0053]-[0054],[0060]-[0063]. Togo evaluates whether the no-switching criterion is fulfilled (e.g., Y ≤ B) or not fulfilled (e.g., Y > B) during a zoom-in operation from a lower magnification X or zoom factor (ZF) value and to a higher magnification X or ZF

- 33 -

value higher than a switch point magnification (or up-transfer ZF) value of A

[X ≥ A].  *See* (APPL-1010), Togo, [0060]-[0064].



**(APPL-1010), Togo, FIGS. 5 and 6, juxtaposed and annotated**

**64.**    As shown in annotated FIG. 6 above, when the no-switching criterion

is **fulfilled** in zoom-in operation, the output image includes only wide image data

from the wide-angle lens, for increasing levels of zoom (1)-(4).  (APPL-1010),

Togo, [0054].  In contrast, and as shown in annotated FIG. 5(4) (juxtaposed above

annotated FIG. 6(4)) having the same magnification (zoom factor) as FIG. 5(4),

when the no-switching criterion is **not fulfilled** in zoom-in operation, the output

image is digitally-zoomed tele image data from the telephoto lens.  (APPL-1010),

Togo, [0054] ("The setting magnifications in (1) to (4) in FIG. 6 substantially

correspond to (1) to (4) in FIG. 5.").  Further, a POSITA would have understood

that Togo's FIG. 5(4) shows that at higher zoom level (4), when the telephoto

image fully encompasses the area of the output image, the output includes only

digitally-zoomed tele image data, as indicated by the diagonal lines, which is also

used for telephoto image 21.   (APPL-1010), [0054], [0043], [0047-0049].

### 5.    Reasons to Combine Togo with Golan and Martin

**65.**    A POSITA would have been motivated to apply Togo's teaching to

evaluate an imaging distance-based, no-switching criterion during zoom-in for

possible override of switching from only wide image data to telephoto image data

at a magnification (zoom factor) over a predetermined magnification threshold.

The application of Togo's no-switching criterion teaching in the analogous

continuous zoom video switching design of Golan and Golan would produce the

obvious, beneficial, and predictable results of avoiding output image degradation

when the quality of the telephoto image data would be degraded based on

- 35 -

closeness of the subject as taught by Togo.

66.    **First**, the references are analogous prior art and are in the same field of endeavor pertaining to digital zoom camera systems including a camera controller operatively connected to wide and tele lens systems. (APPL-1005), Golan, [0036]-[0037] ("Zoom control sub-system 100 includes a tele image sensor 110 coupled with a narrow lens 120 having a predesigned FOV 140, a wide image sensor 112 coupled with a wide lens 122 having a predesigned FOV 142, a zoom control module 130 and an image sensor selector 150"); (APPL-1010), Togo [0022], [0031] (describing a "mobile terminal device" wherein "[i]mage data from the first imaging module 1 (wide lens system) and the second imaging module 2 (tele lens system) are input to an image control means 4." In both camera systems, the camera controller selects wide or tele imaging data based on a specified magnification or distance of the object to be imaged. (APPL-1005), Golan, [0039] ("Zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112)"); (APPL-1010), Togo, [0036]-[0037] ("a user sets a setting magnification (defined as X) of the image of the subject to be photographed via a keying means 6, and this setting magnification X is input to the image control means. The image control means 4 performs image processing based on the image from the first imaging module 1, the image from the second imaging module 2.")

- 36 -

**67.    Second**, a POSITA would have been motivated to incorporate the teachings of Togo with Golan's camera system because the references share a need to provide output images of objects at various ranges with a compact imaging system. Golan discloses "a continuous electronic zoom for an image acquisition system, having multiple imaging devices each with a different fixed field of view ... [that] facilitates a light weight electronic zoom with a large lossless zooming range." (APPL-1005), Golan, [0009]. Togo discloses "an imaging device for a mobile terminal device that is thin and has a large telephoto magnification can be realized without the need for an optical zoom lens."  (APPL-1010), Togo, [0020]. Furthermore, both Golan and Togo share a need for high-quality output images from the compact dual lens system. *See* (APPL-1005), Golan, [0015] ("the electronic calibration is performed with sub-pixel accuracy"); (APPL-1010), Togo, [0064] ("the imaging device of the present invention described above can suppress degradation of a high-magnification image a close distance"). "[A]ny need or problem known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 420 (2007).  Here, providing effective, high-quality imaging of objects at a range of distances through the use of two different imaging sections is a need shared by Golan and Togo, and provides at least one reason to combine the respective teachings for further

- 37 -

improvement in image quality in the combination.

**68.    Third**, Golan's expressed desire to achieve "continuous electronic zoom with uninterrupted imaging, when switching back and forth between the first image sensor array and the second image sensor array" would have motivated a POSITA to incorporate Togo's teachings of a no-switching criterion based on a specific "setting magnification X" and "photography distance Y" of an object to be imaged. *See* (APPL-1005), Golan, [0015]; (APPL-1010), Togo, [0049]. In particular, the specific switching (and no-switching) criterion of Togo would provide useful guidance to a POSITA in choosing between the wide and tele lenses within the Golan system "when switching back and forth between" the lenses, based parameters of an object to be imaged, thereby maintaining the "uninterrupted imaging" sought by Golan. *See* (APPL-1005), Golan [0040]; (APPL-1010), Togo, [0002], [0037].

**69.    Fourth**, combining the teachings of Togo with the system of Golan would have produced operable results that are predictable.  Specifically, combining Togo's no-switching criterion based on a specific setting magnification and imaging distance of an object to be imaged with Golan's zoom control sub-system 100 to determine when to "switch[] back and forth" between the wide and tele lenses would have been no more than the combination of known elements according to known methods (such as producing high-quality, in-focus images with

- 38 -

the wide and tele images in both references), and would have been obvious to a POSITA to achieve the benefits of "continuous electronic zoom" described by Golan. *See* (APPL-1005), Golan, [0040]; (APPL-1010), Togo [0020], [0031]. The combination of Togo's teaching with the digital camera of Golan does not require physical incorporation of Togo's camera into the digital camera of Golan. To the extent that any modification would have been needed to the system of Golan in order to accommodate the teachings of Togo, such modifications would have been within the level of ordinary skill in the art.

### 6.    Claim 1

**[1.0]**  *A zoom digital camera comprising:*

70.    To the extent that this preamble is deemed limiting, Golan teaches a zoom digital camera.

71.    Specifically, Golan is titled "**Continuous Electronic Zoom for an Imaging System with Multiple Imaging Devices** Having Different Fixed FOV," and teaches a zoom digital imaging system with multiple imaging devices each defining an aperture for capturing a digital image. (APPL-1005), Golan, Title. Golan explains that "**digital zoom** is a method of narrowing the apparent angle of view of **a digital still or video image**," and that "[u]sing two (or more) image sensors, having different fixed FOV, facilitates a light weight electronic zoom with a large lossless zooming range." (APPL-1005), Golan, [0003], [0009].

- 39 -

**72.** As shown in Fig. 1 of Golan below, Golan's image acquisition system includes a zoom control sub-system 100, which includes "**a tele image sensor 110 coupled with a narrow lens 120** having a predesigned FOV 140, a **wide image sensor 112 coupled with a wide lens 122** having a predesigned FOV 142, **a zoom control module 130** and an image sensor selector 150." (APPL-1005), Golan, [0037]. Golan's zoom control circuit 130 "receives a required zoom from an operator of the image acquisition system and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position. The relevant camera zoom factor is calculated by zoom control unit 130." (APPL-1005), Golan, [0039].



*Fig 1*

**(APPL-1005), Golan, FIG. 1**

**73.** In Golan's zoom control sub-system 100, each of the Wide imaging device (including wide image sensor 112 and wide lens 122) and the Tele imaging

- 40 -

device (including tele image sensor 110 and narrow lens 120) defines an aperture for generating a corresponding digital image. *See* (APPL-1005), Golan, FIG.1. As such, Golan's image acquisition system including a zoom control sub-system 100 is a multiple aperture digital camera providing digital zoom. It is noted that the '898 Patent states "dual aperture" is "also referred to as dual-lens or two-sensor," and describes that a "multi-aperture imaging system (implemented for example in a digital camera) includes a plurality of optical sub-systems (also referred to as "cameras")." (APPL-1001), '898 Patent, 3:26-28.

**74.** Therefore, Golan's image acquisition system including zoom control sub-system 100 teaches "*[a] zoom digital camera*," as recited in the claim.

> **[1.1]** *a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view (FOV) and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene;*

**75.** Golan teaches a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view (FOV) and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene.

**76.** **First**, as shown in annotated Fig. 1 of Golan below, Golan's zoom control sub-system 100 includes a Wide imaging section that includes a wide lens 122 (fixed focal length Wide lens) with a FOV 142 (Wide field of view FOV$_W$) and a wide image sensor 112 (Wide sensor). (APPL-1005), Golan, FIG. 1, [0036]-[0037].

- 41 -



**(APPL-1005), Golan, FIG. 1, annotated**

77.     **Second**, because Golan's wide lens 122 has "a **predesigned** FOV 142," it teaches a fixed focal length Wide lens. (APPL-1005), Golan, [0037]; *see also* (APPL-1005), Golan, [0009] ("[u]sing two (or more) image sensors, having different **fixed FOV**, facilitates a light weight electronic zoom with a large lossless zooming range"), [0036] ("Zoom control sub-system 100 includes multiple image sensors, each with a **fixed** and preferably different **FOV**, configured to provide continuous electronic zoom capabilities with uninterrupted [imaging], when switching back and forth between the image sensors."); [0043] ("Both image

- 42 -

acquisition devices (110 and 112) include an image sensor array coupled with a

lens (120 and 122, respectively), providing a **fixed FOV (tele FOV 140 and wide**

**FOV 142, respectively**).").

**78.**     A POSITA would have understood that because wide lens 122 has a

FOV 142 that is fixed and has a predesigned value, the wide lens 122 has a fixed

focal length, and corresponds to the fixed focal length Wide lens as claimed.

**79.**     In a digital camera, the focal length of a lens determines the angle of

FOV relative to a given sensor format, and as such, an FOV angle may be computed

based on the focal length f of the lens and the diagonal (K) of the sensor.  (APPL-

1017), Jacobson, 48.  For example, as shown in the imaging system of Figure 4.13 of

Jacobson below, the angle of FOV is the angle subtended at the lens by the diagonal

(K) of the sensor when the lens is focused on infinity.  (APPL-1017), Jacobson, 48.

For a given sensor diagonal size K, a lens having a fixed FOV has a fixed focal

length.

- 43 -



**Figure 4.13**   Field (angle) of view (FOV) of a lens related to format dimension

**(APPL-1017), Jacobson, FIG. 4.13, annotated**

**80.**   A POSITA would have understood that normally an angle of FOV is defined as "the angle subtended at the lens by the diagonal (K) of the sensor when the lens is focused on infinity." (APPL-1017), Jacobson, 48.  For example, as shown in the imaging system of FIG. 4.13 of Jacobson, the FOV angle A is twice the semi-angle of view θ, and the focal length f of a lens determines the FOV angle A relative to a given sensor format as follows:

$$A = 2\theta = 2\tan^{-1}\left(\frac{K}{2f}\right), \tag{1}$$

(APPL-1017), Jacobson, 48.

**81.**   The FOV in the '898 Patent is defined as "measured from the center axis

- 44 -

to the corner of the sensor (i.e. half the angle of the normal definition)." (APPL-1001), '898 Patent, 8:26-28.  As such, a POSITA would have understood that the FOV in the '898 Patent corresponds to the semi-angle of view θ of Fig. 4.13 of Jacobson calculated as:

$$\text{FOV} = \theta = \tan^{-1}\left(\frac{K}{2f}\right). \qquad\qquad (2)$$

**82.**    Because Golan's wide lens 122 of the Wide imaging section has a fixed FOV 142, it has a fixed focal length.  Thus, Golan teaches a Wide imaging section with a fixed focal length wide lens.

**83.**    **Third**, the Wide imaging section of Golan is operative to provide Wide image data of object 20 (an object or scene), which is "viewed from both tele image sensor 110 and wide image sensor 112."  (APPL-1005), Golan, [0037]. Specifically, Golan teaches that the Wide imaging section of zoom control sub-system 100 includes a "**wide image acquisition device**."  (APPL-1005), Golan, [0037]; *see also* (APPL-1005), Golan, Abstract, [0041].   Further, zoom control circuit 130 "receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position," and an "**image frame is acquired by the selected image acquisition device**."  (APPL-1005), Golan, [0039], [0041], [0048].  A POSITA would have understood that when the wide image sensor 112 is selected, the Wide imaging section of Golan (including wide lens 122 and wide image

- 45 -

sensor 112) provides Wide image data of an object or scene as the acquired image frame.

84.    Therefore, Golan's zoom control sub-system 100 includes a Wide imaging section that includes a wide lens 122 with a fixed FOV 142 and a wide image sensor 112, where the Wide imaging section is operative to provide Wide image data of object 20, which teaches "*a Wide imaging section that includes a fixed focal length Wide lens with a Wide field of view (FOV) and a Wide sensor, the Wide imaging section operative to provide Wide image data of an object or scene*" as recited in the claim.

**[1.2]**    *a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene; and*

85.    Golan teaches a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene.

86.    **First**, as shown in annotated Fig. 1 of Golan below, Golan's zoom control sub-system 100 includes a Tele imaging section that includes a tele image sensor 110 (Tele sensor) coupled with a narrow lens 120 (a fixed focal length Tele lens) having a predesigned FOV 140 (Tele FOV).  (APPL-1005), Golan, FIG. 1, [0036]-[0037]; *see also* (APPL-1005), Golan, Abstract ("a computerized image

- 46 -

Declaration of Frédo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 10,230,898

acquisition system [] having … **a tele image acquisition device** having **a tele**

**image sensor array** coupled with **a tele lens** having a narrow FOV.").



**(APPL-1005), Golan, FIG. 1, annotated**

87.    **Second**, for the same reason discussed in [1.1], because Golan's tele

lens 120 has "a **predesigned** FOV 140," it teaches a fixed focal length Tele lens.

(APPL-1005), Golan, [0037]; *see also* (APPL-1005), Golan, [0009], [0036],

[0043].  As such, Golan teaches a Tele imaging section including a fixed focal

length tele lens.

- 47 -

APPL-1003 / Page 50 of 109

88.     **Third**, Golan teaches a FOV 140 (Tele FOV) of the narrow lens 120 that is narrower than FOV 142 (Wide FOV) of the wide lens 122.  Specifically, Golan provides that "[p]referably, wide FOV 142 is **substantially wider than narrow FOV 140**."  (APPL-1005), Golan, [0043].  In other words, Golan teaches that narrow FOV 140 is narrower than wide FOV 142.  *See also* Golan, FIG. 1, [0009], [0037] (providing that "[i]n the optimal configuration, the FOV of wide image sensor 112 can be calculated by multiplying the FOV of tele image sensor 110 by the optimal zoom of image sensors 110 and 112," where the optimal zoom is greater than one).

89.     **Fourth**, the Tele imaging section of Golan is operative to provide Tele image data of object 20 (the object or scene), which is "viewed from both tele image sensor 110 and wide image sensor 112."  (APPL-1005), Golan, [0037].  Specifically, Golan teaches that the Tele imaging section of zoom control sub-system 100 includes a "**tele image acquisition device**."  (APPL-1005), Golan, [0037]; *see also* (APPL-1005), Golan, Abstract ("a computerized image acquisition system [] having … **a tele image acquisition device** having a tele image sensor array coupled with a tele lens having a narrow FOV.").  Further, zoom control circuit 130 "receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position," and an "image frame is acquired by the selected

- 48 -

image acquisition device." (APPL-1005), Golan, [0039], [0041], [0048]. A POSITA would have understood that when the tele image sensor 110 is selected, the Tele imaging section of Golan (including tele lens 120 and tele image sensor 110) provides Tele image data of the object or scene as the acquired image frame.

90.     Therefore, Golan's zoom control sub-system 100 includes a Tele imaging section that includes a tele image sensor 110 and a tele lens 120 with fixed Tele FOV 140 narrower than fixed wide FOV 142, where the Tele imaging section is operative to provide Tele image data of object 20, which teaches "*a Tele imaging section that includes a fixed focal length Tele lens with a Tele FOV that is narrower than the Wide FOV and a Tele sensor, the Tele imaging section operative to provide Tele image data of the object or scene*" as recited in the claim.

**[1.3]**    ***c) a camera controller operatively coupled to the Wide and Tele imaging sections and***

91.     Golan teaches a camera controller operatively coupled to the Wide and Tele imaging sections.

92.     Specifically, Golan teaches a zoom control sub-system 100 of a digital camera that includes a camera controller including a zoom control circuit 130 coupled to the Wide and Tele imaging sections. As shown in annotated Fig. 1 below, Golan describes that "zoom control circuit 130 receives a required zoom from an operator of the image acquisition system, and selects the relevant image sensor (110 and 112) by activating image sensor selector 150 position." (APPL-

- 49 -

1005), Golan, [0036].



**(APPL-1005), Golan, FIG. 1, annotated**

**93.**     Golan further teaches that the zoom control circuit 130 "resample[s]
the acquired image frame to the requested zoom."  (APPL-1005), Golan, FIG. 2,
[0048].  Specifically, zoom control circuit 130 "computes the zoom factor between
the fixed zoom of the selected image acquisition device and the requested zoom,"
and "performs electronic zoom on the acquired image frame to meet the requested
zoom" based on the computed factor.  (APPL-1005), Golan, [0049].

- 50 -

**94.**    As such, Golan's zoom control circuit 130 is coupled to the Wide and

Tele imaging sections to select one of the Wide and Tele imaging sections based

on a requested zoom, receives an image frame acquired by the selected imaging

section, and performs digital zoom to the acquired image frame to obtain an

acquired image frame with said requested zoom.  (APPL-1005), Golan, claim 1.

**95.**    Therefore, Golan's zoom control sub-system 100 includes a camera

controller including a zoom control circuit 130 coupled to the Wide and Tele

imaging sections for receiving a requested zoom and provide an acquired image

frame with the requested zoom, which teaches "*a camera controller operatively

coupled to the Wide and Tele imaging sections*" as recited in the claim.

> **[1.4]** *[the camera controller … ] configured to evaluate if a no-switching
> criterion is fulfilled or not fulfilled, wherein if the no-switching
> criterion is fulfilled in a zoom-in operation between a lower zoom
> factor (ZF) value and a higher ZF value at a zoom factor (ZF)
> higher than an up-transfer ZF, the camera controller is further
> configured to output a zoom video output image that includes only
> Wide image data, and*

**96.**    Golan combined with Martin and Togo render obvious that the camera

controller is configured to evaluate if a no-switching criterion is fulfilled or not

fulfilled, wherein if the no-switching criterion is fulfilled in a zoom-in operation

between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor

(ZF) higher than an up-transfer ZF, the camera controller is further configured to

output a zoom video output image that includes only Wide image data.

- 51 -

97.     **First**, Golan teaches a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF.  Golan teaches a zoom switching setting that depends on the Wide and Tele fields of view, including a predetermined up-transfer ZF (e.g., a switch zoom value tangent(FOV$_{Wide}$)/tangent(FOV$_{Tele}$)) for switching from Wide image to Tele image during zoom-in.  Specifically, Golan explains that "[u]sing two (or more) image sensors, having different fixed FOV, facilitate a light weight electronic zoom with **a large lossless zooming range**."  (APPL-1005), Golan, [0009].  Golan describes that in an example, such a large lossless zooming range has a value of (Wide_FOV/Narrow_FOV)$^2$, which is provided by "switching between the image sensors" and performing digital zoom to both Wide and Tele images. (APPL-1005), Golan, [0009].

98.     As explained in detail below, a POSITA would have understood that the underlying geometric relationships and as such, would have understood that Golan's informal terminology, "Wide_FOV/Narrow_FOV," corresponds to the relative magnification ratio of an object "**magnified** in tele image sensor 110 with respect to wide image sensor 112," thereby representing tangent($\theta$_wide)/tangent($\theta$_tele), where $\theta$_wide and $\theta$_tele are the corresponding semi-angle of view $\theta$ such as illustrated in Fig. 4.13 of Jacobson below, and accordingly corresponds to "*tangent(FOV$_{Wide}$)/tangent(FOV$_{Tele}$)*" as claimed.  *See*

- 52 -

(APPL-1005), Golan, [0037] ("An object 20 is viewed from both tele image sensor

110 and wide image sensor 112, whereas the object is **magnified in tele image**

**sensor 110 with respect to wide image sensor 112, <u>by a predesigned factor</u>**.").



**Figure 4.13**  Field (angle) of view (FOV) of a lens related to format dimension

**(APPL-1017), Jacobson, FIG. 4.13, annotated**

**99.**     Normally an angle of FOV is defined as "the angle subtended at the lens

by the diagonal (K) of the sensor when the lens is focused on infinity."  (APPL-1017),

Jacobson, 48.  For example, as shown in the imaging system of FIG. 4.13 of

Jacobson, the FOV angle A is twice the semi-angle of view θ, and the focal length f of

a lens determines the FOV angle A relative to a given sensor format as follows:

- 53 -

$$A = 2\theta = 2\tan^{-1}\left(\frac{K}{2f}\right), \tag{1}$$

(APPL-1017), Jacobson, 48.

**100.** The FOV in the '898 Patent is defined as "measured from the center axis to the corner of the sensor (i.e. half the angle of the normal definition)." (APPL-1001), '898 Patent, 8:26-28. As such, a POSITA would have understood that the FOV in the '898 Patent corresponds to the semi-angle of view θ of Fig. 4.13 of Jacobson calculated as:

$$\text{FOV} = \theta = \tan^{-1}\left(\frac{K}{2f}\right). \tag{2}$$

APPL-1003 / Page 57 of 109



(a) Simple lens

1. $\dfrac{1}{u} + \dfrac{1}{v} = \dfrac{1}{f}$ $\left.\right\}$ $u = f\left(1 + \dfrac{1}{m}\right)$

2. $\dfrac{h_2}{h_1} = \dfrac{I}{O} = \dfrac{v}{u} = m$ $v = f(1 + m)$

3. For $u = \infty$, or for $u \gg v$, $v = f$ so that $m = \dfrac{f}{u}$

4. $xy = f^2$

**(APPL-1017), Jacobson, FIG. 4.12(a), annotated**

**101.** As shown in equation 3 of Figure 4.12(a) of Jacobson (reproduced above), where u is much greater than v, magnification m may be computed as follows:

$$m = f/u. \tag{3}$$

Thus, in these cases, image magnification (e.g., for each of Tele or Wide images)

- 55 -

depends directly on the focal length for a subject at a fixed distance u.

**102.** In Golan, assume that the object distance u is the same or substantially the same for the Wide and Tele images capturing the same scene, then the relative magnification ration M of the magnification $m_{Tele}$ of Tele image to the magnification $m_{Wide}$ of Wide image may be computed as:

$$\text{M} = m_{Tele} \,/\, m_{Wide} \;=\; f_{Tele} \,/\, f_{Wide}, \tag{4}$$

where $f_{Tele}$ and $/ f_{Wide}$ are the focal lengths of the Tele and Wide lenses respectively.

**103.** Based on Equation (2), tangent(FOV) may be computed as follows:

$$\text{tangent(FOV)} = \frac{K}{2f}. \tag{5}$$

As such, $\text{tangent}(FOV_{Tele})$ and $\text{tangent}(FOV_{Wide})$ may be computed as follows:

$$\text{tangent}(FOV_{Tele}) = \frac{K_{Tele}}{2f_{Tele}}. \tag{6}$$

$$\text{tangent}(FOV_{Wide}) = \frac{K_{wide}}{2f_{Wide}}. \tag{7}$$

**104.** As such, the relative magnification ratio M may be expressed as:

$$\text{M} = m_{Tele} \,/\, m_{Wide} \;=\; f_{Tele} \,/\, f_{Wide} \;=\; \frac{K_{Tele}}{2\text{Tan}(FOV_{Tele})} \,/\, \frac{K_{Wide}}{2\text{Tan}(FOV_{Wide})} =$$

$$\frac{\text{tangent}(FOV_{Wide})}{\text{tangent}(FOV_{Tele})} * \frac{K_{Tele}}{K_{Wide}}. \tag{8}$$

**105.** Golan describes a lossless electronic zoom, also referred to as the optimal zoom, as:

APPL-1003 / Page 59 of 109

Optimal_Zoom=(Wide_FOV/Narrow_FOV)$^2$.          (9)

(APPL-1005), Golan, [0009].  A POSITA would have understood that Golan's Optimal_Zoom is determined based on the relative magnification ratio M of Tele image to Wide image, and specifically, Optimal_Zoom equals to M$^2$.  As such, based on (9), Golan teaches that:

M = tangent(Wide FOV)/tangent(Tele FOV).          (10)

**106.**    Comparing equation (8) where $M = \frac{\text{tangent}(FOV_{Wide})}{\text{tangent}(FOV_{Tele})} * \frac{K_{Tele}}{K_{Wide}}$ and

equation (10), we have $\frac{K_{Tele}}{K_{Wide}} = 1$, indicating that Golan's Tele and Wide sensor

sizes $K_{Tele}$ and $K_{Wide}$ are substantially the same.

**107.**    In Golan's example where "Wide_FOV=Narrow_FOV*6," a lossless zooming range of 36 is provided. (APPL-1005), Golan, [0009].  As such, a POSITA would have understood that lossless zooming range of 36 is provided by switching between Wide and Tele sensors at an up-transfer ZF (e.g., having a value of tangent($FOV_{Wide}$)/tangent($FOV_{Tele}$) = 6) that is the relative magnification ratio of Tele image to Wide image, e.g., during a zoom-in operation, performing digital zoom to Wide image for a requested zoom factor between 1 and 6, and performing digital zoom to Tele image for a requested zoom factor between 6 and 36.

**108.**    Golan teaches that the switch setting is used to "select[] the relevant image sensor."  Specifically, a zoom control 130 (sensor control module) "receives

- 57 -

a required zoom from an operator of the image acquisition system, and **selects the**
**relevant image sensor** (110 and 112) by activating image sensor selector 150
position." (APPL-1005), Golan, [0039]. A POSITA would have understood
Golan to teach selecting Wide image sensor and providing a zoom video output
image including only Wide image data when a requested zoom factor value is less
than the predetermined switch zoom factor $ZF_T$, and selecting Tele image sensor
and providing a zoom video output image including only Tele image data when the
requested zoom factor value is greater than the up-transfer ZF.

109.   **Second**, Togo teaches that at a requested zoom factor (ZF) value, a
camera controller is configured to evaluate if a no-switching criterion is fulfilled or
not fulfilled, and if the no-switching criterion is fulfilled the camera controller is
further configured to output a zoom video output image that includes only
digitally-zoomed Wide image data.

110.   Like Golan, Togo teaches a camera controller (Image Control Means
4) operatively coupled to Wide and Tele imaging sections. Specifically Togo
teaches a zoom digital camera with "[a] first imaging module 1 … for a wide-angle
image" including a "wide angle lens system 7" and "a first imaging element 8 such
as a CCD camera …" (a Wide imaging section). (APPL-1010), Togo, [0023].
Togo's zoom digital camera also includes "[a] second imaging module 2 … for a
telephoto image" including a "telephoto lens system 10" and "a second imaging

- 58 -

element 11 such as a CCD camera" (a Tele imaging section). (APPL-1010), Togo,

[0026]. Wide angle lens system 7 and telephoto lens system 10 are each "fixed

magnification lens system[s]." (APPL-1010), Togo, [0024], [0027]. A POSITA

would understand Togo's reference to CCD camera as possible examples of

imaging elements 8 and 11 as describing the possibility of CCD-type image

sensors.



**(APPL-1010), Togo, FIG. 1, annotated**

**111.** Togo recognizes that "by **switching between or compositing images**

- 59 -

of a plurality of optical systems and a plurality of imaging elements joined to these optical systems, a wide dynamic range of enlargement magnification from wide-angle to telephoto can be realized." (APPL-1010), Togo, [0002]. For example, in a configuration having "an imaging module with a wide-angle lens and an imaging module with a telephoto lens, when a subject is at a short distance, an image of the imaging module of the wide-angle lens, which has a short focal length, is **switched** to, and when the subject is at a long distance, an image of the imaging module with the telephoto lens is **switched** to." (APPL-1010), Togo, [0008].

**112.** Furthermore, Togo recognized that a near-field object problem can arise when "a telephoto imaging module with a long focal length is **less sharp at close distances** compared to a wide-angle imaging module whose focal length is short." Togo, [0012]. As such a system zooms in, "a switch is made from the wide-angle imaging module to the telephoto imaging module. However, at this time, if the subject is close, the **image quality degrades** due to the image being from the telephoto imaging module." Togo, [0013].

**113.** Togo's solution is for image control means 4 (a camera controller) to employ a no-telephoto **criterion** based on image quality. For example, as shown in annotated FIG. 7 below, one switching criterion is based on when "**the image quality** of the cutout image 22 of the wide-angle image becomes **poorer** than **the image quality** of the telephoto image 23." (APPL-1010), Togo, [0066]. Togo

- 60 -

describes an example image quality no-switching criterion to include that "setting

magnification X < A" or "setting magnification X $\geqslant$ A and the imaging distance Y

$\leqslant$ B".  (APPL-1010), Togo, [0061]-[0062].



**(APPL-1010), Togo, FIG. 7, annotated**

**114.**   As shown in annotated FIGS. 5 and 6 below, when the switching

criterion is not fulfilled (i.e., no-switching criterion is fulfilled) as shown in FIG. 6,

no use is made of the telephoto image, because the image quality of zoomed wide

- 61 -

Declaration of Frédo Durand, Ph.D.
*Inter Partes* Review of U.S. Patent 10,230,898

image is higher than the telephoto image, and the output image is only zoomed

wide image as shown in FIG. 6(4) below ("**the enlarged images are generated**

**entirely from cutout images (digital zooms) of the wide-angle image** 20"). *See*

(APPL-1010), Togo, [0053]-[0054],[0060]-[0063], [0066].



**(APPL-1010), Togo, FIGS. 5 and 6, juxtaposed and annotated**

**115.** On the other hand, as shown in FIG. 5 above, when the image quality

switching criterion ("image quality of the cutout image 22 of the wide-angle image

- 62 -

becomes poorer than the image quality of the telephoto image 23") is fulfilled (i.e.,

no-switching criterion is not fulfilled), ((APPL-1010), Togo, [0066]), telephoto

image data is used, and "**compositing <u>or switching</u>** to the telephoto image

becomes effective." (APPL-1010), Togo, [0047]-[0049], [0069]. In addition to

switching, Togo discloses support for compositing, in which "the telephoto image

is pasted in a center portion of the wide-angle image. (APPL-1010), Togo, [0047-

0049, 0063]. However, when the zoom factor is sufficiently large, such that the

zoomed area is entirely covered by the telephoto image, Togo uses only the

telephoto data. Specifically, as shown in FIG. 5(4), when the no-switching

criterion is not fulfilled at magnification level (4), only digitally zoomed Tele data

is provided, as indicated by its diagonal lines for telephoto image data. A POSITA

would understand that at such a magnification level, Togo switches to using just

the telephoto image.

**116.** Therefore, a POSITA would understand Togo to teach camera

controller operation that depends on image quality evaluation (e.g., using imaging

distance and/or comparative pixel density evaluations), and that these compositing

or **switching criteria** (or non-compositing or **no-switching criteria**, if specified

conversely), determine whether digital zooming output includes or switches to the

telephoto image depending on whether a non-compositing or no-switching

criterion is fulfilled or not fulfilled. Togo also teaches that "because image quality

- 63 -

depends on a performance of a lens system that is used and the like, theoretically

strict derivation is difficult." (APPL-1010), Togo, [0066].

**117.** A POSITA would have been motivated to apply Togo's teaching of

evaluating a no-switching criterion in the system of Golan and Martin when

zooming in with a requested zoom factor greater than the switch zoom position

$ZF_T$ = tangent (FOV$_{Wide}$)/tangent (FOV$_{Tele}$) for the benefit of improved image

quality as described in Togo.

**118.** A POSITA would have understood that Golan teaches separate

embodiments that use switching (e.g., zoom control sub-system 100 of FIG. 1) and

that use fusion (e.g., camera system 600 of FIG. 6) between Wide and Tele

sections for video output images. As such, a POSITA would have been motivated

to apply Togo's no-switching criterion (instead of its no-compositing criterion)

teaching to the embodiments using switching (e.g., zoom control sub-system 100

of FIG. 1), because in zoom control sub-system 100 of FIG. 1 of Golan, there is no

need for applying a no-compositing criterion. Furthermore, a POSITA would have

understood that Togo's image quality no-switching criterion applies to a digital

camera including image sensors of a substantially similar size or of different sizes.

*See also* Ground 1: Reasons to Combine Togo, Golan, and Martin.

**119.** Therefore, the digital camera of Golan, Martin, and Togo includes a

camera controller, which is configured to evaluate if a no-switching criterion is

- 64 -

fulfilled or not fulfilled based on image quality comparison between Wide and

Tele images in a zoom-in operation between a lower zoom factor (ZF) value and a

higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF at a requested

zoom factor greater than an up-transfer ZF. If the no-switching criterion is

fulfilled, a zoom video output image that includes only Wide image data. As such,

the combination renders obvious "*[the camera controller …] configured to*

*evaluate if a no-switching criterion is fulfilled or not fulfilled, wherein if the no-*

*switching criterion is fulfilled in a zoom-in operation between a lower zoom factor*

*(ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer*

*ZF, the camera controller is further configured to output a zoom video output*

*image that includes only Wide image data*," as recited in the claim.

> **[1.5]** ***wherein if the no-switching criterion is not fulfilled, the camera controller is further configured to output a zoom video output image that includes only transformed, digitally zoomed Tele image data.***

**120.** Golan combined with Martin and Togo renders obvious that if the no-

switching criterion is not fulfilled, the camera controller is further configured to

output a zoom video output image that includes only transformed, digitally zoomed

Tele image data.

**121. First**, Golan teaches switching from Wide image to Tele image in a

zoom in operation in a zoom-in operation between a lower zoom factor (ZF) value

and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF (($ZF_T =$

- 65 -

tangent ($FOV_{Wide}$)/tangent ($FOV_{Tele}$)), the zoom video output image includes only digitally-zoomed Tele image data. (APPL-1005), Golan, FIG. 1, [0009], [0036]; *see also* [1.4].

122. **Second**, as discussed at [1.4], a POSITA would have been motivated to apply Togo's teachings of image quality non-switching criterion to Golan and Martin, such that in the combination of Golan, Martin, and Togo, a camera controller is configured to evaluate if a no-switching criterion (e.g., based on image quality comparison between Wide and Tele images) is fulfilled or not fulfilled in a zoom-in operation between a lower zoom factor (ZF) value and a higher ZF value at a zoom factor (ZF) higher than an up-transfer ZF ($ZF_T$ = tangent ($FOV_{Wide}$)/tangent ($FOV_{Tele}$)). If the no-switching criterion is fulfilled, switching is not performed, and the zoom video output image includes only digitally-zoomed Wide image data.

123. A POSITA would have understood that in the combination, if the no-switching criterion is **not** fulfilled, switching from Wide image to Tele image as taught in Golan is performed, and the zoom video output image includes only digitally-zoomed Tele image data. (APPL-1005), Golan, FIG. 1, [0009], [0036]; *see also*, (APPL-1010), Togo, FIG. 5(4).

124. **Third**, Martin teaches when switching between two successive images having different points of view, executing registration using critical alignment to register a succeeding image to a preceding image to generate a transformed

- 66 -

succeeding image in video output images for a stable video display.

**125.**    Specifically, Martin teaches a computing device configured to perform critical alignment of two images to reduce discontinuity in video output images and to provide stable video output images by executing registration between two parallax images having different point of views for performing position matching to the video output images when switching.  As shown in Fig. 1 below, Martin describes that cameras 10 and 12 "being displaced from each other" capture sets of images "of a common scene 14," "resulting sets of images from cameras of images from cameras 10 and 12 will be parallax images."  (APPL-1006), Martin, 3:39-46.



**FIG. 1**

**(APPL-1006), Martin, FIG. 1**

- 67 -